UNITED STATES OF AMERICA

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KENNETH HUNT | ) |
|     Plaintiff-Petitioner | ) |
| v. | ) C. A. NO. _____ |
| JAMES BENDER, Acting Commissioner of Correction, and the DEPARTMENT OF CORRECTION ARTHUR BREWER, Program Director and contractural agent of UMASS CORRECTIONAL HEALTH PROGRAM | ) |
|     Defendants-Respondents | ) |

07 CA 12323 PBS

MAGISTRATE JUDGE _Illieg_

PLAINTIFF'S COMPLAINT FOR DECLARATORY
JUDGEMENT AND INJUNCTIVE RELIEF

The plaintiff respectfully moves this Honorable Court for declaratory judgement pursuant to 28 U.S.C. § 2201, as well as injunctive relief under Fed. R. Civ. P. 65(a), for cause.

An injunction, preliminary in nature, is required to restrain the defendants and their subordinates from interfering with plaintiff's prescribed medical care by medical professionals of defendants' own choice, which conduct by defendants and their subordinates causes plaintiff appreciable harm.

The plaintiff invokes his right to redress the deprivation, under color of state law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by

- 1 -

the Constitution of the United States and for that providing equal rights of all citizens within the jurisdiction of the United States. 28 U. S. C. § 1343(a)(1), et seq.

Section 4 of the preceding statute rests the right of the plaintiff to the recovery per damages to secure equitable or other relief under an Act of Congress providing for the protection of civil rights.

Jurisdiction in this complaint is further annexed to the District Court relative to all civil actions arising under the Constitution, laws or treaties of the United States pursuant to 28 U. S. C. § 1331.

## I. PARTIES

1. KENNETH HUNT (HUNT), Plaintiff, is in the custody of the Department of Correction (DOC) and incarcerated at MCI Shirley Medium (SHIRLEY), is relevant at all times to this matter.

2. JAMES BENDER (BENDER), Defendant, is the acting commissioner and chief administrative officer of the DOC responsible for the implementation of policy and training of his subordinates within correctional facilities of the Commonwealth, is relevant at all times in this complaint.

3. ARTHUR BREWER (BREWER), Defendant, is the chief executive of UMASS CORRECTIONAL HEALTH PROGRAM (UMCHP), a contractual agent of the DOC, responsible for implementing policy and procedures to treat, medically, inmaes of said facilities stated in ¶ 2, relevant as well at all times in this complaint.

## II. PRELIMINARY STATEMENT

4. This complaint arisies from the tortuous conduct of the defendants, their subordinates, agents and medical providers, toward plaintiff when they interfere with his prescribed treatment recommended by defendants' own medical professionals.

5. Said interference by defendants is tactical and designed to delay, interrupt the prescribed treatment, as well discourage plaintiff from pursuing his claim in the federal forum.

6. Plaintiff is appreciably harmed in this interference that interrupts his progression while treated, as well is in direct contradiction to a precedent established by defendants in a related case of gender disorder, **Kosilek v. Maloney**, 221 F.Supp.2d 156 (D. Mass. 2002) (**Kosilek I**), and per Case No. 00-12455-MLW (Kosilek II).

7. Incorporating the preceding paragraph, as if fully set forth herein, defendants' precedent meets and is typical of accepatable strategy delineated in the Standards of Care for Gender Identity Disorders, 5th Version. **EXHIBIT A.**

8. There have been two (2) stipulated agreements between the parties in this matter, both relating to Case No. 95-10169-NG and identified as **Hunt v. David Forsberg et al**, circa 1999, and **Hunt v. Mass. Dept. of Correction et al**, circa 2004, which the plaintiff maintains is an example of defendants' bad-faith performances. It is notable that on 06-21-99, plaintiff's former counsel, Zalkind, Rodriguez, Lunt & Duncan, compelled defendant DOC to implement the treatment for plaintiff's disorder and not just "may," but will" reference the standards described in ¶ 7. **EXHIBIT B.**

## III. FACTS

9. On diverse dates, as well on 07-24-03, plaintiff was examined by a physician or physicians of Fenway Community Health Clinic at SHIRLEY where an initial examination done by Dr. Seil, also here at SHIRLEY in 1998 and a follow-up for an updated psychological evaluation in 2003, which provided for a treatment regimen of hormone therapy, bra, laser hair removal and a gender reassignment surgurical procedure. **EXHIBITS C., D.**

10. On diverse dates, as well on 10-04-05, DR. Maria Warth, an endocrinologist at the Lemuel Shattuck Hospital (LSH), did recommend the treatment desecribed in the preceding, ¶ 9, as well as to prepare plaintiff for reassignment surgery. **EXHIBITS E., F. G.**

11. On diverse dates, as well on 09-22-04, plaintiff's received numerous replies to his grievances and inquiries as to his treatment, but from a wide-range of subordinates of the DOC notwithstanding that he directed said inquiries to defendant Commissioner of Correction and which replies tended to both delay and otherwise confuse plaintiff. **EXHIBIT H.**, seven (7) chronologically displayed.

12. On diverse dates, as well on 09-25-07, plaintiff continues to grieve and inquire as to treatment delays and reassessments, culminating with his complaint to defendant BENDER on the nature and type of responses. **EXHIBIT I.**, twelve (12) chronologically displayed.

13. In good faith and intention, plaintiff forwards a copy of a recently-discovered text, Transsexualism, A Correctional

treatsie relative to GID inmates in prison that is considered a supplement to the Harry Benjamin Fifth Version (Standards for Care for Gender Identity Disorders. See ¶ 7. **EXHIBIT J.**

14. On 09-16-05, plaintiff attempted to reopen the civil action previously stipulated and was properly denied. Again in February of 2007, another attempt was made by plaintiff to reopen the dismissed action and suffered the same fate. The plaintiff, admittedly, proceeded in such action strictly from frustration where his treatment regimen is continuaklly and improperly interrupted. With a modicum of expertise as to legal matter, as well comprehension skills not more than a 2.2 grade average, he has had to rely upon the assistance of inmate friends and the resident law clerks at SHIRLEY.

15. Defendants opposed the aborted reopening of Case No. 95-10169-NG, **Hunt v. Mass. Dept. of Correction et al**, see ¶ 3, page 6, where they state plaintiff failed to state a claim for an Eighth Amendment violation. It is to that claim that plaintiff now alleges that the defendants clearly display their deliberate indifference in the matter.

16. On 06-16-04, defendants specifically stated that they were unwilling to enter into a stipulation for dismissal in the case described in the preceding should it require or compel them to apply treatments for GID not acceptable in their own determinations. **EXHIBIT K.**

17. Contrary to the above, the defendant-DOC, in 1999, did agree in principal that plaintiff's GID will reference the Harry Benjamin standards. See ¶ 8.

18. The plaintiff is responded to by yet another unit of the DOC, specifically its Reentry & Reintegration Division, that plaitiff's gender disorder is currently under review by the Health Services Department, another DOC entity, that Fenway Community Health is to be replaced with another mental health concern, specifically Mental Health Management (MHM) of Virginia, recently contracted by UMCHP, who shall conduct the re-evaluation. See **EXHIBIT H**, letter from Veronica M. Madden, Associate Commissioner, 09-07-07.

19. The above is vehicle, finally, that prompts plaintiff to bring this action, as it simply provides for deliberative delays, interference and an otherwise bad faith approach to this matter, based soley on an alleged security interest and not on clinical reasons having already disregarded the Harry Benjamin standards.

20. Defendants have chosen to disregard the Harry Benjamin standards notwithstanding that is it specific to their own objections relative to this matter, i.e., that plaintiff had not demonstrated the existance of exceptional circumstances that warrant the extraordinary relief he seeks. See defendants' opposition, Case No. 95-10169-NG, ¶ 3, page 5. To the contrary, as Dr. Sheila Kirk, founder and director of the only trans-gender surgical and medical center, known as TSMC, in Pittsburgh, incepted in 1998, stated, changes in such therapy could affect one's health adversely. This is to say that delays and interference is just as bad. See Feminizing Hormonal Therapy For The Transgendered, page 97, 1999 Edition.

## IV. INJUNCTIVE RELIEF

21. The plaintiff is entitled to injunctive relief under Fed. R. Civ. P. 65(a)(c)(d) where the actions and inactions of the defendants, their agents and subordinates, state actors all, interfere with plaintiff's prescribed treatment for a gender identity disorder (GID).

22. Plaintiff's treatment is both recommended and properly prescribed by medical professionsals, all of whom are selected and approved by defendants. It is to be remembered that the plaintiff is in the custody of these same defendants.

23. Defendants' interference threaten plaintiff with irreparable injury, said interference being deliberate and made to delay such treatment prescribed for the plaintiff.

24. While a demonstration of immediate harm or injury is not a prerequisite for an allowance of an injunction, the plaintiff readily asserts that the harm or injury is not redemable.

25. The plaintiff suffers hot flashes, depression, mood swings, severe headaches, as well as psychiartric problems resulting from fluctuating estrogen dosages by the endorcrinologist who is not, admittedly, a gender specialist. Plaintiff has repeatedly requested such specialist, but has been denied. See **EXHIBIT 1.** (Internet downloaded material qualified by notes identifying sources, three pages).

26. Defendants' violative conduct ignores precedent that they themselves established in a related case and where the

E X H I B I T  1.

This is a list of potential effects of estrogen therapy in natal males. Every body is different and there is no way to predict what someone's response to hormones will be. In addition, the right dosage for one person may not be the same as for someone else.

The feminizing effects of estrogen can take several months to become noticeable and several years to be complete. Some of these changes will be permanent and some will not be permanent. This list is not exhaustive.

1. Permanent changes that would remain even if estrogen therapy stopped include:
    a. Breast development. Breast development may take years to reach full size. There are natural variations in the size of breasts, and one person's breast development will not correlate with that of another person's. If estrogen therapy is discontinued, there may be some breast shrinkage, but breast development will not completely disappear.
    b. Brain structures are affected by testosterone and estrogen. The long term effects of changing the levels of one's hormones through the use of estrogen therapy and testosterone suppressants has not been scientifically studied and are impossible to predict. These effects may be beneficial, damaging, or both.
    c. Changes in fertility and sperm production (see information below in # 6).

2. NON-permanent changes that would eventually go away/change back if estrogen therapy stopped include:
    a. Decreased existing acne.
    b. Male pattern balding stops or slows (no hair re-growth of what is already gone will occur).[1]
    c. Skin may become softer. Some caution may be warranted if using depilatories for hair removal due to skin changes. There may be greater skin sensitivity to chemicals.
    d. Facial and body hair growth may *decrease* in thickness or quantity to a greater or lesser extent but will not stop growing. Hair follicles that have been producing hairs will continue unless treated with electrolysis or other proven permanent hair removal procedures.
    e. Redistribution of body fat to a more female pattern (i.e. Abdominal fat may decrease while fat on buttocks and thighs may increase).
    f. Changes in body odors.

3. Estrogen may cause or contribute to depression. It may cause variations in emotions from what you have experienced prior to estrogen therapy. Some people experience being more "weepy" and emotionally sensitive. Some people report no changes emotionally at all. There is no way to know how one person will respond by the reports of another's experiences. If you feel your emotions are "out of control", contact your physician and/or your therapist to discuss these changes. After 14-weeks on estrogen therapy, one study found that "MtFs expected and experienced more feelings of being tired and flat, tense and nervous, gloomy and depressed."[2] There is also evidence from research indicating that transgender women

---

[1] Giltay, E. J. & L. Gooren, J. G. (2000). Effects of Sex Steroid Deprivation/Administration on Hair Growth and Skin Sebum Production in Transsexual Males and Females. *The Journal of Clinical Endocrinology & Metabolism*, 85(8), 2913- 2921. Downloaded from jcem.endojournals.org at Boston University Library Serials Dept - P35 on August 9, 2007.

[2] Slabbekoorn D., Van Goozen S., Gooren L., Cohen-Kettenis P. (2001). Effects of Cross-Sex Hormone Treatment on Emotionality in Transsexuals. *The International Journal of Transgenderism*, 5(3), Downloaded from http://www.symposion.com/ijt/ijtvo05no03_02.htm on August 7, 2007.

may experience increased energy and feels of relaxation after 8-weeks of hormone treatment with a corresponding decrease in "feelings of fear and exhaustion."[3]

4. The effects of estrogen will not provide protection against sexually transmitted diseases or HIV infection. Condoms or other barrier methods should be used as part of one's safer sex practices to prevent infections.

5. Due to breast development from estrogen therapy, monthly breast self-examinations, an annual medical exam, and annual mammograms after age 40 are recommended.

6. Estrogen therapy will decrease hormones that support the size and function of natal testicles, which may then effect overall sexual functioning and fertility. The changes that *may* occur include:
    a. Up to 40% shrinkage in size of the testicles. Monthly self-testicular exams are recommended unless one has had an orchidectomy (removal of the testicles).
    b. Decrease in testosterone production from the testicles.
    c. The amount and quality of erections and ejaculation may decrease or stop entirely.
    d. Sperm will still be present in the testicles, but may stop maturing which may cause infertility.
    e. If estrogen therapy is stopped, the ability to make sperm healthy, mature sperm **may** or **may not ever** come back.
    f. Erections may no longer be firm enough for penetrative intercourse.
    g. There may be a decrease or loss of morning and spontaneous erections.
    h. Sex drive or libido may decrease within three months of estrogen therapy.[4]

7. Taking estrogen *can* significantly increase the risk of blood clots (thrombosis), which *can* result in:
    a. Death.
    b. Deep vein thrombosis. (Blood clots in the lower leg).
    c. Chronic leg vein problems.
    d. Pulmonary embolism (blood clot to the lung, which can cause permanent lung damage or death).
    e. Cerebral vascular accident (stroke) which may result in permanent brain damage, blindness, paralysis, difficulty talking, or death.
    f. Heart Attack.

8. **The risk of blood clots on estrogen therapy is extremely high if you smoke tobacco**, especially if over the age of 35. Stop smoking tobacco completely while on estrogen therapy.

9. Estrogen can cause increased blood pressure. If existing high blood pressure is controlled with medication and/or diet and exercise, you may be able to take estrogen safely with close medical monitoring.

---

[3] Ibid. Authors reference findings from a study done by Van Kemenade, J.F.L.M., Cohen-Kettenis, P.T., Cohen, L., and Gooren, L.J.G. (1989). Effects of the pure antiandrogen RU 23.903 (Anandron) on sexuality, aggression, and mood in male-to-female transsexuals. *Archives of Sexual Behavior, 18*, 217-228.
[4] Slabbekoorn D., Van Goozen S., Gooren L., Cohen-Kettenis P. (2001).

10. All medication including estrogen puts a stress on the liver, which may lead to liver inflammation or liver disease. Anyone on estrogen therapy needs to be monitored for liver problems before starting estrogen and periodically during therapy. There is a slight risk of long-term estrogen use causing liver cancer.

11. Estrogen may increase migraine headaches; this may be a reason to choose to stop taking estrogen and may also be a cause for estrogen to be discontinued by your physician.

12. Estrogen may cause nausea and vomiting, similar to morning sickness in a pregnant woman. If nausea and vomiting are severe and/or prolonged, it will require medical attention and a change in, or discontinuation of, hormone therapy.

13. The most dangerous side effects from estrogen therapy occur in connection with smoking cigarettes, being overweight, being over 40 years old, having a history of blood clots, high blood pressure, or prior estrogen dependent cancer. *If* estrogen is offered in any of the above cases, it may need to be discontinued *at any time* if concerns or complications arise which are threatening to physical and/or psychological well-being.

14. Estrogen therapy may cause changes in cholesterol. HDL (good cholesterol) may go up and LDL (bad cholesterol) may go down.

15. Estrogen therapy *may* prevent prostate problems. There is a slight chance that taking estrogen will cause overgrowth of the prostrate. An annual prostate exam is recommended for people 50 years of age and older.

16. Estrogen therapy *will not* change your voice tone (make it higher pitch). Some people have good results in changing how their voices sound after vocal training and speech therapy with a voice trainer.

17. "Street" hormones, dietary supplements, herbs, recreational drugs or medications may be detrimental to good health and could be contraindicated while using estrogen. The physician providing estrogen therapy will need to be informed of any other medications that you take.

18. Hormones must be taken as prescribed. It is important to inform your physician of any problems or concerns with treatment. *Too much estrogen in the body may be converted into testosterone – do not take more than prescribed.*

19. Reasons to contact a physician immediately may include the following non-exhaustive list:
    a. You experience hives, rashes, swelling, vomiting
    b. A skin condition that looks like varicose veins on the face or other parts of the body
    c. Lightheadedness, dizziness, migraine headaches
    d. Pain in the legs, chest, lungs

*THIS LIST IS NOT TO BE CONSIDERED MEDICAL ADVICE*

**CONSULT A MEDICAL PROFESSIONAL AND/OR A PHARMACIST FOR SPECIFIC MEDICATION QUESTIONS AND FOR A FULL LIST AND EXPLANNATION OF POSSIBLE SIDE EFFECTS OF ALL MEDICATIONS – IF IN DOUBT, ASK A LICENSED HEALTH CARE PROFESSIONAL**

parties in that case have agreed in principle to specific GID treatment as accepted and delineated in the Standards of Care For Gender Disorders, Fifth Version, as exhibited in ¶ 6 of plaintiff's complaint for declaratory and injunctive relief, an integral part of this request; see also **Kosilek v. Maloney**, 221 F.Supp.2d 156 (D. Mass. 2002) (**Kosilek I**) and C. A. No. 00-12455-MLW (Kosilek II).

27. Plaintiff has been subjected to treatment unlike that described in the preceding paragraph, which relfects an intentional action predicated to delay and interfere with the plaintiff's like treatment.

28. Defendants have displayed bad faith performance when stipulating to dismissals that include an agreement negating a jury trial and to adequately treat the plaintiff. See **Hunt v. David Forsberg et al** of 09-07-99, and **Hunt v. Mass. Dept. of Correctional et al** of 10-12-04, both relative to C. A. No. 95-10169-NG. Here, the DOC agreed to implement the "Treatment for Hunt's gender identity disorder will [not "may"] reference ... Standards of Care For Gender Identity Disorders, Fifth Version."

29. Plaintiff will assert he has not received said treatment described in the preceding, nor has his repeated requests produced any change in the DOC agenda.

30. Defendants' own experts have consistantly recommened as early as 1990 that plaintiff's treatment regimen should be hormone therapy, bra, laser hair removal, and in certain reports, a gender reaassignment surgical procedure, as

- 8 -

exhibited in ¶ 9 of plaintiff's complaint for declaratory and injunctive relief, an integral part of this request.

31. On three separate examinations of the plaintiff, his endocrinologist, Dr. Maria Warth, revisists her recommendation that plaintiff receive a bra, laser hair removal, female attire and an emotional assessment prior to reassignment surgery, as exhibited in ¶ 10 of plaintiff's complaint as stated in the preceding.

32. Notwithstanding an extensive history of plaintiff's complaints and requests for continued treatment, as exhibited in ¶¶ 11, 12 and 13 of his complaint, the defendants apply layer upon layer of responsive surbordinates and agents to otherwise delay and discourage plaintiff from his demands for the treatment prescribed and agreed to as stipulated in civil actions.

33. In final desperation the plaintiff forwards a copy of a recent text obtained from friends relative to GID and titled Transsexualism: A Correctional, Medical or Behavioral Report, by Rodney L. Fry, RN, BSN, CCHP, supporting plaintiff's requests and the Standards of Care for Gender Identity Disorders, Fifth Edition, as exhibited in ¶ 13 of plaintiff's complaint.

35. Incorporating the preceding, as if fully set forth herein, the plaintiff asserts that the defendants' claim that he has not demonstrated the existance of exceptional circumstances that warrant extraordinary relief has been countered by Dr. Sheila Kirk, founder and director of the only trans-gendered surgical and medical center known as the TSMC, in Pittsburgh

and incepted in 1998, stated that "changes in such [GID] therapy could affect one's health adversely." See Feminizing Hormonal Therapy For The Transgendered, page 97. 1999 Edition. It is reasonable to state as well that delay and interference poses an equal risk.

36. As to the merits of plaintiff's complaint for both declaratory and injunctive relief, he is most likely to prevail where defendants have acted in bad faith in previous attempts.

37. Worse, on 09-07-07, the DOC's Reentry & Reintegration Unit, one of many responding as stated previously, informs the plaintiff that his GID is under review by the Health Services Department, another layer of defendants' bureaucracy, and that Fenway Community Health is to be replaced with another mental health concern, Mental Health Management of Virgina, which has recently been contracted by UMCHP and where yet another evaluation is slated, as exhibited in ¶ 18 of plaintiff's complaint, an integral part of this request.

38. Plaintiff has alleged, through implication, that the defendants violate the Eighth Amendment by deliberate indifference to his health and its progression, that attaches a due process abridgement under the Fourteenth Amendment, where the defendants violated plaintiff's civil rights when they acted intentionally and knowingly of the injury or harm predicated upon a prisoner in their custody, as well as the prevailing law prohibiting such actions or inactions.

39. Public interest need not be considered except it a case where it may be appropriate. In fact, the public interest is served in this matter when the moving party for injunctive relief seeks only to be medically treated as prescribed by specialists recommended and appointed by defendants, the latter having agreed in principal to follow certain standards described in this complaint. See ¶ 28.

40. Plaintiff understands the complexities of the issues in GID and does not focus on unresolved matters, i.e., reassignment surgery, that have yet to be determined.

41. Plaintiff has limited his claims herein as to the lack of prescribed treatment through defendants' interference thereto that delay and otherwise harm plaintiff in the process.

42. The issues of discrimination, equal opportunity, due process, deliberate indifference attach to said claims as duly stated in the preceding. It cannot be gainsaid that defendants' conduct is deliberate and knowingly of laws protecting the plaintiff, a civil rights violation.

43. Notwithstanding the treatment afforded another GID inmate in defendants' custody, the plaintiff will allege that he is also held out from like treatment where the issue of reassignment surgey may have been resolved on behalf of another prisoner who may or may not stipulated to such surgery in another venue.

44. For all the reasons set forth in this request for injunctive relief, as well the Facts stated, plaintiff prays that relief be granted as a preliminary injunction;

45. that defendants, their subordinates and agents be, as much as possible without delaying plaintiff's treatment regimen, restrained from interfering, or reevaluating continually where it appears not to be productive in said treatment plan;

46. that defendants expedite, when possible, as well facilitate when probable, the treatment regimen prescribed by medical professionals in this matter relative to GID;

47. that a specialist in GID cases and one who is a medical doctor of endocrinology, be separately appointed by this Court to prescribe treatment that shall ensure that the proper and medically applied standards are used on behalf of the plaintiff's general health;

48. that counsel, preferably with experience in GID matters, be appointed for the plaintiff who lacks the ability to duly litigate this action;

49. that failing appointment of private counsel, an auxiliary person, perferably an inmate law clerk duly certified by the DOC and currently residing in the same facility as the plaintiff, be appointed to assist him in this matter

50. that plaintiff's anticipated name change where a requisite petition rests with the Worcester Probate and Family Court at this time, Case No. 07C0372CA, **In re Kenneth Lawrence Hunt, Jr.**, be allowed to supplant his current name to Katheena N. Soneeya.

V. PRAYERS FOR RELIEF

a) That this Court declare the rights of the parties;

b) that this Court issue preliminary injunctive ORDERS restraining defendants from interfering with his medical treatment regimen as currently prescribed and until a proper resolution of this Complaint is made;

c) that, in accordance with Fed. R. Civ. P. 65(a)(1), the plaintiff, in the spirit of cooperation, shall have duly served a copy of this Complaint to defendants' counsel, the Department of Correction, to the attention of Ms. Nancy Ankers White, its Chief Counsel and Assistant Attorney General, for their information and opportunity for opposition, if any;

d) that, provided an injunction does issue, this Court grant such additional relief as stated in ¶¶ 45 through 50 herein.

Respectfully submitted,

*Kenneth Hunt*

Kenneth Hunt, pro se
Plaintiff-Petitioner
Box 1218
Shirley, MA 01464

December 7, 2007