UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KATHEENA NEVIA SONEEYA, f/k/a/ Kenneth Hunt, <br><br> Plaintiff, <br><br> v. <br><br> LUIS S. SPENCER, in his official capacity as Commissioner of the Massachusetts Department of Correction, <br><br> Defendant. | Civil Action No. 07-12325-JLT |

### PLAINTIFF'S MOTION TO STRIKE CERTAIN TRIAL TESTIMONY OF STEPHEN LEVINE

1. On Wednesday, February 1, 2012 – the third day of trial in this matter – the Court heard testimony from the Defendant's expert witness, Dr. Stephen Levine. Dr. Levine's testimony focused primarily on his evaluation regarding the appropriateness of sex reassignment surgery to treat plaintiff Katheena Soneeya.

2. Ms. Soneeya hereby moves to strike those portions of Dr. Levine's testimony that related to Defendant's Trial Exhibit Exhibit FF – an article by Cecilia Dhejne et al. entitled "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden," (the "Dhejne Study") introduced into evidence during re-direct examination by the Department of Corrections ("DOC"). Dr. Levine's testimony regarding this article is irrelevant to the status of the Standards of Care as the governing set of prudent professional standards for the treatment of Gender Identity Disorder ("GID"). Moreover, and perhaps more importantly, it is clear (now that Plaintiff's counsel have had an opportunity to read Exhibit FF,

which was provided to them for the first time during Dr. Levine's re-direct exam), Dr. Levine's testimony regarding the Dhejne Study is misleading and mischaracterized the study's findings. Accordingly, Dr. Levine's misleading testimony on this topic should be stricken in its entirety, pursuant to Fed. R. Civ. P. 402 and 403.[1]

3. Because the Dhejne Study was not cited to in Dr. Levine's written expert report, was not provided to Plaintiff as one of the materials on which Dr. Levine relied, and was never otherwise produced to Plaintiff during discovery, Plaintiff's counsel only saw the article for the first time when it was introduced during the re-direct examination of Dr. Levine.  Plaintiff's counsel did not have an opportunity to meaningfully review its 14 pages of single-spaced text before the conclusion of Dr. Levine's testimony, or to cross-examine Dr. Levine regarding the substance of the Dhejne Study.

4. As an initial matter, Dr. Levine agreed during his testimony that the WPATH Standards of Care reflect the consensus among experts in the field of GID treatment regarding the criteria for the appropriate treatment of GID, including sex reassignment surgery.  But he nevertheless testified on re-direct that the Dhejne Study contradicted certain conclusions reached in the Standards of Care regarding the effectiveness of sex reassignment surgery for patients suffering from GID.  Because there is no dispute between the parties' experts on this central point – that the Standards of Care set forth the appropriate criteria for the treatment of Ms. Soneeya's undisputed GID – Dr. Levine's criticisms of the sources cited in the Standards of Care, and his characterization of the Dhejne Study as questioning the long-term benefits of sex reassignment surgery are irrelevant to this case.

---

[1] A motion to strike evidence is timely so long as it is brought prior to the close of evidence, even if it might have been brought earlier in the case.  *See Jay Edwards, Inc. v. New England Toyota Distributor, Inc.*, 708 F.2d 814, 822 (1st Cir. 1983) (motion to strike made on last day of trial was timely even though it could have been made earlier).

5.     More significantly, however, in describing the Dhejne Study Dr. Levine grossly mischaracterized the substance and conclusions of the article.

6.     Dr. Levine erroneously testified that the Dhejne Study indicated that post-operative patients showed an elevated risk of psychological suffering from receiving sex reassignment surgery; that the Study suggested that sex reassignment surgery may be contributing to the "demise" of its recipients; and that the Dhejne Study now reflects the "final answer" on the efficacy of sex reassignment surgery: specifically that its harm might outweigh its benefits.

7.     The Dhejne Study reaches no such conclusions. To the contrary, on its face, the authors state that, based on its data, "*no inferences can be drawn as to the effectiveness of sex reassignment as a treatment for transsexualism*. In other words, the results should not be interpreted such as sex reassignment *per se* increases morbidity and mortality. *Things might have been even worse without sex reassignment*." Ex. 1 (Dhejne Study) at 10.

8.     Significantly, contrary to Dr. Levine's characterization, the Dhejne Study recognizes that "[t]he present form of sex reassignment [surgery] has been practiced for more than half a century and is the internationally recognized treatment to ease gender dysphoria in transsexual persons." *Id.* at 2. The Dhejne Study also explicitly states that it does not even address whether SRS is an effective treatment: "This study sheds new light on transsexual persons' health after sex reassignment. It does not, however, address whether sex reassignment is an effective treatment or not." *Id.* at 3. Later, the Dhejne Study suggests that "*even though sex reassignment alleviates gender dysphoria*, there is a need to identify and treat co-occurring psychiatric morbidity in transsexual persons not only before but after sex reassignment." *Id.* at 9 (emphasis added).

9. The Dhejne Study also notes that its "statistical power was limited," because "transsexualism is a rare condition and Sweden is a small country," further contravening Dr. Levine's characterizations about its supposed statistical significance. *Id.* at 10-11.

10. Contradicting Dr. Levine's testimony that the Dhejne Study provides proof that individuals receiving sex reassignment surgery are at greater risk of suicide, the study actually finds that "[e]ven though the overall mortality was increased across both time periods [compared to the non-GID general population], ***it did not reach statistical significance for the period 1989-2003.***" *Id.* at 7 (emphasis added). In other words, individuals receiving sex reassignment surgery in Sweden after 1989 were *not significantly any more likely* than members of the general population to commit suicide. Individuals receiving sex reassignment surgery after 1989 were also *not significantly any more likely* than members of the general population to *attempt* suicide. The study also provides an explanation for this change over time, noting that since the 1980's "treatment has evolved with improved sex reassignment surgery, refined hormonal treatment, and more attention to psychosocial care that might have improved the outcome." *Id.* at 10 (internal citation omitted).

11. In discussing the limitations of its own research design, the Dhejne Study notes that: "For the purpose of evaluating whether sex reassignment is an effective treatment for gender dysphoria, it is reasonable to compare reported gender dysphoria pre and post treatment. Such studies have been conducted either prospectively, or retrospectively, and suggest that sex reassignment of transsexual persons improves quality of life and gender dysphoria." *Id.* at 10 (internal citations omitted). As it explicitly states, the Dhejne Study does not make this comparison, using the general population of Sweden as its "control," and not the GID population.

4

12. Ultimately, the study only concludes "that post surgical transsexuals are a risk group that need long-term psychiatric and somatic follow-up.  Even though surgery and hormonal therapy alleviates gender dysphoria, it is apparently not sufficient to remedy the high rates of morbidity and mortality found among transsexual persons [generally].  Improved care for the transsexual group after the sex reassignment should therefore be considered." *Id.* at 11.

13. Because Dr. Levine's characterizations of the Dhejne Study are flatly inaccurate, they are both irrelevant and misleading, and should be stricken pursuant to Fed. R. Evid. 402 and 403.  *See Kenney v. Head*, --- F.3d ---, 2012 WL 230024, at *3-5 (1st Cir. Jan. 26, 2012) (affirming trial court's exclusion of evidence as irrelevant under Rule 402 and, in the alternative, Rule 403 because it "risked confusing the issues and misleading" the finder of fact); *Lacaillade v. Loignon Champ-Carr, Inc.*, 2011 WL 6020703, at *5 (D.N.H. Dec. 2, 2011) (excluding evidence as irrelevant under Rule 402 and, if marginally relevant, under Rule 403 because it was likely to cause confusion).[2]

## CONCLUSION

For the reasons stated above, the testimony of defense witness Dr. Stephen B. Levine with respect to the Dhejne Study should be stricken.

Respectfully submitted,

---

[2] Plaintiff will provide appropriate citations to the portions of the trial transcript involving the Dhejne Study once the transcript becomes available.

KATHEENA NEVIA SONEEYA,


*/s/ Daniel V. McCaughey*

By: Daniel V. McCaughey (BBO #662037)
Alfred A. Day (BBO #654436)
Kristin G. Ali (BBO #673538)
Jessica M. Lindemann (BBO # 675722)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199
Tel: 617-951-7000
Fax: 617-951-7050
Daniel.McCaughey@ropesgray.com

February 1, 2012

**LOCAL RULE 7.1(a)(2) CERTIFICATION**

I, Daniel V. McCaughey, hereby certify pursuant to Local Rule 7.1(a)(2) that on February 1, 2012, counsel for the Plaintiff sought to confer in good faith with the counsel for the Defendant, but were unable to obtain a response regarding the issues raised by the above motion.

*/s/ Daniel V. McCaughey*_____
Daniel V. McCaughey

**CERTIFICATE OF SERVICE**

I, Daniel V. McCaughey, hereby certify that this document, filed through the ECF system, will be served electronically to the registered participants identified on the Notice of Electronic Filing ("NEF"), and that paper copies will be sent via electronic mail to those identified on the NEF as non-registered participants on February 1, 2012.

*/s/ Daniel V. McCaughey*_____
Daniel V. McCaughey