UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KATHEENA SONEEYA | * | |
| f.k.a. Kenneth Hunt, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 07-12325-JLT |
| | * | |
| LUIS S. SPENCER | * | |
| in his official capacity, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM

March 29, 2012

TAURO, J.

I.      Introduction

        Katheena Soneeya is a male-to-female transsexual currently serving a natural life sentence

in the custody of the Massachusetts Department of Correction (DOC).  She[1] has been

incarcerated since 1982, and is currently housed at MCI-Shirley, a medium security male prison.

She is suing Defendant for violation of her Eighth and Fourteenth Amendment rights under the

United States Constitution, and for a violation of her rights under Article 114 of the Declaration

of Rights of the Massachusetts Constitution.  A bench trial was held on January 29, 2012.

II.     Background

        A.      Factual Background

        In 1982, Massachusetts Superior court convicted Katheena Soneeya (born Kenneth Hunt)

of the murder of two women, and she is currently serving a life sentence without possibility of

---

[1]Although Plaintiff is biologically male, the court will refer to her using feminine pronouns
in deference to her expressed gender identity.

parole.  She has been in the custody of the DOC since her conviction in 1982, and has been

housed at a number of different facilities during the term of her incarceration.  She is currently

housed at MCI-Shirley, a medium security male prison.

Although Soneeya was born a biological male, she has consistently suffered from gender

dysphoria, or a sense that her physical body does not match her gender identity.  From early

childhood on, Ms. Soneeya has felt that she was a "woman."[2]  She has told medical providers that

as a child she would wear her mother's clothing or makeup when she could, she preferred female

friends, and she and her brother would play a game of mock-sex where she would take the female

role.[3]

This persistent cross-gender identification is intertwined with a personal history

characterized by early trauma and sexual development.  Ms. Soneeya testified to feeling like a

"freak" as she was growing up, and she suffered rejection and ostracization, as well as sexual,

physical, and emotional abuse from her parents and others.[4]   Medical and prison records

submitted in to evidence also show that Ms. Soneeya has a history of psychiatric treatment related

to "self mutilative behavior and suicidal ideation."[5]  Ms. Soneeya's history also reflects two

suicide attempts in Boston when she was between the ages of fourteen and seventeen.[6]  In 1982,

---

[2]Trial Tr. II-6:15-23 (Testimony of Katheena Soneeya); Pl. Ex. 1 (Power 1990 Mental
Health Examination) at 3-5.

[3]Pl. Ex. 10 (1998 Seil Letter).

[4]Pl. Ex. 1 (Power 1990 Mental Health Examination) at 3-5; see also Pl. Ex. 44 (2011
Levine Report) at 4-6.

[5]Pl. Ex. 7 (1997 Carpenter Eval.) at 2.

[6]Id.

Ms. Soneeya was convicted of the murder of her cousin and another woman, and was sentenced to life in prison without the possibility of parole.

Ms. Soneeya was first diagnosed with gender identity disorder ("GID") in 1990, while in DOC custody.[7] Ms. Soneeya initially sought help from mental health services at Old Colony after she attempted to castrate herself in order to "get rid of the one problem that's been bothering [her for her] whole life."[8] In a 1990 evaluation, Dr. Judith Power diagnosed Ms. Soneeya with "transsexualism, polysubstance abuse, personality disorder, NOS with histrionic borderline and antisocial features."[9] Ms. Soneeya testified at trial that she was "stunned" by the diagnosis, and by the realization that, she "grew up suffering with this for [her] whole life and realized that there was treatment around the corner that [she] couldn't get."[10]

Gender Identity Disorder is defined by the "Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, Text-Revised" ("DSM-IV-TR") as a major mental illness characterized by "a strong and persistent cross-gender identification."[11] Individuals with GID experience "[p]ersistent discomfort with [their] sex or sense of inappropriateness in the gender role of that sex," and in adults "the disturbance is manifested by symptoms such as preoccupation with getting rid of primary and secondary sex characteristics . . . or belief that he or she was born the wrong

---

[7]Pl. Ex. 1(1990 Power Eval.) at 3 (diagnosing Ms. Soneeya with "transsexualism," and discussing her "gender identity issues").

[8]Trial Tr. II at 8:5-11:17 (Testimony of Katheena Soneeya).

[9]Pl. Ex. 1 (1990 Power Eval.) at 3.

[10]Trial Tr. II at 12:11-13:3 (Testimony of Katheena Soneeya).

[11]Trial Tr. I at 50:4-24 (Testimony of Dr. Randi Kaufman).

sex."[12]

The course of treatment for Gender Identity Disorder generally followed in the community is governed by the "Standards of Care" promulgated by the World Professional Association for Transgender Health ("WPATH").[13] A new version of the Standards of Care, the seventh version, was released in September, 2011, after Plaintiff filed her initial complaint in this case.[14]  Both the sixth version and the seventh version of the SOC are relevant to the instant proceeding.  The sixth provides the standard for Plaintiff's past treatment, and because plaintiff seeks only prospective relief, the seventh version provides the community standard for treatment of GID going forward. The Standards of Care are generally understood to be flexible clinical guidelines, which individual health professionals and programs may modify.[15]  The Standards of Care explicitly state that, "[c]linical departures from the SOC may come about because of a patient's unique anatomic, social, or psychological situation; an experienced health professional's evolving method of handling a common situation; a research protocol . . . or the need for specific harm reduction strategies."[16]

The Standards of Care put forth three major areas of therapy for GID, which consist of:

---

[12]Pl. Ex. 62 (DSM-IV-TR) at 537-38.

[13]Trial Tr. I at 53:4-7 (Testimony of Dr. Randi Kaufman); Trial Tr. III-68:15-19 (Testimony of Dr. Stephen Levine).  The Standards of Care were previously known as the Harry Benjamin International Gender Dysphoria Association's Standards of Care. Pl. Ex. 51 (Harry Benjamin International Gender Dysphoria Association's Standards of Care 6th Version ("SOC v6"; Pl. Ex. 53 (WPATH Standards of Care, 7th Version ("SOC v7") at 1 n.1.

[14]Trial Tr. I-54:9-15 (Testimony of Dr. Randi Kaufman).

[15]Pl. Ex. 53 (SOC v7) at 2.

[16]Id.

4

(1) hormone therapy; (2) a real-life experience living as a member of the opposite sex; and (3) sex reassignment surgery.[17]  Not all persons suffering from GID want or require all three types of therapy in order to alleviate their gender dysphoria.[18]  Ultimately, the level of treatment that a patient requires depends on the severity of their GID diagnosis, and the treatment of gender dysphoria has become more individualized with the adoption of the seventh version of the Standards of Care.[19]

Under the Standards of Care, initiation of each stage of triadic therapy should only be undertaken once the patient meets certain eligibility and readiness criteria.  Initiation of hormone therapy requires that the patient has: (1) persistent, well-documented gender dysphoria; (2) the capacity to make informed treatment decisions; (3) attained the age of majority; and (4) reasonable control over any medical or mental health concerns.[20]  While sex reassignment surgery is not necessary for all patients, for some, "surgery is essential and medically necessary to alleviate their gender dysphoria."[21]  The seventh version of the Standards of Care asserts that, "[t]he vast majority of follow-up studies have shown an undeniable beneficial effect of sex reassignment surgery on postoperative outcomes such as subjective well being, cosmesis, and sexual function."[22]  The sixth version of the standards of care sets forth readiness and eligibility criteria

---

[17]Kosilek v. Maloney 221 F. Supp. 2d 156, 166 (D. Mass 2002). See Pl. Ex. 51 (SOCv6) at 3.

[18]Trial Tr. at I-64:2-10 (Testimony of Dr. Kaufman).

[19]Pl. Ex. 53 (SOC v7) at 8-9.

[20]Pl. Ex. 53 (SOC v7) at 34.

[21]Pl. Ex. 53 (SOC v7) at 54.

[22]Pl. Ex. 53 (SOCv7) at 207.

for sex reassignment surgery.  The eligibility criteria are:

> 1.      Legal age of majority in the patient's nation;
> 2.      Usually 12 months of continuous hormonal therapy for those without a medical contraindication . . . ;
> 3.      12 months of successful continuous full time real-life experience.  Periods of returning to the original gender may indicate ambivalence about proceeding and generally should not be used to fulfill this criterion;
> 4.      If required by the mental health professional, regular responsible participation in psychotherapy throughout the real-life experience at a frequency determined jointly by the patient and the mental health professional.  Psychotherapy per se is not an absolute eligibility criterion for surgery;
> 5.      Demonstrable knowledge of the cost, required lengths of hospitalization, likely complications, and post surgical rehabilitation requirements of various surgical approaches;
> 6.      Awareness of different competent surgeons.[23]

The readiness criteria are:

> 1.      Demonstrable progress in consolidating one's gender identity;
> 2.      Demonstrable progress in dealing with work, family, and interpersonal issues resulting in a significantly better state of mental health; this implies satisfactory control of problems such as sociopathy, substance abuse, psychosis, suicidality, for instance.[24]

With respect to the relevance of other psychiatric disagnoses to a patient's GID treatment,

the sixth version of the Standards of Care take the position that "[t]he presence of psychiatric

comorbidities does not necessarily preclude hormonal or surgical treatment, but some diagnoses

---

[23]Pl. Ex. 51 (SOC v6) at 20.  Although the SOC v7 doesn't distinguish between "readiness" and "eligibility" criteria, it has similar prerequisites for SRS.  See Pl. Ex. 53 (SOC v7) at 58-62.

[24]Pl. Ex. 51 (SOC v6) at 20.

pose difficult treatment dilemmas and may delay or preclude the use of either treatment."[25]

At trial, two experts testified regarding treatment for GID in general, and Ms. Soneeya's treatment while in DOC custody in particular.  Plaintiff's expert, Dr. Randy Kaufman, Psy.D., is a clinical psychologist and psychotherapist with a private practice in Cambridge, Massachusetts. Her current practice focuses on treatment of individuals with GID and other gender identity issues.

From 1999 through 2005, Dr. Kaufman worked at the Fenway Clinic, the premiere institution in New England for treatment of gender identity issues.[26]  At the Fenway Clinic, Dr. Kaufman worked primarily with patients with gender identity issues.[27]  She developed the transgender health program at the Fenway Clinic and started the first two support groups for individuals with GID.[28]  In 2001, while still at the Fenway Clinic, Dr. Kaufman opened her private practice in Cambridge, Massachusetts, which she maintains today.[29]  She currently sees twenty-eight patients with gender identity issues in her private practice, and she has treated three hundred seventy-two patients with gender identity issues over the course of her career.[30]

Between 2003 and 2005, the Fenway Clinic had a contract with UMass Medical School, for the evaluation of prisoners in the custody of the DOC for gender identity disorder.  Pursuant

---

[25]Pl. Ex. 51 (SOC v6) at 7.

[26]Trial Tr. I at 41:11-43:25, 111:2-16 (Testimony of Dr. Kaufman).

[27]Trial Tr I at 42:10-12 (Testimony of Dr. Kaufman).

[28]Trial Tr. I at 43:7-17 (Testimony of Dr. Kaufman).

[29]Trial Tr. I at 44:10-11 (Testimony of Dr. Kaufman).

[30]Trial Tr. I at 45:1-9 (Testimony of Dr. Kaufman).

to this contract, Dr. Kaufman evaluated a number of inmates in DOC custody including Ms.

Soneeya.[31]  She has published a number of articles on transgender and gender identity issues, and

she previously testified as an expert in the Kosilek litigation in this district.[32]  Dr. Kaufman has

evaluated Ms. Soneeya twice, once in 2003 as part of her work with the Fenway Clinic, and once

in 2010 in preparation for this litigation.[33]

The defense called Dr. Stephen Levine as an expert witness.  Dr. Levine is a practicing

clinical psychiatrist who specializes in sexuality.[34]  He is also a professor of psychiatry at Case

Western Reserve University, and has written a number of scholarly articles and publications in the

field of psychiatry and human sexuality.[35]  He was the chairman of the writing group that was

commissioned to write the fifth version of the Harry Benjamin Standards of Care.[36]  In 1974, Dr.

Levine co-founded the Case Western Reserve University Gender Identity Clinic.[37]  The clinic

evaluated and provided services to individuals who were seeking to transition from one gender to

another.  The clinic coordinated care with two local hospitals, and in some cases offered

hormones and sex reassignment surgery.  In addition to providing services, the clinic also

conducted research, and the clinic staff wrote a number of papers dedicated to the then-emerging

---

[31]Trial Tr. I at 45:12-22; Pl. Ex. 46 (2003 Kaufman Eval.).

[32]Trial Tr. I at 46:7-49:11 (Testimony of Dr. Kaufman).

[33]Trial Tr. I at 64:23-66:19, 73:3-24 (Testimony of Dr. Kaufman).

[34]Trial Tr. III at 8:6-9:11 (Testimony of Dr. Levine).

[35]Trial Tr. III at 9:12-11:16 (Testimony of Dr. Levine).

[36]Trial Tr. III at 12:11-14 (Testimony of Dr. Levine).

[37]Trial Tr. III at 15:14-17 (Testimony of Dr. Levine).

field of gender identity disorders.[38]  While the clinic served a large volume of patients in the

1970s, the number of patients has diminished dramatically over the years.[39]  The clinic that Dr.

Levine co-founded has seen about four hundred GID patients since it opened in 1974.  Of that

number approximately thirty of those patients were in Dr. Levine's personal case load.  At the

time of trial, Dr. Levine did  not have any GID patients in his personal case load.[40]

Dr. Levine currently serves as the GID consultant for MHM, the private contractor that

provides mental health services for inmates in the custody of the DOC.[41]  He was retained in this

capacity following his testimony as a court-appointed expert in previous litigation in this district

concerning the DOC's treatment of another prisoner with GID.[42]  In his role as GID consultant to

MHM, Dr. Levine has personally interviewed about a dozen inmates with GID, and he had an

instrumental role in establishing MHM's supervision group and GID treatment committee.[43]

Dr. Levine has met with Ms. Soneeya twice.  Once in 2008, to do an initial evaluation of

Ms. Soneeya in his capacity as the GID consultant for MHM, and again in 2011 in preparation for

this litigation.[44]  The 2008 meeting lasted for approximately one hour because it was cut short due

---

[38]Trial Tr. III at 15:20-17:3 (Testimony of Dr. Levine).

[39]Trial Tr. III at 17:2-3 (Testimony of Dr. Levine).

[40]Trial Tr. III at 61:11-25 (Testimony of Dr. Levine).

[41]Trial Tr. III at 27:5-17 (Testimony of Dr. Levine).

[42]Trial Tr. III at 54:16-55:11 (Testimony of Dr. Levine).  See generally Kosilek v. Maloney, 221 F. Supp. 2d 156 (D. Mass. 2002).

[43]Trial Tr. III at 27:11-13 (Testimony of Dr. Levine).

[44]Trial Tr. III at 52:8-15 (Testimony of Dr. Levine).

to an incident at the prison.[45]  The 2011 meeting lasted four hours.  In addition to these meetings,

Dr. Levine has been routinely appraised of Ms. Soneeya's care and progress through his work as

a GID consultant to MHM.  He participates in monthly meetings with the GID supervision and

treatment groups that directly oversee Ms. Soneeya's care.[46]  Dr. Levine testified at trial that

when he prepared for his evaluation of Ms. Soneeya in 2008, he assumed that she would never

receive sex reassignment surgery because it was prohibited by prison policy.[47]

     While both experts agree that Plaintiff indisputably suffers from GID, they differ on the

question of whether sex reassignment surgery is medically necessary in this case.[48]  Both Dr.

Levine and Dr. Kaufman concur that plaintiff has a genuine, consolidated female gender identity,

and that she has been receiving hormone treatment for her GID since 2003.[49]

     In particular, Dr. Kaufman and Dr. Levine disagree as to whether Ms. Soneeya has

fulfilled the eligibility and readiness criteria in the standards of care, and whether the standards of

care are applicable in the prison context.  Both Dr. Levine and Dr. Kaufman agree that

continuation of hormone therapy can be clinically appropriate in the prison setting.  They differ as

to the feasibility of a patient undergoing a "real life experience" as prescribed by the Standards of

Care, while incarcerated, and, therefore, whether sex reassignment surgery can ever be medically

---

[45]Trial Tr. III at 52:11-12 (Testimony of Dr. Levine); see Pl. Ex. 45 (2008 Report of Dr. Levine) (indicating that conversation ended "at the last minute before prisoner count.").

[46]Trial Tr. II at 73:5-8 (Testimony of Dr. Andrade) (indicating that Dr. Levine "calls in for an hour each month, from eleven to twelve, to review all cases of significant clinical concern.").

[47]Trial Tr. III at 57:20-58:7 (Testimony of Dr. Levine).

[48]See Pl. Ex. 44 (2011 Levine Eval.); see also Pl. Ex. 47 (2010 Kaufman Eval.).

[49]See Pl. Ex. 44 (2011 Levine Eval.); Pl. Ex. 47 (2010 Kaufman Eval.); see also Pl. Ex. 48 (2011 Kaufman Response to 2011 Levine Eval.) at 2.

appropriate for a patient who has not undergone the real life experience as a free person.[50]  In

addition, Dr. Levine testified at trial that while Plaintiff meets the eligibility criteria under the

standards of care, "the mental health staff that deal[] with her . . . do not feel that she meets the

readiness criteria . . . because of her psychological makeup and her inability to deal with things . . .

in a nuanced fashion."[51]  Dr. Kaufman and Dr. Levine also disagree about the long term benefits

of sex reassignment surgery for any patient with GID.  Dr. Levine, in particular, emphasized that

there is a lack of empirical evidence from long term studies demonstrating positive outcomes for

GID patients who have undergone sex reassignment surgery because a majority of patients are

lost to follow up and unable to be reached years after their surgery.[52]  This position is, however,

contrary to the one endorsed by the Standards of Care and Dr. Kaufman, which indicate that the

evidence available shows generally positive outcomes for most patients who have sex

reassignment surgery.[53]

---

[50]See Trial Tr. III at 23:10-26:25 (Testimony of Dr. Levine).

[51]Trial Tr. III at 74:23-75:3 (Testimony of Dr. Levine).

[52]Trial Tr. III at 74:23-81:1 (Testimony of Dr. Levine).

[53]Trial Tr. I at 101:9-102:8 (Testimony of Dr. Randi Kaufman); Pl. Ex. 53(SOC v7) at 54-55.  At trial, Dr. Levine emphasized a new study from Sweden (Trial Tr. III - 79:6-81:1 Testimony of Dr. Levine) (Def. Ex. FF: Dhejne Study)), which was based on population data for all transsexuals who have undergone sex reassignment surgery in that country.  The study indicated that postoperative transsexuals have a higher mortality rate, from all causes, than the population at large, but it contained no data regarding the relative mortality rate of transsexuals who had undergone sex reassignment surgery and those who had not.  It, therefore, cannot be said to provide evidence either for or against the effectiveness of sex reassignment surgery as a treatment for GID.  Indeed, the Dhejne Study itself states that, "no inferences can be drawn as to the effectiveness of sex reassignment as a treatment for transsexualism.  In other words, the results should not be interpreted such as sex reassignment per se increases morbidity and mortality.  Things might have been even worse without sex reassignment." (Def. Ex. FF at 10).  The study is, however, an indication that long term complications of sex reassignment surgery are an important factor that should be considered by the patient and his or her health care

Ms. Soneeya has a long history of seeking treatment for her GID from the DOC with varying degrees of success over time.  Ms. Soneeya was initially diagnosed with GID in 1990, after she had been in DOC custody for eight years.[54]  Since that time, the DOC's response to her requests for treatment has been characterized by a series of delays, bureaucratic mismanagement, and seemingly endless security review with no clear rhyme or reason.  In 1999, after settling a law suit against the DOC and nine years after her initial diagnosis, Ms. Soneeya received her first treatment plan that indicated that the Standards of Care should be followed in deciding her course of treatment.[55]  Between 1990 and 2003 Ms. Soneeya received a number of psychological evaluations that confirmed the diagnosis of GID, and also diagnosed her with comorbid personality disorders.[56]  Pursuant to those evaluations, Ms. Soneeya was provided with psychotherapy, but her therapists had little or no experience in treating gender identity disorders.[57] In 2003, Ms. Soneeya was evaluated by Drs. Kaufman and Kapila as part of a contractual

---

professionals in making the decision to go forward with sex reassignment surgery.

[54]Def. Ex. A (Plaintiff's Medical Records).

[55]Def. Ex. H. (Hickey Mental Health Treatment Plan).

[56]See Pl. Ex. 1(1990 Power Eval.); Pl. Ex. 5 (1992 King Eval.); Pl. Ex. 6 (1997 Russel Eval.); Pl Ex. 7 (1997 Carpenter Eval.); Pl. Ex. 10 (1998 Seil Eval.); Pl. Ex. 11 (1999 Hickey Treatment Plan); Pl Ex. 46 (2003 Fenway Eval.); Pl. Ex. 45 (2008 Levine Eval.).

[57]See Joint Ex. 1 (Dep. of Dr. Angeles) at 20:6-22:22 (Testifying that she was at one point Ms. Soneeya's primary care provider, and that she had no prior experience treating patients with GID); Joint Ex. 2 (Dep. of Dr. Arthur Brewer) at 29:3-30:17 (indicating that his training in treatment of GID was limited to a symposium he attended in 2007 or 2008, and that he was unaware of whether any of the medical staff at UMass had attended training sessions on GID); Joint Ex. 5 (Dep. of William Micucci) at 37:6-40:14 (indicating that his experience treating patients with GID was limited to his experience within the DOC, and trainings provided by various DOC contractors including the Fenway Clinic and Dr. Levine); see also Trial Tr. I-74:14-75:10 (Testimony of Dr. Kaufman) (indicating that Mr. Micucci spoke about Plaintiff's GID "from a really clinically uninformed perspective.").

arrangement between the Fenway Clinic and the UMass Correctional Health Program, then the

DOC's mental health provider.[58]  That report confirmed Ms. Soneeya's GID diagnosis, and

indicated that Ms. Soneeya should immediately receive hormone therapy coupled with ongoing

psychotherapy.[59]  The report also indicated that although the evaluators did not believe that Ms.

Soneeya was currently a candidate for sex reassignment surgery, that this should be re-considered

in the future as her treatment progressed.[60]  That evaluation also noted that although Ms. Soneeya

did have a comorbid diagnosis of sociopathy, this was well controlled in the prison environment.[61]

In September 2003, pursuant to the Fenway Clinic evaluation, Ms. Soneeya began to

receive hormone therapy under the care of Dr. Maria Warth.[62]  Dr. Warth was, at that time, an

endocrinologist on staff at the Lemuel Shattuck Hospital (the outpatient hospital under contract

with the DOC to provide specialized care to DOC inmates).[63]  Although Dr. Warth had no prior

experience in treating patients with GID, she made an effort to familiarize herself with the medical

literature related to hormone therapy for GID patients and with the Standards of Care.[64]  Ms.

Soneeya experienced some complications related to her hormone therapy, including physical side

---

[58]Trial Tr. I at 64:23-69:17 (Testimony of Dr. Kaufman); see Pl. Ex. 46 (2003 Fenway Report).

[59]Pl. Ex. 46 (2003 Fenway Report) at 5-6.

[60]Pl. Ex. 46 (2003 Fenway Report) at 6.

[61]Pl. Ex. 46 (2003 Fenway Report) at 6.

[62]Joint Ex. 8 (Dep. of Dr. Warth) at 8:21-9:3, 9:10-10:15, 37:22-38:7.

[63]Joint Ex. 8 (Dep. of Dr. Warth) at 8:21-9:3, 9:10-10:15, 37:22-38:7.

[64]Joint Ex. 8 (Dep. of Dr. Warth) at 31:12-32:25, 88:13-89:7.

effects, and she continues to seek evaluation and adjustment of her endocrine care.[65]  Dr. Warth

was hesitant to increase Ms. Soneeya's hormone dosage because of concerns related to the

physical side effects of increased estrogen in a person of Ms. Soneeya's age and weight.[66]

In 2007, MHM took over from UMass as the DOC's mental health contractor.[67]  Since

2008, the mental health care provided to Ms. Soneeya has been supervised by Dr. Levine in his

capacity as the GID consultant for MHM.[68]  Mental health clinicians who were assigned to treat

inmates diagnosed with GID were also provided with some training on GID treatment, including a

training provided by Dr. Kaufman in 2002 and one provided by Dr. Levine in 2008.[69]  In 2005, the

Fenway Clinic made a formal recommendation to UMass that Ms. Soneeya be able to feminize her

appearance further including access to female canteen items and clothing, and permanent removal

of facial and body hair.[70]  It was the understanding of Dr. Kaufman at the time that even though

the recommended feminine products were "everyday" items readily available in the real world, it

---

[65]Trial Tr. II at 21:9-23:6 (Testimony of Katheena Soneeya), Pl. Ex. 47 (2010 Kaufman Report) at 1-4 (indicating that Plaintiff had experienced development with hormones, but had also experienced complications and would benefit from an evaluation by an endocrinologist with experience treating patients with GID).

[66]Joint Ex. 8 (Dep. of Dr. Warth) at 47:12-50:19.

[67]Joint Ex. 9 (Dep. of Dr. Zakai) at 25:14-27:19; Trial Tr. II at 79:17-80:10 (Testimony of Dr. Andrade).

[68]Joint Ex. 9 (Dep of Dr. Zakai) at 79:3-80:3, 81:8-15; Joint Ex. 5 (Dep. of William Micucci) at 39:4-42:24; Joint Ex. 6 (Dep. of Merleen Mills) at 24:11-25:6; Trial Tr. at II-72:1-73:15 (Testimony of Dr. Andrade); Trial Tr. III-27:14-28:4 (Testimony of Dr. Levine); Trial Tr. at I-77:1-18 (Testimony of Dr. Kaufman); Def. Ex. A (Plaintiff's Medical Records) at 318-457.

[69]Joint Ex. 5 (Dep. of William Micucci) at 39:4-40:20.

[70]Pl. Ex. 23 (Letter to Dr. Applebaum from Drs. Kaufman and Kapila).

was necessary for her and Dr. Kapila to make a formal clinical recommendation in writing

because, "the inmates were having a very difficult time receiving [them]," "the DOC didn't want

to produce them," Ms. Soneeya would not be able to receive these feminine items without a

formal letter.[71]

    In spite of the Fenway Clinic's recommendations, Ms. Soneeya did not receive feminizing

items in 2005.  In late 2005, UMass wrote a letter to the DOC, which endorsed the Fenway Clinic

treatment plan, and recommended that Ms. Soneeya receive laser hair removal and access to

female clothing and cosmetics.[72]  UMass submitted another written recommendation for GID

treatment in April of 2006, in which it warned that, "further delay in providing the recommended

treatment likely will result in continued or increased levels of distress for each afflicted individual,

with the possibility of self-inflicted injury, and, to that extent, the treatment recommendations are

medically necessary."[73]  The DOC has not provided Plaintiff with any sort of permanent hair

removal to date.  The DOC takes the position that these recommendations were not treatment

orders because they were not submitted on the appropriate type of form.[74]

    In addition to the UMass and Fenway Clinic recommendations, Dr. Warth recommended

progressive GID treatment consistent with the standards of care beginning in 2005.[75]  Dr. Warth's

---

    [71]Trial Tr. I-72:15-22 (Jan. 30, 2012) (Testimony of Dr. Randi Kaufman); Pl. Ex. 23 (Letter from Dr. Kaufman to Dr. Applebaum).

    [72]Pl. Ex. 27 (Letter from Dr. Applebaum to Peter Heffernan).

    [73]Pl. Ex. 30 (GID Treatment Recommendation Request Form).

    [74]Trial Tr. II at 151:23-162:3, 165:17-167:2 (Testimony of Lawrence Weiner); Joint Ex. 4 (Dep. of Terre Mashall) at 105:12-110:9; 115:4-116:4, 118:19-120:16, 121:10-122:22, 134:14-138:22, 140:3-4.

    [75]See Pl. Ex. 24 (Progress Notes of Dr. Warth).

recommendations included a request that Ms. Soneeya be provided with more feminine items, be given permanent hair removal, and assessed for readiness for sex reassignment surgery.[76]  Dr. Warth continued to make these recommendations until she ended her employment with the Lemuel Shattuck Hospital in June 2008.[77]  The DOC was aware of the recommendations, but did not treat them as medical orders.[78]

Contrary to the recommendations of her mental health providers, Ms. Soneeya did not receive any female clothing or cosmetics until late 2009.[79]  The former DOC Chief Psychiatrist testified in a deposition that this was inconsistent with the treatment plan for Ms. Soneeya and had "complicated" her treatment.[80]  Ms. Soneeya's repeated requests for female clothing and canteen items between 2003 and 2009 were met by a pattern of obstruction and delay on the part of the DOC.  In 2004, one of Ms. Soneeya's requests for female canteen items, such as lipstick and mascara, was submitted to then-Commissioner Kathleen Dennehy for a final decision on security review. The treatment request was denied.  The DOC reasoned that these items, "could present an escape risk [by] altering appearance (male to female)."[81]  There is no record, however, of any

---

[76]See Pl. Ex. 24 (Progress Notes of Dr. Warth).

[77]See Pl. Ex. 24 (Progress Notes of Dr. Warth).

[78]Joint Ex. 4 (Dep. of Terre Marshall) at 9:6-10:6, 11:14-25, 12:9-16, 12:23-13:12, 13:19-14:9, 14:22-15:7, 15:14-17:16, 17:23-18:8, 75:20-22, 76:25-78:9, 85:5-20, 85:23-86:17, 95:12-99:3.

[79]Joint Ex. 9 (Dep. of Dr. Zakai) at 101:2-101:23.  See Trial Tr. II at 28:23-30:19 (Testimony of Katheena Soneeya).

[80]Joint Ex. 9 (Dep. of Dr. Zakai) at 101:2-101:23.

[81]Joint Ex. 4 (Dep. of Terre Marshall) at 143:11-145:23.

inmate ever using cosmetics to effect an escape from DOC custody.[82]

In late 2006, the DOC conducted a more formal "security review" of the UMass and Fenway Clinic recommendation that Ms. Soneeya receive female canteen items.  That treatment recommendation was denied in a "security opinion," which had no stated criteria.[83]  In 2009, the recommendation that Ms. Soneeya be given access to female clothing and canteen items was reviewed again, this time with the support of then-Superintendent Duane MacEachern and three other prison officials.   Mr. MacEachern took the position that the female canteen items Ms. Soneeya currently has access to did not raise any security concerns, and that the risk of any hypothetical concerns could be mitigated.[84]  The recommendation was once again denied by then-Deputy Commissioner James Bender with no explanation.[85]

Until 2010, the DOC had no formal policy for treating prisoners with GID, and the process for obtaining access to treatment was largely ad hoc.[86]  UMass Correctional Health currently provides health care for inmates in DOC custody, but since 2007 MHM has had a contract with the DOC to provide mental health services.  At trial, Dr. Robert Diener who is currently Chief Psychiatrist for the DOC, testified that the DOC did not renew UMass's contract to provide mental health services to DOC inmates, and instead replaced UMass with MHM.  This replacement occurred after UMass's outside expert had recommended sex reassignment surgery

---

[82]Joint Ex. 4 (Dep. of Terre Marshall) at 143:11-145:23.

[83]Joint Ex. 4 (Dep. of Terre Marshall) at 138:23-139:17.

[84]Joint Ex. 3 (Dep. of Duane MacEachern) at 51:6-18, 53:8-13.

[85]Pl. Ex. 42 (Letter from Duane MacEachern to James Bender); Joint Ex. 3 (Dep. of Duane MacEachern) at 55:3-61:2.

[86]See Joint Ex. 4 (Dep. of Terre Marshall) 35:17-42:18.

for at least one inmate with gender identity disorder.[87]  Once MHM assumed responsibility for inmates' GID care, it ordered a reevaluation of Ms. Soneeya.  This reevaluation was prompted in part by the DOC's dissatisfaction with the findings in prior patient evaluations.[88]  Dr. Levine was hired by MHM as a GID consultant based on his testimony in the Kosilek trial.[89]  His 2008 evaluation did not contemplate sex reassignment surgery being an available treatment option for Ms. Soneeya.[90]  In the report, Dr. Levine switches back and forth between using masculine and feminine pronouns, and advises that Ms. Soneeya may have to "come to grips" with the reality that she may have to "live with her male genitalia."[91]  He also recommended that, "[u]ntil Katheena changes her mind about taking hormones, they should be continued."[92]  At trial, Dr. Kaufman testified that the inconsistency in pronoun use, and the recommendations in the 2008 report are inconsistent with both the sixth and seventh versions of the Standards of Care.[93]

The various clinicians and experts who have evaluated Ms. Soneeya also disagree as to the level of risk she faces in relation to her gender dysphoria.  Dr. Kaufman testified at trial that she was concerned that if Ms. Soneeya was denied sex reassignment surgery, she would lapse into hopelessness and commit suicide.  Ms. Soneeya herself has indicated that she would commit

---

[87]Trial Tr. II at 142:18-22, 143:13-25 (Testimony of Dr. Diener).

[88]Joint Ex. 9 (Dep. of Dr. Zakai) at 70:11-72:10.

[89]Trial Tr. III-55:15-18 (Testimony of Dr. Stephen Levine).

[90]Pl. Ex. 45 (Levine 2008 Evaluation).

[91]Pl. Ex. 45 (Levine 2008 Evaluation) at 4.

[92]Pl. Ex. 45 (Levine 2008 Evaluation) at 4.

[93]Trial Tr. II at 89:2-14, 86:3-102:8 (Testimony of Dr. Andrade).

suicide if denied this form of treatment.  Dr. Levine, however, opined that any depression Ms.

Soneeya faces after possibly being denied sex reassignment surgery could be managed by the

mental health services available at the DOC, and Ms. Soneeya's medical records reflect that she

has not recently engaged in self harm, and that she is relatively stable and well adjusted in her

current prison environment.

In 2010, the DOC adopted and enacted a formal GID policy.  Prior to the promulgation of

the 2010 GID policy, the DOC had no consistent process for reviewing security concerns raised

by GID treatment recommendations.[94]  It was clear, however that, "[i]t was the commissioner's

ultimate role to determine whether there was an overwhelming security or safety or corrections

issue."[95]  The 2010 policy creates a GID Treatment Committee, which is responsible "for

reviewing the overall treatment of all GID diagnosed inmates . . . on a quarterly basis," and a GID

Management and Security Committee, which is tasked with reviewing, "any elements of the

Treatment Plan that may potentially present security, safety, or operational difficulties within a

correctional environment."[96]   The policy goes on to state that,

> The Treatment Plan for inmates diagnosed with GID shall not contain
> provisions for services that are not medically necessary for the
> treatment of GID within the Department.  These elective or cosmetic
> services generally include but are not limited to:
> a.      Feminization or masculinization procedures such as laser hair
>         removal and/or electrolysis for permanent facial, chest or other
>         body hair removal . . .
> b.      Plastic surgery, including . . . rhinoplasty, tracheal shaving,
>         facial feminization/masculinization, mastectomy . . . (FTM),
>         and breast augmentation (MTF) . . .

---

[94]Joint Ex. 4 (Dep. of Terre Marshall) 31:6-13.

[95]Joint Ex. 4 (Dep. of Terre Marshall) at 39:4-6.

[96]Pl. Ex. 50 (DOC 2010 GID Policy) at 652.05-652.06.

      c.      Genital sex reassignment surgery is prohibited as it presents overwhelming  safety and security concerns in a correctional environment.[97]

The GID policy further indicates that all final recommendations by the GID Treatment Committee must undergo security review by the GID Management and Security Committee. After such review, "[t]he Security Review is then forwarded to the Commissioner for the final [security] determination.  If the Commissioner's decision is not in support of the recommended treatment plan, the Treatment Plan is returned to the GID Treatment Committee for consideration of potential clinical alternatives that meet the inmate's needs."[98]  Under the policy, "[t]he decision of the Commissioner regarding any aspect of a GID inmate's management within the Department shall be final."[99]

The depositions and trial testimony in this case indicate that Dr. Kaufman is the only provider to recommend sex reassignment surgery for Ms. Soneeya.  Her treating clinicians and Dr. Levine have expressed concern over her readiness for sex reassignment surgery in light of her comorbid psychological diagnoses, and unwillingness to engage in therapy.[100]  The evidence submitted also indicates, however, that the DOC has never provided Ms. Soneeya with an individualized evaluation of her treatment where sex reassignment surgery is considered an option.  It is also clear that the DOC's haphazard and reactionary approach to security review has

---

[97]Pl. Ex. 50 (DOC 2010 GID Policy) at 653.03(D)(6)( c).

[98]Pl. Ex. 50 (DOC 2010 GID Policy) at (C)(5) p. 11.

[99]Pl. Ex. 50 (DOC 2010 GID Policy) at 652.06(A)(4)

[100]See Pl. Ex. 1 (1990 Power Eval.) at 6; Pl. Ex. 5 (1992 King Eval.) at 3; Pl. Ex. 7 (1997 Carpenter Eval.) at 17; Pl. Ex. 10 (1998 Seil Eval.) at 8; Pl. Ex. 11 (1999 Hickey Treatment Plan) at 1-2.

resulted in delays in treatment that have had an adverse impact on Ms. Soneeya's care. The various experts and clinicians who have evaluated Ms. Soneeya also disagree as to the level of risk posed by her GID.

      B.     Procedural Background:

Plaintiff filed the first complaint in this case pro se in December of 2007. In August of 2008, Judge Gertner granted Plaintiff's Motion to Appoint Counsel, and the law firm of Ropes & Gray LLP was appointed to represent Ms. Soneeya. On December 15, 2008, Plaintiff filed the First Amended Complaint, and after discovery, Plaintiff filed the Second Amended Complaint in December of 2010. In April of 2011, the case was assigned to Judge Stearns, and in May, 2011, the case was reassigned to this Judge. A bench trial was held on January 30, 2012.

III.    Discussion

      A.     Legal Standard

The Eighth Amendment, which is made applicable to the States through the Due Process Clause of the Fourteenth Amendment, "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes."[101] When serving a term of imprisonment, "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met."[102] In Estelle v. Gamble, the Supreme Court held that prison officials' deliberate indifference to an inmate's serious medical need may constitute a violation of the Eighth Amendment's prohibition on cruel and unusual punishment.[103] In its opinion, the Court further

---

[101]Wilson v. Seiter, 501 U.S. 294, 296-97 (1991) (citing Robinson v. California, 370 U.S. 660, 666 (1962)).

[102]Estelle v. Gamble, 429 U.S. 97, 103 (1976).

[103]Id. at 104.

emphasized that, "[t]he Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency' against which we must evaluate penal measures."[104]

The inquiry into whether prison officials' denial of medical care to an inmate amounts to an Eighth Amendment violation has both an objective and a subjective component.[105]  Objectively, "it must be proven that there is a serious medical need and that adequate care has not been provided."[106]  Not every ailment qualifies as a serious medical need for Eighth Amendment purposes.  Rather, "[a] serious medical need is one that involves a substantial risk of serious harm if it is not adequately treated."[107]  In general, a serious medical need is "one 'that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the need for a doctor's attention.'"[108]

Prisoners have a right, under the Eighth Amendment to receive adequate treatment for their serious medical needs.  Prisoners must be provided with, "services at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards."[109]  Adequate care is based on an individualized assessment of an inmate's

---

[104]Id. at 102 (quoting Jackson v. Bishop, 404 F.2d 571, 579 (8th Cir. 1968)).

[105]Kosilek, 221 F. Supp. 2d at 160.

[106]Id. at 160.

[107]Id.

[108]Mahan v. Plymouth County House of Corrections, 64 F.3d 14, 18 (citing Gaudreault v. Municipality of Salem Mass., 923 F.2d 203, 208 (1st Cir. 1990).

[109]Battista v. Dennehy, 2006 WL 1581528 at *7 (D. Mass., March 22, 2006) (quoting U.S. v. DeCologero, 821 F.2d 39, 42 (1st Cir. 1987)).

medical needs in light of relevant medical considerations.[110]  Courts must evaluate whether the care being provided is minimally adequate, but should defer to the considered judgment of prison officials in choosing between different forms of adequate medical care.[111]

Once it has been established that a prisoner suffers from a serious medical need, it must also be shown that prison officials have acted with 'deliberate indifference' to that need.[112]  In Whitley v. Albers, the Supreme Court emphasized that:

> [i]t is obduracy and wantonness, not inadvertence or error in good faith that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.[113]

Deliberate indifference may be manifested in a variety of ways, including by "prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with treatment once prescribed."[114]  Other courts have found that "consciously choosing 'an easier and less efficacious' course of treatment plan may constitute deliberate indifference, if the choice was made for non-medical reasons not rooted in a legitimate penological purpose."[115]

---

[110]Kosilek, 221 F. Supp. 2d at 160.

[111]Id. at 160-161.

[112]Estelle, 429 U.S. at 106; see Farmer v. Brennan, 511 U.S. 825, 840-47 (1970).

[113]Whitley v. Albers, 475 U.S. 312, 319 (citing Estelle, 429 U.S. at 105-106).

[114]Estelle, 429 U.S. at 104-05.

[115]Kosilek, 221 F. Supp. 2d at 183 (citing Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998); Durmer v. O'Carroll, 991 F.2d 64, 67-69 (3d Cir. 1993)).

As the First Circuit has made clear, the Eighth Amendment standard for what behavior constitutes deliberate indifference "is in part one of subjective intent."[116] Here, as in criminal law, "subjective intent is often inferred from behavior and even in the Eighth Amendment context . . . a deliberate intent to harm is not required . . . . Rather, it [may be] sufficiently evidenced 'by denial, delay, or interference with prescribed health care.'"[117]  In Battista v. Clarke, the First Circuit found that there was sufficient evidence to support a finding of deliberate indifference where, "even though it does not rest on any established sinister motive or 'purpose' to do harm," the Department of Corrections' actions reflected a "composite of delays, poor explanations, missteps, changes in position and rigidities – common enough in bureaucratic regimes but here taken to an extreme."[118]

The deliberate indifference inquiry has two parts.  First, it must be established that the responsible official is aware of the facts from which he or she could infer that a substantial risk of serious harm exists, and second, the official must also draw that inference.[119]  In deciding what type of care to provide, or even in rare circumstances, whether to provide care for a prisoner's medical needs, it is appropriate for prison officials to weigh the "practical constraints imposed by the prison environment."[120]  In determining whether the subjective standard of deliberate indifference has been satisfied:

---

[116]Battista v. Clarke, 645 F.3d 449, 453 (1st Cir. 2011).

[117]Id. at 453 (citing Farmer, 511 U.S. at 835).

[118]Battista, 645 F.3d at 455.

[119]Kosilek, 221 F. Supp. 2d at 161.

[120]Id. at 161, 182 (citing Farmer 511 U.S. at 832).

> [t]he duty of prison officials to protect the safety of inmates and prison personnel is a factor that may properly be considered in prescribing medical care for a serious medical need. . . . [A] prison official, acting reasonably and in good faith, might perceive an irreconcilable conflict between his duty to protect safety and his duty to provide adequate medical care.[121]

A decision to alter or deny treatment on such grounds might not rise to the level of an Eighth Amendment violation because the infliction of pain on the individual inmate "would not be unnecessary or wanton," in light of the realities of prison administration.[122]  Cost of treatment, however, may not be used as a reason to deny an inmate medically necessary care.[123]

A prison official is a proper defendant in an Eighth Amendment suit if that official was "personally involved" in the decision to deny treatment for Plaintiff's serious medical need.[124] Personal involvement may be established, "by showing that the official knew of the prisoner's need for medical care and yet failed to provide the same."[125]

An Eighth Amendment violation may be found based upon the failure of a correctional institution to adapt an established policy in order to adequately address an inmate's serious

---

[121]Kosilek, 221 F. Supp. 2d at 161, 182 (citing Farmer, 511 U.S. at 845; White v. Farrier, 849 F.2d 322, 325 (8th Cir. 1988)).

[122]Kosilek, 221 F. Supp. 2d at 161; see also Whitley v. Albers 475 U.S. at 319 ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause.").

[123]Kosilek, 221 F. Supp. 2d at 161, 182; see also Ancata v. Prison Health Servs. Inc., 769 F. 2d 700, 705 (11th Cir. 1985).

[124]See Braga v. Hodgson, 605 F.3d 58, 61 (1st Cir. 2010) (granting summary judgment in favor of Defendant Sheriff because of Plaintiff's failure to allege Sheriff's "personal involvement with or knowledge of [Plaintiff's] medical care.").

[125]Ramirez v. Colon, 21 F. Supp. 2d 96, 98 (D.P.R. 1997).

medical need.[126]  The Ninth Circuit held in <u>Allard</u> that denial of treatment for gender dysphoria based on a blanket prison policy, rather than individual need, may constitute deliberate indifference under the Eighth Amendment standard.[127]  Similarly, the Seventh Circuit recently upheld a District Court's invalidation of a Wisconsin law that prohibited the use of hormones or sex reassignment surgery as a treatment for inmates suffering from gender identity disorder.[128]  There, the Seventh Circuit affirmed the District Court's finding that an Eighth Amendment violation "stemmed from 'removing even the consideration of hormones or surgery," as options for GID treatment.[129]  In <u>Brooks v. Berg</u>, the District Court for the Northern District of New York also found that a "blanket denial of medical treatment is contrary to a decided body of case law," and that "[p]risons must provide inmates with serious medical needs some treatment based on sound medical judgment."  The court continued: "[P]rison officials cannot deny transsexual inmates all medical treatment by referring to a prison policy. . . ."[130]  Indeed, another sitting of this court has found that treatment decisions concerning inmates with GID must be based on an individualized judgment made by the inmate's medical providers instead of a broad departmental policy.[131]

---

[126]<u>See</u> <u>Mahan,</u> 64 F.3d at 18.

[127]<u>Allard v. Gomez</u>, 9 Fed. Appx. 793, 795 (9th Cir. 2001).

[128]<u>Fields v. Smith,</u> 653 F.3d 550, 559 (7th Cir. 2011).

[129]<u>Id.</u> at 551; <u>see also</u> <u>Fields v. Smith</u> 713 F. Supp. 2d at 865-67.

[130]<u>Brooks v. Berg</u>, 270 F. Supp. 2d 302, 310 (N.D.N.Y. 2003) (vacated in part on other grounds).

[131]<u>Kosilek</u>, 221 F. Supp. 2d at 193 (Wolf, J.) ("It is permissible for the DOC to maintain a presumptive freeze-frame policy.  However, decisions as to whether psychotherapy, hormones, and/or sex reassignment surgery are necessary to treat Kosilek adequately must be based on an

Because this case involves only prospective injunctive relief, the court must focus on the state of affairs at the time of trial.  "In order to obtain an injunction, the prisoner must prove that the Defendant official was, at the time of trial, 'knowingly and unreasonably disregarding an intolerable risk of harm, and [that he] will continue to do so.'"[132]  As the Supreme Court has emphasized, "[i]f the evidence establishes that an inmate faces an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness," and the responsible officials are thus required to take action to abate that risk.[133]

In sum, in order to obtain relief on her Eighth Amendment claim in this case, Plaintiff must prove that: "(1) [s]he has a serious medical need; (2) which has not been adequately treated; (3) because of [Commissioner Spencer's] deliberate indifference; and (4) that deliberate indifference is likely to continue in the future."[134]

B.    Application

1.    Serious Medical Need

It is undisputed that Ms. Soneeya has a gender identity disorder, and it is well established that GID may constitute a serious medical need.[135]  As with other mental illnesses, gender identiy disorders have varying degrees of severity.  Whether GID creates a serious medical need for

---

individualized medical evaluation of Kosilek rather than as a result of a blanket rule. . . . Those decisions must be made by qualified professionals . . . such professionals must exercise sound medical judgment.") (internal citations and quotations omitted).

[132]Id. at 183.

[133]Farmer, 511 U.S. at 846 n.9.

[134]Kosilek ,221 F. Supp. 2d at 184.

[135]See id. at 184; Alexander v. Weiner, ___ F. Supp. 2d ___, 2012 WL 149492 (D. Mass Jan. 18, 2012) (Tauro, J.); Field, 712 F. Supp. 2d at 862 (citing cases).

which the Eighth Amendment requires treatment in any given case depends on the severity of the individual inmate's disorder.[136]

In the Kosilek case, another sitting of this court found that an inmate with a GID diagnosis and a similar history of "mental anguish," suicide attempts, and self mutilation had a serious medical condition for which the Eighth Amendment required treatment.[137]  Courts in other circuits have similarly noted that gender identity disorder may constitute a serious medical need. In De'Lonta v. Angelone the Fourth Circuit found that an inmate's "need for protection against continued self-mutilation constitutes a serious medical need to which prison officials may not be deliberately indifferent."[138]  The Seventh Circuit also recently affirmed the decision of the District Court for the Eastern District of Wisconsin, which found that prisoners with GID suffered from a serious medical need.[139]  Ms. Soneeya has clearly demonstrated that she has a serious medical need because she has shown that she has a condition that has been diagnosed by a medical professional, and that, if left untreated, is likely to cause her serious harm.

It is clear from the evidence presented in this case that Ms. Soneeya's GID diagnosis constitutes a serious medical need.  The record reflects a history of suicidality and one attempt at self castration while in DOC custody.[140]  Ms. Soneeya was initially diagnosed with GID (then called transsexualism) in 1990, and that diagnosis was re-confirmed by a series of mental health

---

[136]See Kosilek, 221 F. Supp. 2d at 184.

[137]Id.

[138]De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003).

[139]Field, 653 F.3d at 544-555.

[140]See Pl. Ex. 7 at 2 (1997 Seil Eval.); see also Trial Tr. at II 8:5-11:17 (Testimony of Katheena Soneeya).

evaluations up to and including the reports prepared by both Plaintiff and Defendant in preparation for this trial.[141]  She has a serious medical need, "that has been diagnosed by a physician as mandating treatment."[142]

As Ms. Soneeya has gradually received access to more treatment for her GID, her mental stability and adjustment have improved.[143]  She has  fixated on sex reassignment surgery as the solution to her problems since the time of her initial diagnosis in 1990.[144]  Ms. Soneeya testified at trial that she is "running on hope" that she will receive sex reassignment surgery, and that she does not "want to go through [her] natural life sentence tormented, miserable [and] in pain, . . . being ridiculed because [she is] different."[145]

2.  Adequacy of Treatment

Ms. Soneeya's treatment while in DOC custody has been characterized by a pattern of delays, inconsistencies, and seemingly endless security review.  Ms. Soneeya first received her diagnosis of GID in 1990, after she had been in custody for eight years.[146]  It was not until nine

---

[141]See, e.g., Pl. Ex. 1 (1990 Power Eval.) at 6; Pl. Ex. 5 (1992 King Eval.) at 3; Pl. Ex. 7 (1997 Carpenter Eval.) at 17; Pl. Ex. 10 (1998 Seil Eval.) at 8; Pl. Ex. 11 (1999 Hickey Treatment Plan) at 1-2.

[142]Mahan, 64 F.3d at 18 (internal quotations omitted).

[143]See Trial Tr. I 77:11-82:12; see also Pl. Ex. 45 (2008 Levine Report) at 3-4.

[144]See Pl. Ex. 1 (1990 Power Eval.) at 6; Pl. Ex. 5 (1992 King Eval.) at 3; Pl. Ex. 7 (1997 Carpenter Eval.) at 17; Pl. Ex. 10 (1998 Seil Eval.) at 8; Pl. Ex. 11 (1999 Hickey Treatment Plan) at 1-2; Pl. Ex. 44 (2011 Levine Report) at 8-9; Pl. Ex. 45 (2008 Levine Report) at 1-2; Pl. Ex. 46 (2003 Fenway Eval.) at 6; Pl. Ex. 47 (2010 Kaufman Eval.) at 1-3.

[145]Trial Tr. II-32:20-33:3 (Testimony of Katheena Soneeya).

[146]Pl. Ex. 1 (1990 Power Eval.) at 3 (diagnosing Ms. Soneeya with "transsexualism," and discussing her "gender identity issues"), Def. Ex. A. (Plaintiff's Medical Records).

years later, and after the settlement of a lawsuit against the DOC, that Ms. Soneeya first received a treatment plan that prescribed treatment in accordance with the Standards of Care.[147]  It was not until four years after that, in the summer of 2003, that Ms. Soneeya was evaluated by a medical professional with expertise in GID.[148]  In the fall of 2003 that she was able to begin hormone treatment under the care of Dr. Maria Warth.[149]  Even then, Dr. Warth had no previous experience in treating patients with GID.[150]  Once Ms. Soneeya began hormone therapy, she experienced a number of negative side effects, changes in treatment, and difficulties with dosing and administration.[151]  Ms. Soneeya has recently started to see a new endocrinologist, who she expects to further adjust her hormone regimen.[152]

Ms. Soneeya's efforts to obtain female canteen items and clothing, which her medical providers indicated were necessary for her treatment, were similarly drawn out over several years. In July 2005, two years after its initial report, the Fenway Clinic indicated that it was medically necessary for Ms. Soneeya to have access to methods to further feminize her appearance.  These included permanent removal of facial and body hair, access to women's clothing, including a bra, underpants, and shoes, and access to canteen items available to other women in DOC custody,

---

[147]Def. Ex. H. (Hickey Mental Health Treatment Plan).

[148]See Pl. Ex. 46, Trial Tr. I at 64:23-66:18.

[149]Joint Ex. 8 (Dep. of Dr. Warth) at 8:21-9:3, 9:10-11:15, 37:22-38:7.

[150]Id. at 31:12-32:25, 88:13-89:7.

[151]Trial Tr. II at 21:13-23:6 (Testimony of Katheena Soneeya).

[152]Trial Tr. II at 22:20-23, 40:18-41:20 (Testimony of Katheena Soneeya).

such as lipstick and mascara.[153]  Dr. Kaufman was required to formalize her recommendations for these items in a letter to Dr. Appelbaum in 2005 because, "the inmates were having a very difficult time receiving [access to those canteen and clothing items]."  A formal letter was necessary to allow Ms. Soneeya to gain access to her recommended treatment because, "the DOC didn't want to produce them."[154]  Between 2005 and late 2009, the DOC denied repeated requests for access to female clothing and canteen items both from Ms. Soneeya and from UMass, the DOC's contractual medical provider, on Ms. Soneeya's behalf.[155]  The DOC's stated reason for not providing these items in a timely fashion is that these recommendations were not on the proper type of medical treatment request form.[156]  This form was purportedly required to initiate a security review of the requested treatment, but it is not clear from any of the evidence that there was ever a standardized process for either medical or security review of treatment recommendations for GID inmates prior to the implementation of the 2010 GID policy.[157]

The DOC has provided Ms. Soneeya with psychotherapy on an ongoing basis since her initial diagnosis in 1990.[158]  This therapy has, however, almost exclusively been with providers

---

[153]Pl. Ex. 23 (Letter from Dr. Kaufman to Dr. Appelbaum).

[154]Trial Tr. I-72:15-22 (Testimony of Dr. Randi Kaufman).

[155]See Trial Tr. I at 70:4-10; Pl. Ex. 23 (Letter from Dr. Kaufman to Dr. Applebaum); Joint Ex. 4 (Dep. of Terre Marshall) at 114:2-118:22.

[156]See Joint Ex. 4 (Dep. of Terre Marshall) at 109:7-13, 114:2-125:25. Trial Tr. II-161:23-162:3, 165:17-167:2 (Testimony of Lawrence Weiner).

[157]See Joint Ex. 4 (Dep. of Terre Marshall) at 37:9-41:22, 109:7-13, 114:2-125:25.

[158]See Def. Ex. A (Plaintiff's Medical Records).

who have little or no experience or expertise in the treatment of patients with GID.[159]   Although

the DOC's  first mental health care contractor, UMass, hired the Fenway Clinic, a group with

expertise in the treatment of GID, to assess Ms. Soneeya and others within DOC custody

suffering from gender dysphoria, the treatment recommendations from outside experts were often

delayed or not implemented at all.[160]   In 2007, after years of disagreements with UMass over the

treatment of GID prisoners and the implementation of the Fenway Clinic's recommendations, the

DOC hired a new contractor, MHM, to provide mental health care to the inmates in DOC

custody.[161]   The DOC switched mental health providers in part because it disagreed with UMass

and the Fenway Clinic's treatment recommendations for inmates with GID.[162]   After the switch

from UMass to MHM, inmates suffering from GID were reevaluated by MHM's GID expert, Dr.

Stephen Levine.

        It was understood by Ms. Soneeya's diagnosing, treating, and reviewing clinicians that sex

reassignment surgery would not be permitted while she was in prison.[163]   In 2010, the DOC

formalized this approach by adopting its GID Treatment Policy, which contains a blanket

prohibition on laser hair removal, cosmetic surgery, and sex reassignment surgery as treatments

---

[159]See supra note 57.

[160]See Joint Ex. 4 (Dep. of Terre Marshall) at 114:2-125:25; see also discussion of
Plaintiff's medical history supra section II A.

[161]See Trial Tr. II-142:18-22, 143:13-25 (Testimony of Dr. Diener).

[162]See id.

[163]See Trial Tr. II 101:2-11 (Testimony of Dr. Andrade); Joint Ex. 4 (Dep. of Terre
Marshall) at 85:12-17; Joint Ex. 5 (Dep. of William Micucci) at 119:24-120:4; Trial Tr. III at
57:20-58:1 (Testimony of Dr. Levine).

for GID inmates.[164]  Because of this blanket policy, Ms. Soneeya has never been evaluated by

MHM or the DOC for sex reassignment surgery or further feminization.  Indeed, her most recent

interview with Dr. Levine was solely for the purpose of this litigation.[165]

The 2010 GID policy establishes pathways for medical and security review of treatment

recommendations for inmates with GID.  While the implementation of some procedure for dealing

with treatment recommendations for patients with GID is undoubtedly an improvement, the policy

is flawed in that it creates blanket prohibitions on some types of treatment that professional and

community standards indicate may sometimes be necessary for the adequate treatment of GID.[166]

This blanket ban on certain types of treatment, without consideration of the medical requirements

of individual inmates, is exactly the type of policy that was found to violate Eighth Amendment

standards in other cases both in this district and in other circuits.[167]

Here, as in the Kosilek case, the DOC has approached Ms. Soneeya's needs as a legal,

rather than a medical, problem, and have failed to offer her the type of individualized medical

_____

[164]Pl. Ex. 50 (DOC 2010 GID Policy) at 652.03(D)(6).

[165]Trial Tr. II at 89:10-92:25 (Testimony of Dr. Andrade).

[166]See Pl. Ex. 50 (DOC 2010 GID Policy) at 652.03(D)(6); Trial Tr. I at 55:6-64:22
(Testimony of Dr. Kaufman), Pl. Ex. 53 (SOC v7) at 54-55; Kosilek 221 F. Supp. 2d at 186
(noting that Plaintiff was precluded from receiving treatments commensurate "with modern
medical science that prudent professionals in the United States prescribe as medically necessary
for some . . . individuals suffering from gender identity disorders.").

[167]See Kosilek, 221 F. Supp. 2d at 193 (requiring individual assessment of inmate's
medical needs rather than application of blanket "freeze-frame" approach to GID treatment);
De'Lonta, 330 F.3d at 635 (overturning dismissal of prisoner's Eighth Amendment suit where she
alleged inadequate treatment under a blanket policy that prohibited hormone therapy for GID);
Field, 653 F.3d at 558-59 (upholding the District Court's invalidation of Wisconsin statute that
created a blanket ban on hormone therapy and sex reassignment surgery for inmates with GID).

assessment that the law requires.[168]  In <u>Kosilek</u>, the court emphasized that while federal courts should defer to the considered judgment of prison officials regarding inmate care and safety, there is no such considered judgment where an inmate has not received an individualized medical evaluation.[169]  In that litigation, the court found that the plaintiff inmate was not receiving adequate treatment for her GID where she had not been evaluated for hormone therapy, sex reassignment surgery, or other treatments for her condition.[170]  The DOC has pointed to Ms. Soneeya's progress in achieving stability in prison, and her lack of current problems with instability, anxiety, and depression as evidence that her GID is being adequately treated.[171]  While it is clear that Ms. Soneeya has made progress, and that she appreciates the help she has received from her clinicians at the DOC, it is unclear whether Ms. Soneeya's treatment has succeeded in mitigating her severe gender dysphoria and removed the risk of serious future harm.  While the DOC has offered to treat any depression or anxiety that might occur as a result of the denial of SRS, treating the symptoms is not a substitute for treating Ms. Soneeya's underlying condition. The DOC cannot, therefore, claim that Ms. Soneeya is receiving adequate treatment for her serious medical needs because it has not performed an individual medical evaluation aimed solely at determining the appropriate treatment for her GID under community standards of care.

---

[168]<u>See</u>, <u>e.g.</u>, Trial Tr. II at 87:2-92:25 (Testimony of Dr. Andrade) (Levine and Kaufman reports were prepared for litigation purposes and didn't guide treatment decisions for Ms. Soneeya).

[169]<u>Kosilek,</u> 221 F. Supp. 2d at 186.

[170]<u>Id.</u> at 188.

[171]<u>See</u> Def. Prop. Find. Facts [#122] at 23-24 ("Merleen Mills testified that during the time she worked with Soneeya, she saw Soneeya become calmer, less anxious and generally well-adjusted." (Joint Ex. 6 (Dep. of Merleen Mills) at 26:6-20)).

3.    Deliberate Indifference

In Battista v. Clarke, the First Circuit held that 'deliberate indifference' may be found even

in the absence of "any established sinister motive or 'purpose' to do harm."  Rather, a pattern of

"delays, poor explanations, missteps, changes in position and rigidities," may be used to infer

deliberate indifference on the part of the Department of Corrections.[172]  In this case, as discussed

above, the DOC has been anything but responsive to Ms. Soneeya's needs or the

recommendations of her medical providers.  Ms. Soneeya waited nine years after her initial

diagnosis to receive a treatment plan that applied community standards of care.  She waited

another four years to receive an evaluation by an expert in gender identity disorders.  She has yet

to be evaluated by an expert within the DOC for further feminization or sex reassignment surgery.

Ms. Soneeya has been forced to wait months, and sometimes years for the implementation of

basic recommendations, such as access to female undergarments and makeup. This pattern of

denials and delay occurred without any formal structure in place for reviewing treatment

recommendations, or security concerns.

Here, as in the Battista case, DOC representatives responded to recommendations of their

own medical advisers regarding treatment for GID inmates by going "back and forth apparently

looking for an out."[173]  When dissatisfied with UMass and the Fenway Clinic's recommendations,

the DOC hired a new mental health services provider.  The DOC also denied Ms. Soneeya's

requests for a bra and canteen items, that were prescribed as medically necessary, for "security

reasons" without saying what those reasons were or making any sort of individualized security

---

[172]Battista 645 F.3d at 455.

[173]See id., 645 F.3d at 454-455.

inquiry into the specifics of Ms. Soneeya's situation.

While courts should defer to the considered judgment of prison administrators in the "adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security,"[174] no deference is required where it is apparent that a considered judgment has not been made.  The DOC's 2010 GID policy removes the decision of whether sex reassignment surgery is medically indicated for any individual inmate from the considered judgment of that inmate's medical providers.  It does so without engaging in an individualized review of security concerns.  In Field v. Smith, the Seventh Circuit found that a Wisconsin statute that banned hormone therapy and sex reassignment surgery for inmates was unconstitutional where that statute "remove[d] even the consideration of hormones or surgery for inmates with gender issues."[175]  The district court in that case emphasized that deliberate indifference may be found where a prison official "consciously chooses to disregard a nurse's or doctor's directions in the face of medical risks," and that by removing decisions regarding what treatment is medically necessary from the discretion of an inmate's medical providers, the statute was facially invalid.[176]

Here, as in Battista, Plaintiff is seeking only injunctive relief, and therefore, "the separate roles of individual defendants [need not] be sorted out."[177]   It is clear, however, that the 2010 GID policy rests final treatment decisions as to all GID inmates within the discretion of the

---

[174]Whitley v. Albers, 745 U.S. 312, 321-22 (1986) (quoting Bell v. Wolfish, 441 U.S. at 547).

[175]Fields, 653 F.2d at 558 (quoting Fields 712 F. Supp. 2d at 865-67).

[176]Fields, 712 F. Supp. 2d at 866-67 (affirmed by Fields1, 653 F.2d 550 (7th Cir. 2011)).

[177]Battista, 645 F.3d at 452.

Commissioner.[178]  Unlike the DOC's policies with respect to other medical conditions, treatment recommendations for GID inmates are subject to review by a security committee, and the Commissioner has the last word as to whether a form of therapy will be made available to an inmate.[179]  Here, as in the Kosilek case, because the GID policy prohibits certain treatments, decisions concerning Plaintiff's medical care were, "as a practical matter, made by [Spencer], rather than by the medical professionals employed by the DOC."[180]

In Kosilek, the court reasoned that its decision put the Department of Corrections, "on notice that [Plaintiff's] severe gender identity disorder constitutes a serious medical need,"  and emphasized that, "decisions as to whether psychotherapy, hormones and/or sex reassignment surgery are necessary to treat [Plaintiff] adequately must be based on an 'individualized medical evaluation' rather than as a result of a blanket rule."[181] Failure to offer such an individualized assessment in the face of Plaintiff's serious medical needs constitutes is sufficient to allow the court to conclude that there is deliberate indifference in this case.

Commissioner Spencer and the DOC are indisputably aware of Ms. Soneeya's serious medical need.  In light of the Kosilek case and others like it in this district, including Ms. Soneeya's own prior litigation, it is clear that Commissioner Spencer and the DOC were aware that GID may constitute a serious illness that requires treatment.  Since Ms. Soneeya's initial diagnosis she has consistently sought, and her providers have consistently recommended further

---

[178]Pl. Ex. 50 (DOC 2010 GID Policy) at 652.06(A)(4).

[179]See Joint Ex. 4 (Dep. of Terre Marshall) at 39:2-41:16; Pl. Ex. 50 (DOC 2010 GID Policy) at 652.06(A)(4).

[180]Kosilek, 221 F. Supp. 2d at 186.

[181]Id. at 193.

feminization.  It is also evident from her requests for sex reassignment surgery and more

psychotherapy that Ms. Soneeya's severe gender dysphoria persists, in spite of the treatment she

has already received.  Nonetheless, the DOC has declined to engage in an individualized inquiry

into Ms. Soneeya's medical needs, and instead has relied on blanket prohibitions and amorphous

security concerns that do not reflect the considered opinions of individuals within the DOC who

regularly interact with Ms. Soneeya in either medical or security capacities.  The DOC and

Commissioner Spencer are thus aware of Ms. Soneeya's serious medical need, and yet have

chosen to deliberately disregard that need by failing to undertake a good faith evaluation of her

medical care, or the security implications of the various treatment options.[182]

### 4.  Likely to Continue

The record before the court indicates that the DOC's pattern of obstruction and delay is

likely to continue in the future.  It was not until 2010 that the DOC implemented the GID policy

in this case.  The GID policy itself does not allow for consideration of sex reassignment surgery,

laser hair removal, or other plastic surgery to treat GID inmates.  The policy on its face has no

exceptions for cases where those procedures may be found to be medically necessary, and it was

the testimony from the DOC's own contract-employees that they believe the Policy to prohibit

some forms of treatment.[183]  At trial, the DOC's GID expert testified that he does not believe that

the real life experience is possible in the prison environment, and that, therefore, sex reassignment

---

[182]See, e.g., Trial Tr. IV at 25:10-27:8 (Testimony of Duane MacEachern) (indicating that approval of certain canteen items for Ms. Soneeya had been denied by Commissioner for "security reasons" without further explanation); Trial Tr. IV at 50:9-51:1 (indicating that a person who had previously been male might be able escape over the fence that surrounds MCI Framingham, without consideration of Ms. Soneeya's individual physical abilities).

[183]Trial Tr. II at 57:20-58:7 (Testimony of Dr. Levine); Trial Tr. II at 101:6-101:16 (Testimony of Dr. Andrade); Trial Tr. II at 134:5-21 (Testimony of Dr. Diener).

surgery, may never be medically necessary for an inmate.[184]  This is contrary to the vast weight of the literature in the field, and the provisions of the Standards of Care.

At this time, it cannot be said that sex reassignment surgery is indisputably medically necessary, or that the provision of sex reassignment surgery to Ms. Soneeya would not cause insurmountable security concerns.  There has been ample testimony to support both the contention that sex reassignment surgery is necessary for Ms. Soneeya's GID, and that she has not made sufficient progress in her psychotherapy to be ready to take that dramatic and irreversible step.  The testimony in this case, and the evaluation by the DOC's GID expert were prepared in the course of litigation, and were, therefore,  not designed to advance or facilitate Ms. Soneeya's treatment.  Similarly, although none of the experts currently recommend laser hair removal for Ms. Soneeya, it may become necessary at some point in the future in light of other developments in her care.[185]  It should thus be available for consideration in Ms. Soneeya's case as it is for patients in the community. It is clear that with the current GID policy in place, and given the DOC's long history of obstruction and delay, it is likely that the DOC will persist in not providing Ms. Soneeya with an individualized evaluation by a qualified medical professional as to her readiness for sex reassignment surgery, and the security implications thereof.

Because the DOC has shown deliberate indifference to Ms. Soneeya's serious medical need through its pattern of delay, and failure to provide her with individualized treatment, and because such treatment is likely to continue in the future under the DOC's new GID policy, it is clear that injunctive relief is appropriate in this case.  Under the Prison Litigation Reform Act,

---

[184]Trial Tr. III at 24:13-26:25 (Testimony of Dr. Levine).

[185]See Pl. Ex. 47 (2010 Kaufman Report) at 5.

prospective relief must be narrowly tailored, and must "extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."[186]  The Act goes on to state that "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."[187]

In light of these considerations, and consistent with the analysis above, this court finds that the DOC's GID policy is facially invalid insofar as it determines, without exception, that certain accepted treatments for GID are never medically necessary for inmates in GID custody.  In Ms. Soneeya's case, the DOC must conduct an individualized assessment of her readiness for sex reassignment surgery, applying community standards for acceptable care of patients with GID. This must be followed by a good faith security review, which takes into account Ms. Soneeya's individual history of incarceration and present circumstances.

C.      State Law Claims

Ms. Soneeya also alleges that her rights under Article 114 of the Amendments to the Massachusetts Constitution have been violated because the DOC has discriminated against her because of a disability.  Absent an explicit waiver, Eleventh Amendment immunity precludes private litigation against states and state agencies in federal court.[188]  Massachusetts law states

---

[186]18 U.S.C. § 3626(a)(1)(A).

[187]Id.

[188]Penhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984); Bd. of Trs. of the Univ. of Alabama v. Garrett, 531 U.S. 356, 364 (2001); City of Boerne v. Flores, 521 U.S. 507 (1997); Cory v. White, 457 U.S. 85, 90 (1982).

that actions to enforce rights protected by Article 114 of the Amendments to the Massachusetts Constitution must be brought in State superior court.[189]  It is well established that "[a] state's consent to be sued in its state courts is not sufficient to constitute a waiver of its Eleventh Amendment immunity."[190]  Because the Commonwealth has not waived its Eleventh Amendment immunity for actions seeking to enforce rights secured by Article 114 in Federal Court, this court does not have jurisdiction to hear Ms. Soneeya's state law claims.

## IV.  Conclusion

For the foregoing reasons, this court finds that Commissioner Spencer and the Department of Corrections have violated Ms. Soneeya's rights under the Eighth Amendment because of their deliberate indifference to her serious medical needs.  Accordingly, judgment is entered for Plaintiff on Counts I and II of her Second Amended Complaint.  The DOC must provide Ms. Soneeya with treatment for her GID in accordance with community standards for adequate care, including but not limited to an individualized assessment of her hormone regimen, psychotherapy needs, and readiness for sex reassignment surgery by a medical provider with expertise in treating patients with GID.  The DOC must also conduct a good faith security review of any treatment recommendations that relies on articulable reasons for approving or denying treatment given the specific context of Ms. Soneeya's incarceration.  It cannot be said, however, that an order for sex reassignment surgery is undoubtedly medically necessary for Ms. Soneeya at this time given the broad disagreement between her various medical providers.  As stated above, this court does not

---

[189]Mass. Gen. Laws c. 93, § 103; Shedlock v. Dept. of Correction, 442 Mass. 852-53 n.6 (2004).

[190]Erwin Chemerinsky, Federal Jurisdiction 440 (4th ed. 2003); See, e.g., Florida Dept. of Health & Rehabilitative Servs. v. Florida Nursing Home Assn., 450 U.S. 147, 149-150 (1981).

have jurisdiction over Ms. Soneeya's state law claims, and thus declines to address Ms. Soneeya's

allegations in Count III of the Second Amended Complaint.

AN ORDER HAS BEEN ISSUED.


_____/s/ Joseph L. Tauro_____
United States District Judge