```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3
     KATHEENA NEVIA SONEEYA, f/k/a     )
 4   KENNETH HUNT,                     )
                                       )
 5                  Plaintiff,         )
                                       )
 6   vs.                               )
                                       ) No. 1:07-cv-12325-DPW
 7   THOMAS A. TURCO III, in his       )
     official capacity as              )
 8   Commissioner of the               )
     Massachusetts Department of       )
 9   Correction,                       )
                                       )
10                  Defendant.         )
                                       )
11

12
        BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK
13
                            **REDACTED**
14
                   STATUS AND SCHEDULING CONFERENCE
15

16

17
             John Joseph Moakley United States Courthouse
18                          Courtroom No. 1
                           One Courthouse Way
19                          Boston, MA 02210
                       Wednesday, November 7, 2018
20                              10:34 a.m.

21

22
                      Brenda K. Hancock, RMR, CRR
23                       Official Court Reporter
             John Joseph Moakley United States Courthouse
24                         One Courthouse Way
                            Boston, MA 02210
25                           (617)439-3214
```

```
 1
 2    APPEARANCES:

 3         ROPES & GRAY LLP - MA
           By: Kaitlin A. Bergin, Esq.
 4             Nicole G. White, Esq.
           Prudential Tower
 5         800 Boylston St.
           Boston, MA 02199-3600
 6         On behalf of the Plaintiff.

 7         COMMONWEALTH OF MASSACHUSETTS - DEPARTMENT OF CORRECTION
           By: Jennifer M. Staples, Esq.
 8             Samuel M. Miller, Esq.
           70 Franklin Street
 9         Suite 600
           Boston, MA 02110
10         On behalf of the defendant.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  All rise.
 3       (The Honorable Court entered the courtroom at 10:34 a.m.)
 4            THE CLERK:  This Honorable Court is now in session.
 5       Please be seated.  Civil Action Number 07-12325, Soneeya v.
 6       Bender, et al.
 7            THE COURT:  Well, I wanted to get you in to be sure
 8       that I have got this in place, the evidentiary hearing, but I
 9       was also struck by a reference to the transfer to Framingham of
10       an anatomical male, male-to-female gender dysphoric inmate.
11       Maybe somebody can explain a little bit more who that is, what
12       the circumstances were, because that struck me as somewhat
13       unusual.
14            MS. STAPLES:  Sure, your Honor.  I can certainly fill
15       you in on that.  Jennifer Staples for the Department of
16       Correction defendants.  The Department actually has several
17       gender-dysphoric inmates, many of them, or several of them, the
18       males to females, have been asking for surgery and a transfer
19       to Framingham.  There is the new crime bill that's come into
20       place that's going to be in effect at the end of the year that
21       requires inmates be housed in the facility of the gender that
22       they identify with, barring severe security concerns; and the
23       Department also, as the Court knows, must look at each case on
24       a case-by-case basis.  The inmate that has been transferred is
25       actually an open case in this court known as Jane Doe, but,
```

```
 1    given the Protective Order, her name is XXXXXXXXXXXXXX.
 2            THE COURT:  Which judge has that, do you know?
 3            MS. STAPLES:  Stearns, I believe, Judge Stearns.  And
 4    she actually filed a case in this court concerning an ADA
 5    violation originally.  She did go through -- the Gender
 6    Committee did do an evaluation of her.  They made a
 7    determination that she should be transferred to Framingham
 8    based on her symptoms.
 9            Just to give you some background, she's not seeking
10    surgery.  She's only seeking placement in Framingham.  She was
11    sentenced only to three to four years for drug offenses.  She
12    is scheduled to be released in August of 2019.
13            THE COURT:  Did she receive hormone therapy?
14            MS. STAPLES:  She is receiving hormone therapy, came
15    in on hormone therapy, and my memory is she's been on hormone
16    therapy for almost 30 years.  She has had a long history of
17    identifying as female that has been documented.
18            THE COURT:  Preexisting her incarceration?
19            MS. STAPLES:  Exactly.
20            THE COURT:  And the crime for which she is committed?
21            MS. STAPLES:  Is a drug offense, two drug offenses,
22    possession of Class A, I believe, with intent to distribute.
23    She was given three to four years concurrent for both.
24            THE COURT:  All right.
25            MS. STAPLES:  She actually, the Department -- so, it
```

1   was recommended that she be transferred to Framingham based on
2   the Gender Treatment Committee.  We did a security review that
3   we are required to do under our policy, similar to what we did
4   with Ms. Soneeya, and the Gender Committee -- I mean, the
5   security review meeting happened, various people weighed in,
6   and the decision was made by both the Deputy Commissioners that
7   she is a candidate for this transfer.  The Commissioner
8   reviewed that and agreed, and she was transferred, I believe,
9   September 25th, I think it was.  I'm sorry.  I don't have the
10  details of that.
11              THE COURT:  No, no.  This is not meant to be a pop
12  quiz.
13              MS. STAPLES:  That's okay.
14              THE COURT:  I saw this and it was in the back of my
15  mind.
16              MS. STAPLES:  Sure.
17              THE COURT:  That was somewhat unusual from past
18  experiences.
19              MS. STAPLES:  Right.  So, she was transferred
20  September 25th.  The case remains open still.  The parties have
21  agreed to sort of -- we are doing 30 to 60 increment days with
22  Judge Stearns to see how things are going.  I can report right
23  now she seems to be doing quite well, we have had no issues, no
24  problems.  She continues to get treatment.  There's been
25  some -- a lot of the treatment for GD inmates have been

1   centered in Norfolk, because that's where we can transfer them
2   or they are housed, so it took some hurdles to move everything
3   and get it to Framingham and figure out the best way to get the
4   treatment done.  But, other than that, things have been going
5   fine.
6            THE COURT:  Well, thank you for that.  That is more
7   information than I expected I was going to get.  I just saw
8   that and kind of said what is that, who is that, that kind of
9   thing.  So, thank you.
10           So, back to this question of timing here.  You have
11  asked for a live hearing the week of February 11th, which I
12  think poses some difficulties for me, and I want to be sure I
13  have got a date reasonably close to that.
14           (The Court conferred with the Clerk off the record)
15           THE COURT:  One of the most daunting things I do is
16  try to schedule.  Let's see if I can get that -- it appears
17  that from about the middle of February until the end I am going
18  to be out of state, so I would like to get to this shortly
19  thereafter, if I can, which means the beginning of March, if
20  those are problems for any of you.  And how long of a time
21  period do you think this evidentiary hearing is going to be,
22  given the outline of what you have?
23           MS. WHITE:  Good morning, your Honor.  Nicole White
24  for plaintiff.  We are fine in March, and we had anticipated
25  two days, probably not two full days.

1           THE COURT:  Not two full days?  Your days are full
2  days or -- when you say "two" --
3           MS. WHITE:  Not.
4           THE COURT:  So, if I set this for March 4, does that
5  work?
6           MS. STAPLES:  That's fine for us, your Honor.
7           MS. WHITE:  That's fine, your Honor.  Thank you.
8           THE COURT:  Okay.  And what I might do -- are these
9  people that you have out-of-state people?  Dr. Ettner?
10          MS. WHITE:  Yes, both of ours are out of state.
11          THE COURT:  So, let me see if I can --
12          MS. STAPLES:  Also, your Honor, Dr. Levine is out of
13  state as well, but I know he anticipates testifying, so I will
14  just double check that date with him.
15          THE COURT:  Right.  What I am going to do is block
16  those two dates, a full day, so if you have got somebody from
17  out of state, that we will get to them and not tie up their
18  travel when they travel.  So, we will block out those two days
19  for it.
20          The time period for the submissions seem to me to be
21  fine and will give me enough time to understand what the
22  parties are about.
23          One of the things that I do, generally, in non-jury
24  matters is take the direct testimony by affidavit, and then
25  cross-examination can happen thereafter, and I am not sure that

1    there is any reason I shouldn't do it that way here.  I tend to
2    find direct examination in non-jury matters to be -- I will not
3    call it "tedious," nothing is tedious that happens in the
4    courtroom -- but it is less than thrilling, and I can get
5    prepared early on by reading the affidavits.
6              Now, let me raise something else.  I have from time to
7    time, particularly in non-jury cases, used a method of
8    simultaneous presentation of experts.  It is sometimes referred
9    to as "hot-tubbing."  That is to say the two experts, Dr.
10   Levine and Dr. Ettner, would sit next to each other in the jury
11   box, and they can talk to each other.
12             Now, here is how I think about it, and I will also
13   have Ms. Beatty send you a *Law Review* article that discusses
14   this methodology, which is not uncommon in Australia, which is
15   where I picked it up from a friend there, and I've used it
16   well, I think, in certain circumstances.  The certain
17   circumstances are these:  If you have got two experts who have
18   respect for each other, who are not showboats, who don't think
19   that this is the opportunity to become junior prosecutors and
20   are willing to engage in a discussion that is, from my
21   perspective, like what I would anticipate takes place in
22   peer-review, the editorial boards of peer reviews, that is,
23   talking through what are the strong points, what are the weak
24   points and that kind of thing, it is very helpful to me to get
25   a better understanding of expertise.  Lawyers hate it, of

1  course, because they are not controlling it, and sometimes I
2  have done it or get a co-conspirator to do it as a surprise to
3  avoid the undue preparation of the experts.  The surprise was
4  most recently in a redistricting case where I was sitting on a
5  three-judge panel, and we all sit and want to hear them talk
6  after lunch, and you, lawyers, can't talk to them during lunch,
7  but they were two people who liked each other, that actually
8  had dinner with each other from time to time, they just had
9  different views in the case.  So, it was helpful to us to hear
10 it that way.
11         Now, if there are some concerns about that, of course,
12 I would like to hear it.  If the parties have some concerns
13 about whether or not it would be a productive activity because
14 of personality characteristics of experts, maybe you want to
15 think about that, too.  It has gone bad when it becomes a
16 reality TV show, which it has from time to time.  But my view
17 is that, once the people are qualified as experts, I would like
18 to hear how they play it out between themselves, talking to
19 each other, asking questions of each other, or however they do
20 it.
21         So, what I propose to do is I will give a copy of
22 the -- find a copy of an article that outlines this process
23 pretty extensively, and you can look at it and you can get back
24 to Ms. Beatty just whether or not there would be an objection
25 to that.

1          Now, what it would mean, I think, is this:  that we
2     would have the plaintiff's expert testify in the ordinary
3     course, but that probably means direct examination by
4     affidavit; so, it is cross and then redirect and recross.  Then
5     the defendant's expert would do the same.  Then I would turn to
6     them and say, "Now I want to hear the two of you," because I
7     assume these experts are going to be present for that two-day
8     period, "I want to hear the two of you talk to these issues and
9     have four or five questions that you would ask each other,"
10    that tease out differences and matters of importance to them,
11    and we would go from there.  And I would end up asking them
12    questions as well.  You would not be examining them
13    immediately, but after they ask each other questions and I ask
14    questions, then I will invite further questions from you.  But
15    I have to say that, particularly in an expert-heavy kind of
16    case, it frequently works out well with experts who, as I say,
17    have respect for each other but, nevertheless, different
18    opinions and are able to tease that out.  So, I throw that out.
19         So, what I have is that you are filing pre-hearing
20    briefing on January 11th.  I would like to have the expert
21    affidavits of direct testimony then.
22         MS. STAPLES:  Okay.
23         THE COURT:  Then there is a pre-hearing briefing
24    process for January 28th.  If you have objections to the
25    affidavits or aspects of the affidavits, I would like them to

```
 1   be identified at that point.  I don't mean to direct your
 2   activities, except to say I have been around a while, and so
 3   nicks and cuts of evidentiary objection are not likely to be a
 4   productive use of your time, but if it's something fundamental
 5   I will think about it.  I don't think that these are
 6   circumstances in which there will be Daubert challenges there,
 7   but that is the time to do that, to raise that.
 8              I tend to think that I have had some experience in
 9   these kinds of cases and this kind of process generally, and I
10   can handle it in the courtroom itself.  So, this is a kind of
11   issue spotting in the affidavits to identify problems that are
12   remedial.  If there is an opportunity to remedy it, I will let
13   somebody remedy it, if they didn't cite the right page or they
14   made a hearsay reflection.  If they can remedy it, I will let
15   them.  The short of it is I am fairly hospitable to direct
16   examination, and then it gets teed up for cross and stirred up
17   in a hot tub.  Okay?
18              Anything else we need to talk about here at this
19   point?  Does that give you the schedule that you need?
20         MS. STAPLES:  Mm-hmm.
21         MS. WHITE:  Yes, your Honor.
22         THE COURT:  Okay.  Good.  Thank you very much.
23         MS. STAPLES:  Thank you, your Honor.
24         MS. WHITE:  Thank you, your Honor.
25    (WHEREUPON, the proceedings adjourned at 10:58 a.m.)
```

C E R T I F I C A T E

I, Brenda K. Hancock, RMR, CRR and Official Court Reporter of the United States District Court, do hereby certify that the foregoing transcript constitutes, to the best of my skill and ability, a true and accurate transcription of my stenotype notes taken in the matter of *Soneeya v. Bender, et al.*, No. 1:07-cv-12325-DPW.

Date:   11/14/18                    /s/ *Brenda K. Hancock*
                                    Brenda K. Hancock, RMR, CRR
                                    Official Court Reporter