# EXHIBIT A

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

KATHLEENA NEVIA SONEEYA,
f/k/a Kenneth Hunt,

v.

CIVIL ACTION NO.
07-CV-12325

THOMAS A. TURCO, III, in his official
capacity as Commissioner of the
Massachusetts Department of Correction.

### DR. STEPHEN LEVINE'S RESPONSE TO PLAINTIFF'S
### FIRST REQUEST FOR THE PRODUCTION OF DOCUMENTS

Dr. Stephen Levine responds to Plaintiff Katheena Nevia Soneeya ("Plaintiff") Requests

for Production of Documents ("Requests") as follows:

### REQUEST NO. 1

All Documents and Communications, including without limitation Communications with

the DOC concerning or relating to the evaluation of Ms. Soneeya conducted by Dr. Randi

Ettner on March 22, 2016 and Dr. Ettner's subsequent report and recommendation

regarding Ms. Soneeya's treatment plan dated April 4, 2016, including without limitation

Documents and Communications related to the review conducted by You and/or MPCH

in or around April 2016, as referenced in the DOC's status report, dated May 2, 2016

[Dkt. No. 213].

**SPECIFIC OBJECTIONS**

The Defendant objects to this Document Request on the grounds that the request is
ambiguous and over broad, it cannot readily be complied with, and it seeks to impose
obligations to produce information that is equally or more easily available to Plaintiff than
it is to the Defendant.  Defendant also objects to this request on the grounds that it seeks
information that exceeds the permissible scope of discovery set forth in FRCP Rules 26.
Without waiving these objections and subject thereto, the Defendant responds to this
request as follows:

1

**RESPONSE**

Notwithstanding prior objections, please see Exhibit 1.

## REQUEST NO. 2

All Documents and Communications, including without limitation any notes, reports, and any drafts for mark-ups thereof, concerning or relating to Your and/or the GD Treatment Committee's evaluation of Ms. Soneeya conducted on December 5, 2017 (the December evaluation) and the subsequent report and recommendation released on or around January 12, 2018 (the "January Report") among or between Defendants regarding Plaintiff.

**SPECIFIC OBJECTIONS**

The Defendant objects to this Document Request on the grounds that the request is ambiguous and over broad, it cannot readily be complied with, and it seeks to impose obligations to produce information that is equally or more easily available to Plaintiff than it is to the Defendant.  Defendant also objects to this request on the grounds that it seeks information that exceeds the permissible scope of discovery set forth in FRCP Rules 26. Without waiving these objections and subject thereto, the Defendant responds to this request as follows:

**RESPONSE**

Notwithstanding prior objections, please see Exhibit 2.

## REQUEST NO. 3

All Documents relied upon or considered by You/or the GD Treatment Committee in conducting the December 5 Evaluation in drafting/or developing the January 12 Report, including without limitation the recommendation that Ms. Soneeya be transferred to MCI-Framingham for a period of one year.

**SPECIFIC OBJECTIONS**

The Defendant objects to this Document Request on the grounds that the request is ambiguous and over broad, it cannot readily be complied with, and it seeks to impose obligations to produce information that is equally or more easily available to Plaintiff than it is to the Defendant.  Defendant also objects to this request on the grounds that it seeks information that exceeds the permissible scope of discovery set forth in FRCP Rules 26. Without waiving these objections and subject thereto, the Defendant responds to this request as follows:

**RESPONSE**

Notwithstanding prior objections, please see Exhibit 3.

**REQUEST NO. 4**

All Documents and Communications concerning or relating to any meetings or calls held

by the GD Treatment Committee regarding Ms. Soneeya's Medical Care from January 1,

2016 to the present including without limitation any notes relating thereto and all

Communications with any person present at the meetings relating thereto.

**SPECIFIC OBJECTIONS**

The Defendant objects to this Document Request on the grounds that the request is ambiguous and over broad, it cannot readily be complied with, and it seeks to impose obligations to produce information that is equally or more easily available to Plaintiff than it is to the Defendant.  Defendant also objects to this request on the grounds that it seeks information that exceeds the permissible scope of discovery set forth in FRCP Rules 26. Without waiving these objections and subject thereto, the Defendant responds to this request as follows:

**RESPONSE**

Other than the documents provided in Exhibits 1-3, and the GD Treatment Committee Meeting Minutes, Dr. Levine has not located any other documents in his possession related to this request. Dr. Levine will supplement his response should he locate additional documents responsive to this request.

**REQUEST NO. 5**

All Documents and Communications concerning or relating to the security review reports

issued by the DOC on February 14, 2018 and April 24, 2018 (the "Security Reports"),

including without limitation the DOC's denial of Ms. Soneeya's transfer to MCI-

Framingham and the DOC's request to consider treatment alternatives.

**SPECIFIC OBJECTIONS**

The Defendant objects to this Document Request on the grounds that the request is
ambiguous and over broad, it cannot readily be complied with, and it seeks to impose
obligations to produce information that is equally or more easily available to Plaintiff than
it is to the Defendant.  Defendant also objects to this request on the grounds that it seeks
information that exceeds the permissible scope of discovery set forth in FRCP Rules 26.
Without waiving these objections and subject thereto, the Defendant responds to this
request as follows:

**RESPONSE**

Dr. Levine is not in possession of any documents responsive to this request. Dr. Levine
will supplement his response should he locate additional documents responsive to this
request.

**REQUEST NO. 6**

All Documents and Communications, including without limitation any notes, reports, and

any drafts or mark-ups thereof, concerning or relating to the report and recommendation

issued by You and/or the GD Treatment Committee on April 13, 2018 (the "April

Report"), including without limitation any Documents relating to the meeting of the GD

Treatment Committee on March 16, 2018 at which the Security Reports were discussed.

**SPECIFIC OBJECTIONS**

The Defendant objects to this Document Request on the grounds that the request is
ambiguous and over broad, it cannot readily be complied with, and it seeks to impose
obligations to produce information that is equally or more easily available to Plaintiff than
it is to the Defendant.  Defendant also objects to this request on the grounds that it seeks
information that exceeds the permissible scope of discovery set forth in FRCP Rules 26.
Without waiving these objections and subject thereto, the Defendant responds to this
request as follows:

**RESPONSE**

Dr. Levine is not in possession of any documents responsive to this request. Dr. Levine will supplement his response should he locate additional documents responsive to this request.

**REQUEST NO. 7**

All Documents relied upon or considered by You and/or the GD Treatment Committee in

drafting and/or developing the April 13 Report.

**SPECIFIC OBJECTIONS**

The Defendant objects to this Document Request on the grounds that the request is ambiguous and over broad, it cannot readily be complied with, and it seeks to impose obligations to produce information that is equally or more easily available to Plaintiff than it is to the Defendant. Defendant also objects to this request on the grounds that it seeks information that exceeds the permissible scope of discovery set forth in FRCP Rules 26. Without waiving these objections and subject thereto, the Defendant responds to this request as follows:

**RESPONSE**

Other than the documents identified in Exhibits 1-3, and the GD Treatment Committee Minutes from April 13, 2018, Dr. Levine is not in possession of any other documents responsive to this request. Dr. Levine will supplement his response should he locate additional documents responsive to this request.

Respectfully submitted,

Dr. Stephen Levine
By his attorney,

Melissa Garand, BBO# 554727
Koufman & Frederick, LLP
145 Tremont Street 4th Floor
Boston, MA 02111
(617) 423-2212
mg@kflitigators.com

5

## *CERTIFICATE OF SERVICE*

I, Melissa Garand, certify that on this 3rd day of July, 2018, a copy of the above pleading was sent electronically to the registered participants as identified on the Notice of Electronic Filing, with paper copies being sent to those indicated as non-registered participants.

Melissa Garand

# EXHIBIT 3

**MPCH066—MPCH073 intentionally omitted**

I. <u>Intuition</u> is a mysterious process of knowing. It is mysterious because people have knowledge whose origins are obscure to them. They know but don't know how they know. Intuition is an important ingredient to clinical judgment. It is a product of unconscious processes and often results in a viewpoint or a hunch. The viewpoint or the hunch may be wrong. In basic sciences intuition provides the inspiration for the creative design of an experiment. In clinical medicine and psychiatry, intuition is crucial to diagnosis and therapy. It is the result of at least three factors: accumulating experience, hidden and expressed ethical values, and forgotten knowledge whose practical application has become automatic. Because knowledge and values evolve, clinical intuition is not infallible, but it is not to be dismissed as irrelevant or irrational.

II. My clinical intuition strongly suggests that providing SRS for this male prisoner serving a life sentence for the sexually maiming murders of two women is foolish and dangerous. It risks causing harm to the inmate, current and future prisoners, and the institutions responsible for them. My intuition is not a defense of my recommendations. Going from a macro to a more patient focused level, I will review my reasoning. Prisons are public institutions and the decision in this case may set a precedent not only in Massachusetts but throughout US state and federal prisons.

III. <u>Political fallout</u>: This case has large political overtones.

   a. The general public has good reason to create a fuss over giving a prisoner the opportunity to have SRS at government expense. SRS outside of prison is an **elective** procedure generally not funded by private or public insurance in this country. Despite some GID experts who claim medical necessity, our collective medical system does not agree.

      i. Most individuals with GID outside of prison find other ways of coping with their gender dysphoria; only a minority elects SRS.

      ii. Clinical recommendations for managing patients with GID are not based on prison populations. Inmates with GID are an unstudied population.

      iii. Numerous lay groups in society will be outraged at the irony that a person can claim to be a transsexual in prison and end up suing the prison for an operation that is

         1. Frequently surgically problematic. The operation carries with it a 30% rate of additional surgery to deal with vaginal, rectal, urinary, or aesthetic complications.

         2. The only surgery provided for inmates to ameliorate personal distress over a body part. What could justify in these economically challenged times of crushing public deficits spending money to assist a person with his subjective sense of being in the wrong body by creating a vagina?

MPCH074

    iv.  Why create a vagina for a prisoner who lives in an environment where sexual relationships are a punishable crime?

    v.  Why perform this surgery among prisoners when the long-term psychological outcome of the SRS is viewed skeptically by many respected professionals in the field?

b. **This case has an unarticulated minority civil rights agenda.** What is not at issue in this case is:

    i.  The right of a free citizen to express his gender identity any way he desires.

    ii.  Discrimination in vocation, housing, or rights to marry based on orientation or gender identity.

What is at issue is intrusion of sexual minority civil rights agenda with clinical judgment about how to handle inmates who declare a new sexual identity. *Is there a civil right to have SRS?* The DOC has objected that each of the GID evaluations done by Dr. Kaufman and others at the Fenway clinic reached the same conclusion—all patients were diagnosed with GID and recommendations on the basis of that diagnosis were given for biological interventions and social support for furthering their feminine identities and behaviors in prison. In all other psychiatric diagnosis recommendations for patients with the same diagnosis vary considerably from patient to patient. What has been lost in the Fenway recommendations is knowledge of the capacities and incapacities of the inmates, their prison environment, the meaning of their past criminality and diverse manifestations of past and ongoing mental and behavioral symptoms and the coping devices used by prisoners facing life in prison. By simply focusing on eligibility and readiness criteria, Dr. Kaufman leads the reader to believe these are the only considerations and that there is no disagreement possible about the readiness criteria. In this way, the idea is subtly advanced any person who has GID has a right to SRS if certain SOC criteria are met. Dr. Kaufman offers no skepticism, hesitance, or awareness of possible adversities. Dr. Kaufman's report can be read as Soneeya (and others) has a right to any treatment that the inmate desires in order to align body and gender identity. I suspect that this case has been chosen to try to establish a precedent that governments and ultimately health insurance carriers should pay for SRS throughout the land.

IV. **The Soneeya case: arguments for SRS.** The hope is that SRS will relieve intense subjective distress over having male genitalia. SRS will further solidify the patient's evolving identity as a woman and create happiness and the sense of beginning life again. Moreover,

a. SRS will prevent Soneeya's suicide.

b. It is only fair because the inmate has been on hormones for years and was led to believe that hormones were the first step towards SRS.

3

    c.  SRS is a recognized treatment for this condition all over the world recommended by numerous experts in GID.

    d.  It is humane and necessary approach to a end subjective suffering

V.  **It is not possible to become a woman in a biological sense:** There is more to masculinity and femininity than breast and genital structure. It is quite possible to present oneself as a woman and to believe in one's feminine essence. However, biology, the social experiences of the post operative transsexuals, or the psychological experiences of interacting with a transgendered person all suggest that we should not confuse politeness in accepting the aspired to status of the person with being a woman. Trans people, particularly those with visibly apparent masculine bodily forms, constitute a type of third sex. They are trans females not females. Many of them do not care; they are happy being themselves—"female."

    a.  Experience with the DOC's GID program has already within 33 months has yielded two examples of prisoners giving up their trans identities. In addition, an inmate who is awaiting a judicial decision about SRS whose androgen levels are zero is now complaining of increasing masculine manifestations of his upper body.

    b.  Experience outside of prison in my GID program supports the policy of caution since suicide, drug addiction, reversion, and serious depression have all been seen after SRS. When a patient tells himself passionately that "I want this, need this, I am really a woman" and he receives SRS, if often turns out to be not what one expected. This is not different than many other human passionate desires for things.

    c.  Dr. Pfafflin who is reported to have done the research in 1990 demonstrating how well post operative patients do, in 2010 cautions readers based on a successful case followed after surgery that the patient realized that he only had the surgery to avoid dealing with his abuse experiences in treatment.

VI.  **GID is a mental illness:** GID is classified as a mental illness throughout the world. Many professionals in the GID community act as though they believe that the disorder is the result of an accident of nature which is best treated by giving the patient everything he wants including multiple plastic surgeries. SRS quickly becomes a civil rights issue and generates the rhetoric that residing in a sick society that cannot tolerate gender nonconformity is the problem rather than an individual's tragic inability to create a stable sense of sexual identity. GID is a sorrowful situation for most people and creates a considerable subjective burden but it typically is not the only problem that the patient has.

    a.  **Most GID has in addition associated mental illnesses.** These include basic disorders of social conduct—character pathologies that include psychopathic features—that got them into prison. Prisoners' anxiety, depression, somatization, and psychosis are often surface manifestations of their underlying personalities. It has been recognized for over 50 years that beyond the surface manifestations of psychopaths is a highly symptomatic person. Assuming that SRS

MPCH076

cures the patients outside of prison of his associated problems is clinically naïve.

VII. **Who is the legitimate decision maker on this matter?**
   i. The security expertise of prison officials.
   ii. The clinical expertise of prison psychiatrists and GID committee who have cared for over a dozen transsexual prisoners in Massachusetts for 33 months.
   iii. The clinical expertise of Dr. Levine who was the head of the committee that wrote the 5th version of the SOC in 1999. Over 90% of the language of the current 6th version is identical to the 5th version.
   iv. A clinician whose every report recommends hormones and or surgery to all prisoners with GID.
   v. A judge in a courtroom.

VIII.     **Soneeya's situation**.
A very disturbed child and adolescent. Abjectly unattached to either parents, both of whom egregiously ignored and abused him, he had an early onset criminal life, did not become literate, spent time in jails and homes for disturbed children, and made several serious suicide attempts. Before prison, he estimated that he had at least 100 sex partners of each sex in promiscuous and commercial activities. He was a heavy user of alcohol and substances of abuse and spent much of his time high on something until arrested for murder. He is an illegal alien who seeks out mental health assistance frequently but is unable to give up his grossly unrealistic ideas or deal with his painful past. Instead, he unrealistically puts his hope on getting SRS, being found innocent of murder or at least living among women prisoners or going home after suicide—from where he fled because he had no home to go to.

IX. **SOC guidelines are not decision trees that guarantee clinical success** in free society. Dr. Kaufman has erred in his evaluation of Soneeya's mental health and readiness for SRS, risk of suicide, and fails to understand the threats to Soneeya's safety as a prisoner.
   a. Dr. Levine also contends that the inmates continuing inability to think realistically should make clinicians extremely hesitant to perform SRS. Individuals who are this developmentally disturbed are not thought to be good candidates for SRS.
   b. This professional disagreement between Drs. Levine and Kaufman rests upon their differing perceptions about what is real, what is illusion, what is hope, what is coping with a life sentence about psychologically?

IX. **Putting the case in a larger medical context**
Feb 15, 2011 NYTimes article, Wariness on Surgery of the Mind discusses the controversies about the FDA approval of psychosurgery for OCD. The arguments are that surgery has not been sufficiently tested, its long term effectiveness and side effects are not known, and that calling it therapy raises peoples hopes well beyond what is scientifically supportable. Dr. Fins, chief of medical ethics at Cornell Hospital, is not against surgery, he is opposed to

MPCH077

misrepresentation of the operation as therapy and thinks clinical trials should be held first before approval, as with medications.  Proponents of this new form of psychosurgery does not want to deprive people of the chance to get free of the terrible grip of OCD who might suicide without it.  Deep brain stimulation was approved as a device.  Other studies have noted that after psychosurgery called a capsulotomy patients long term effects were apathy and poor self control even though they scored lower on symptom severity scale.  Science requires an agnostic attitude—skepticism.  But proponents have strong financial interest in deep brain stimulation.  All agree that the field should set up a registry of all patients who have had surgery for psychiatric problems "Just because it looks good at first and everyone gets excited, doesn't mean its necessarily efficacious or your work is done.  Recall that in the 1950s many people believed in psychosurgery only to have it eventually discredited after many people's lives became even more limited than they used to be when symptomatic.

**[Hormone Therapy and Medical Care for Incarcerated Persons.** Persons who are receiving treatment for gender identity disorders should continue to receive appropriate treatment following these Standards of Care after incarceration. For example, those who are receiving psychotherapy and/or cross-sex hormonal treatments should be allowed to continue this medically necessary treatment to prevent or limit emotional lability, undesired regression of hormonally-induced physical effects and the sense of desperation that may lead to depression, anxiety and suicidality. Prisoners who are subject to rapid withdrawal of cross-sex hormones are particularly at risk for psychiatric symptoms and self-injurious behaviors. Medical monitoring of hormonal treatment as described in these Standards should also be provided. Housing for transgendered prisoners should take into account their transition status and their personal safety.]

1.  jurists are being asked to make decisions on matters that the vast majority of mental health professionals avoid because of their intuitive negative reactions and their deeper knowledge that treating psychological disturbances with irreversible surgical interventions is a poor idea.
2.  Look at psychiatry's disgracefully failed experience with psychosurgery for diverse mental problems in the 1950s.
3.  Look at the modest results in modern attempts to stimulate the brain for mental disorders that are today's hopes for tomorrow.

ii.  . Justification is also based on his statement that he will suicide without SRS.  Is this the patient's current belief, the evaluator's belief, the patient's manipulative ploy to obtain SRS, the collective clinical experience with suicidal threats among prisoner's or psychiatric patients?  Mental health professionals are well known to be unable to predict most suicides.  Most

suicide evaluations determine whether a patient should be on suicide watch in a prison; they do not speak of the long term possibility of suicide.

MPCH079

**MPCH080—MPCH096 intentionally omitted**