1                  UNITED STATES DISTRICT COURT
2                    DISTRICT OF MASSACHUSETTS

3    _____

4    KATHEENA SONEEYA,

5                 Plaintiff,          Civil Action
                                      No. 07-12325-DPW
6    v.
                                      April 8, 2019
7    THOMAS A. TURCO III, in his official
     capacity as Commissioner of the
8    Massachusetts Department of Correction,  10:23 a.m.

9                 Defendant.
     _____

10

11

12            TRANSCRIPT OF BENCH TRIAL DAY 1

13        BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

14            UNITED STATES DISTRICT COURT

15          JOHN J. MOAKLEY U.S. COURTHOUSE

16               1 COURTHOUSE WAY

17              BOSTON, MA  02210

18

19

20

21            DEBRA M. JOYCE, RMR, CRR, FCRR
22             KELLY MORTELLITE, RMR, CRR
                 Official Court Reporters
23           John J. Moakley U.S. Courthouse
             1 Courthouse Way, Room 5204
24               Boston, MA  02210
                joycedebra@gmail.com
25



1    APPEARANCES:

2    FOR THE PLAINTIFF:

3    Anne F. Hancock
     Sara Bellin
4    Ropes & Gray - MA
     Prudential Tower
5    800 Boylston Street
     Boston, MA 02199-3600
6    617-235-1036

7    FOR THE DEFENDANT:

8    Jennifer M. Staples
     Samuel A. Miller
9    Department of Correction
     70 Franklin Street
10   Suite 600
     Boston, MA 02110
11   617-727-3300

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                  P R O C E E D I N G S

 2            (The following proceedings were held in open

 3    court before the Honorable Douglas P. Woodlock, United States

 4    District Judge, United States District Court, District of

 5    Massachusetts, at the John J. Moakley United States Courthouse,

 6    1 Courthouse Way, Boston, Massachusetts, on April 8, 2019.)

 7            THE CLERK:  All rise.

 8            This honorable Court is now in session.  Please be

 9    seated.

10            Civil action 07-12325, Soneeya v. Turco.

11            THE COURT:  Well, I notice that it's now 10:25, that

12    the plaintiff was presented in the courtroom at 10:20.  The

13    question of the failure of the Department of Corrections to

14    meet its responsibility in presenting that plaintiff here is a

15    matter that I will take up at a later point.  I expect an

16    explanation tomorrow from the Department of Corrections after

17    you've had an opportunity to consult whoever you need to

18    consult with.  But that's today.

19            Tomorrow this better not happen.  I'm not sure why it

20    did.  I've had some preliminary suggestions.  It suggests a

21    lack of coordination, at best, on the part of the Department of

22    Corrections.  Of course this is a case about the way in which

23    the Department of Corrections treats someone, so one would have

24    thought that there would have been greater attention, but

25    apparently not.
</pre>

1          That being the case, we'll take it up.  It may become

2    evidentiary in this case.

3          Now, by way of scheduling and housekeeping, I realize

4    that the two gender dysphoria experts have scheduling issues, I

5    think, that require them not to be here longer than today.  Is

6    that the case or not?

7          MS. HANCOCK:  No, your Honor.  Dr. Ettner is available

8    tomorrow as well if needed.

9          MS. STAPLES:  As is Dr. Levine.

10          THE COURT:  Okay.  So I leave it to the parties to

11    coordinate so that -- and not disrupt the schedules of the two

12    experts, but I was told that we would have maybe 15 minutes of

13    cross-examination of the plaintiff, then something like a half

14    hour for each of the experts.  My hope would be then to take a

15    break and move to the hot tub dimension of it after lunch.

16          Does that schedule work for everyone?

17          MS. HANCOCK:  That sounds about right.  My

18    cross-examination of Dr. Levine might be more like 45 minutes,

19    if time permits, but I can also cut short if --

20          THE COURT:  No, it's critically important to me to

21    understand this case, to learn as much as I can from the

22    experts through examination, through the mechanism that I've

23    outlined.  If this spills over to tomorrow, it spills over to

24    tomorrow.

25          MS. HANCOCK:  Thank you, your Honor.

1          THE COURT:  So, as I understand it, the plaintiff is

2     tendering the testimony of Ms. Soneeya.

3          MS. BELLIN:  Yes, that's right, your Honor.  We are

4     moving to admit as Ms. Soneeya's direct testify her affidavit

5     dated February 28, 2019, which was submitted under seal with

6     this Court on March 11, 2019.

7          THE COURT:  Which is received, and I assume the

8     defendants are going to cross-examine.

9          MS. STAPLES:  That's correct.

10          THE COURT:  One other thing, this is by way of a

11     general apology.  I'm embarrassed to have to disclose it, but

12     it is the case that I have a great deal of trouble with names,

13     just have to explain that.  And I mean no disrespect to anyone

14     when I get names wrong or in this case the chosen gender wrong.

15     My clerks told me that I had improperly referred to the

16     requested gender of the plaintiff here as "he" rather than

17     "she" earlier.  I may do it again.  I hope not, but you'll

18     understand that no disrespect is meant.

19          That similarly goes for the doctors here.  I sometimes

20     refer to someone as "Mr." when they should be referred to "Dr."

21     People have the right to have the names that they -- and

22     genders that they wish to have presented to the Court, and I'll

23     try to observe that.  But I just provide that by preemptive

24     apology, and I will try my very best to avoid what seems to be

25     a tendency on my part.

1          I would only add by way of explanation, perhaps, and

2     Ms. Beatty worked for me before I came on the bench over

3     30 years ago and was my courtroom deputy for about ten years

4     thereafter, and was married during that time period and I used

5     to refer to her even to the point where she moved on to higher

6     responsibilities as Ms. Quartulli, because I couldn't get the

7     married name correct.  She's now come back to work for me, and

8     I periodically refer her as Ms. Quartulli, and that was a long

9     time ago.

10         So by way of general explanation, that's a problem I

11    have with names, and so I'll do my very best.

12         So we'll have the plaintiff take the witness stand.

13         Ms. Soneeya, if you could go over to the witness stand

14    there.

15         MS. BELLIN:  Your Honor, if I may, we would also like

16    to admit Exhibit 7 and 16 through Ms. Soneeya's affidavit.

17         THE COURT:  And I understand there are no objection to

18    these?

19         MS. STAPLES:  No objection, your Honor.

20         THE COURT:  They are received.

21         (Exhibits 7 and 16 received into evidence.)

22         KATHEENA NEVIA SONEEYA, having been duly sworn by the

23    Clerk, was examined and testified as follows:

24         THE WITNESS:  Yes, ma'am.

25         THE CLERK:  Please be seated and state your full name.

1          THE WITNESS:  My full name is Katheena Nevia Soneeya.

2          THE COURT:  Ms. Soneeya, if you could put the

3    microphone in front of your mouth, it's easier to pick up the

4    voice.

5          THE WITNESS:  Yes, sir.

6          THE COURT:  You may inquire.

7          MS. STAPLES:  Your Honor, would you prefer us to stay

8    at the table?

9          THE COURT:  Wherever you're comfortable.  I ordinarily

10   require examination from the podium for a variety of reasons,

11   but if you've got your materials laid out there, that's fine.

12         MS. STAPLES:  I can do this over there, that's fine.

13         (Pause.)

14                     CROSS-EXAMINATION

15   BY MS. STAPLES:

16   Q.   Good morning, Ms. Soneeya.

17   A.   Good morning, ma'am.

18   Q.   I'm Jennifer Staples.  We've met before, haven't we?

19   A.   Yes, ma'am.

20   Q.   I took your deposition a while back?

21   A.   Yes.

22   Q.   How are we doing today?

23   A.   A little nervous.

24   Q.   That's okay.  We're all a little nervous.

25         Ms. Soneeya, can you please tell us, how long have

1  you been imprisoned by the Department of Corrections?

2  A.   I've been in prison since -- 37 years.

3  Q.   And what are the crimes that you being imprisoned for?

4        MS. BELLIN:  Objection, your Honor.

5        THE COURT:  Overruled.

6  A.   First- and second-degree murder.

7  Q.   Okay.  And is one with parole and -- with the possibility

8  of parole and one without the possibility of parole?

9  A.   Yes, ma'am.

10  Q.   And you've been in a number of DOC institutions since

11  you've been in the department's custody; isn't that true?

12  A.   Yes.

13  Q.   But you've been at MCI-Shirley for an extended period of

14  time?

15  A.   Yes, ma'am.

16  Q.   And that's since 1998, correct?

17  A.   Yes, ma'am.

18  Q.   Okay.

19        And where are the places you've been housed at

20  MCI-Shirley?

21  A.   I've been housed in A1, A2, B1, and B2.

22  Q.   Okay.  And, Ms. Soneeya, at some point you actually

23  changed your name while were you in the department's custody;

24  isn't that correct?

25  A.   Yes, ma'am.

1    Q.   Okay.  And tell me, your first name is Katheena?

2    A.   Yes, ma'am.

3    Q.   And where did that name come from?

4    A.   I was searching for a name.  I was under pressure to get

5    one, so I seen Kathleen Dennehy at that time was on TV and I

6    kind of liked the name, so I changed it a little bit to make it

7    my own.

8    Q.   And who was Kathleen Dennehy at the time?

9    A.   She was the commissioner.

10    Q.   Of the Department of Corrections?

11    A.   Yes, ma'am.

12    Q.   Okay.  And you have a middle name, correct?

13    A.   Yes, ma'am.

14    Q.   What is that middle name?

15    A.   Nevia.

16    Q.   Where did that name come from?

17    A.   I was trying to turn heaven backwards, so I came up with

18    that one.

19    Q.   And then Soneeya is considered your last name?

20    A.   Yes, ma'am.

21    Q.   And what does that mean?

22    A.   My mother was named Sonia Hunt, and I wanted to honor her

23    because she had passed away.  Because Sonia is such a common

24    name, I changed that a little bit to the point where when you

25    say it, it still sounds the same.

1  Q.   Okay.  And were you able to legally change your name while

2  were you in the department?

3  A.   Yes, ma'am.

4  Q.   And when did you do that?

5  A.   I think that was in 2007, I think.

6  Q.   Okay.  Now, you've been diagnosed with gender dysphoria;

7  is that correct?

8  A.   Yes, ma'am.

9  Q.   Do you remember when that happened?

10 A.   That's been a while ago.  That was several years, over --

11 close to 20 I think.

12 Q.   Okay.  And did it happen after a certain event that

13 happened at Old Colony?

14 A.   Yes, ma'am.

15 Q.   And what was that event?

16 A.   I tried to cut off my genitals.

17 Q.   Okay.  And you did that around 1990 at Old Colony?

18 A.   Around that time, yes, ma'am.

19 Q.   How long had you been in the department's care when that

20 happened?

21 A.   I had been in since 1980 -- '82.

22 Q.   And it was around that time when this incident happened at

23 Old Colony, that's when you were diagnosed with gender

24 dysphoria?

25 A.   Yes, ma'am.

1  Q.   So you had been living in the department's custody for

2  almost ten years as a male; is that fair to say?

3  A.   The best I could, yes.

4  Q.   Okay.

5       MS. BELLIN:  Objection, your Honor.  I think that

6  Ms. Soneeya may have misunderstood that question.

7       THE COURT:  Well, signalling to her that she might

8  have by counsel is improper.  Just raise the objection.  If I

9  want the answer or some explanation of it, I'll ask for it.

10      MS. BELLIN:  Okay.

11      THE COURT:  It's overruled.

12  BY MS. STAPLES:

13  Q.   Have you ever had an incident like what happened at Old

14  Colony, have you ever had that kind of attempt again?

15  A.   No, ma'am.

16  Q.   Okay.  Do you remember signing an affidavit that was

17  submitted to the Court that was going to be part of your direct

18  testimony?  Do you remember doing that?

19  A.   Which one?

20      MS. STAPLES:  Your Honor, I have a copy.  I don't know

21  if there's a way I could present this affidavit so she could

22  review that.

23      THE COURT:  If there's an extra copy maybe counsel for

24  Ms. Soneeya --

25      MS. BELLIN:  May I approach?

```
 1              THE COURT:  Yes, just put it in front of the
 2     plaintiff.
 3              MS. STAPLES:  Thank you.
 4     BY MS. STAPLES:
 5     Q.   Ms. Soneeya, we're going to have you look at that
 6     affidavit.  You let me know if that looks familiar to you,
 7     okay?
 8     A.   Yes, ma'am.
 9              I need my glasses.
10              THE COURT:  Are you using the trial affidavit here?
11              MS. STAPLES:  Yes.  It's the one that was submitted to
12     the Court, your Honor.
13              THE COURT:  Okay.
14              (Pause.)
15     A.   Yes, ma'am.
16     Q.   Does that look familiar to you?
17     A.   Yes.
18     Q.   And that's an affidavit that you signed with your
19     attorneys that was submitted to your Court as your testimony;
20     is that fair to say?
21     A.   Yes, ma'am.
22     Q.   Did you read that over carefully?  Not today, I'm just
23     saying when you signed.
24     A.   Oh, yes I did.
25     Q.   You have reviewed it.
```

```
 1   A.   Yes, ma'am.

 2   Q.   I'm going to ask you just to look at paragraph 6 on page

 3   2, if you could.  Could you take a look at that for me?

 4        (Pause.)

 5   A.   Yes, ma'am.

 6   Q.   Have you read that paragraph yourself?

 7   A.   Usually I have a reader that helps me.

 8   Q.   Okay.

 9   A.   But I do my best.

10   Q.   Okay.  If I read this to you, see if it makes sense to

11   you.

12        It says, paragraph 6, you say:  "I experience

13   significant distress because my gender identity does not match

14   my body.  I hate that I have even the remnants of male anatomy

15   because knowing that I have a penis reminds me every day that I

16   am not a complete woman."

17   A.   Correct.

18   Q.   Okay.  Is that something you agree with?

19   A.   Yes, ma'am.

20   Q.   Okay.

21        Tell me, how do you deal with that distress on a

22   daily level?

23   A.   Well, it is hard.  I try to hold onto hope, to my dreams

24   that I hope that one day that I can be a complete female.  That

25   keeps me going.  Every day it's a struggle, but I try the best
```

1    that I can.

2    Q.    And how do you do that?  Do you write to people?  Do you

3    do anything that helps you with the stress?

4    A.    Yes.  I have written to a lot of people.

5    Q.    Who do you write to?

6    A.    I've written to Black and Pink.  Some of the pen pals that

7    they have provided me with has given me some support.

8    Q.    Okay.  And do you receive any treatment at MCI-Shirley for

9    your gender dysphoria?

10   A.    Yes, ma'am.

11   Q.    Can you tell me a little bit about that?

12   A.    I receive estrogen treatments.

13   Q.    Okay.  That's hormones?

14   A.    Yes, ma'am.

15   Q.    And what do you understand those to be for?  What do they

16   help you with?

17   A.    Well, it's to put me through a transitional stage.

18   Q.    Okay.  Tell me what that means.

19   A.    That means that it allows me to feminize more, breast

20   development, skin softening, you know, and basically that's

21   about as furthest that stage goes.

22   Q.    How often do you take the hormones?

23   A.    Once a week, ma'am.

24   Q.    And do you get anything else for your gender dysphoria

25   symptoms?

1    A.    I take aspirin, vitamin E, multivitamin, calcium, and

2    that's about it.

3    Q.    Okay.  But do you get any other treatment?  Do you get

4    electrolysis?

5    A.    Yes, I get electrolysis well.

6    Q.    And what do you understand electrolysis does for you?

7    A.    Electrolysis gets rid of the hair on the face that allows

8    you to be more feminine in your transition.

9    Q.    And are you allowed to get female canteen items?

10   A.    Yes, ma'am.

11   Q.    And what do you purchase when you get those?

12   A.    I used to purchase the lipstick.  You can get bras,

13   underwear, a duster from the prison.  That's about it.

14   Q.    Okay.  Do you get anything -- I think we talked at your

15   deposition, do you get anything for hair loss from the top of

16   your head?

17   A.    I did.

18   Q.    Nothing anymore from that?

19   A.    No, ma'am.

20   Q.    And do you see a therapist on a regular basis?

21   A.    Yes, ma'am.

22   Q.    Okay.  And it used to be Meaghan Dupuis; is that correct?

23   A.    Correct.

24   Q.    How long did you see Meaghan?

25   A.    For over two years.

Q.   Didn't she have a relationship with you, see you for close

to nine years?

A.   No.

Q.   Okay.  It was only two years?

A.   Two years, a little more.

Q.   Okay.  How often would you see Ms. Dupuis when you saw

her?

A.   Once a month.

Q.   And do you see someone now?

A.   Someone has been scheduled but I haven't formally had a

session with her yet.

Q.   That's because Ms. Dupuis left her job, correct?

A.   Yes, ma'am.

Q.   That's your understanding?

A.   Yes.

Q.   You talked a little bit about your pen pals, and you

mentioned Black and Pink.  Can you tell me what Black and Pink

is?

A.   It's an organization that deals with LGBT.

Q.   Okay.  That's the lesbian, gay, bisexual, transgender

community?

A.   Yes, ma'am.

Q.   Do you know what type of organization they are?

A.   Not really, only that they have corresponded with me, they

have spoken with me on correspondence level, but not the real

1  inner workings of it.

2  Q.   Okay.  And do you write to anybody else?  Do you have any

3  other pen pals?

4  A.   Yes.

5  Q.   Who do you write to?

6  A.   I write to quite a few people.

7  Q.   Okay.  And they write back to you?

8  A.   Yes, ma'am.

9  Q.   All right.  And while you're at MCI-Shirley, do you have a

10  separate shower time?

11  A.   Yes, ma'am.

12  Q.   Okay.  So you don't shower with the other male inmates.

13  A.   It varies.  Sometimes there is male inmates out taking

14  showers as well, the runners.

15  Q.   Are you -- but do you have a separate shower schedule

16  time?

17  A.   Yes, ma'am.

18  Q.   And are you also in a single cell?

19  A.   Yes, ma'am.

20  Q.   And how long have you -- is that a medical order for you?

21  A.   No.

22  Q.   Okay.  But you've been kept in a single cell for a while?

23  A.   Yes, ma'am.

24  Q.   And in your affidavit, I don't know if you recall, I can

25  tell you that I read where you had talked about, even though

1    you haven't tried to surgically change yourself, cut yourself,

2    you think about it; is that correct?

3    A.   Yes, I do.

4    Q.   Okay.  How often do you think about it?

5    A.   When things goes wrong sometimes.

6    Q.   Okay.  Like what kind of things go wrong?

7    A.   Sometimes I lose hope sometimes that this is not going to

8    happen for me, but I struggle to keep it together.

9    Q.   Okay.  When you say "this" is not going to happen to me,

10   do you mean having the gender-confirming surgery?

11   A.   Yes.

12   Q.   Or do you mean going to MCI-Framingham?

13   A.   Having the surgery and as well as going to MCI-Framingham.

14   Q.   Is that what you're asking from the Court, have the

15   surgery first and then go to MCI-Framingham?

16   A.   Yes, ma'am.

17   Q.   I assume you've never been to Framingham; is that correct?

18   A.   Yes.

19   Q.   Tell me what you know about MCI-Framingham.

20   A.   I know that the rules are different than the male

21   population that I'm in.  They're a lot more stricter.  The

22   settings are different.  They have way better programs than the

23   male prison does.  My knowledge is somewhat limited.  My

24   knowledge is somewhat limited because I haven't been full

25   access to a lot of the stuff that I would need to fully

1    understand what really goes on, only the menial stuff that I

2    have.

3    Q.   Okay.  Well, do you take part in any programs at

4    MCI-Shirley?

5    A.   No.

6    Q.   No programs.

7    A.   No, ma'am.

8    Q.   Are you in any classes at Shirley?

9    A.   I was.

10   Q.   What were you in?

11   A.   The math class.

12   Q.   Okay.  And did you complete that program?

13   A.   No.

14   Q.   Have you had any jobs at MCI-Shirley?

15   A.   Yes, ma'am.

16   Q.   You've had actually quite a few jobs, correct?

17   A.   Over the years, yes.

18   Q.   All right.  Tell me a few of the jobs you've had at

19   MCI-Shirley.

20   A.   I worked as a janitor in the unit.  I also worked at the

21   programs building.  I've also worked at HSU.  I also have been

22   a handicap pusher.

23   Q.   When you say a "handicap pusher," tell me what that job

24   is.

25   A.   That job is when somebody is confined to a wheelchair, and

1    I push him to all his appointments, to the chow hall; and where

2    he's needed to go, I push him there.

3    Q.   What other jobs have you had?

4    A.   I also working at the shack.  I also sometimes volunteer

5    cleaning the visiting room.

6    Q.   Do you remember telling me in your deposition you also

7    painted, did a lot of painting at MCI-Shirley?

8    A.   Yes.  That was part of the working in the programs and the

9    HSU.

10   Q.   Okay.  And you painted -- that's painting the walls and

11   cleaning up the rooms and things like that.

12   A.   Yes.

13   Q.   Now, I'm going to ask you if you remember -- do you

14   remember meeting with Dr. Levine?

15   A.   Yes, ma'am.

16   Q.   Okay.  Who do you know Dr. Levine to be?

17   A.   I'm sorry.  Can you repeat that?

18   Q.   Who is Dr. Levine?

19   A.   He is the doctor that they brought in as part of the GD

20   committee.

21   Q.   So he's part of the treatment committee at the Department

22   of Corrections?

23   A.   Yes, ma'am.

24   Q.   And how many times -- do you remember how many times you

25   met with him?

1    A.    Twice, I think.  Maybe three times, but twice that I'm

2    familiar with.

3    Q.    Okay.  And that's been over a series of years, correct?

4    A.    Yes, ma'am.

5    Q.    Okay.  Do you remember when you met with him, did you meet

6    with him alone or did you meet with him with other doctors?

7    A.    I met with him with a team of doctors that were there,

8    yes.

9    Q.    And do you remember how long those meetings would last?

10   A.    Four hours, I think.

11   Q.    Okay.  So a significant amount of time.

12   A.    Yes, ma'am.

13   Q.    And what would -- would -- what would you talk to them

14   about?

15   A.    Well, they basically ask me a lot of questions, and I just

16   answer them.

17   Q.    Okay.  Did they ask questions about you?

18   A.    Yes, ma'am.

19   Q.    Okay.  Did they ever do any testing on you?  Do you

20   remember?

21   A.    No, ma'am.

22   Q.    Okay.  Tell me, do you know who Dr. Ettner is?

23   A.    Yes, ma'am.

24   Q.    Okay.  Who is Dr. Ettner?

25   A.    Dr. Ettner is the doctor that came and did the evaluation

1    on me.

2    Q.    Okay.  How many times did you meet with Dr. Ettner?

3    A.    Twice.

4    Q.    And do you remember how long those sessions were?

5    A.    Four hours, I think.

6    Q.    About the same amount?

7    A.    Yes.  I didn't have a watch with me so I didn't --

8    Q.    Okay, that's all right.

9          Do you remember if she did any testing on you?

10   A.    Yes.

11   Q.    She did do testing?

12   A.    Yes.

13   Q.    Do you remember how long of the four hours that testing

14   took?

15   A.    About three.

16   Q.    Okay.  Now, you've had a few -- some disciplinary reports

17   at MCI-Shirley; isn't that correct?

18   A.    Yes, ma'am.

19   Q.    But you haven't had one in a while.

20   A.    Yes, ma'am.

21   Q.    How long has it been?

22   A.    Over five years.

23   Q.    Okay.  Do you remember what the last one was that you had?

24   A.    Not offhand, no.

25   Q.    Okay.  Now, do you remember the time when the treatment

```
 1  committee informed you that they were going to recommend you be
 2  transferred to MCI-Framingham?  Do you remember that day?
 3  A.   Yes, ma'am.
 4  Q.   Do you remember in your affidavit you said you were very
 5  happy to hear that recommendation; is that correct?
 6  A.   Correct.
 7  Q.   Okay.  So it was okay that they weren't recommending
 8  surgery for you, you were happy to go to MCI-Framingham?
 9          MS. BELLIN:  Objection, your Honor.  Ms. Staples has
10  mischaracterized --
11          THE COURT:  I hear the objection, I overrule it.
12          You may continue.
13          MS. STAPLES:  Thank you, your Honor.
14          THE WITNESS:  Can you repeat it?
15  BY MS. STAPLES:
16  Q.   Do you -- you recall hearing them recommend that you go to
17  MCI-Framingham; is that correct?  You remember that day.
18  A.   Yes, ma'am.
19  Q.   Okay.  And you remember in your affidavit you wrote that
20  you were very happy about that.  Do you remember writing that
21  or read that in your affidavit?
22  A.   I remember that, ma'am.
23  Q.   So I'm asking you, were you happy about that even though
24  they didn't recommend the surgery right way?
25  A.   I was and I wasn't happy.  It was kind of like a mixed
```

1  feeling.

2  Q.    Okay.  Do you recall telling Dr. Levine you thought it was

3  a great idea in case it didn't work out?

4  A.    No.

5  Q.    Okay.

6  A.    Not those words.

7  Q.    Do you remember the words you used?

8  A.    Yes, ma'am.

9  Q.    Tell me what you said.

10  A.    I told Levine that I wanted to have the surgery so I can

11  go into the prison as a complete female, and I felt that going

12  in there for six months to one year, it was more as a delay as

13  far as allowing me to be a complete female.

14          But I understood when he explained to me that he

15  wanted me to have some form of real life experience living and

16  being with the females, so I agreed with him on that point,

17  because it was no point on arguing on the rest of me getting

18  the surgery.  So I went along and I said, Okay, I would do that

19  as one step closer to getting the surgery that he need.

20  Q.    Okay.  And did you talk to -- when you met with

21  Dr. Levine, did you talk about how you would fit into

22  MCI-Framingham?  Any plans about that?

23  A.    Yes.  He did speak to me about that.

24  Q.    Okay.  And do you have any concerns if you were to go to

25  Framingham about fitting in with the other female inmates?

1   A.   Well, any new environment is a challenge within itself, to

2   find new friends, to find who likes you, who doesn't like you.

3   So it is -- it is a challenge that can be overcome the same as

4   any other female that comes into the prison system there that

5   has to find their own way as well.

6   Q.   Did you remember talking to Dr. Ettner about ways to fit

7   in at MCI-Framingham?

8   A.   Yes, I did.

9   Q.   You did?

10   A.   Yes.

11   Q.   How often did you talk to Dr. Ettner -- did you talk to

12   her at both meetings about that?

13   A.   It was more in the second one, I think.  I'm not sure.

14   It's been a while.

15   Q.   Okay.

16       MS. STAPLES:  Your Honor, if I could just have one

17   minute, please.

18       THE COURT:  Yes, you may.

19       (Discussion off the record.)

20       MS. STAPLES:  Your Honor, I just have a few brief

21   questions for her.

22       THE COURT:  All right.

23       MS. STAPLES:  Thank you.

24   BY MS. STAPLES:

25   Q.   Ms. Soneeya, you talked about some of the treatment you're

```
 1   getting from the Department of Corrections, correct?
 2   A.    Yes, ma'am.
 3   Q.    You talked a little bit about the hormones you're getting?
 4   A.    Yes, ma'am.
 5   Q.    And the electrolysis?
 6   A.    Yes.
 7   Q.    And the counseling?
 8   A.    Yes.
 9   Q.    And the female canteen items?
10   A.    Yes.
11   Q.    And have they helped with your symptoms for gender
12   dysphoria?  Have they helped them at all?
13   A.    It's like a yes and a no question on that.
14   Q.    Okay.  Why don't you explain that for me.
15   A.    Okay.  It helped in the sense that it allowed me to have
16   some form of expression of the female, but then I was saddened
17   because they no longer sell the lipsticks and the female items
18   to make you look feminine.
19   Q.    Okay.  So it helped somewhat?
20   A.    Yes, it helped somewhat.  But I wanted more.  I wanted to
21   be more feminine.  I want to be more makeup and more expression
22   and more allowing me to express myself more openly --
23   Q.    Okay.
24   A.    -- as female.
25   Q.    And I think you testified that you wanted to become a
```

1  complete woman.  What does that mean to you?

2  A.   A complete woman will allow me to live a normal life

3  within the corrections system.  It will be no more penises,

4  there won't be no more half man, half woman, it would just be

5  one woman.

6  Q.   And is it -- my understanding is when we talked at your

7  deposition, you're actually appealing one of your convictions;

8  is that true?

9  A.   Yes, ma'am.

10  Q.   Okay.  So you basically don't admit to either of the

11  crimes that you're convicted for; is that correct?

12  A.   That is correct.

13        MS. STAPLES:  Your Honor, if I could have just one

14  brief moment.

15        THE COURT:  Yes.

16        MS. STAPLES:  Thank you.

17        (Discussion off the record.)

18        MS. STAPLES:  That's all, your Honor, thank you.

19        THE COURT:  Any further questions, Ms. Bellin?

20        MS. BELLIN:  Yes, your Honor, I have a couple of

21  questions to ask.

22        THE COURT:  Yes.

23              REDIRECT EXAMINATION

24  BY MS. BELLIN:

25  Q.   Good morning, Katheena.

1    A.    Good morning.

2    Q.    How are you doing?

3    A.    Nervous.

4    Q.    I'll try to be quick, all right?

5    A.    Okay, ma'am.

6    Q.    Katheena, for how long have you been living as a woman

7    within the prison system?

8    A.    Off and on for years.

9    Q.    How would you -- for how long is years?

10   A.    Well, I started acting out female in '82.

11   Q.    Okay.  Do you remember testifying earlier about presenting

12   in between 1982 and 1990 before your autocastration attempt?

13   A.    Can you rephrase that?

14   Q.    Sure.  So you were living as a female since 1982 prior to

15   your autocastration attempt?

16   A.    Yes, ma'am.

17   Q.    Okay.  You spoke a little bit on your cross-examination

18   about your feelings regarding your treatment now; is that

19   right?

20   A.    Yes, ma'am.

21   Q.    How do you feel about having a penis?

22   A.    That I wish it was gone; I hate seeing it; I basically

23   hate looking at it; I hate touching it.

24   Q.    How often do you feel this way?

25   A.    All the time.

1    Q.   You also spoke a little bit about not participating right

2    now in programming at MCI-Shirley?

3    A.   Yes, ma'am.

4    Q.   Do you want to participate in programming at MCI-Shirley?

5    A.   Yes.

6    Q.   And why do you not participate in programming?

7    A.   Well, because the male inmates no longer accept me as one

8    of theirs, their own, so they won't play with me, they just

9    walk off the basketball court or the soccer field.  They just

10   won't have nothing to do with me.

11   Q.   How does that make you feel?

12   A.   It hurts because I like playing, but I have to understand

13   their feelings as well.

14   Q.   Okay.  Katheena, do you remember talking a little bit

15   about your reaction to the denial of transfer?

16   A.   Yes, ma'am.

17   Q.   How did you feel when you learned that transfer was

18   denied?

19   A.   I was -- I was very sad about it.  I wasn't happy.  I felt

20   that another setback that I have to endure.

21            MS. BELLIN:  Your Honor, may I have a moment?

22            THE COURT:  Yes.

23            (Discussion off the record.)

24            MS. BELLIN:  Your Honor, I have no further questions.

25            THE COURT:  Ms. Staples, anything?

1          MS. STAPLES:  No, your Honor.

2          THE COURT:  All right, Ms. Soneeya, you may step down.

3          THE WITNESS:  Thank you, your Honor.

4          THE COURT:  Next witness.

5          (Discussion off the record.)

6          MS. HANCOCK:  At this time, your Honor, we would like

7    to move into evidence Dr. Randi Ettner's affidavit, signed

8    February 28, 2019, and filed with the Court on March 19, 2019.

9          THE COURT:  All right.  It's received.

10         MS. STAPLES:  No objection, your Honor.

11         THE COURT:  Dr. Ettner.

12         MS. HANCOCK:  In connection with the affidavit, we

13   would like to move a few exhibits into evidence.

14         THE COURT:  All right.

15         MS. HANCOCK:  That is Exhibit 2, the 7th edition of

16   the Standards of Care; Exhibit 3, which is Dr. Ettner's

17   evaluation when she was the parties' joint independent

18   evaluator in 2016; and then Exhibit 26, which was Dr. Ettner's

19   most recent expert report.

20         THE COURT:  I'm sorry, the last one?

21         MS. HANCOCK:  Dr. Ettner's --

22         THE COURT:  What number?

23         MS. HANCOCK:  I'm sorry, 26.

24         THE COURT:  26, okay.

25         MS. HANCOCK:  Yes.

1          THE COURT:  All right.

2          MS. STAPLES:  No objection to those, your Honor.

3          (Exhibits 2, 3, 26 received into evidence.)

4          RANDI CAHAN ETTNER, Ph.D., having been duly sworn by

5  the Clerk, was examined and testified as follows:

6          THE CLERK:  Please be seated and state your full name.

7          THE WITNESS:  Randi Cahan Ettner.

8          THE COURT:  You may inquire.

9                    CROSS-EXAMINATION

10 BY MS. STAPLES:

11 Q.   Good morning, Dr. Ettner.

12 A.   Good morning.

13 Q.   My name is Jennifer Staples.  I work for the Department of

14 Corrections.

15          We actually did a deposition together not that long

16 ago, although not in person.  Do you remember that?

17 A.   I do.

18 Q.   Okay.  Dr. Ettner, when were you hired for this case by

19 plaintiff's counsel?

20          As an expert.  I'm sorry.

21 A.   I was originally appointed by the Court in -- prior to

22 2011.

23 Q.   Okay.  But when were you hired by plaintiff's counsel as

24 an expert in this matter?

25 A.   2016, I believe.

1    Q.   Do you recall the first report you wrote for the Court was

2    in 2016?

3    A.   Yes.

4    Q.   Okay.  So that was your court appointment.

5    A.   Correct.  I was --

6    Q.   Go ahead.

7    A.   I was contacted much earlier, however, when the Court was

8    appointing an expert.

9    Q.   Okay.  Do you recall testifying I believe in your

10   affidavit -- well, let me just ask you this.

11        How many reports have you written in this matter for

12   Ms. Soneeya?

13   A.   Two.

14   Q.   Okay.  One was in 2016?

15   A.   Correct.

16   Q.   And that was for the Court.

17   A.   Yes.

18   Q.   And the second report was in 2018?

19   A.   Yes.

20   Q.   Okay.  Dr. Ettner, do you know what the issue is in this

21   case?

22   A.   Yes.

23   Q.   Can you tell me what that is?

24   A.   Whether Katheena Soneeya is an appropriate candidate for

25   gender-affirming surgery.

1   Q.   Would you be surprised if I told you the issue is whether

2   the Department of Corrections or the commissioner for the

3   correction violated a court order from 2012?

4   A.   I would not be surprised.  I would have no knowledge of

5   that.

6   Q.   Okay.  So you don't know what the 2012 order says?

7   A.   Correct.

8   Q.   Are you aware that the other issue in this case is whether

9   the commissioner violated a 2014 court order?  Are you aware of

10  that?

11  A.   No.

12  Q.   Okay.  So you have no opinion or you don't know what the

13  2014 order says.

14  A.   That's true.

15  Q.   Okay.  So you didn't issue an opinion in either report as

16  to whether the commissioner did or did not violate a court

17  order; is that fair to say?

18          THE COURT:  Well, I'm not sure experts issue opinions

19  about violations of court orders.  They give us facts and

20  background and opinions having to do with their expertise.

21          My understanding is there's one person in the

22  courtroom who makes a decision about whether or not a court

23  order has been violated.

24          MS. STAPLES:  I understand, your Honor.  I just didn't

25  know if she knew that was the issue.

1          THE COURT:  In any event, let's get to her opinions,

2     the ones that she's offered.

3          MS. STAPLES:  Thank you.

4     BY MS. STAPLES:

5     Q.   Dr. Ettner, you're not a medical doctor; isn't that

6     correct?

7     A.   That's correct.

8     Q.   You're a licensed clinical and forensic psychologist?

9     A.   Yes.

10    Q.   And can you tell me what "forensic" means?

11    A.   It's -- in the context of forensic psychology, it's the

12    interaction of psychology and the law.

13    Q.   Okay.  So does that mean you're hired as an expert, as you

14    are today?

15    A.   Not necessarily.

16    Q.   Would it include also rendering opinions for attorneys or

17    for courts?

18    A.   It may.

19    Q.   Okay.  Now, in both your reports you make a recommendation

20    for Ms. Soneeya that she receive gender-confirming surgery;

21    isn't that true?

22    A.   Yes.

23    Q.   And isn't that a medical procedure?

24    A.   Yes, a surgical procedure.

25    Q.   Okay.  So you are making a recommendation for a medical or

1  surgical procedure; isn't that correct?

2  A.    Yes.

3  Q.    And you're not a medical doctor, correct?

4  A.    Yes.

5  Q.    Now, I just want to clear something up a little bit.  In

6  your affidavit and your deposition you had stated that you had

7  been treating gender dysphoric and gender non-conforming people

8  since 1977, but in other affidavits you say 1980.  Is there a

9  reason for the discrepancy?

10 A.    Yes.

11 Q.    Can you tell me that?

12 A.    Yes.  In '77, I was a volunteer.

13 Q.    Okay.  So you have been involved with treatment since '77.

14 A.    That's correct.

15 Q.    Okay.  Is there any other medical or surgical procedure

16 that a non-medical doctor recommends?

17 A.    Yes.

18 Q.    Can you tell me one, an example?

19 A.    Transplant surgery a psychologist would weigh in on, and

20 bariatric procedures as well.

21 Q.    They would recommend a medical procedure?

22 A.    They would provide input as to the patient's eligibility

23 for those procedures.

24 Q.    Right.  But would they recommend the procedure?

25 A.    I don't know.

1    Q.    Can you briefly describe what gender dysphoria is?

2    A.    Gender dysphoria is a serious, but, fortunately, treatable

3    medical condition.

4    Q.    And would you describe it for us?

5    A.    Yes.  It's when there's an incongruity between a person's

6    gender identity and the birth they were assigned to -- the sex

7    they were assigned to at birth.  And if that incongruity gives

8    rise to clinically significant distress, then they receive the

9    diagnosis of gender dysphoria.

10   Q.    Are there gradations of the distress for gender dysphoric

11   individuals?  In other words, are there some that have more

12   severe symptoms than others?

13   A.    Yes.

14   Q.    And what is the criteria you use to determine that?

15   A.    The distress, the patient's experience, and often

16   psychological testing.

17   Q.    Is it fair to say that not every person who has gender

18   dysphoria wants the surgery?

19   A.    Yes.

20   Q.    Okay.  And is it fair to say that you -- do you ever

21   recommend the surgery for someone who hasn't asked for it?

22   A.    I don't typically recommend surgery.  I evaluate clients

23   and determine if they're eligible and if they meet the criteria

24   outlined by the Standards of Care.

25   Q.    Well, you're recommending surgery for Ms. Soneeya,

1  correct?

2  A.   Correct.

3  Q.   But that's because she's asking for it; is that fair to

4  say?

5  A.   No.

6  Q.   Okay.  Well, have you ever recommended gender-confirming

7  surgery for somebody who hadn't asked for it?

8  A.   No.

9  Q.   Let me bring you to -- if I could have Exhibit 2

10 available, the Standards of Care.

11        THE COURT:  Does the notebook in front of Dr. Ettner

12 include Exhibit 2 so she has it in front of her?

13        MS. STAPLES:  I think there's a book, but does the

14 computer --

15        THE CLERK:  Are you HDMI or VGA?

16        THE COURT:  I believe it's in that notebook.  But if

17 it's going to be discussed, then it's going to be put up on the

18 screen so others can see it as well.

19        MS. STAPLES:  We're doing that right now, your Honor.

20 BY MS. STAPLES:

21 Q.   Dr. Ettner -- I'll wait until you finish your water.

22        Can you tell me what the WPATH Standards of Care are?

23 A.   Standards of Care are guidelines, translated into 18

24 different languages, that set forth best practices for the

25 treatment of individuals who are gender non-conforming,

1    transgender, or transsexual.

2    Q.    Okay.  And what edition is the most recent edition?

3    A.    7.

4    Q.    And you were involved in the writing and publishing of

5    those; is that correct?

6    A.    Yes.

7    Q.    And what -- remind me -- I'm sorry.  I know it's in your

8    affidavit.  Remind me again what your position is with WPATH?

9    A.    Presently I am the secretary of WPATH.

10   Q.    Okay.  Now, you mentioned WPATH.  The Standards of Care

11   are guidelines, correct?

12   A.    Correct.

13   Q.    So, in other words, they're not binding, correct?

14   A.    Correct.

15   Q.    Okay.  And in fact, and the purpose of it, if you look at

16   page 1, scroll down to the 1, 2, 3.  When you scroll down under

17   standard use of purpose of care, it's on page 1 of the

18   Standards of Care.

19          Do you see that, Doctor?

20   A.    I do.

21   Q.    If you look at the third paragraph there it says the

22   overall goal of the Standards of Care is to provide clinical

23   guidance for health professionals; is that correct?

24   A.    Yes.

25   Q.    So there's nothing in the standards of care that mandates

1    any treatment -- I'm sorry, mandates any recommendation for
2    treatment.
3    A.    The Standards of Care offer criteria for treatment.
4    Q.    And could you agree the standards offer more of a process
5    for healthcare professionals than an outcome?
6    A.    I'm not certain how you're defining "process" versus
7    "outcome."
8    Q.    Okay.  Well, let me ask you this.  Nowhere in the
9    Standards of Care does it mandate that every gender dysphoric
10   person get surgery?
11   A.    Correct.
12   Q.    And nowhere in the Standards of Care does it mandate any
13   other treatment.
14   A.    Correct.
15   Q.    Okay.  And in fact, if you look on page 2 of the Standards
16   of Care, the title of the next section right there on page 2,
17   the Standards of Care are flexible clinical guidelines, so they
18   apply and allow for some flexibility, correct?
19   A.    On a case-by-case basis, yes.
20   Q.    And in fact, they say in that paragraph that they actually
21   provide for some modification of the Standards of Care,
22   correct?
23   A.    Yes.
24   Q.    And they say that's based on someone's social or
25   anatomical makeup or background, correct?

1    A.    Yes.

2    Q.    Okay.  So the Standards of Care are to be used as

3    guidelines for any healthcare professional, but they also

4    suggest other people can use the Standards of Care, correct?

5    A.    Yes.

6    Q.    In fact, they encourage educators and families and friends

7    of people who are transgender or gender dysphoric to also use

8    the Standards of Care, correct?

9    A.    Yes.

10   Q.    Because the goal of the Standards of Care is to promote

11   acceptance and the health and well-being of transgender or

12   gender dysphoric individuals; is that a fair statement?

13   A.    I would say that is perhaps one goal.

14   Q.    Okay.  Well, if you look on page 1 of the Standards of

15   Care, the bottom, the last paragraph, it talks about wanting to

16   ensure social tolerance.  Do you see that?

17   A.    Yes.

18   Q.    Equality, correct?

19   A.    Yes.

20   Q.    The full rights of citizenship?

21   A.    Yes.

22   Q.    It talks about promote -- health is promoted through

23   public policies, correct?

24   A.    Correct.

25   Q.    Legal reforms that promote tolerance and equity; is that

1    correct?

2    A.    Yes.

3    Q.    So the Standards of Care are more than just medical

4    guidelines.

5    A.    They include medical guidelines and issues of human

6    rights.

7    Q.    So they also include advocacy for transgendered and gender

8    dysphoric people, correct?

9    A.    I would say advocacy for a condition that's the most

10   misunderstood area of human behavior.

11   Q.    But it's a form of advocacy, fair to say?

12   A.    No, I wouldn't say that.

13   Q.    The Standards of Care -- then I'm confused.  They do put

14   in -- they talk about advocacy in the Standards of Care.

15            THE COURT:  I find this to be argumentative.  Move on.

16   BY MS. STAPLES:

17   Q.    In your affidavit, Doctor -- you remember providing the

18   affidavit for the Court?

19   A.    Yes.

20   Q.    Do you remember -- do you have that affidavit in front of

21   you?

22            MS. STAPLES:  I don't know if we have a copy for the

23   Doctor.

24            THE COURT:  I'm not sure that Dr. Ettner has a copy of

25   her affidavit.

1           It's not -- I don't believe it's in the book,

2    Dr. Ettner.  I think counsel will provide you with one.

3           MS. HANCOCK:  May I approach, your Honor?

4           THE COURT:  Yes.

5           (Pause.)

6           THE WITNESS:  Thank you.

7    BY MS. STAPLES:

8    Q.   Do you have that affidavit in front of you?

9    A.   I do.

10   Q.   Okay.  And you recall signing that affidavit, Doctor?

11   A.   Yes.

12   Q.   I want to refer you to just, please, to paragraph 6 of

13   your affidavit.

14          In that paragraph you state that you evaluated,

15   diagnosed, and treated between 2,500 and 3,000 individuals with

16   gender dysphoria and mental health issues related to gender

17   variance from 1980 to present; is that correct?

18   A.   Yes.

19   Q.   Okay.  Can you just describe for me what it means by

20   "mental health issues related to gender variance"?  What does

21   that mean?

22   A.   Some of the social issues that ensue from the condition of

23   being gender incongruent.

24   Q.   So it's the social issues, something outside of the

25   actual -- outside that's happening to the person?  In other

1   words -- I'm sorry.

2   A.    It can be outside or inside.

3   Q.    Okay.  And when was the last time you actually treated

4   somebody for gender dysphoria or gender non-conforming?  Do you

5   have an active practice?

6   A.    Yes.

7   Q.    So when was the last time you met with somebody?

8   A.    Friday.

9   Q.    Okay.  And in that paragraph you say -- you refer to

10  approximately 300 patients for gender-confirming surgery; is

11  that correct?

12  A.    Yes.

13  Q.    Okay.  Was that 300 of the 2,500 to 3,000?

14  A.    Not necessarily.

15  Q.    Okay.

16  A.    It may have been some individuals who came for a

17  second-opinion letter.

18  Q.    Okay.  And can you just describe for me what you would

19  do -- what is the process you go through when you refer someone

20  to surgery?

21  A.    That depends on if it's a person who I'm writing a first

22  letter of referral for or a second-opinion letter.

23  Q.    Okay.  If it's the first letter of referral -- well, why

24  don't you explain to the Court and for all of us briefly what's

25  the process when someone is seeking to have the surgery.

1   A.   They must first meet the criteria as outlined in the

2   Standards of Care.

3   Q.   And what is that criteria?

4   A.   It depends on the surgery that they're seeking.

5   Q.   If they're seeking gender-confirming surgery, male to

6   female, what would be the criteria?

7   A.   It depends on whether you're talking about vaginoplasty or

8   orchiectomy or breast augmentation.

9   Q.   Are all of those criteria --

10  A.   All of those are considered gender-confirming surgeries.

11  Q.   Right.  But the Standards of Care talk about six criteria,

12  correct?

13  A.   Six criteria for genital surgery.

14  Q.   Okay.  So let's stay with genital surgery.  Is that what

15  you're recommending for Ms. Soneeya?

16  A.   Yes.

17  Q.   Okay.  So let's stay with that.

18          What are those six criteria?

19  A.   The six criteria are a person must be of the age of

20  majority in a given country, they must have a persistent

21  diagnosis of gender dysphoria, well-documented and persistent.

22  Q.   I'm sorry.  I don't mean to interrupt you, Doctor.  I just

23  want to know what does "persistent" mean?

24  A.   Having been documented over a period of time, not a sudden

25  onset of gender dysphoria.

1  Q.   And what period of time would you say would qualify?

2  A.   Well, the DMS-5 determines that.

3  Q.   Okay.  Can you tell me what that is today?

4  A.   Six months.

5  Q.   Okay.  So a minimum of six months would be persistent in

6  your view and per the DSM?

7  A.   That's for the diagnosis, not for the criteria of meeting

8  genital surgery.

9  Q.   Okay.

10 A.   For that, they must have undergone cross-sex hormone

11 therapy, living in a congruent gender role for 12 months, and

12 they must have the ability to provide informed consent.  And

13 finally, if there are any medical or mental health issues, they

14 must be well controlled.

15 Q.   And for how long should they be well controlled?

16 A.   At the time of surgery or at the time if in the case of a

17 severe mental illness they might require reevaluation

18 periodically prior to surgery to document that the condition is

19 indeed still well controlled.

20 Q.   Okay.

21 A.   Either medical or mental.

22 Q.   Okay.  So those are the criteria that you examine the

23 person who's come for genital surgery to see if they meet that;

24 is that correct?

25 A.   Those are the minimum criteria for eligibility.

1   Q.   Okay.  What else is done to determine whether this person

2   should be recommended for genital surgery?

3   A.   It's done on a case-by-case basis.

4   Q.   Can you give me examples of other things that might be

5   examined for somebody coming in and requesting that surgery?

6   A.   What kind of example would you -- are you looking for?

7   Q.   Well, I'm asking you what would be your process, someone

8   came into your practice --

9        MS. HANCOCK:  Objection, calls for speculation, your

10  Honor.

11       THE COURT:  Overruled.

12       You can put the full question.

13       MS. STAPLES:  Thank you.

14  BY MS. STAPLES:

15  Q.   If someone came to you in your practice and said that they

16  wanted to have genital surgery, we talked about the six

17  criteria that you would determine, what else would be done by

18  you to determine whether they were a candidate or not?

19  A.   If it was someone that I've been working with for a long

20  time and I knew the client very well and if they were -- had

21  severe gender dysphoria and if they were -- that dysphoria was

22  not contained by cross-sex hormones and social role transition,

23  and they were experiencing clinically significant distress that

24  interfered with some important area of functioning, and if they

25  were experiencing anatomical dysphoria and I was aware they had

1    this persistent, well-documented gender dysphoria because they

2    had been under my care, and they were stating that they were

3    wanting and needing surgery at this time, I would perform an

4    assessment which would then be the basis for a letter of

5    referral to a surgeon.

6    Q.   And when you say "an assessment," is that -- what would

7    that entail?

8    A.   Well, the Standards of Care actually provide the minimum

9    requirements of what goes into an assessment.

10   Q.   Okay.  And can you tell me what those are?

11   A.   I can tell what you some of them are.

12   Q.   Sure.

13   A.   Demographic information, how long the gender dysphoria has

14   been persistent, whether or not the person has met the

15   criteria, a sex and gender evaluation, what was the onset of

16   the gender dysphoria, attempts of the person to cope with the

17   gender dysphoria, any medical issues that the person has, prior

18   surgeries that they've undergone, whether or not they use

19   tobacco, illicit substances, et cetera, et cetera.

20        A thorough assessment of the person's current status,

21   their history, the severity of their gender dysphoria, and

22   other personal information that I've gleaned about that

23   individual through treatment that actually serves to inform

24   care for the surgeon or the team that the surgeon works with.

25   Q.   So that's somebody who has been in your care for a while;

1    is that correct?

2    A.    In that example, yes.

3    Q.    So tell me what the process was for your recommendation

4    with Ms. Soneeya, because she's not a patient of yours,

5    correct?

6    A.    Correct.

7    Q.    So was an assessment done similar for Ms. Soneeya?

8    A.    An assessment was done using interview and

9    psychodiagnostic testing.

10   Q.    Okay.  And that occurred on two occasions, correct?

11   A.    Yes.

12   Q.    Okay.  So you didn't have the extended information from

13   Ms. Soneeya that you did for somebody in your own practice; is

14   that fair to say?

15   A.    I had different information.  I had the advantage of using

16   psychodiagnostic testing to provide an abundance of information

17   that I couldn't get through interview.

18   Q.    Okay.  Because I believe in your affidavit you discuss the

19   testing that you performed for Ms. Soneeya, correct?

20   A.    Yes.

21   Q.    Okay.  And is it fair to say your meetings with her both

22   times, both for 2016 and 2018 reports, I know they weren't --

23   may not have been in those years, but they were approximately

24   three hours, I believe, you said?

25   A.    Approximately.

1    Q.    Okay.  How much of that time was testing?

2    A.    The testing was interspersed throughout.  Approximately an

3    hour or an hour and 15 minutes would have been actual

4    test-taking time.

5    Q.    And can you describe for me the testing that was done --

6    A.    Yes.

7    Q.    -- for Ms. Soneeya?  Because I believe -- and correct me

8    if I'm wrong, Doctor -- you did the same testing both times for

9    Ms. Soneeya?

10   A.    Yes.

11   Q.    Okay.  Can you describe them for me?

12   A.    The tests themselves?

13   Q.    Please.

14   A.    The Beck Anxiety Inventory, the Beck Hopelessness Scale,

15   the Beck Depression Inventory, and the Traumatic Symptom

16   Inventory Number 2.

17   Q.    And what did the first test, what would that be testing

18   for?

19   A.    The first test that I've mentioned?

20   Q.    Yes.

21   A.    I think that was the Beck Anxiety Inventory.  It measures

22   four different components of anxiety and the severity of the

23   symptomatolgy, if present.

24   Q.    So when you say the "severity of the symptomatolgy," do

25   you mean the symptoms of gender dysphoria?

1    A.    No.

2    Q.    Okay.  Can you describe then what you mean by the

3    symptomatolgy?

4    A.    Anxiety symptoms.

5    Q.    Okay.  So they may not be related to gender dysphoria?

6    A.    Correct.

7    Q.    And can you tell me the second test you mentioned, what

8    would that test for?

9    A.    That's the Beck Hopelessness Scale.

10   Q.    And would that test for?

11   A.    Hopelessness is a construct that underlies many

12   psychological disorders.  It's a better predictor of suicide

13   than depression.

14   Q.    And so that's what you were testing Ms. Soneeya for?

15   A.    For hopelessness.

16   Q.    Okay.  And would that be whether related to gender

17   dysphoria or not?

18   A.    Depends on the individual.

19   Q.    But it may be for something else; is that fair to say?

20   A.    Yes.

21   Q.    And what was the third test that you mentioned?

22   A.    The Beck Depression Inventory?

23   Q.    Please, that's the test.

24   A.    Correct.

25   Q.    Okay.  What did that test for?

1   A.   For various aspects of depression and depressive

2   symptomatolgy and the severity.

3   Q.   Okay.  And how did Ms. Soneeya, in 2016, how did she rate

4   on those tests?

5   A.   I don't have those scores in front of me.  Those are in my

6   file.

7   Q.   Do you recall what your findings were on those?

8   A.   I recall in general that those scores on the anxiety and

9   the depression measures did not reach the level of a DMS-5

10  diagnosable disorder.

11  Q.   Okay.  They weren't at a point where you were concerned

12  about them.  Is that a fair layman's term to say?

13  A.   They didn't meet the criteria for a diagnosis.

14  Q.   Okay.  And was that true for both 2016 and 2018?

15  A.   Correct.

16  Q.   Okay.

17        THE COURT:  If I could just interrupt.

18        When you say "diagnosis," diagnosis of what?

19        THE WITNESS:  Generalized anxiety disorder, panic

20  disorder, a phobia --

21        THE COURT:  Suicidal ideation?

22        THE WITNESS:  Suicidal ideation would be more from the

23  depression scale, the Beck depression scale.

24        THE COURT:  That's inferring it from the Beck

25  depression scale.

1          THE WITNESS:  It actually asks questions about suicide

2     ideation.

3          THE COURT:  And with respect to that, what did you

4     find, if you recall?

5          THE WITNESS:  She did not meet the criteria for major

6     depressive order.  The depression was in the mild range.

7          THE COURT:  Okay.  And that maps more or less to

8     suicidal ideation; is that it?

9          THE WITNESS:  It maps more to feelings of depression.

10    The hopelessness scale actually is a better predictor of

11    suicide than the depression scale.

12         THE COURT:  Speaking of that, then.

13         THE WITNESS:  Earlier on, in 2016, she scored higher

14    on the hopelessness scale than she did in 2018.

15         THE COURT:  Okay, thank you.

16         MS. STAPLES:  Thank you, your Honor.

17    BY MS. STAPLES:

18    Q.   Dr. Ettner, how many -- I believe you testified or you put

19    in your affidavit that you have evaluated 35 incarcerated

20    people?

21    A.   Approximately.

22    Q.   Approximately.  Who have been diagnosed with gender

23    dysphoria?

24    A.   Not all had been diagnosed with gender dysphoria.

25    Q.   Okay.  Can you describe of the 35 incarcerated individuals

1    you evaluated, tell me how many of those suffering from gender

2    dysphoria.

3    A.    All suffered from gender dysphoria.

4    Q.    Okay.  So all were -- were all diagnosed or some were just

5    not diagnosed?

6    A.    Correct.

7    Q.    Okay.  And how many of the 35 were actually requesting

8    gender-confirming surgery?

9    A.    Perhaps six.

10   Q.    And did you recommend the surgery for all six of them?

11   A.    No.

12   Q.    And what was it about the ones you did not recommend the

13   surgery for, why did you not recommend the surgery for them?

14   A.    Either they hadn't met the criteria or they had other

15   issues that were not well controlled or they simply were not

16   requesting or at the point where they would be considered an

17   appropriate candidate for surgery.  They hadn't perhaps started

18   hormones yet.

19   Q.    Okay.

20            MS. STAPLES:  Your Honor, if I could just have a

21   moment.

22            THE COURT:  You may.

23            (Pause.)

24   BY MS. STAPLES:

25   Q.    Dr. Ettner, when you first evaluated Ms. Soneeya around

1    2016 and you applied the Standards of Care, correct?

2    A.    Yes.

3    Q.    And did you modify them at all for any reason?

4    A.    No.

5    Q.    Okay.  Did you take into account her past crimes at all?

6    A.    No.

7    Q.    Did you consider anything about her adjustment in the

8    prison environment?

9    A.    Yes.

10   Q.    What did you consider in 2016?  What was it about her

11   adjustment in the prison setting that you considered?

12   A.    Her isolation.

13   Q.    Okay.  Tell me about that.

14   A.    Making a social role transition in a male facility is

15   extremely challenging, and Ms. Soneeya had been living in her

16   affirmed gender for many, many years.

17   Q.    In the male prison.

18   A.    In the male prison.  And was isolated as a result of that.

19   Q.    And how did that factor into your recommendation?

20   A.    It amplified the persistence and the severity of her

21   gender dysphoria and the resiliency that she demonstrated in

22   attempting to present as a female while living in an all-male

23   facility.

24   Q.    So that spoke just to her -- not just, but it spoke to her

25   gender dysphoria, the level of distress; is that fair to say?

1    A.    It spoke to that, yes.

2    Q.    Okay.  Did you speak to Ms. Soneeya at all in 2016 about

3    her -- the risks of the surgery?

4    A.    Yes.  She had a binder which she produced in which she

5    shared with me, and we discussed some of the complications that

6    can arise during surgery.

7    Q.    Okay.  So she presented a binder to you.  But did you talk

8    to her in detail about the risks of the surgery?

9    A.    In detail?

10   Q.    Yes.

11   A.    We discussed it in general.

12   Q.    Okay.  Is that part of determining whether she has

13   informed consent?

14   A.    Informed consent is a process.

15   Q.    Okay.  Well, is part of that discussing risks of a

16   surgery?

17   A.    Yes.

18   Q.    Dr. Ettner, I'd like for you to just take a look at your

19   2016 report, if you could.

20              I don't know what number that is.

21              THE COURT:  Is that 3?  Is that Exhibit 3?

22              MS. STAPLES:  Exhibit 3, your Honor.

23              (Discussion off the record.)

24              THE WITNESS:  I have it.

25              THE COURT:  I do want it on the screen as well,

1    because there are spectators.

2    BY MS. STAPLES:

3    Q.    So, Doctor, you have that in front of you now?

4    A.    I do.

5    Q.    This was the report you issued because the Court had

6    appointed you at that point, correct?

7    A.    Yes.

8    Q.    Now, in your report you talk about the relevant background

9    history of Ms. Soneeya, on page 2?

10   A.    Yes.

11   Q.    And you talk about details of her history of abuse,

12   correct?

13   A.    Yes.

14   Q.    Did -- is that a factor that you considered when you made

15   your recommendation about her having gender-confirming surgery?

16   A.    It's part of every assessment that clinical psychologists

17   do.

18   Q.    So it is something you consider when you're considering

19   whether to recommend somebody for gender-confirming surgery?

20   A.    No.

21   Q.    You don't.

22   A.    Are you talking specifically about abuse?

23   Q.    I'm talking about a history of abuse or a history of

24   violence.  Would that be something you consider in making a

25   recommendation for gender-confirming surgery?

```
 1    A.    Not necessarily, no.

 2    Q.    Okay.  Did you do it for Ms. Soneeya?

 3    A.    No.

 4    Q.    But you added it into your report?

 5    A.    It's in every evaluation, yes.

 6    Q.    Okay.

 7              MS. STAPLES:  If we could have the 2018 report.

 8              THE COURT:  This is Exhibit 26?

 9              MS. STAPLES:  It is Exhibit 26, your Honor, thank you.

10    BY MS. STAPLES:

11    Q.    Do you have that in front you, Doctor, Exhibit 26?

12    A.    I'm trying to find it.

13              THE COURT:  I think it's -- Dr. Ettner, I think it may

14    be in the three-ring binder that you have there.

15              MS. BELLIN:  If I may, your Honor, Dr. Ettner, it's

16    tab 26 of that hard-copy binder there.

17              THE WITNESS:  Did you say 26?

18              MS. BELLIN:  Yes.

19              THE COURT:  Not to confuse matters further, but it's

20    also Exhibit 1 to her affidavit.  Am I correct?

21              MS. BELLIN:  Yes, that's also correct.

22    BY MS. STAPLES:

23    Q.    Do you have that in front of you?

24    A.    Yes.

25    Q.    Now, nowhere in that report is Ms. Soneeya's relevant
```

1    history, is there, or background?

2    A.    No.

3    Q.    Okay.  Why is that?

4    A.    Because that had been documented elsewhere by myself and

5    by other individuals who had evaluated Ms. Soneeya.

6    Q.    And it was not even referenced, though, correct?

7    A.    Correct.  Not in the subsequent report.

8    Q.    Okay.  Now, also in comparing the two reports, the 2018

9    report also lists a number of studies in it, correct?

10   A.    Yes.

11   Q.    Which were not also listed in the 2016 report, correct?

12   A.    Correct.

13   Q.    Now -- sorry to keep jumping around, Doctor.  But if you

14   look at your affidavit, I had a question on one of the

15   notations -- or one of the statements you made in your

16   affidavit.

17            On page 11 of your affidavit -- I'm sorry, page 12,

18   paragraph 46.

19   A.    I'm sorry --

20   Q.    It's your affidavit.

21   A.    Page 12?

22   Q.    Page 12, paragraph 46.

23   A.    My paragraphs are not numbered.

24            MS. HANCOCK:  I think -- by "affidavit" do you mean

25   the one -- the direct testimony for today?

1          MS. STAPLES:  Correct.

2          MS. HANCOCK:  Are you looking at your report or --

3          (Pause.)

4   A.   Yes, I now find paragraph 46.

5   Q.   Okay.  You state in paragraph 46 that without surgery,

6   Ms. Soneeya's gender dysphoria will intensify with age,

7   correct?

8   A.   Yes.

9   Q.   Okay.  What is the basis of that?  Where does -- what is

10  the basis of that statement?

11  A.   In the literature.

12  Q.   Okay.  But your testimony today was that Ms. Soneeya

13  actually has -- her anxiety has decreased since 2016, correct?

14  A.   I don't believe I testified that her anxiety had

15  decreased.

16  Q.   I thought you had testified that her testing on the

17  anxiety --

18  A.   The test measures showed a decrease on the Beck Anxiety

19  Inventory.

20  Q.   Okay.  And when you say "the literature," what literature

21  speaks to gender dysphoria increasing -- the symptoms

22  increasing with age?

23  A.   Literature published in a -- in two peer-reviewed

24  journals.

25  Q.   And which ones are those?

1  A.   One is Maturitas, and one is Current Opinion in

2  Endocrinology and Obesity, I believe.

3  Q.   Now, I just want to speak to you also about the issue of

4  Ms. Soneeya -- it's your understanding that at some point back

5  in, I believe, the '90s, Ms. Soneeya attempted autocastration?

6  A.   Yes.

7  Q.   Okay.  And I believe in your affidavit, I believe -- this

8  is the affidavit you submitted for court.  You talk about that

9  as -- let's make sure I have the right -- you talk about that

10  as surgical self-treatment?

11  A.   Correct.

12  Q.   Okay.  And I believe you say that it would be the last

13  option for her, in your report.  It would be the last resort?

14  A.   Yes.

15  Q.   In your opinion, is that ever an option?

16  A.   I'm sorry.  I don't understand the question.

17  Q.   Well, you speak to autocastration and you say it would be

18  the last resort.

19  A.   Correct.

20  Q.   Is it ever an acceptable resort or option for anybody?

21       THE COURT:  What does "acceptable" mean here?  Do you

22  mean should some doctor prescribe it?

23       MS. STAPLES:  Well, if talking about it as a last

24  resort presumes that it's an option, I'm just exploring that.

25       THE COURT:  Perhaps the better question is what do you

1    mean by "last resort"?

2    BY MS. STAPLES:

3    Q.    What do you mean by "last resort"?

4    A.    Individuals who do not receive adequate treatment or

5    sufficient treatment often resort to removing their own

6    testicles, not as an act of mutilation but as an attempt to

7    remove the target organ that produces testosterone.

8    Q.    And that's what you refer to as surgical self-treatment.

9    A.    The literature refers to that as surgical self-treatment,

10   and so I use that term.

11   Q.    Is there any other example of a human being performing

12   surgical self-treatment on them for any medical or psychiatric

13   condition?

14   A.    Well, I'm familiar with people who have an infected part

15   of the body and can't get care so they might attempt to remove

16   that infected area themself.

17   Q.    When did that happen?

18             MS. HANCOCK:  Objection, your Honor.  I'm -- this --

19             THE COURT:  I'll hear it, but --

20   A.    Someone in Madagascar had a very badly infected foot, and

21   they had no means of treatment, so they amputated their foot.

22   Q.    And you equate that with surgical self-treatment for a GD

23   person who attempts to remove their scrotum or penis?

24   A.    No.

25             MS. HANCOCK:  Objection, your Honor.

```
 1            THE COURT:  I want to be sure I understand the
 2     significance of this.  This is a description of a self-help
 3     undertaking by someone?
 4            MS. STAPLES:  Well, if that's what --
 5            THE COURT:  Where are you going with it?
 6            MS. STAPLES:  Well, because I believe, your Honor, the
 7     argument is if Ms. Soneeya doesn't receive either her treatment
 8     or a transfer, she might commit this again.
 9            THE COURT:  Right.
10            MS. STAPLES:  I'm exploring that.
11            THE COURT:  How does that questioning get to this?
12            MS. STAPLES:  Because the idea that it's
13     self-treatment as opposed to self-mutilation is a very big
14     difference, and I'm just challenging --
15            THE COURT:  No, it's a normative difference.  We're
16     dealing with nomenclature here in an area in which people are
17     now trying to express themselves in various ways to express
18     other underlying concerns.  But self-mutilation, self-help,
19     surgical self-treatment, they all amount to the same thing.
20            MS. STAPLES:  Okay.
21     BY MS. STAPLES:
22     Q.    Dr. Ettner, you actually were retained in another case in
23     Massachusetts recently, the Jane Doe case.  Do you recall that?
24     A.    Yes.
25     Q.    Okay.  And in that matter you wrote an affidavit for
```

```
 1   Ms. Doe, correct?

 2   A.   Yes.

 3   Q.   And that was submitted to the court, correct?  Is that

 4   your understanding?

 5   A.   Yes.

 6   Q.   And it wasn't this court, it was a different court; is

 7   that correct?  I'm sorry, not to your Honor, to a different

 8   judge.  Do you know that?

 9   A.   I don't know whom it was submitted to.

10        THE COURT:  So the record is clear, it's Docket number

11   17-12255 before Judge Stearns.

12        MS. STAPLES:  That's correct, your Honor.

13        THE COURT:  Okay.

14        MS. STAPLES:  If I could have that, that is

15   actually --

16        (Discussion off the record.)

17        MS. STAPLES:  It's a disputed exhibit, I believe, your

18   Honor.

19        MS. HANCOCK:  Yes, we object on the ground of

20   relevance.

21        THE COURT:  What is the relevance?

22        MS. STAPLES:  The relevance is, your Honor, Dr. Ettner

23   provided a recommendation for Jane Doe, who it appears is

24   suffering from the same type of gender dysphoria issues as

25   Ms. Soneeya, but came to a different recommendation.  And I'd
```

1   like to just explore --

2           THE COURT:  Okay, it will be permitted.  Do we have a

3   copy --

4           MS. STAPLES:  We do, your Honor.  I think it's --

5           MS. RICHARD:  Defendants D.

6           MS. STAPLES:  D as in David?

7           MS. RICHARD:  D as in David.

8           MS. STAPLES:  So it's defendant's D.

9           THE COURT:  What I think I'd like to do with that

10  is -- I'll keep it marked for identification since it's been

11  used for -- I take it for purposes of Dr. Ettner's

12  recommendation here; is that right?

13          MS. STAPLES:  That's correct.

14          THE COURT:  Okay.  So I'm receiving it for that

15  purpose.

16          MS. STAPLES:  Thank you, your Honor.

17  BY MS. STAPLES:

18  Q.   So you were asked to render an opinion in that case as

19  well, correct?

20  A.   Yes.

21  Q.   And in that case, Jane Doe was suffering from gender

22  dysphoria as well; isn't that true?

23  A.   Jane Doe had a diagnosis of gender dysphoria.  She was not

24  suffering from gender dysphoria.

25  Q.   Jane Doe was not suffering symptoms of gender dysphoria?

1    A.    Jane Doe's gender dysphoria was controlled with hormone

2    management and genderal transition.

3    Q.    Was she in distress?

4    A.    She was in distress for another reason.

5    Q.    And that was because she wanted to be moved to the female

6    prison; is that correct?

7    A.    Not entirely, no.

8    Q.    Why else was she distressed?

9    A.    She was experiencing traumatic events during her

10   incarceration at the time that I provided that affidavit.

11   Q.    So your recommendation was that she be moved to

12   MCI-Framingham, correct?

13   A.    Correct.

14   Q.    She did not ask for the surgery; is that correct?

15   A.    Correct.

16   Q.    And you did not recommend the surgery; is that correct?

17   A.    That's correct.

18   Q.    And she was diagnosed with gender dysphoria.

19   A.    She has a diagnosis of gender dysphoria, yes.

20   Q.    Now, Doctor, you don't have a background in corrections at

21   all, do you?

22   A.    No.

23   Q.    Okay.

24         THE COURT:  Can I pause for a moment just so I'm clear

25   on this.

 1          MS. STAPLES:  I'm sorry, your Honor.

 2          THE COURT:  The traumatic events, broadly stated, what

 3    were they?

 4          THE WITNESS:  She was being groped by the male inmates

 5    and she was being forced by corrections officers to shower

 6    publicly in front of other men.  She was being badly harassed.

 7    She was being sexually assaulted, and I diagnosed her with

 8    post-traumatic stress disorder when I met with her.

 9          THE COURT:  All right.

10          You may proceed.

11          MS. STAPLES:  Thank you, your Honor.

12          Your Honor, I would ask if -- that affidavit be

13    introduced into evidence based on Dr. Ettner's opinion about

14    Jane Doe.

15          THE COURT:  Jane Doe is not on trial here.  You're

16    using it for purposes of impeachment.  As far as I'm concerned,

17    I'm receiving it for purposes of impeachment, but I'll receive

18    the whole thing for those purposes, but it's not substantive

19    evidence in this case.

20          MS. STAPLES:  I understand, your Honor.  I just want

21    to be sure.

22          THE COURT:  That's why I'm keeping it as Exhibit D.

23          MS. STAPLES:  Thank you, your Honor.

24    BY MS. STAPLES:

25    Q.   We were talking, Dr. Ettner, about your correctional past.

1   You don't have a history or experience in the correctional

2   field, correct?

3   A.   Correct.

4   Q.   And you have never worked in a prison, correct?

5   A.   Correct.

6   Q.   And you have no history of -- or experience in writing

7   prison policies or regulations about safety and security,

8   correct?

9   A.   Not about safety and security.

10  Q.   Right.  And in fact, when you made the recommendation that

11  Ms. Soneeya receive the surgery, you didn't consult with the

12  safety and security corrections people at the prison -- at the

13  department; is that fair to say?

14  A.   Yes.

15  Q.   And I think you testified or we talked a little bit about

16  Ms. Soneeya's crimes.  When you made the recommendation for her

17  to have surgery, did you consider her crimes?

18  A.   No.

19  Q.   Are you aware of what her crimes are?

20  A.   Yes.

21  Q.   Did you consider the makeup of MCI-Framingham?  And when I

22  say that, I mean, first of all, the physical plant of

23  MCI-Framingham, are you aware of that at all?

24  A.   No.

25  Q.   Are you aware or did you consider the population at

1  MCI-Framingham, the female population?

2  A.   No.

3  Q.   So you're not aware of their history or mental health

4  status or anything of that nature when you made this

5  recommendation for Ms. Soneeya?

6           MS. HANCOCK:  Objection, asked and answered.

7           THE COURT:  Well, more broadly, just so it shapes the

8  discussion here, I think, unless there's something more,

9  neither Dr. Levine nor Dr. Ettner considered the security

10  issues --

11           MS. STAPLES:  That's correct.

12           THE COURT:  -- here.

13           Referring to the population of Framingham as some

14  undifferentiated mass doesn't, I think, advance it.

15           MS. STAPLES:  No, I wasn't --

16           THE COURT:  Does Framingham hold murderers?

17           MS. STAPLES:  It does.

18           THE COURT:  Does it hold murderers of women?

19           MS. STAPLES:  Yes.

20           THE COURT:  Does it hold women who have abused other

21  women?

22           MS. STAPLES:  Yes.

23           THE COURT:  So I think it's going to be helpful, if

24  we're going to be focusing on that, to perhaps unpack the

25  demographics of Framingham rather than this undifferentiated

```
 1   reference, which of course is not something Dr. Ettner referred
 2   herself to, nor did Dr. Levine.
 3             MS. STAPLES:  That's correct.  It also --
 4             THE COURT:  So I think probably I want to hear that
 5   from people who know about it and considered it rather than
 6   people who didn't, unless you say they should have.
 7             MS. STAPLES:  Well, that will be part of the argument,
 8   but that's fine, your Honor.
 9             THE COURT:  Should Dr. Levine have considered it as
10   well?
11             MS. STAPLES:  Absolutely and -- absolutely.
12             THE COURT:  At the therapeutic stage?
13             MS. STAPLES:  I would suggest it would be part of it,
14   yes.
15             THE COURT:  And were they asked to?
16             MS. STAPLES:  They didn't --
17             THE COURT:  Did the DOC regulations require them to do
18   that?
19             MS. STAPLES:  The DOC required the treatment committee
20   to consider alternatives if there was a safety and security
21   problem.
22             THE COURT:  And who brings the safety and security
23   problems to their attention?
24             MS. STAPLES:  The commissioner.
25             THE COURT:  Did the commissioner in this case?
```

1          MS. STAPLES:  He did.

2          THE COURT:  All right.  In any event, we know from

3     Dr. Ettner that she didn't consider those, unless there's

4     something more.  Because she's not simply a backboard against

5     which to throw arguments.

6          MS. STAPLES:  No, your Honor, I'm just trying --

7          THE COURT:  She's hear to provide testimony, and I'll

8     hear her testimony if it's relevant here and if it's

9     percipient.

10          MS. STAPLES:  Again, I would just add the population

11     to Framingham also has a history of trauma and violence.  That

12     was what I was going to ask --

13          THE COURT:  I have no -- there seems to be no question

14     about that, although I'm not sure that Dr. Ettner's familiar

15     with that.  And that's what I mean as a backboard bouncing off

16     arguments.  If there's someone percipient who could tell us

17     about that, that would be helpful.

18          MS. STAPLES:  Okay.

19          THE COURT:  So I've ruled on the objection here,

20     receiving enough information to realize that Dr. Ettner is not

21     familiar with this area.

22          MS. STAPLES:  Okay.

23          THE COURT:  And we'll move on to something else.

24          MS. STAPLES:  Thank you.

25     BY MS. STAPLES:

1   Q.   Dr. Ettner, have you ever spoken to anyone on the

2   treatment committee at the department, who works with the

3   department, about Ms. Soneeya?

4   A.   I'm sorry.  Would you repeat the question?

5   Q.   Sure.  Have you spoken to anybody who was a member of the

6   gender dysphoria treatment committee about their recommendation

7   for Ms. Soneeya?

8   A.   No.

9   Q.   Do you know what their recommendation for Ms. Soneeya was?

10  A.   Yes.

11  Q.   Okay.  And is it your understanding that they were

12  recommending that she be transferred to MCI-Framingham for a

13  year to see how she acclimates at MCI-Framingham?

14  A.   Yes.

15  Q.   And if she successfully acclimated at MCI-Framingham, they

16  would consider giving her gender-confirming surgery.  Is that

17  your understanding?

18  A.   Yes.

19  Q.   And you disagree with that recommendation; is that

20  correct?

21  A.   Yes.

22  Q.   And why do you disagree with that?

23  A.   Because it -- living a year in a women's prison is not a

24  precondition for having medically necessary surgery.  And my

25  opinion is that Ms. Soneeya requires surgery and that placing

1   this year-long delay on the surgery puts her at risk.

2   Q.   Well, wouldn't it be also fair to say that the treatment

3   committee's recommendation was just a modification of the

4   Standards of Care?

5            MS. HANCOCK:  Objection, mischaracterizes.  I'm not

6   sure --

7            THE COURT:  Well, I will permit this question.  She

8   may answer if she chooses.

9   A.   It is a readout of the entire section of the Standards of

10  Care that specifically addresses the care for people who are

11  institutionalized and requires that that care mirror the care

12  in the community.  And in the community, people are not

13  required to live among other females for a year prior to

14  obtaining medically indicated treatment.

15  Q.   Well, none of the Standards of Care are requirements,

16  correct?

17  A.   They're guidelines.

18  Q.   They're guidelines.  And it does provide for flexibility,

19  correct?

20  A.   Correct.

21  Q.   And they -- the recommendation, as you say, takes into

22  account the individual person and their situation and their

23  needs and their limitations, correct?

24  A.   Correct.

25  Q.   So isn't it fair to say that the treatment committee's

1    recommendation may have been just a modification of the

2    Standards of Care?

3    A.    Not in my opinion.

4    Q.    Okay.

5          THE COURT:  In this particular -- that is, the

6    particular of year of time spent in the women's prison.

7          MS. STAPLES:  Correct.

8          THE COURT:  Okay.

9          MS. STAPLES:  If I could just have a moment, your

10   Honor.

11         THE COURT:  Yes.

12   BY MS. STAPLES:

13   Q.    Have you --

14         THE COURT:  Just a second.

15         (Discussion off the record.)

16         THE COURT:  Go ahead.

17         MS. STAPLES:  Thank you.

18   BY MS. STAPLES:

19   Q.    And would it be fair, Dr. Ettner, that you did not follow

20   up with the treatment committee to find out what was behind

21   their recommendation or discuss that with them?  Is that fair

22   to say?

23   A.    Follow up personally?

24   Q.    Correct.

25   A.    Correct.

1    Q.    When was the last time you followed up with Ms. Soneeya?

2    A.    I saw Ms. Soneeya in June of 2018.

3    Q.    And that was the last time you saw her?

4    A.    Correct.

5    Q.    When was the last time you saw Jane Doe?

6    A.    I don't recall offhand when I met with Jane Doe.

7    Q.    Have you seen Ms. Jane Doe since your affidavit was

8    written?  For her case?

9    A.    The affidavit in which I diagnosed post-traumatic stress

10   disorder?

11   Q.    Correct.

12   A.    No.

13            MS. STAPLES:  Your Honor, if I could just have a

14   moment?

15            THE COURT:  Yes.

16            (Discussion off the record.)

17            MS. STAPLES:  Just a few more questions, your Honor.

18            THE COURT:  All right.

19            This is a latitudinarian view of what 30 minutes is?

20            MS. STAPLES:  Am I beyond 30 minutes?  I haven't been

21   timing myself.

22            THE COURT:  No, I want the full recommendation, but

23   when people tell me what their plans are and their scheduling,

24   perhaps people will refine it a little bit more to be more

25   accurate.

1              MS. STAPLES:  I promise I'll be brief, your Honor.

2    BY MS. STAPLES:

3    Q.   So, Dr. Ettner, you referenced two peer-reviewed articles

4    about symptoms of gender dysphoria increasing or becoming more

5    severe as someone ages?

6    A.   Yes.

7    Q.   Can you tell me what those articles again were?  I'm

8    sorry.

9    A.   Yes.  Can I refer to the bibliography?

10   Q.   Of course.

11             (Pause.)

12             THE COURT:  And the bibliography is your 2018 report?

13             MS. STAPLES:  Correct, your Honor.  It's part of that

14   number 26.

15             THE COURT:  And that's Exhibit 3; is that right?  Or

16   26.

17             MS. STAPLES:  26.

18             THE COURT:  Okay.

19   A.   One is Ettner, "Care of the Elderly Transgender Patient,"

20   in Current Opinion in Endocrinology and Diabetes, 2013,

21   volume 20, number 6.  The second is Ettner and Wylie, 2013,

22   "Psychological and Social Adjustment in Older Transsexual

23   People," in Maturitas, 74(3).

24   Q.   So you wrote those?

25   A.   I co-wrote one, and I wrote one independently.

1    Q.    Okay.  So those are articles that you authored or

2    co-authored?

3    A.    In peer-reviewed journals, yes.

4    Q.    What does "peer review" mean?

5    A.    I'm sorry.  I didn't hear you.

6    Q.    Peer review, could you just explain that for me?

7    A.    A peer-reviewed journal is a journal where -- when a

8    scientific article is submitted, experts in the field review

9    that article and send feedback to the author to either revise

10   that article or they reject the article or they accept the

11   article without revision.  And then it's published.

12   Q.    Have most of your articles been peer-reviewed?

13   A.    All of the articles that have been listed in my

14   bibliography that I've authored or co-authored have been

15   peer-reviewed.

16   Q.    If I could just draw your attention to page 1 of your

17   bibliography.

18   A.    Which bibliography, I'm sorry, are you looking at?

19   Q.    We're looking at the one that's attached to your 2018 -- I

20   believe that's the one.

21          THE COURT:  Is it Exhibit B to 26?

22          MS. STAPLES:  I'm sorry, your Honor.  I'm looking at a

23   different page.

24   BY MS. STAPLES:

25   Q.    I guess it might be easier just for me to ask.

```
1              Do you recall an article that you wrote, "Tomboys
2    Revisited:  A Retrospective Comparison of Childhood Behaviors
3    in Lesbian and Transmen"?
4    A.   Yes.
5    Q.   And where was that published?
6    A.   That was published, I believe, in the Journal of Child and
7    Adolescent Psychiatry, but I will have to check.
8    Q.   I think that's correct.  Was that a peer-reviewed article?
9    A.   Yes, it is.
10   Q.   That's not an article where you can pay to be published?
11   A.   All articles now require a payment for -- in order for
12   open access, most journals require some form of payment.
13   Q.   Okay.  So there was a payment for that, but your testimony
14   is it was also peer-reviewed?
15   A.   I did not make the payment personally.  Yes, that article
16   was peer-reviewed and co-authored with Dr. White at Erasmus
17   University in Rotterdam.
18   Q.   And I believe this is my last question, Doctor.
19              Ms. Soneeya has some limited reading comprehension;
20   isn't that fair to say?
21   A.   Yes.
22   Q.   Did that influence her response to any psychodiagnostic
23   testing at all?
24   A.   No.
25              MS. STAPLES:  If I could have just one brief moment,
```

1   your Honor.

2               THE COURT:  Yes.

3               (Discussion off the record.)

4               MS. STAPLES:  Nothing further, your Honor.

5               THE COURT:  All right.  So because there's been some

6   testimony that Dr. Ettner is relying upon those two articles,

7   I'll leave it to plaintiff's counsel to provide copies for me.

8               MS. HANCOCK:  Yes, your Honor.

9               THE COURT:  I don't have subscriptions to either of

10  the periodicals.

11              MS. HANCOCK:  Fair enough.

12              THE COURT:  You may inquire, Ms. Hancock.

13                        REDIRECT EXAMINATION

14  BY MS. HANCOCK:

15  Q.   You talked a little bit about WPATH when -- during your --

16  the cross-examination.

17              Can you explain to us what types of people or

18  organizations belong to WPATH?

19  A.   WPATH is an organization that has chapters throughout the

20  world.  There's EPATH, which is a European chapter; there's a

21  Latin-American chapter; There's a Canadian chapter; there's a

22  U.S. chapter.  There are close to 2,000 members.  They're all

23  professionals, primarily surgeons, mental health professionals,

24  and endocrinologists.

25  Q.   And what types of organizations endorse WPATH's Standards

1  of Care?

2  A.   The Standards of Care are endorsed by the American

3  Psychiatric Association, the American Medical Association, the

4  American Psychological Association, the World Health

5  Organization, the National Committee on Correctional Health,

6  the American College of Obstetrics and Gynecology, the United

7  States Department of Health and Human Services, the American

8  Academy of Family Physicians, the National Association of

9  Social Workers, the American Society of -- American College of

10  Surgeons, the American College of Plastic Surgeons, the

11  American Academy For Public Health, and I think I'm leaving

12  some out.  There are some other organizations I can't recall.

13         THE COURT:  Does the American academy still call

14  itself plastic surgeons?

15         THE WITNESS:  I think it's the American Society of

16  Plastic Surgeons.

17         Oh, I've left out the Endocrine Society, who writes

18  the guidelines, by the way, for the treatment of gender

19  dysphoria, the endocrinological treatment.

20  BY MS. HANCOCK:

21  Q.   And you were asked on cross about whether or not you are a

22  medical doctor.

23         Is there any sort of requirement in the gender

24  dysphoria field that you must be a medical doctor in order to

25  treat or evaluate patients in terms of recommending care?

1    A.    No.

2    Q.    And you also talked -- Ms. Staples asked you about the

3    flexibility in the Standards of Care.  How does the section

4    regarding flexibility interact with the section on how the

5    Standards of Care should apply in the institutionalized

6    setting?

7    A.    The institutionalized section specifically states that

8    people should not be denied care based on where they live, and

9    that care for people who are institutionalized should mirror

10   care in the community, just like any other condition.  So

11   people who have diabetes should be treated appropriately

12   regardless of where they reside.

13   Q.    In your opinion, is Dr. Levine's requirement that

14   Ms. Soneeya be transferred to Framingham prior to receiving

15   surgery an -- a permissible application of the Standards of

16   Care?

17   A.    I see it as a burden and an additional requirement that

18   the Standards of Care do not require.

19   Q.    Now, in talking about -- you testified a little bit

20   about --

21          THE COURT:  Just so I can clarify this because it's an

22   issue that I will want to hear a little bit more about, it's

23   not directed one way or the other where the location of the --

24   where the patient will be located.  That's not part of the

25   standard?

1          THE WITNESS:  I'm sorry.

2          THE COURT:  The location of the plaintiff is not a

3     matter of the Standards of Care; is that correct?

4          THE WITNESS:  Correct.

5          THE COURT:  And -- if I may, just so I understand this

6     fully -- the amount of time it takes, that is, the immediacy,

7     is not itself directed by the Standards of Care?

8          THE WITNESS:  Only to the extent that it's that

9     treatment should follow the diagnosis --

10          THE COURT:  In an orderly fashion, I would assume?

11          THE WITNESS:  Correct.  And literature has documented

12     that delays in treatment lead to increases in suicide,

13     depression, and other bad outcomes.

14          THE COURT:  Okay.  And that will be assessed in terms

15     of whether or not the delay will, in fact, lead to that.

16          THE WITNESS:  Yes.

17          THE COURT:  Okay.  Go ahead.

18     BY MS. HANCOCK:

19     Q.   Now, you were also asked in cross about Ms. Soneeya's

20     depression and anxiety.  What -- is Ms. Soneeya's gender

21     dysphoria still severe, even though she's not currently

22     suicidal?

23     A.   Yes.

24     Q.   And is surgery still medically necessary for her, even if

25     she's not suicidal or have a -- score high on the anxiety

1    scale, for example?

2    A.    Yes.

3    Q.    Can you explain why that is so?

4    A.    Every person experiences gender dysphoria differently.

5    And Ms. Soneeya has severe gender dysphoria, and it frustrates

6    her and it causes her extreme distress, but she does not meet

7    the criteria for another mental illness.  She does not have

8    another co-occurring mental condition or a physical condition

9    that would require control or management in addition to the

10   gender dysphoria.

11   Q.   In your opinion, if Ms. Soneeya does not receive surgery,

12   what's the likely outcome?

13            MS. STAPLES:  Objection.

14            THE COURT:  Well -- just a moment.

15            If you have an opinion.

16            THE WITNESS:  I do have an opinion.

17            THE COURT:  All right.  I'll receive it.

18            THE WITNESS:  My opinion is that in the prison system

19   we oftentimes see the natural course of untreated gender

20   dysphoria, and typically there are three trajectories:

21   emotional decompensation; surgical self-treatment, which we've

22   discussed; or suicide, particularly when people have long

23   sentences.

24   BY MS. HANCOCK:

25   Q.    And applying that to Ms. Soneeya, what's your opinion?

```
 1   A.   Ms. Soneeya would likely attempt surgical self-treatment

 2   or suicide if she's denied surgery.  She's already attempted

 3   surgical self-treatment in the past.  She is aware, however,

 4   that the tissue that is removed during autocastration is

 5   necessary for gender confirmation surgery, and that's why it

 6   would be the absolute last resort, because preserving that

 7   tissue is important for a successful vaginoplasty procedure.

 8           MS. HANCOCK:  No further questions.

 9           THE COURT:  All right, Ms. Staples, anything?

10           MS. STAPLES:  Nothing further, your Honor.

11           THE COURT:  All right, you may step down.  Thank you.

12           So referring to the question of timing, are there

13   adjustments to be made in the timing of the examination of

14   Dr. Levine?

15           MS. HANCOCK:  Yes, your Honor.  It would probably be

16   safe to budget more like an hour or so.  I have to admit it's

17   my first rodeo.

18           THE COURT:  Let me add redirect and so on.  What do

19   you think?

20           MS. STAPLES:  Very briefly, your Honor.

21           THE COURT:  Okay.  All right.

22           So we'll march and finish off the direct examination

23   before we take a break, to be followed by the supplementary

24   examination, self-examination, I guess I'd say, of the experts.

25           That's going to be followed after lunch.
```

1          MS. STAPLES:  So at this time, your Honor, we would

2     bring up Dr. Levine.  We would ask that his affidavit that was

3     filed with the Court under seal, and it was signed on

4     February 26, 2019, be entered into evidence or accepted by the

5     Court.

6          THE COURT:  Right, it's received.

7          MS. STAPLES:  And, your Honor, there are a number of

8     exhibits we anticipate coming in through Dr. Levine.

9          THE COURT:  Okay.  I think they can be received now

10    unless there's going to be some particular objection.

11         MS. STAPLES:  I think ones would be his prior reports

12    that we're asking come into evidence in connection with his

13    affidavit.  Plaintiff has an objection to those.

14         THE COURT:  What is the objection of my looking at

15    them for substantive purposes?

16         MS. HANCOCK:  It would be relevance, your Honor.

17         THE COURT:  But this is his evaluation of Ms. Soneeya,

18    right?

19         MS. HANCOCK:  Yes.

20         THE COURT:  So I'm going to receive them.

21         MS. STAPLES:  It's number 11, 18, 20, 32, 33, 34, 503,

22    and Defendant's A, B, and C.

23         THE COURT:  The Defendants A, B, and C are --

24         MS. STAPLES:  Those recommend the surgery reports that

25    they had objected to --

1          THE COURT:  That's three.  I thought there were two

2     that --

3          MS. STAPLES:  No, there's a 2008, 2012 --

4          THE COURT:  Then I'll receive them all substantively.

5     For A, B, and C, together with her counsel we'll renumber those

6     as exhibits for substances purposes because they relate to

7     Ms. Soneeya.

8          MS. STAPLES:  Thank you.

9          (Exhibits 11, 18, 20, 32, 33, 34, 503 received into

10    evidence.)

11         MS. HANCOCK:  If we could just have a moment, your

12    Honor, we have some binders for Dr. Levine.

13         THE COURT:  Right, okay.

14         MS. HANCOCK:  And just for the record --

15         THE COURT:  Hold on a second.

16         MS. STAPLES:  Dr. Levine is asking -- he just needs to

17    go to the bathroom briefly.

18         THE COURT:  We'll take a five-minute recess.  We

19    won't, but, in any event, let me see if I can do this

20    housekeeping now.

21         I interrupted you, Ms. Hancock.  You said that you got

22    binders?

23         MS. HANCOCK:  Yes.  We are distributing binders for

24    impeachment purposes and during the evaluation.

25         THE COURT:  Okay.

1          MS. HANCOCK:  In the event that we need them.

2          (Discussion off the record.)

3          THE COURT:  So Ms. Beatty has just advised me that we

4     should call A, B, and C 35, 36, and 37.

5          MS. STAPLES:  Thank you, your Honor.

6          (Exhibits 35, 36, 37 received into evidence.)

7          MS. HANCOCK:  As another housekeeping matter, your

8     Honor, we would renew our objections to Dr. Levine's affidavit

9     which were previously filed with the Court.

10          THE COURT:  And I'm treating it the same way.

11          MS. HANCOCK:  Just for the record.

12          MS. BELLIN:  Your Honor, may I approach?

13          THE COURT:  Yes.

14          MS. HANCOCK:  Ms. Soneeya has to use the restroom.

15          THE COURT:  She's in custody.  Her custodians have to

16     accompany her.

17          You can use the lockup.

18          THE WITNESS:  Thank you, your Honor.

19          MS. STAPLES:  Your Honor, I'm sorry, I'm being asked

20     by multiple people if they can use the restroom.  I assume it's

21     okay to let them?

22          THE COURT:  It is, although when the principal

23     returns, we're going to be ready to go.

24          STEPHEN B. LEVINE, M.D., having been duly sworn by the

25     Clerk, was examined and testified as follows:

```
 1            THE CLERK:  Please be seated and state your full name.

 2            THE WITNESS:  Stephen Barrett Levine.

 3            THE COURT:  You may inquire, Ms. Hancock.

 4                        CROSS-EXAMINATION

 5   BY MS. HANCOCK:

 6   Q.   Good afternoon, Dr. Levine.  You provided an affidavit for

 7   the purposes of today, correct?

 8   A.   I did.

 9   Q.   But you did not provide an expert report in connection

10   with your testimony today, correct?

11   A.   I only -- I'm not sure what an expert report is, other

12   than the affidavit.

13   Q.   Well, you did not prepare a report for the purpose of this

14   litigation today, correct?

15   A.   No.

16   Q.   You only provided your affidavit, right?

17   A.   Yes.

18   Q.   And you did not provide a list of materials or studies

19   that you relied upon in preparing your affidavit, correct?

20            THE COURT:  Just so we're clarified on this.  We have

21   35, 36, and 37, which are the previous reports --

22            MS. HANCOCK:  Yes.

23            THE COURT:  -- here, which were introduced in

24   connection with his testimony.

25            MS. HANCOCK:  I'm sorry -- oh, okay.
```

1          THE COURT:  I mean, I'm not sure where this is going

2     on just the affidavit.  Because it's not just the affidavit;

3     it's those exhibits which are before the Court as well, which

4     include opinions.

5          MS. HANCOCK:  Understood.

6     BY MS. HANCOCK:

7     Q.   You did not provide a list of materials or articles that

8     you relied upon in developing those prior reports, correct?

9     A.   Correct.

10    Q.   And you're not a member of the WPATH, are you, Dr. Levine?

11    A.   No longer.

12    Q.   And in your affidavit --

13         THE COURT:  If you could put the microphone more

14    directly -- you have a soft voice, so to pick it up, we've got

15    to have the mic close to you.

16    A.   I said I'm no longer a member of WPATH.

17    Q.   Thank you.

18          And you testified in your affidavit that you

19    disagreed with key concepts of the Standards of Care, correct?

20    A.   I do.

21         THE COURT:  I hate to keep interrupting.  When did you

22    leave WPATH or no longer be a member of WPATH?

23         THE WITNESS:  Let me calculate this.

24         (Pause.)

25         THE WITNESS:  I was the writing chairman for the fifth

1    edition, and that came out in 1999.  I believe two years later

2    I attended the -- a meeting of WPATH in Galveston.  And as a

3    result of what I experienced in the meeting at Galveston, I no

4    longer renewed my membership.

5         THE COURT:  So somewhere in the range of 2001, 2002.

6         THE WITNESS:  Approximately, your Honor.

7    BY MS. HANCOCK:

8    Q.   And as you just said, you last assisted in the

9    participating in drafting the Standards of Care in 1999; is

10   that correct?

11   A.   Correct.

12   Q.   So that's roughly 20 years ago?

13   A.   Yes, 20.

14   Q.   And two versions have been released since that time,

15   correct?

16   A.   Yes.  The next version was released almost immediately, I

17   think a year later.  It had minor modifications but was

18   basically probably 95 percent of what was in the previous

19   standard.  But the new standard, which was -- came out seven

20   years, eight years ago was considerably expanded from about 20

21   pages to 121 pages.

22   Q.   Thank you.  If I have follow-up question, I'll ask you to

23   elaborate.  If you could just answer my question to the best of

24   your ability.

25        THE COURT:  Well, if you want instructions to a

```
 1    witness, ask me.
 2              MS. HANCOCK:   Okay.  Apologies, your Honor.
 3    BY MS. HANCOCK:
 4    Q.   So two versions were released since 1999, correct?
 5    A.   Correct.
 6    Q.   And one in 2001, as you just testified, right?
 7    A.   Right.
 8    Q.   And another one in 2011; is that right?
 9    A.   Yes.
10    Q.   And as you understand it, there's going to be an eighth
11    version coming out soon, correct?
12    A.   Yes.
13    Q.   And you're not involved in drafting that version, correct?
14    A.   I am not.
15    Q.   And you requested to participate in drafting that version,
16    correct?
17    A.   I'm not sure that's correct.
18    Q.   You did not ask to be involved in drafting that version?
19    A.   I think -- I think I actually might have, now that you
20    bring it up, but I was told I had to be a member of WPATH.
21    Q.   Now, you've worked as a consultant for the DOC since
22    around 2007 or 2008.  Does that sound right?
23    A.   That sounds right.
24    Q.   And you're not technically engaged by the DOC, though,
25    right?
```

```
 1   A.    I am paid as a consultant.

 2   Q.    But the work that you do is for the benefit of the DOC,

 3   correct?

 4            MS. STAPLES:  Objection.

 5            THE COURT:  Well, no, I'll permit that question.

 6            If you understand it.

 7   BY MS. HANCOCK:

 8   Q.    And --

 9            THE COURT:  Maybe before we get another question I

10   want to hear the answer to this one.

11            THE WITNESS:  Would you clarify your question, please?

12   BY MS. HANCOCK:

13   Q.    Well, the work that you do in connection with your

14   consultation with the DOC is for the benefit of the DOC,

15   correct?

16   A.    Yes.

17   Q.    And in 2008, the DOC's previous consultant recommended

18   that 12 inmates receive surgery, correct?

19   A.    Yes.

20   Q.    And the DOC's then mental health care provider reached out

21   to you to reevaluate those 12 inmates, correct?

22   A.    I think there's something in your question that is not

23   correct, but the gist of your question is correct.

24            If you repeat the question, I'll be able to point out

25   why it is slightly not correct.
```

1    Q.    That's okay.  I'll move on.

2           And as you understand it, the DOC's then mental

3    health care provider reached out to you because of your

4    testimony in Kosilek, correct?

5           MS. STAPLES:  Objection.

6           THE COURT:  He may answer.

7    A.    Yes.

8    Q.    And in Kosilek, your opinion was that Ms. Kosilek's

9    treatment plan was adequate; isn't that right?

10          MS. STAPLES:  Objection.

11          THE COURT:  No, overruled.

12          Just so I'm clear, I know it as Kosilek, but you're

13   talking about the case that was before Judge Wolf and then went

14   to the Court of Appeals.

15          MS. HANCOCK:  Yes, I am.

16          THE COURT:  All right.

17          I think we have an answer to the question already.

18          THE WITNESS:  I thought that the -- that it was

19   adequate treatment for Kosilek, yes.

20   BY MS. HANCOCK:

21   Q.    And it was adequate without surgery, right?

22   A.    Without surgery.

23   Q.    And you also thought that the threat of autocastration or

24   suicide without surgery was exaggerated; isn't that right?

25   A.    Yes.

1    Q.   And you thought that prisons were competent to handle that

2    kind of periodic suicidal ideation, correct?

3    A.   Yes.

4    Q.   And in 2008, you reevaluated those 12 inmates, right?

5    A.   Yes.

6    Q.   And after evaluating those 12 inmates, you determined that

7    none of them needed surgery; isn't that right?

8    A.   I determined -- I gave an individual treatment plan for

9    12, and each of those treatment plans could have potentially in

10   the future led to additional treatment.  But I did not

11   recommend immediate sex reassignment surgery for any of those

12   dozen inmates.

13   Q.   And one of those dozen inmates was Ms. Soneeya, wasn't it?

14   A.   I think so.

15   Q.   You think so, you don't know?

16        MS. STAPLES:  Objection.

17   A.   I don't remember the names of all 12 of them.  I have been

18   involved with Ms. Soneeya since 2008.  So it's likely that

19   you're correct.

20        THE COURT:  Just so we have a protocol, when there's

21   an objection, don't answer the question until I have a chance

22   to rule on it.

23        But I'll provide a historic ruling, which is I

24   overrule it.

25        MS. HANCOCK:  Thank you, your Honor.

BY MS. HANCOCK:

Q.   And you got paid to conduct those 12 evaluations for the

DOC, correct?

A.   Correct.

Q.   And every two years you give a training for the DOC,

right?

A.   Approximately.

Q.   Approximately.  And you get paid to do those trainings,

don't you, Dr. Levine?

A.   I do.

Q.   And you also participate in the GD treatment committee,

correct?

A.   I do.

Q.   And you also get paid to do that, right?

A.   I do.

Q.   And when the DOC thinks it has a case that's going to be

litigated, it reaches out to you and asks you to evaluate and

provide an opinion, correct?

          MS. HANCOCK:  Objection.

          THE COURT:  If he knows.

A.   I think in this case it has.  In another case it has, but

I have no idea of how many other cases that the DOC litigates

and they do not consult with me.  So if you're implying that

I'm always asked by the DOC to come to courtrooms for things

that are adjudicated, that's beyond my awareness and I would

1    imagine the answer is no.

2    Q.   Well, it's happened more than once; isn't it right?

3    A.   It's happened twice.

4    Q.   In fact, you testified that -- in your deposition earlier

5    this year, that when they often have a case that they think is

6    going to be litigated and involves a serious matter, that's

7    when they reach out to you, right?

8    A.   I may have said that, but perhaps it's not accurate

9    because I don't know the number of times that they have

10   litigation that they don't involve me.

11   Q.   And is that what happened in 2017 of this year with

12   respect to Ms. Soneeya?

13           MS. STAPLES:  Objection.

14           THE COURT:  I'm not sure what it is that happened.

15   BY MS. HANCOCK:

16   Q.   Well, they reached out to you when they anticipated

17   Ms. Soneeya's case would be litigated, correct?

18           MS. STAPLES:  Objection.

19           THE COURT:  See, the problem is it merges his

20   knowledge of their choices or their discretion.  And so I'm

21   going to sustain the objection to that.

22           MS. HANCOCK:  Let me go on, your Honor.

23   BY MS. HANCOCK:

24   Q.   And you're getting paid for your time today; isn't that

25   right, Dr. Levine?

1    A.    I am.

2    Q.    Now, you've only ever been hired to testify on behalf of

3    state departments of corrections; isn't that right?

4          (Pause.)

5    A.    I mean, I've been hired to do other things in my life, but

6    that's not what you're asking me.

7          THE COURT:  If I understand the question -- I don't

8    mean to interrupt, but in cases involving disputes between

9    departments of correction and inmates, have you ever testified

10   for anyone other than the Department of Corrections?

11         THE WITNESS:  No.

12   BY MS. HANCOCK:

13   Q.    So you've never testified on behalf of an inmate seeking

14   care from a Department of Corrections; is that right?

15   A.    That's right.

16   Q.    And other states also reached out to you after your

17   testimony in Kosilek; is that right?

18   A.    Please repeat that.

19   Q.    After your testimony in Kosilek, other states, state

20   department of corrections started to reach out to you for your

21   opinion, correct?

22         MS. STAPLES:  Objection.

23   A.    Yes.

24         THE WITNESS:  I'm sorry.

25         MS. STAPLES:  I'll withdraw the objection, your Honor,

```
 1   that's fine.
 2            THE COURT:  They passed in the night, and so I'm going
 3   to receive the answer, which is "yes," as I understand it.
 4   BY MS. HANCOCK:
 5   Q.   And these other state department of corrections, they know
 6   about your testimony in Kosilek.
 7            MS. STAPLES:  Objection.
 8            THE COURT:  Again, the knowledge of the states is a
 9   little uncertain here.  Perhaps inferences can be drawn from
10   it, but I'm not sure this witness is in position to answer it
11   unless he says that he was told.
12   BY MS. HANCOCK:
13   Q.   Well, you testified in your deposition earlier this year
14   that all these states reach out to me and it's interesting to
15   me that all these states reach out -- all these states know
16   about my testimony in the Kosilek case.
17            Does that sound familiar?
18   A.   Yes.
19   Q.   And you've testified as an expert for other state
20   department of corrections, right?
21   A.   Yes.
22   Q.   And you also give trainings to other state department of
23   corrections, right?
24   A.   Yes.
25   Q.   And one of those trainings was a training to the Idaho
```

1   Department of Corrections; isn't that right?

2   A.   Yes.

3   Q.   And you gave a training to the Idaho DOC in roughly 2016.

4   Does that sound right?

5   A.   Yes.

6   Q.   And you trained the Idaho DOC that surgery should not be

7   conceived as lifesaving; is that right?

8   A.   I don't recall that at all.

9   Q.   Well, we can -- can we pull up -- it is tab 21.

10          It's tab 21 in your binder, and if you turn to slide

11   43.

12          MS. HANCOCK:  I'm sorry.  In volume II of the green

13   binder.

14          THE COURT:  Is there a reason -- just so I know, is

15   there a reason that it runs from 43 to the next page is 51?

16          MS. HANCOCK:  Yes, your Honor.  This was filed in

17   connection with the litigation that's ongoing, the Edmo --

18          THE COURT:  The Edmo matter.  So it didn't receive

19   pages -- or if there were, pages 44 through 50?

20          MS. HANCOCK:  We have the full presentation, if your

21   Honor would like to view it.  But we thought this was a little

22   more authenticated, given that it was filed with the Court.

23          THE COURT:  Okay.  I just want -- because I saw -- you

24   always want to learn how it turned out, if I turn from page 43

25   I get to page 51.

```
 1              MS. HANCOCK:  Fair enough.
 2              THE COURT:  But if it's not relevant, it's not
 3     relevant.
 4              MS. HANCOCK:  No, it's not relevant.
 5     BY MS. HANCOCK:
 6     Q.   You recognize this as the presentation you gave to the
 7     Idaho DOC, correct?  And it's titled, "Medical Necessity for
 8     Transgender Inmates:  In Search of Clarity When Paradox,
 9     Complexity, and Uncertainty Abound"?
10     A.   Yes.
11     Q.   And if you turn to page 43, the second bullet, it states,
12     SRS is not conceived as lifesaving?
13     A.   Where are the page numbers here?
14     Q.   543.  So it's the little white on the bottom right.
15     A.   Page 43.  Okay.  Preventing death among inmates with
16     gender dysphoria.
17     Q.   Yes.  And the second bullet, it states:  SRS is not
18     conceived as life-saving, as is repairing a potential leaking
19     aortic aneurysm, but as life-enhancing, as is providing
20     augmentation for women distressed about their small breasts.
21              Does that refresh your recollection?
22     A.   Yes.
23     Q.   And you're aware of a case called Edmo v. Idaho DOC,
24     correct?
25     A.   No, I'm not aware.
```

```
 1   Q.   So you're not aware that the court considered you to be an
 2   outlier in the field of gender dysphoria; is that right?
 3            MS. STAPLES:  Objection.
 4            THE COURT:  Well, if he's familiar with that
 5   characterization, he can answer "yes" or "no."
 6   BY MS. HANCOCK:
 7   Q.   So you're not aware that the court found that you were
 8   considered to be an outlier in the field of gender dysphoria?
 9   A.   I'm unaware.
10   Q.   And you're not aware that the court found that you do not
11   ascribe to the WPATH Standards of Care; is that right?
12            MS. STAPLES:  Objection.
13            THE COURT:  I'm less interested in what the court
14   found on that than I am the substantive question.
15            Does he -- well, do you subscribe to the WPATH
16   standard of care?
17            THE WITNESS:  I subscribe to it as guidelines.  I
18   subscribe to it in many ways, but there are subtle objections
19   that I have to it, and --
20            THE COURT:  Would it be fair to say those are
21   refinements of the Standards of Care as they exist now?
22            THE WITNESS:  Yes.
23            THE COURT:  And you understand that the direction that
24   was given by both Judge Tauro and Judge Young in this case was
25   to apply the Standards of Care that's provided by WPATH?
```

1          THE WITNESS:  Yes.

2          THE COURT:  And did you?

3          THE WITNESS:  Yes.

4          THE COURT:  You can inquire further what that means,

5     but I just want to understand the ground rules here.

6          (Pause.)

7          MS. HANCOCK:  Just a minute, your Honor.

8          (Pause.)

9     BY MS. HANCOCK:

10    Q.   Now, you testified in your affidavit that you disagree

11    with key concepts in the Standards of Care, correct?

12    A.   Correct.

13    Q.   And you wouldn't say a key concept are subtle differences,

14    would you?

15         MS. STAPLES:  Objection.

16         THE COURT:  Overruled.

17    A.   Well, in some cases they're subtle; in some cases they're

18    simply disagreements.

19    Q.   They're simply disagreements.  And you disagree that the

20    Standards of Care should apply equally in prisons; isn't that

21    right?

22    A.   Well, that's a subtlety.

23    Q.   That's a subtlety, even though there's two -- strike that.

24         You think that the Standards of Care application to

25    institutionalized settings is kind-hearted and dangerous; isn't

1  that right?

2  A.  It's kind-hearted, it's motivated by compassion; and it's

3  dangerous in -- to the extent that the people who wrote those

4  standards seem to have very little indication of the people in

5  prison, why they're in prison, what their psychological

6  capacities are, and their motivations for -- the possible

7  motivations other than genuine gender dysphoria for wanting to

8  presenting themselves for hormones and surgery.

9  Q.  Now --

10  A.  In that regard, they are a little naive.

11  Q.  You issued a report in a case called Norsworthy, correct?

12  A.  What is the case called?

13  Q.  Norsworthy?

14  A.  Norsworthy, a California case.  Yes.

15  Q.  In that case, you issued a report in which you opined that

16  it's not accurate to apply the Standards of Care as applying

17  equally to prisons, correct?

18  A.  I may have, yes.

19  Q.  Let's turn to the Standards of Care.  If you could please

20  turn to --

21      THE COURT:  Is there a copy of the Norsworthy

22  affidavit or --

23      MS. HANCOCK:  Yes, there is, your Honor.

24      THE COURT:  Is that what you're going to refer to now?

25      MS. HANCOCK:  No.  I'm now turning to the Standards of

1    Care, but we can -- if your Honor is interested, we can look at

2    his Norsworthy report.

3            THE COURT:  I just want to understand.  He's

4    confronted with it.  If there's a document, I'd like to see it.

5    First I'm interested in his recollection, but then I want to

6    see the document, too.

7            MS. HANCOCK:  Sure.  So let's go through Norsworthy.

8    BY MS. HANCOCK:

9    Q.   Can you please turn to tab 17 in volume II.

10   A.   Page 17?

11   Q.   Tab 17.

12            And you recognize this as your expert report in

13   Norsworthy v. Beard?

14   A.   I don't recognize it, but it's -- it looks like it's my

15   report.

16   Q.   Okay.  Can you please turn to page 6?

17            MS. STAPLES:  Which page?  I didn't hear.

18            MS. HANCOCK:  Page 6.

19            MS. STAPLES:  Thank you.

20   BY MS. HANCOCK:

21   Q.   And I'll call your attention to IV.

22   A.   Yes.

23   Q.   And you write, "The argument that institutionalized

24   individuals should have the same right to treatment" --

25            THE COURT:  If you could go a little bit slower, both

1   for me and the court reporter.

2           MS. HANCOCK:  Sorry, your Honor.

3   BY MS. HANCOCK:

4   Q.   "The argument that institutionalized individuals should

5   have the same right to treatment for gender dysphoria that

6   community-dwelling individuals possess is based upon the

7   medical illness and minority rights paradigms.  This section of

8   the Standards of Care makes no mention of an inmate's

9   psychiatric comorbidity.  In fact, it does not even mention

10  prisoners specifically.  It urges institutions to recognize the

11  need for care for gender dysphoria.  Some outside experts

12  interpret this to mean that inmates should be given SRS."

13          Did I read that correctly?

14  A.   You did.

15  Q.   Now if you could please turn to tab 12 in your binder.

16  This is the Standards of Care.

17          THE COURT:  Which for our present purposes is

18  Exhibit 2 here.

19          MS. HANCOCK:  Yes.

20          THE COURT:  In the case itself.

21          MS. HANCOCK:  Yes.

22  BY MS. HANCOCK:

23  Q.   And if you could please turn to page 67.

24          And if you go to bottom half of page 67, it states

25  that "the Standards of Care in their entirety apply to all

1    transsexual, transgender, and gender non-conforming people

2    irrespective of their housing situation."

3            Did I read that correctly?

4    A.   Oh, the first -- I'm sorry.  You were talking about the

5    topic sentence, yes.

6    Q.   And right above that it states, "People should not be

7    discriminated against in their access to appropriate healthcare

8    based on where they live, including institutional environments

9    such as prisons or long, intermediate-term healthcare

10   facilities."

11           Did I read that correctly?

12   A.   You did.

13   Q.   And below it it says, "Access to these medically necessary

14   treatments should not be denied on the basis of

15   institutionalization or housing arrangements."

16           Did I read that correctly?

17           (Pause.)

18   Q.   It's the second sentence.

19   A.   Yes, I see it now, yes.

20   Q.   Now, this section is not the only key concept that you

21   disagree with in the Standards of Care; is that right?

22           MS. STAPLES:  Objection.

23           THE COURT:  I'm not sure he says he disagrees with

24   this concept as a concept.

25   BY MS. HANCOCK:

1    Q.    Do you agree that the Standards of Care should apply

2    equally in the prison setting?

3    A.    As you previously had me read, what I'm saying is that the

4    committee that wrote this section did not seem to be aware of

5    the unique psychopathologies, the patterns of behavior over

6    time that got people into prison.

7              So that in the community, if we knew someone had a

8    serious traumatic background and was involved in many criminal

9    activities and had evidence of psychopathy, we would be

10   hesitant to automatically recommend -- quickly recommend

11   surgery.

12             But more importantly, those kinds of people in the

13   community are unreliable and often do not come for care.  So

14   that the experts in the world who have written the Standards of

15   Care have had very little clinical experience with people who

16   resemble those people who are in prison for life or for many,

17   many years.

18             And so what I am saying as a clinical psychiatrist is

19   I have recognized there are personality differences and those

20   personality differences need to be factored into the assessment

21   of and the treatment recommendations for inmates.  And that is

22   the basis of my objection to this.

23             I also have a historical objection to this --

24             THE COURT:  Just a moment.

25             Let me be clear about this.  If he's confronted,

1    rather than going through the elaborate process of

2    back-and-forth or recognizing the departure from Queen

3    Caroline's case, I'm going to permit him to testify as to what

4    he means by various things in response to the questions that

5    you put to him.

6            So it's not a matter of not permitting you to control

7    the witness, but I want to ultimately hear what the witness has

8    to say about his views about it.

9            And so when you bring to his attention things that may

10   seem to be discordant between his views and the SOC, the

11   follow-up question that I will expect to hear or at least the

12   follow-up answer that might be volunteered is one that I'll

13   receive here.  But not at length.

14           And so, Dr. Levine, I cut you off at a particular

15   point because you're entering into a narrative now, and I'll

16   permit question and answer to develop this.

17   BY MS. HANCOCK:

18   Q.   You believe that WPATH views gender dysphoria as a medical

19   condition and not a mental illness; is that right?

20   A.   Yes.

21   Q.   And in your opinion, as you testify in your affidavit,

22   gender dysphoria is a psychiatric condition, not a medical

23   condition; isn't that right?

24   A.   Right.

25   Q.   And since it's not a serious medical condition, you view

1    surgery as life-enhancing and not saving, correct?

2    A.    Yes.

3    Q.    And you believe that surgery is always an elective

4    procedure, don't you?

5    A.    Always an elective procedure.

6    Q.    And there's no immediacy to surgery, in your view; isn't

7    that right?

8    A.    Well, "immediacy" is a relevant term.  And so immediacy is

9    not -- immediacy like a gangrenous leg or an acute

10   appendicitis, that's an immediacy thing.

11            An elective procedure to correct genital dysphoria --

12   that is, dysphoria about the presence of the male genitalia --

13   is not immediate -- doesn't have the same kind of immediacy

14   that other surgical emergencies have.

15   Q.    And so, in your view, surgery is never medically

16   necessary, correct?

17   A.    That's not true.

18   Q.    That's not true.

19   A.    It is not true.

20            THE COURT:  When you say "surgery," you men SRS?

21            MS. HANCOCK:  I do.

22            THE COURT:  The answer is, no, you don't believe that

23   SRS is never medically necessary.

24            THE WITNESS:  I have -- may I elaborate, your Honor?

25            THE COURT:  No, I just want the answer to this one.

1          THE WITNESS:  It is occasionally medically necessary.

2          THE COURT:  Okay.

3   BY MS. HANCOCK:

4   Q.   Well, you've previously testified in this case that you

5   would never say it's medically necessary because that implies

6   that gender dysphoria is a serious medical condition, right?

7   A.   Correct.

8   Q.   You, instead, like to use the term "psychologically

9   beneficial"; isn't that right?

10  A.   Yes.

11  Q.   And so in deciding whether or not surgery is inappropriate

12  for a patient -- is appropriate for a patient, you look to

13  whether it would benefit and please the patient, correct?

14  A.   Yes.

15  Q.   And that's because, in your view, gender dysphoria is a

16  psychiatric condition, correct?

17  A.   It is a special -- it is a special variety of human

18  suffering and it is -- of its very nature, it is psychological,

19  as opposed to -- I mean, I guess we'll discuss this this

20  afternoon.

21  Q.   Yes.  There will be lots of time in the hot tub.

22          Can you please turn -- let's see what the Standards

23  of Care say on this.  Can you please turn to tab 12 in volume

24  II of your green binder?

25  A.   I have that open.

1    Q.   Can you please turn to page 54?

2         Now, you see the header where it says "Sex

3    Reassignment Surgery is Effective and Medically Necessary,"

4    don't you?

5    A.   Page 54, is that what you said?

6    Q.   Yup.  There's a header right underneath --

7    A.   Yes.

8    Q.   And this section continues to state, "While many

9    transsexual, transgender, and gender non-conforming individuals

10   find comfort with their gender identify, role, and expression

11   without surgery, for many others surgery is essentially and

12   medically necessary to alleviate their gender dysphoria."

13        Did I read that correctly?

14   A.   Yes.

15   Q.   And it continues, "For the latter group, relief from

16   gender dysphoria cannot be achieved without modification of

17   their primary and/or secondary sex characteristics to establish

18   greater congruence with their gender identity."

19        Did I read that correctly?

20   A.   You did.

21   Q.   Now, this section also talks about the benefits of

22   surgery; isn't that right?

23        I will point you to -- if you look at page 5, the

24   first full sentence of the paragraph, it says, "Follow-Up

25   surgeries have shown an undeniable beneficial effect of sex

1    reassignment surgery on postoperative outcomes such as

2    subjective well-being, cosmesis, and sexual function."

3           Did I read that correctly?

4    A.   Yes, but I don't know what the last part actually means in

5    terms of sexual function.

6           THE COURT:  Let me just say not quite accurately.  I

7    think you said "follow-up surgeries," and you meant "studies."

8           MS. HANCOCK:  Studies.  Sorry, your Honor.  Yes.

9    BY MS. HANCOCK:

10   Q.   And in support of this statement, the Standards of Care

11   cite to numerous studies, correct?

12   A.   It does.

13   Q.   And there's also an appendix to this section, appendix D,

14   right, at the very bottom.  And I'll have you please turn to

15   page 107, which is appendix D.

16   A.   All right.

17           (Pause.)

18   Q.   Are you there?

19   A.   Yes.

20   Q.   And this section describes additional evidence for

21   surgical outcomes related to surgery, right?

22   A.   Yes.

23   Q.   And cites additional evidence in support of the statement

24   that surgery has an undeniable beneficial effect on individuals

25   with gender dysphoria, correct?

1    A.    Yes.

2    Q.    But you disagree that surgery has an undeniable beneficial

3    effect, don't you, Dr. Levine?

4    A.    Again, this is a matter of subtlety and a matter of

5    scientific method and a matter of politics.

6          It's very rare for physicians to represent their --

7          THE COURT:  I want to hear the science, I don't want

8    to hear the politics.

9          THE WITNESS:  Yes.  In science it's very rare for

10   people to be authoritative and say things like "undeniable."

11   In fact, the problem with gender reassignment surgery is if you

12   evaluate it in the short term, many of these statements are

13   absolutely correct except for the one about sexual function,

14   which is decidedly not correct.

15         And if you look at the data which is not in the

16   Standards of Care, even though the writers of the Standards of

17   Care had access to the information, the long-term outcome in

18   terms of mental health is not good for a large percentage of

19   people, including postoperative suicide.

20         THE COURT:  If I can, Doctor, then one of your

21   reservations about this section is it doesn't reference the

22   Swedish and the Denmark -- Danish studies.  Is that it?

23         THE WITNESS:  Yes.

24         THE COURT:  Any other studies?

25         THE WITNESS:  No.  Those are the primary ones I'm

1    aware of.

2             There's another study about -- from Italy -- of seven

3    or -- seven people of 12 people who have asked for surgical

4    operations to return them to the male gender role.

5             THE COURT:  Okay.

6    BY MS. HANCOCK:

7    Q.    This is the first time you've referenced that study; isn't

8    that right, Dr. Levine?

9    A.    Well, in one of my published articles --

10   Q.    Is that study referenced in your affidavit?

11   A.    No.

12   Q.    Your affidavit cites to two studies, correct?

13   A.    Yes.

14   Q.    And the first study is a Swedish study, correct?

15   A.    Yes.

16   Q.    It's called -- it's by Cecilia Dhejne, and it's called the

17   "Long-Term Follow-Up of Transsexual Persons Undergoing Sex

18   Reassignment Surgery:  Cohort in Sweden."  Right?

19   A.    Yes.

20   Q.    And you also reference another study, a Danish study by

21   Simonsen, called "Long-Term Follow-Up of Individuals Undergoing

22   Sex Reassignment Surgery:  Somatic Morbidity and Cause of

23   Death," correct?

24   A.    Correct.

25   Q.    And you cite these two studies as evidence suggesting

1    there's a huge suicide rate post-surgery, correct?

2              MS. STAPLES:  Objection.

3              MS. HANCOCK:  It's referenced --

4              THE COURT:  Just a moment.  If the use of the word

5    "huge" was included in something that he said?

6    BY MS. HANCOCK:

7    Q.   Yes.  If you turn to your affidavit, it's in paragraphs 18

8    to 19.

9    A.   Well --

10   Q.   So I want to talk --

11             THE COURT:  Do you have your affidavit in front of

12   you?

13             THE WITNESS:  No.

14   BY MS. HANCOCK:

15   Q.   It's in volume I of the first green binder.

16             (Pause.)

17   A.   Where is it?

18   Q.   Tab 1.

19   A.   Tab 1.

20   Q.   Yes.

21   A.   Okay.

22   Q.   Page 5, paragraph 18.  The study -- this is what you wrote

23   in your affidavit:  "The study showed a huge suicide rate for

24   this group compared to control groups."

25             Did I read that correctly?

1    A.    You did.

2          May I explain that word?

3    Q.    I will ask you follow-up question.  I want to talk through

4    the study first.

5    A.    Okay.

6    Q.    Now, the control groups in this study were members of the

7    general population, correct?

8    A.    Yes.  They were --

9    Q.    They were not preoperative transgender individuals,

10   correct?

11   A.    That's true.

12   Q.    So the study does not compare suicide rates between pre-

13   and postoperative transgender individuals, right?

14   A.    Unfortunately not.

15   Q.    So we don't know whether postoperative transgender

16   individuals have higher suicide rates in comparison to

17   preoperative transgender individuals, correct?

18   A.    That's correct.

19   Q.    In fact, the rate of suicide could have actually been

20   worse for the individuals who needed surgery but who did not

21   receive it; isn't that right?

22   A.    I don't know that to be true at all.

23   Q.    Well, you recognize that this is a real limitation of the

24   Swedish study, correct?

25   A.    Yes.

1    Q.    And the author also explicitly recognized this as a real

2    limitation of her study; isn't that right?

3    A.    From that aspect it is a limitation, but the study has

4    many positive features that the Court needs to understand.

5    Q.    Okay.  Let's look at the study.  Can you please turn to

6    tab 11.  This has been premarked as Exhibit 32.

7    A.    It's volume II or volume I?

8    Q.    I'm sorry.  It's volume II.

9                And if you turn to page 7.

10               (Pause.)

11   A.    I'm there.

12   Q.    In the third paragraph in the left column, the author

13   writes, "The caveat with this design is that transsexual

14   persons before sex reassignment might differ from healthy

15   controls."

16               And she continues, "It is therefore important to note

17   that the current study is only informative with respect to

18   transsexuals person's health after sex reassignment surgery.

19   No inferences can be drawn as to the effectiveness of sex

20   reassignment surgery as a treatment for transsexualism.  In

21   other words, the results should not be interpreted such as sex

22   reassignment surgery per se increases morbidity and mortality.

23   Things might have been even worse without sex reassignment."

24               Did I read that correctly?

25   A.    You did.

```
 1   Q.   Now, you also testified about this study in the 2012
 2   trial, correct?
 3   A.   I think so.
 4   Q.   Well, we can pull it up if you --
 5   A.   Well, if you tell me I did, I did.
 6   Q.   And the Court --
 7            THE COURT:  This is the trial before Judge Tauro.
 8            MS. HANCOCK:  Yes, this is the 2012 trial.
 9   BY MS. HANCOCK:
10   Q.   And you're aware that the Court previously found that this
11   study did not provide any evidence regarding the effectiveness
12   of surgery, correct?
13            MS. STAPLES:  Objection.
14            THE COURT:  If he's aware, he can answer.
15            THE WITNESS:  I am unaware of what the ruling was in
16   that trial.
17   BY MS. HANCOCK:
18   Q.   And the author also recognized additional limitations on
19   her study; isn't that right?
20            (Pause.)
21   Q.   I'll turn you to page 7.  Last paragraph in the left-hand
22   column.  She writes, "Other facets to consider are, first, that
23   this study reflects the outcome of psychiatric and somatic
24   treatment for transsexualism provided in Sweden during the
25   1970s and 1980s.  Since then, treatment has evolved with
```

1    improved sex reassignment surgery, refined hormonal treatment,

2    and more attention to psychosocial care that might have

3    improved the outcome."

4         Did I read that correctly?

5    A.   You did.

6    Q.   So you agree that surgery and hormone therapy has improved

7    since the 1970s and 1980s, correct?

8    A.   I hope that is correct, yes.

9    Q.   I agree.

10        Now, the author also explicitly recognizes in her

11   article that surgery improves the quality of life; isn't that

12   right?

13   A.   Yes.

14   Q.   And that surgery is the internationally recognized

15   treatment to ease a gender dysphoria, correct?

16   A.   Yes, it's what the members of WPATH believe.

17        THE COURT:  Well, the question is limited to this

18   author, so --

19   BY MS. HANCOCK:

20   Q.   Let's turn to page 2, at the top of the paragraph, first

21   sentence.

22        The author writes, "The present form of sex

23   reassignment surgery has been practiced for more than half a

24   century and is the internationally recognized treatment to ease

25   gender dysphoria in transsexual persons."

1          Do you see that?

2    A.   No, I don't.  Where is it?

3    Q.   You don't.

4    A.   Just tell me where it is.

5    Q.   It's in the first paragraph in the left-hand column -- not

6    the first paragraph, the first little segment.  It's the first

7    full sentence.

8    A.   The present form has been practiced -- yes, okay.

9    Q.   And is the international recognized treatment to ease

10   gender dysphoria in transgender persons, correct?

11   A.   Yes, correct.

12   Q.   So now let's turn to the Danish study.

13          If you could, please turn to tab 20, and this has

14   been premarked as Exhibit 33.

15          Now, you testified in your affidavit --

16          THE COURT:  When you say 33, just so I'm clear, is it

17   being offered substantively as 33?

18          MS. HANCOCK:  Yes, it's been premarked as Exhibit 33.

19          THE COURT:  So you're offering it at this point.  I

20   don't think we've received it yet.

21          MS. HANCOCK:  I'm sorry, I thought we --

22          MS. STAPLES:  I thought I went through and I do think

23   I added that in.

24          THE COURT:  Okay.  So 33 would be received.  So I'm

25   clear with respect to the Swedish study, was that also offered?

```
 1                MS. STAPLES:  It was, your Honor.

 2                THE COURT:  So they're both substantively in evidence.

 3                MS. STAPLES:  Yes.

 4                THE COURT:  Okay.

 5     BY MS. HANCOCK:

 6     Q.   Now, you testified in your affidavit that this study has

 7     very similar findings as the Swedish study, right?

 8     A.   It does.

 9     Q.   And this study followed 104 individuals from 1978 to about

10     2010, correct?

11     A.   Yes.

12     Q.   And of those 104 studies -- excuse me, of those 104

13     individuals, only two committed suicide; isn't that right?

14     A.   Only two?  Two out of a hundred.

15     Q.   Two out of 104.

16     A.   That's a very high rate of suicide.

17                THE COURT:  Well, just a moment.  Doctor, don't

18     quibble with the question like that.  It's not -- it's worse

19     than wrong, it's foolish, it's not impressive to me.  You can

20     respond by saying it is two out of a hundred in this --

21     BY MS. HANCOCK:

22     Q.   Two of 104, correct?

23     A.   I think it's actually 98, but --

24     Q.   Okay.  Well, we can check that.

25                If you look in the introduction of the abstract, it
```

1    says, the second sentence, "Accordingly, the present study

2    investigated mortality in somatic morbidity using a sample of

3    transsexual individuals who comprise 98% (n = 104) of all

4    surgically reassigned," and then it continues.

5         That's in the abstract?

6    A.   Yes, yes.

7    Q.   So you would agree it was 104 individuals, right?

8    A.   Yes.

9    Q.   And the first person committed suicide 19 years after

10   receiving surgery, correct?

11   A.   I don't know.

12   Q.   Okay.  We can go to that.

13        If you turn to -- if you look at the top, there are E

14   page numbers.  If you turn to page E63.

15   A.   I'm sorry.  I'm having trouble finding the page numbers.

16   They're all called E68.

17   Q.   If you look at the top --

18        THE COURT:  Top right, or top inside of the --

19   A.   I see now, I'm sorry.  I have it, E63, yes.

20   Q.   Now, the one, two, three, the fourth paragraph down.

21   A.   On the right?

22   Q.   On the right.  And you see the paragraph starting with

23   "Concerning?

24   A.   Yes.

25   Q.   Now, if you go to the last sentence, it says, "Somatic

1    morbidity (i.e., official cause of death) included two suicides

2    (19 and 26 years after SRS respectively)."

3              Do you see that?

4    A.   Yes.

5    Q.   So going back, the first person committed suicide 19 years

6    after surgery, right?

7    A.   Yes.

8    Q.   And the second person, 26 years after surgery, correct?

9    A.   Correct.

10   Q.   And the author characterized this as a low incidence of

11   suicide; isn't that right?

12   A.   Did he?  I don't know.

13   Q.   Well, if you go to page E65, the second -- on the

14   right-hand column, the paragraph starting "Two individuals."

15   If you go all the way down to the last sentence, it says

16   because reasons -- well -- "Because reasons for suicide

17   attempts and manifest suicides often are multifactorial and

18   because of the low incidence in the present study, further

19   research is needed to contextualize these results" -- excuse

20   me -- "research is needed to contextualize these results

21   further."

22             Do you see that?

23   A.   Yes.

24   Q.   So you would agree that the researchers characterize this

25   as a low incidence of suicide, correct?

1   A.   The authors did, yes.

2   Q.   Yes.  And the authors also found that regret was likely

3   not the cause of suicide for these two individuals?

4   A.   Well, that's what they concluded, yes.

5   Q.   That's what they concluded, correct?

6           And that's because these suicides occurred 19 years

7   and 26 years after surgery, right?

8   A.   Yes.

9           THE COURT:  May I just pause here?

10          You made reference earlier to an Italian study.  Is

11  this the Italian study that's referenced at footnote 65, I

12  guess, here in that paragraph?  Is that the one that you were

13  referring to?

14          THE WITNESS:  No.  It was a separate study written by

15  a surgical team about requests for re -- surgery to return

16  people to the male role.

17          THE COURT:  Okay.  Go ahead.

18          THE WITNESS:  I'm sorry.  I don't have that

19  reference --

20          THE COURT:  It's embedded in this one, and that's

21  why -- there's an Italian study embedded in this paragraph, and

22  I wanted to see if that --

23  BY MS. HANCOCK:

24  Q.   I think you said it's not.

25  A.   This is a separate study.

1   Q.   And the Italian study is not in your affidavit, correct?

2   We already --

3   A.   Right.  But --

4   Q.   You cite to two.  These are the two studies?

5   A.   These are the two studies I cited, yes.

6   Q.   Let's turn -- in your affidavit you also testified that

7   SRS has a risk of serious surgical complications, right?

8   A.   Yes.

9   Q.   And again, you don't cite any scientific research or

10  evidence in support of that statement in your affidavit,

11  correct?

12  A.   Correct.

13  Q.   And in your deposition you testified that the surgical

14  reoperation rate is about 30 percent, right?

15  A.   Yes.

16  Q.   And you also testified that back in 2011, the surgical

17  reoperation rate was about 30 percent, right?

18  A.   Yes.

19  Q.   But you testified most recently in your deposition that

20  you don't know if that number is accurate, correct?

21  A.   Well, you're confining me to a yes-or-no answer, so I

22  guess the answer is yes, but it's not really the answer.

23  Q.   Okay.  Well, you -- we can pull up your testimony.

24          Let's go to -- if you go to tab 2 in volume I --

25          THE COURT:  While the doctor is looking at that, we're

1    coming up to a point in which I will -- would ordinarily change

2    the court reporters here.  I also have in mind that it's

3    lunchtime, and if people are going to want to get lunch here,

4    they're going to have to do it before 1:30.  So maybe finding

5    an appropriate break here is appropriate so we can come back

6    here with enough time to continue.

7              MS. HANCOCK:  We can finish with this line of

8    questioning and then just a few more minutes.

9              THE COURT:  Because I think we're going to -- you're

10   going to continue with your cross-examination of Dr. Levine.

11             MS. HANCOCK:  Yes.

12             THE COURT:  So why don't we plan on breaking and then

13   coming back here, can we say 1:45?  Is that enough time for

14   people to get something to eat?

15             MS. HANCOCK:  That's fine with us, your Honor.

16             THE COURT:  You have to get to the cafeteria before

17   1:30.

18             MS. HANCOCK:  Perfect.  Can I just continue this line?

19             THE COURT:  Yes.  No, you can continue.

20   BY MS. HANCOCK:

21   Q.   So as we were discussing -- we were pulling up, if you

22   turn to tab 2, do you recognize this as your deposition?

23   A.   Yes.

24   Q.   In the case of Soneeya v. Thomas A. Turco III?

25   A.   I do.

1   Q.   And this is dated August 30, 2018, and it's your

2   deposition?

3   A.   Yes.

4   Q.   If you could please turn to page 118.

5         Line 10.

6         You testified -- the question you were asked:  "You

7   described the surgery as surgically problematic with a

8   30 percent rate of additional surgeries to deal with

9   complications."

10        And you answered:  "Yes."

11        The next question:  "Is that number currently

12  accurate?"

13        And you answered:  "I don't know.  As a matter of

14  fact, when I recently -- I recently published a paper on

15  informed consent for transgender people.  I realized that in

16  the surgical literature one cannot find an review article about

17  the complication rates."

18        Did I read that correctly?

19  A.   Yes.

20  Q.   So you don't know if the 30 percent reoperation figure is

21  currently accurate, correct?

22  A.   Yes, correct.

23        MS. HANCOCK:  We can break for lunch, your Honor.

24        THE COURT:  Okay.  So we'll take a break now, but

25  because we'll go directly into the hot tub after we finish with

1    Dr. Levine, I think want to make a couple of suggestions for

2    people to think about.

3           Number one, I don't want anybody talking to either of

4    the experts over lunch.

5           Number two, there are really a couple of things I'd

6    like to use to focus the attention of the two experts and their

7    conversation with each other.

8           The first is, and I'll probably look to Dr. Ettner to

9    start the conversation, but it is, broadly conceived, the

10   question of whether or not there is any physical component to

11   gender dysphoria.  We've been talking about physical or

12   psychological.  I understand they blend into each other to some

13   degree, but Dr. Ettner has focused on certain articles that she

14   says supports the idea of a physical compound, basically a

15   neurological component, the brain level.  So I'd like to start

16   the discussion about that.

17          I would look then, not necessarily in order, because I

18   want it to be a conversation, but I would look then to

19   Dr. Levine to raise the question of immediacy.  What does

20   "immediacy" mean in any circumstance like this?  We have the

21   immediacy that's created by gangrene, which is not always the

22   case with various kinds of surgical procedures.

23          And then I would like to have the question of the

24   social context in which someone is receiving this therapy and

25   then working her way through the therapy discussed in some

1  fashion.  That really is a question of location.  Is there a

2  preferred location, recognizing that there are restrictions

3  that are going to be imposed upon persons who are in custody?

4  They should not interfere with a serious medical need, but

5  nevertheless, I want to tease out what location means, whether

6  or not it means that necessarily a transgender person who seeks

7  full recognition of being a woman needs to be in a women's

8  facility.

9        Those are three things that I want to have talked

10  about.  There may be other things that you want to talk about.

11        I told the lawyers, I assume that they passed it on to

12  you, that this works best for me when it's like a discussion at

13  a peer-review journal between people who agree to disagree

14  about issues and are concerned with publishing an article with

15  perhaps limitations but nevertheless that advances some

16  discussion in the area.  That's the kind of interplay that I

17  expect from you.

18        I do not expect nor will I countenance the effort to

19  live out fantasies about being Perry Mason in the examination.

20        Similarly, snarkiness will not work particularly

21  effectively.  I'm not suggesting that either of you would

22  engage in it.  I'm just trying to lay out what's involved here.

23        What I hope for is respectful conversation.  That

24  doesn't mean you pull punches; it simply that means you are

25  grappling with the science, not the politics.  All right?

1          MS. HANCOCK:  We reviewed your Law Review article, and

2     if it would be helpful to the Court we have some proposed

3     guideline discussions, to the extent it will be helpful.

4          THE COURT:  Guideline -- why don't you pass them up to

5     me.

6          MS. HANCOCK:  A Law Review article suggested that.

7          THE COURT:  I'll look them up here.

8          But for now, I will tell the two experts that they

9     should not have any conversation whatsoever with the lawyers in

10    the case.

11         Sometimes I have to tell lawyers, lawyers and the

12    experts, that the reason for that is I do not want the experts

13    to be prepackaged or programmed.  I don't think that's a

14    problem with the two experts here.  They seem to me to have

15    strong views of their own that no amount of prepackaging or

16    program by lawyers is going to interfere.

17         But I simply don't want to have any problem of did

18    somebody suggest something to you, that sort of thing, coming

19    out here.

20         You'll pass those out, I'll look at those and see if

21    there are additional things that I would use to profit.  I use

22    those three issues -- physical versus psychological, location,

23    and immediacy -- simply as topics that can begin conversations.

24         Because somebody has to start a conversation,

25    Dr. Ettner is going to start the conversation with the physical

1    as opposed to the -- and that is as opposed to the role of

2    physical etiology and psychological.

3            So you people should run down and get lunch.  We'll be

4    back here at, let's say, ten of 2:00.

5            MS. STAPLES:  Thank you, your Honor.

6            (Recess taken at 1:19 p.m.)

7            (Resumed, 1:55 p.m.)

8            THE COURT:  We'll continue the examination.

9            MS. HANCOCK:  Yes, thank you, Your Honor.

10   BY MS. HANCOCK:

11   Q.   So before we took a break, you previously testified that

12   you occasionally have said that surgery is medically necessary,

13   correct?

14   A.   Correct.

15   Q.   But that's not what you said in your deposition earlier

16   this year, correct?

17           We can turn to -- if you turn to Tab 2, please, in

18   Volume 1, page 92.  Dr. Levine, if it's easier for you to look

19   it's also on the computer.

20   A.   I have it now.

21   Q.   You were asked, "How were you distinguishing medically

22   necessary and psychologically beneficial?"

23           And you answer, "I thought I explained that to you

24   earlier in the deposition."

25           Now, this is a long answer but I will point your

1    attention down to on page 93, line 14 to 20.  You respond, "I

2    would never say, you know, this is an absolute necessity.  Like

3    I would say I think removing that tumor in that organ is

4    medically necessary to save a person's life.  So I will always

5    object to your trying to get me to mouth this term 'medical

6    necessity.'"

7          That's your testimony, correct?

8    A.    Yes.

9    Q.    Now, you also said -- we also talked about the Standards

10   of Care's application to institutionalized setting, correct?

11   A.    Correct.

12   Q.    And we reviewed the two pages in the Standards of Care for

13   how it should apply to institutions like prisons, correct?

14   A.    Yes.

15   Q.    And earlier this year in your deposition you testified

16   that they -- you agree with this statement -- with this section

17   only to a, quote, very limited extent.

18          Do you recall that?

19   A.    Yes.

20   Q.    Now let's turn to -- I just want to quickly revisit the

21   Standards of Care.  If you could please turn to tab 12, and

22   this has been pre-marked as Exhibit 2.

23   A.    What page is it?

24   Q.    Could you please turn to page 60.  And you're familiar --

25          Oh, are you there?

1              You're familiar with the Standards of Care six
2    eligibility criteria, correct?
3    A.    I am.
4    Q.    And you previously testified that Ms. Soneeya meets these
5    six criteria as stated in the Standards of Care, correct?
6    A.    Yes.
7    Q.    Now, I want to focus on the sixth criterion.  It says,
8    "12 continuous months of living in a gender role that is
9    congruent with gender identity," correct?
10   A.    Yes.
11   Q.    Now, I want to turn, if you could please turn to tab 1 in
12   Volume 1, your affidavit.  If you could please turn to
13   Paragraph 21 on page 6.  And focusing your attention on the six
14   criterion, you write, "Continuous living in gender role also
15   known as a" --
16              Are you with me?
17   A.    Page 6?
18   Q.    Page 6, Paragraph 21, where you list out the six
19   eligibility criteria.
20   A.    I'm sorry.  That's not on my page 6.
21   Q.    Of your affidavit?
22   A.    Volume 1?
23   Q.    Of your affidavit, Paragraph 21?
24   A.    No.  I have me in -- oh, on page 6 of my affidavit,
25   line 21?

1   Q.   Paragraph 21?

2   A.   It just says, Answer, no.

3   Q.   I think you're in the wrong binder.

4   A.   I think I must be.

5   Q.   Volume 1, so the other binder where your affidavit is.

6   A.   I am in Volume 1, yeah.

7   Q.   You're in Tab 1?

8   A.   I must have been in Tab 2, sorry.

9        MS. STAPLES:  It's also on the screen.

10  A.   Okay.

11  Q.   You're with me?

12  A.   I am.

13  Q.   Okay.  So I want to focus on the six criterion.  In your

14  affidavit, you write that the sixth criterion is, "Continuous

15  living in gender role also known as the real life experience,

16  which is the process of relating full-time in the gender role

17  to friends, family, co-workers, teachers, and other citizens

18  all the time for a variable period of time prior to SRS."

19        Did I read that correctly?

20  A.   You did.

21  Q.   Now, turn turning back to the Standards of Care, that's

22  not what the Standards of Care say, is it, Dr. Levine?

23  A.   Item 6 in the Standards of Care is very terse.

24  Q.   Correct.  It does not reference the real life experience

25  or the real life test, does it?

1  A.    It does not.

2  Q.    And those terms were abandoned several years ago, correct?

3  A.    By some people.

4  Q.    Are those terms in the current version of the Standards of

5  Care?

6  A.    Right.

7  Q.    They are not in the current version of the Standards of

8  Care, correct?

9  A.    Correct.

10         THE COURT:  If you could again pull the microphone in

11  front of your mouth so we can pick this up.

12  BY MS. HANCOCK:

13  Q.    Now, we briefly talked about this before the break.  You

14  prepared a report in Norsworthy, correct?

15  A.    I did.

16  Q.    And in Norsworthy, you represented that the Standards of

17  Care sixth criterion requires a real life experience of living

18  in society for one year prior to surgery; isn't that right?

19  A.    If you say so.  I don't recall.

20  Q.    If you don't recall, we can pull it up.  If you turn to

21  Tab 2 in volume 2 -- I'm sorry, Tab 17.

22         THE COURT:  Tab 17 in the exhibits themselves or --

23         MS. HANCOCK:  No.  This is not admitted.  This is a

24  prior report that he wrote in -- exhibit.

25         THE COURT:  Is it in the two volumes?

1          MS. HANCOCK:  Yes.  It's in Volume 2.

2          THE COURT:  Volume 2.

3          MS. HANCOCK:  Yes, and it's Tab 17.

4          THE COURT:  Okay.  Yeah.

5   BY MS. HANCOCK:

6   Q.   If you turn to page 6, the third paragraph down.  You

7   write, "They," as in prisoners, "have no comparable opportunity

8   to live in free society, interact with family, friends, and

9   co-workers and to manage independent living.  They often have

10  no friends or family on the outside who visit them.  The

11  Standards of Care assert that a real-life experience living in

12  society as a woman should be done for" -- I think you meant

13  least -- "at least one year prior to SRS."

14          Did I read that correctly?

15  A.   You did.

16  Q.   And you're aware that the court in Norsworthy found that

17  your report misrepresented the Standards of Care, correct?

18          MS. STAPLES:  Objection.

19          THE COURT:  If he knows.

20          THE WITNESS:  May I answer the question?

21          THE COURT:  Yes.  Do you know whether or not the court

22  made that finding?

23          THE WITNESS:  No, I'm not aware.

24          THE COURT:  Okay.  Let me perhaps, just so I'm clear

25  on this, the Standards of Care that was being used by you in

1    response to the orders of Judge Tauro and Judge Young was the

2    current Standards of Care, correct?

3           THE WITNESS:  Correct.

4           THE COURT:  You made reference to some portion of the

5    Standards of Care being modified over a period of time.  What

6    was that?  Was there some other iteration of the concept that's

7    in Paragraph 6?

8           THE WITNESS:  Not that I'm aware of.

9           THE COURT:  Okay.  Go ahead.

10   BY MS. HANCOCK:

11   Q.   Well, you referenced an additional set of criteria which

12   the judge just asked you about, correct?

13   A.   To tell you the truth, I'm not sure what I'm being

14   questioned about at the moment exactly.

15   Q.   Okay.  Just to refresh your recollection, if you --

16   previously you testified in your deposition earlier this year

17   that you have additional -- an additional set of your own

18   personal criterion that you apply in determining whether or not

19   someone is an appropriate candidate for surgery, correct?

20   A.   The problem is that you're forcing me to say "correct" or

21   "incorrect" to every question and each --

22          THE COURT:  She's entitled to do that.  And if you

23   can't answer the question as it's formulated, you say "I can't

24   answer the question as formulated" and I'll evaluate whether

25   it's credible to say that.  But you answer the question that's

1    put to you by counsel.  If I interfere, I'll interfere.

2         THE WITNESS:  Fine.  Thank you.  I didn't realize

3    that, Your Honor.

4    A.   I can't answer the question as formulated.

5    Q.   Well, one of the your personal criterion is a person must

6    have ambivalence, is that right?

7    A.   Must have ambivalence, yes.

8    Q.   And that means that a person is not too certain about

9    changing their appearance, right?

10   A.   I can't answer that question as you formulated it.

11   Q.   In order to be ready for surgery, in your view, you want

12   to see that a patient shows ambivalence about changing their

13   presentation; isn't that right?

14   A.   You force me to say that's right.

15   Q.   Let's turn to Tab 3 of Volume 1, please.

16        Can you please turn to page 211?

17        THE COURT:  I'm sorry?

18   BY MS. HANCOCK:

19   Q.   Can you please turn to page 211 of Tab 3.  And this was

20   your deposition in this case earlier this year.

21   A.   I'm on page 211 now.

22   Q.   Okay.  Line 4.  You were asked, "Is Ms. Soneeya one of

23   those people, one of the rare people you described that would

24   benefit from gender confirmation surgery?"

25        And you answer -- this is a long answer, so I'll

1    point you -- there's a follow-up question that says, "What are

2    those criterion?"

3            And on page 212, line 21, you respond, "So being

4    certain and not having ambivalence is not a prudent thing, you

5    see.  I want people to be ambivalent about changing, getting

6    rid of their genitals.  I want people to be ambivalent about

7    changing their presentation.  I want them to see that it's a

8    complicated thing for them.  So when someone has no

9    ambivalence, I think psychologically they're not able to think

10   about this and therefore it's dangerous, you see," and you

11   continue.

12            So in your mind, in order to be ready for surgery,

13   you want to see that someone is not certain about changing

14   their presentation, correct?

15            MS. STAPLES:  Objection.

16            THE COURT:  Overruled.  You can answer the question.

17            THE WITNESS:  I can answer the question yes or no?  Or

18   I can answer the question saying that I can't answer the

19   question yes or no.  I can answer your question if you allow me

20   to elaborate.

21            THE COURT:  All right.  Let me put the question in a

22   different way.

23            Do you depart from anything that you said in your

24   deposition on this topic?  We're talking about page 211 through

25   page 213.

1          THE WITNESS:  No, I do not depart, Your Honor.

2          THE COURT:  Okay.  Now you can explore what he means

3     by various of these words.

4          MS. HANCOCK:  Thank you, Your Honor.

5     BY MS. HANCOCK:

6     Q.   But it's also possible to be too ambivalent, in your view,

7     correct?

8     A.   Yes.

9     Q.   And if someone is too ambivalent, then they don't meet

10    your personal criterion, correct?

11    A.   I have -- correct.

12    Q.   Right.  They have to have the right amount of ambivalence,

13    in your view, to be eligible for surgery, correct?

14          MS. STAPLES:  Objection.

15          THE COURT:  Overruled.  You can answer.

16    A.   It's one of the things that evaluators evaluate about how

17    realistic a person is about what is going to happen and what

18    level of concerns they have.  And any person having surgery

19    ought to have some concerns.  There's a normal human

20    apprehensiveness about undergoing surgical procedures, any

21    surgical procedure.  And I would expect any human being who is

22    rational and in control of his reason -- rational, would

23    recognize there are risks to surgery and therefore they would

24    have a certain degree of worry about it.

25          So -- and that's the context for which this section

1    is.  Now, if somebody is saying I'm not sure, someone is saying

2    I am worried, someone is saying I'm going to kill myself even

3    if I have sex reassignment surgery, you know, I assess the

4    degree of ambivalence.  There should be some ambivalence.  The

5    absence of worry, the absence of ambivalence is a sign that a

6    person is unable to tolerate the human experience of surgery,

7    is defending against it, is denying many aspects of his or her

8    life.

9    Q.    Is ambivalence a requirement in the Standards of Care?

10   A.    This is -- no.  Ambivalence --

11   Q.    Now, another one of your --

12         THE COURT:  Just a minute.  Permit him to answer the

13   question.

14         MS. HANCOCK:  I thought you were done.  I'm sorry.

15         THE COURT:  The question, as I understand it -- I mean

16   complete his answer.  I'm sorry.

17         The question is whether or not you consider this issue

18   of ambivalence to be part of the Standards of Care that the --

19   whatever the acronym is -- I keep forgetting it -- imposes.  Do

20   you consider that it is or is not part of the Standards of

21   Care, your concept of ambivalence?

22         THE WITNESS:  My problem with the Standards of Care is

23   that it doesn't seem to represent the human experience.

24         THE COURT:  That's not my question.

25         My question is, do you see anywhere in the Standards

1    of Care that your concept of the human experience is

2    incorporated?

3              THE WITNESS:  No.

4              THE COURT:  Now let me ask another question.  Not to

5    put words in your mouth, but we look at number 2, the capacity

6    for fully informed consent.  Isn't that where it comes?  That

7    is to say that there is an individual who is capable and aware

8    of risks and returns and makes a fully informed judgment with

9    respect to it.

10             THE WITNESS:  That's exactly correct, Your Honor.

11             THE COURT:  Well, I'm not testifying for you, but I

12   just want to be sure that I understand exactly where there is a

13   departure from the Standards of Care and there isn't a

14   departure from the Standards of Care as opposed to differences

15   of wording.

16   BY MS. HANCOCK:

17   Q.   In the context of this deposition when you were testifying

18   about this, you had already said that Ms. Soneeya had met the

19   six eligibility criterion which included Number 2, informed

20   consent, correct?

21   A.   Correct.

22   Q.   And you were discussing these.  These were your additional

23   personal criterion, correct?

24   A.   Correct.

25   Q.   Okay.  Now, another one of your criterion, as you alluded

1    to, is that a person must be realistic about the outcome of

2    surgery; isn't that right?

3    A.    That's right.

4    Q.    So when, in your view, a patient insists that they want to

5    be a complete woman, you do not believe that is realistic,

6    correct?

7    A.    That's true.

8    Q.    So you want the patient to recognize that he or she will

9    be a type of third sex, correct?

10   A.    Correct.

11   Q.    That they will be a transwoman and not a trans -- they

12   will be a transwoman and not a true woman, correct?

13   A.    Or a complete woman.

14   Q.    Now, you also rely heavily on your intuition in

15   determining whether or not someone should receive surgery,

16   correct?

17   A.    I am a physician.  All physicians and psychologists rely

18   on their accumulated experience which represents intuition.  So

19   the answer to your question is yes.

20   Q.    And intuition is also a gut reaction or a hunch, correct?

21           MS. STAPLES:  Objection.

22           THE COURT:  Well, just a moment.  If you adopt that

23   definition or don't, tell us.

24           THE WITNESS:  I don't adopt her definition.

25           THE COURT:  Okay.  So --

1          THE WITNESS:  I've explained my definition.

2          THE COURT:  No.  No.  She gets to ask the questions.

3          THE WITNESS:  I don't accept your hunch.

4    BY MS. HANCOCK:

5    Q.   Understood.  Can you please turn to Tab 31.

6          MS. HANCOCK:  And this has been premarked as Exhibit

7    31, Your Honor.

8    A.   Which volume?

9    Q.   Volume 2, please.

10         THE COURT:  Is it 31 in both?

11         MS. HANCOCK:  Yes.

12         THE WITNESS:  What's the tab number?

13         MS. HANCOCK:  31.

14   BY MS. HANCOCK:

15   Q.   You recognize this document, correct?

16   A.   This document was written for myself.  It was written I

17   think either in anticipation or following the 2011 interview --

18   I can't recall which -- when I wrote this.

19   Q.   Well, you previously testified that you thought it was

20   your musings in response to Dr. Ettner's 2016 report, correct?

21   A.   If that's true, I don't remember.  I couldn't find the

22   date when I looked at this, yeah.

23   Q.   And now, I will point you to in romanette i, intuition,

24   you write, "It is the product of unconscious processes and

25   often results in a viewpoint or hunch.  The viewpoint or the

1   hunch may be wrong."

2           Did I read that correctly?

3   A.   I don't --

4   Q.   It's the fourth sentence down.

5   A.   Yes, I see it, yeah.

6   Q.   And now, you continue that with respect to Ms. Soneeya,

7   "My clinical intuition strongly suggests that providing SRS for

8   this male prisoner serving a life sentence for the sexually

9   maiming murders of two women is foolish and dangerous.  It

10  risks causing harm to the inmate, current and future prisoners,

11  and the institutions responsible for them."

12          Did I read that correctly?

13  A.   You did.

14  Q.   Now, you also believe that a prisoner's crime or criminal

15  history is relevant to evaluating --

16          THE COURT:  Can I just pause to understand the

17  provenance of this document?  What is it?

18          MS. HANCOCK:  I'm sorry.  The what?

19          THE COURT:  The provenance.  What is this document?  I

20  take it that this is a statement of the witness, but where does

21  it come from and --

22          MS. HANCOCK:  I believe --

23          THE COURT:  I'd like to hear from the witness.

24  Perhaps you'll help him, but --

25          MS. HANCOCK:  Yes.

```
 1    BY MS. HANCOCK:

 2    Q.   Well, I believe you previously testified that you thought

 3    this was your musings or, like, thoughts in response to

 4    Dr. Ettner's 2016 report?

 5    A.   If you are right that this is my response to Dr. Ettner's,

 6    I don't think this was ever intended to be read in a court.

 7    This was my processing of -- for my own -- I wrote this for

 8    myself.  I didn't write this for you.

 9            THE COURT:  Well, that may be so, but this is your

10    statement.

11            THE WITNESS:  This was what I wrote on an airplane on

12    a vacation.

13            THE COURT:  Right.  But there's no airplane exception

14    to statements of witnesses.  So let me understand whether or

15    not you agree with this or don't agree with it or in some

16    fashion depart from it.

17            THE WITNESS:  Well, Item Number 1 is my struggle to

18    understand what "human beings" means and what I mean by

19    "intuition."  So I agree with that.

20            Number 2 seems rather harsh to me today.

21            MS. HANCOCK:  Okay.

22    BY MS. HANCOCK:

23    Q.   Now, you also believe that --

24            THE COURT:  So just so I'm clear, this is -- how would

25    I properly characterize this?  As an aide-memoire?  A set of
```

1    reflections on topics that are involved in this case?  How

2    would I characterize it?  I understand it was something for

3    you.  You thought that was never going to see the light of day

4    or at least the light in here.

5          But what is it?  Why did you make this?

6          THE WITNESS:  Because I'm trying to -- you know, the

7    role that I'm placed in requires considerable thought and

8    considerable editing and expression of written material and

9    then rereading it and so forth, and these were just the notes

10   that I had and, if the counsel was correct, following reading

11   Dr. Ettner's evaluation.

12         THE COURT:  Was this made in anticipation of writing

13   another report?

14         THE WITNESS:  I don't recall if I was asked to write a

15   report in rebuttal to Dr. Ettner's.  I just don't recall.

16         But you seem to be sure when I wrote this.

17         THE COURT:  Just a moment.  I think we've exhausted

18   the witness' testimony.

19         Now let me just understand from your point of view

20   what it is.

21         What is it?  How did you get it?

22         MS. HANCOCK:  It was produced to us.

23         THE COURT:  As what?  In response to a --

24   BY MS. HANCOCK:

25   Q.   So I think I might clean up some confusion about what you

1    previously testified what this document was.  If you turn to

2    Tab 2, page 105?

3    A.    Which volume?

4    Q.    Volume 1, Tab 2.

5    A.    I have it.

6    Q.    Page 105, line 8.  You were asked with respect to -- and

7    this is discussing this document.  You were asked, "Do you

8    recognize this?"

9              And you respond, "I think -- is this is the document

10   in response to Ettner's report?"

11             And you were asked, "We're not sure what this is.

12   We're going to ask you about it.

13             "Is this a one-page document?  Maybe these are my

14   notes.  I think the DOC asked me to read the Ettner report and

15   respond to it, and I think this is probably my musings about

16   Dr. Ettner's report."

17             Did I read that correctly?

18   A.    You did.

19   Q.    Okay.  All right.

20             THE COURT:  So this is -- I'm sorry to keep -- but

21   this is an important feature of understanding Dr. Levine's

22   position.  He first refers to this as a one-page document.  Is

23   this the same document?

24             MS. HANCOCK:  Yes, it was the same document that was

25   produced.

 1            THE COURT:  It was just presented --

 2            MS. HANCOCK:  It must have been, or maybe he was

 3    looking at the first page.

 4            THE COURT:  Okay.

 5            MS. HANCOCK:  It was produced to us by the DOC.

 6            THE COURT:  In response to a document request for any

 7    communications between the DOC and Dr. Levine?

 8            MS. HANCOCK:  Or notes.

 9            THE COURT:  Just a moment.  One of your colleagues, I

10    think Ms. Bellin, has a refinement that she'd like to offer.

11            MS. HANCOCK:  So it was produced to us as his notes in

12    preparation for, I believe, his December 2017 evaluation.

13            THE COURT:  Okay.  All right.  So.

14            MS. HANCOCK:  I'm -- this is the --

15            THE COURT:  That's how you got it?  In any event, you

16    got it in response to that?

17            MS. STAPLES:  That's correct, Your Honor.  It was

18    response to notes, any notes he had in preparation for his

19    report writing of Ms. Soneeya.  So we turned over all of his

20    notes.

21            THE COURT:  Okay.

22            MS. HANCOCK:  So --

23            THE COURT:  You can move on.  I just wanted to fully

24    understood the, as I say, provenance of it.

25    BY MS. HANCOCK:

1  Q.   Now, you also believe that a person's crime and criminal

2  history is relevant in evaluating a patient, correct?

3  A.   Correct.

4  Q.   And in your view, crime and criminal history is relevant

5  because it helps you understand the patient's motives for

6  transition; is that right?

7  A.   That's partially correct.

8  Q.   And motives are relevant, in your view, because you think

9  that gender dysphoria is a psychiatric condition and not a

10  medical condition, correct?

11      MS. STAPLES:  Objection.

12      THE COURT:  No, you may answer that question, if you

13  can.  If you understand the question and you can answer it, you

14  can answer it.  If you can't, you just say you can't because of

15  not understanding or whatever.

16  A.   I believe this is a fundamentally psychiatric condition or

17  a psychological condition and therefore motives are a relevant

18  issue.

19  Q.   Correct.  So --

20      THE COURT:  Doctor, I keep interrupting you, but it

21  really is important for me in particular, but also for the

22  court reporter, speak into the microphone, make sure that the

23  microphone is in front of you.  You can choose whatever posture

24  you'd like to choose in the witness box, slouching, if that's

25  what you want to do, but make sure that we can hear what you

1  say.

2  BY MS. HANCOCK:

3  Q.   Well, you wouldn't consider a person's motives when

4  treating them for, in your view, a serious medical condition

5  like thyroid cancer, correct?

6  A.   Okay.

7       THE COURT:  Barbara, that just begs the question what

8  happens to the other one.

9       (Discussion off the record.)

10      THE WITNESS:  Your Honor, what was the phrase that

11  you -- you instructed me, suggested I use when I can't quite

12  answer the question.

13      THE COURT:  If you don't understand the question or --

14  I'm not instructing you about anything you should say, except

15  that if you can't answer the question, tell us you can't answer

16  the question and give us a brief indication of why it is you

17  can't answer the question.

18  BY MS. HANCOCK:

19  Q.   Could I rephrase?

20  A.   Sure.

21  Q.   Okay.  Well, you wouldn't consider a person's motives when

22  you are treating someone for a serious medical condition like

23  thyroid cancer, would you?

24  A.   Under certain conditions, I would consider the motives,

25  absolutely.  The ordinary -- in the ordinary treatment of

1    cancer, we assume the motive is to get better and to receive

2    the care.  But when there's any indication that there's an

3    alternative motive, then we certainly would.  This is not a

4    matter of it's either this or it's that.  Medicine is far more

5    complicated than your questioning is representing to me.

6    Q.    Okay.  Would you consider a person's crime or criminal

7    history when treating them for something like thyroid cancer?

8    A.    No.

9    Q.    Okay.  And you recommended that Ms. Soneeya be transferred

10   as a pathway to surgery, correct?

11   A.    I did.

12   Q.    And you put her on that pathway, even though you're aware

13   of her crime and criminal history, correct?

14   A.    I did.

15   Q.    And even though she disputes her crimes, correct?

16   A.    Even though she disputes her crimes.

17   Q.    So it's fair to say that those were not the most important

18   factors in your recommendation, correct?

19   A.    They were not the most important factors.

20   Q.    Now, do the Standards of Care require consideration of a

21   person's crime or criminal history when determining whether or

22   not to recommend surgery?

23   A.    The Standards of Care have never considered the issue when

24   they wrote the Standards of Care for incarcerated people.

25   That's too sophisticated a question for the -- for the

1    Standards of Care.

2    Q.    Okay.   Well, the Standards of Care state that access to

3    care in institutions like prisons should mirror access in the

4    community, correct?

5    A.    Yes.   But the Standards of Care are not based on any

6    experience with prisoners.   They're based upon politics and

7    compassion, not science and not experience.

8          And that's my objection to this line of -- this is

9    one of my objections to the Standards of Care.   There is --

10   when this was written, there was absolutely not one American

11   prisoner who ever had sex reassignment surgery while in

12   custody.

13         And yet, you are representing the Standards of Care

14   as indicating how prisoners should be handled.   There is no

15   decline -- there was no clinical experience in 2011 with any

16   inmate in the United States.   It could not have been based on

17   anything scientific.   That's why I say it's based on politics,

18   on civil rights, and it's based on compassion.   And it's based

19   on the idea that this is a degree, there's a degree of

20   suffering.

21         THE COURT:   All right.   I've heard the answer.   I

22   think I understand it.   Now we're going to go back to science

23   as opposed to the objections.

24   BY MS. HANCOCK:

25   Q.    Now, the GD treatment committee also considered whether or

1    not Ms. Soneeya's index offense or crimes are relevant to its

2    recommendation, correct?

3    A.   Yes.

4    Q.   And that was because the DOC asked the GD treatment

5    committee to clarify whether or not it had considered

6    Ms. Soneeya's index offense and crimes, correct?

7    A.   I'm not sure.

8    Q.   You're not sure.

9            Okay.  Can you please turn to Tab 29 in Volume 2.

10   It's been pre-marked as Exhibit 20.

11           And you recognize this document, correct?  These are

12   the --

13   A.   The notes of the treatment committee.

14   Q.   Yes.  And if you look at the top, it says, "Stephen

15   Levine, present," correct?

16   A.   It's not on my list, but I --

17   Q.   If you look at the top, it says "Attendees"?

18   A.   Not on my list.

19   Q.   It might be easier to look at the screen.

20   A.   Oh, it's on a previous page, yes.

21   Q.   You were present at the meeting, correct?

22           THE COURT:  What's the number again?  I'm sorry, 20.

23   I'm sorry.

24           MS. HANCOCK:  Yes, Tab 29, pre-marked as Exhibit 20.

25           THE COURT:  Okay.

1          MS. HANCOCK:  If you turn to page 2 -- I'm sorry.  The

2     first sentence underneath.

3          THE COURT:  Just so we can move this along, I'm going

4     to permit our IT people to check the mic while it's going on,

5     if that's not too distracting for you.  Because you're going to

6     be occupying that space with other people in the future, too.

7     Another person in the future.

8     BY MS. HANCOCK:

9     Q.   Now, the first sentence, it says, "The gender dysphoria

10    committee was asked by the Department of Correction health

11    services division whether we considered Ms. Soneeya's index

12    offense and crimes as part of the committee's determination

13    that transfer to a female facility is clinically indicated to

14    ensure that she can adjust prior to having gender affirming

15    surgery, previously referred to as sex reassignment surgery."

16         Does that refresh your recollection as to whether you

17    were asked by the DOC to consider Ms. Soneeya's -- whether or

18    not you considered Ms. Soneeya's index crimes and offenses?

19    A.   I don't -- I don't have a distinct memory of this, but

20    this is --

21    Q.   You have no reason to disagree with this statement --

22    A.   No, I have no reason to disagree.

23    Q.   -- correct?

24         And at this meeting, the GD treatment committee

25    discussed this issue at length; isn't that right?

1  A.   Yes, that's what it says here.

2  Q.   Mm-hmm.  And the committee agreed that consideration of

3  the index offense was not and should not be involved in such

4  clinical treatment decisions, correct?

5  A.   In this case, yes.

6  Q.   This is the -- okay.  And further down, the committee also

7  noted that much like medical issues, mental health decisions

8  are made independent of crime or criminal history.  Do you see

9  that?

10  A.   On the second paragraph?

11  Q.   Yes.

12  A.   Yes.

13  Q.   And it continues, the committee concluded that Ms. Soneeya

14  had -- that "If Ms. Soneeya had gender affirming surgery prior

15  to committing the same index offense and crimes, she would be

16  placed at a female facility and her level of risk would be no

17  different."

18        Did I read that correctly?

19  A.   Yes.

20  Q.   Now I want to turn to your 2017 evaluation of Ms. Soneeya.

21  A.   Where is that?

22  Q.   Now, you -- I'm just shifting topics.

23        You previously evaluated Ms. Soneeya in

24  December 2017; is that right?

25  A.   Yes.

1    Q.    And you haven't reevaluated her again since that time,

2    correct?

3    A.    That was my third evaluation of Ms. Soneeya.

4    Q.    Okay.  And you evaluated Ms. Soneeya along with Drs.

5    Thompson and Andrade, who are members of the GD treatment

6    committee, correct?

7    A.    Correct.

8    Q.    And you think they're both qualified to evaluate and treat

9    Ms. Soneeya, correct?

10   A.    Yes.

11   Q.    And you think they're both qualified to treat Ms. Soneeya.

12   That's true even though Dr. Andrade is not a medical doctor,

13   correct?

14   A.    Yes.

15   Q.    And you also think that a licensed psychologist is

16   qualified to opine on the necessity of surgery, correct?

17   A.    I do.

18   Q.    And you led Ms. Soneeya's evaluation, right?

19   A.    I what?

20   Q.    You primarily led the evaluation of Ms. Soneeya, correct?

21   A.    The verb is what?  Wrote?

22   Q.    Primarily led?

23   A.    Led.

24   Q.    The evaluation?

25   A.    Oh, yes, you mean -- yeah, I wrote the original document,

1    yeah.

2    Q.   Right.  But during the evaluation, you were the primary

3    one who evaluated Ms. Soneeya, correct?

4    A.   I was the primary questioner, yes.

5    Q.   Sure.  Yes.

6         You agree that you were the primary questioner of

7    Ms. Soneeya?

8    A.   That's what I just said, yes.

9    Q.   And you didn't conduct any psychometric testing while

10   doing that evaluation, correct?

11   A.   Oh, no.

12   Q.   So no personality tests, right?

13   A.   No.

14   Q.   No depression or anxiety tests, right?

15   A.   No.

16   Q.   No traumatic symptom tests, right?

17   A.   No.

18   Q.   Now, as you previously testified, you primarily wrote the

19   January report and recommendation, correct?

20   A.   Yes.

21   Q.   Now, if you could please turn to Tab 24.

22        MS. HANCOCK:  And this has been premarked as Exhibit

23   11, Your Honor.

24        THE COURT:  All right.

25   BY MS. HANCOCK:

1    Q.    And if you turn to the next page.  You recognize this as

2    the GD treatment committee's January 2018 report and

3    recommendation, correct?

4    A.    Ah --

5    Q.    I think you can see at the top, the top sentence, it just

6    says at the --

7    A.    Yes.  Yes, I do.

8    Q.    And the three of you were unanimous in your observations

9    and judgments that you presented in this report, correct?

10   A.    Yes.  Surprisingly so, yes.

11   Q.    And this report does not explicitly mention the Standards

12   of Care once; is that right?

13   A.    Well, the Standards of Care are implied in our knowledge

14   base of the three evaluators.

15            May I continue?

16   Q.    That wasn't my question.

17            My question was, does this report explicitly mention

18   the Standards of Care?

19   A.    It implicitly mentions the Standards of Care.  It's not

20   explicit but they're embedded in the thinking.

21            THE COURT:  So the answer is no, it does not

22   explicitly reference the Standards of Care.

23   A.    It doesn't state any --

24            THE COURT:  That's what "explicit" means.

25            THE WITNESS:  I know, yes.

1    BY MS. HANCOCK:

2    Q.   You previously testified that you agreed that Ms. Soneeya

3    met the six eligibility criteria as stated in the Standards of

4    Care, correct?

5    A.   Yes.

6    Q.   And you determined that it would be helpful for

7    Ms. Soneeya to have a form of real life test by transferring

8    her to a women's facility for one year prior to surgery; is

9    that right?

10   A.   Yes.

11   Q.   And if she was still happy with being a woman at

12   Framingham, you would say she could have surgery, in your view,

13   correct?

14   A.   Yes.

15   Q.   And you came up with the idea for transfer, right?

16   A.   Yes.

17   Q.   And just turning to the report, briefly, you found that

18   Ms. Soneeya has been entirely consistent, without waiver, in

19   her female identity, correct?

20   A.   Correct.

21   Q.   And you also found that she sat still, remained calm, and

22   displayed no abnormal thought processes or emotional

23   instability, correct?

24   A.   Correct.

25   Q.   And that Ms. Soneeya did not display any signs of a

1    current mental illness, correct?

2    A.   Correct.

3    Q.   And you also discussed the risks and complications related

4    to surgery with Ms. Soneeya, correct?

5    A.   Yes.

6    Q.   And you found that Ms. Soneeya understood that there were

7    risks of serious complications relating to surgery, right?

8    A.   Yes.  That was the first time in three evaluations that

9    she had any comprehension of the risk involved or at least

10   stated she had any comprehension.

11   Q.   And she even recognized that death was a possibility,

12   correct?

13   A.   She did.

14   Q.   Now, you also discussed transfer to Framingham with

15   Ms. Soneeya, right?

16   A.   Yes.

17   Q.   And she was able to talk to you about the challenges that

18   she would face at Framingham; isn't that right?

19   A.   Yes.

20   Q.   And that included the challenges that she might have

21   making friends and being accepted by other women, correct?

22   A.   Correct.

23   Q.   But she told you she planned to -- if as problems arose,

24   she would reach out to her therapist, right?

25   A.   Yes.

1    Q.   And you also recognized that Ms. Soneeya currently lives

2    in relative isolation at MCI-Shirley, right?

3    A.   Yes.

4    Q.   And that she generally keeps to herself at Shirley because

5    she's afraid of being sexually assaulted or being the victim of

6    violence just like she has in the past, correct?

7    A.   Correct.

8    Q.   Now, if Ms. Soneeya found happiness and friendship at

9    Framingham, she would be one of the rare candidates to meet

10   your criteria for surgery; isn't that right?

11        MS. STAPLES:  Objection.

12        THE COURT:  Well, he may answer that question as

13   phrased.

14   A.   If her adaptation was good and she still, considering the

15   ambivalence, the risk involved with surgery, if she still

16   elected to have surgery, I would say that she should have

17   surgery.

18   Q.   Okay.  Can you please turn to Tab 3 in Volume 1.  This is

19   your testimony from earlier this year.

20        Please turn to page 211 when you get there.

21   A.   211?

22   Q.   211.

23   A.   We were just there, right?

24   Q.   We might have been.  Line 4?

25   A.   Line 4.

1  Q.   Line 4, the question is, "Is Ms. Soneeya one of those

2  people that -- one of the rare people you described that would

3  benefit from gender confirmation surgery?"

4           And you respond, "I think Ms. Soneeya is one of those

5  people who would benefit from living in Framingham and

6  making -- and then with her therapist and herself thinking

7  about this over the course of the year, if she still -- if she

8  found happiness and friendship at Framingham, for example, then

9  I would say that she would meet my criteria.  My criterion for

10  sex reassignment surgery."

11           Did I read that correctly?

12  A.   Yes.

13  Q.   And if she met that criterion, you would conclude that

14  surgery is medically necessity; is that right?

15  A.   I would conclude that it was psychologically beneficial;

16  and in the culture of the day, that requires me to say it's

17  medically necessary.

18  Q.   Okay.  Let's revisit the -- if you could please turn back

19  to Tab 24.  This is the January 2018 report, premarked as

20  Exhibit 11.  If you go to page 4 at the end of the second

21  paragraph.

22           The committee writes, "We would then declare that

23  Katheena Soneeya's genital surgery is medically necessary."

24           Do you see that?

25  A.   I'm sorry.  Where exactly on page 4?

```
1    Q.    Second paragraph, the last sentence.  After one year at
2    MCI-Framingham --
3    A.    No.  I see exactly where you're saying.
4    Q.    Now, if Ms. Soneeya is not transferred then she can't
5    satisfy the transfer condition, correct?
6    A.    I find it very difficult to answer that question without
7    elaborating.
8              THE COURT:  I'll permit you to.
9              MS. HANCOCK:  I can rephrase.
10             THE COURT:  If you don't, I'm going to -- we'll go on
11   forever, so I'm going to permit him to answer the question the
12   way he'd like to answer the question and you can follow up on
13   it.
14             THE WITNESS:  So I have watched the evolution of
15   Ms. Soneeya over 11 years, 10 years perhaps.  I've seen her
16   gone -- go from certainty and inability to give informed
17   consent on the basis of understanding to a greater basis of
18   understanding and a giving up of the fantasies about what was
19   going to happen to her once she had sex reassignment surgery --
20   live in a cottage with a white picket fence and married to a
21   correction officer and have a child by that correction officer.
22             So I've watched this enormous evolution in Ms. Soneeya
23   over a decade in terms of her ability to think realistically.
24   I recognize this is a very disadvantaged human being from early
25   life.  She has multiply been traumatized by multiple things.
```

1    She has not received the benefit that ordinary children in any

2    society receive.

3            As a result, she's had a very chaotic,

4    self-destructive adolescence, and she's had a dramatic

5    improvement by incarceration.  As she has told me personally,

6    she recognizes that incarceration has saved her life.

7            So I know there's a vulnerability inherent in this

8    human being.  I'm just trying to give her a chance as a doctor,

9    as a fly-in doctor, appreciating where she's coming from

10   developmentally, a chance to be sure that this is the right

11   thing for her.

12           After she experiences what has been very difficult for

13   her, she has the identity that she's a female.  She has never

14   been with females for 37 years, except for the occasional

15   therapist.  She tells me that she wants to learn how to be a

16   female from other females.  And therefore, this is a good thing

17   for her to be at Framingham.  She will complete her identity

18   transformation, becoming a more and more complete woman.

19           She recognizes that she doesn't make friends easily

20   and that she gets really upset when people don't accept her

21   status.  That's why she doesn't play soccer and basketball, she

22   says, because people don't accept her as a woman or as -- they

23   just don't accept her.

24           So acceptance, I recognize from multiple interviews,

25   is what -- acceptance as a woman, being treated as a woman, as

1  a normal woman is what makes this inmate happy and decreases

2  her gender dysphoria.

3  　　　　All I'm trying to do here is give Ms. Soneeya an

4  opportunity to experience herself in the way she wants,

5  learning from other women, interacting with other women.  And

6  if she decides -- because sex reassignment surgery or gender

7  conforming surgery in the community is always an elective

8  procedure.

9  　　　　Doctors don't tell people to have sex reassignment

10  surgery, as Dr. Ettner clarified this morning.  They just go

11  along with it if they meet criteria and if they think they're

12  mentally well enough to tolerate the arduous process of

13  changing one's gender in this way.

14  　　　　So when I recommended that she go to Framingham for a

15  trial, it was to prevent her from having decompensations.  We

16  were thinking about her.  We recognize, based on our knowledge

17  of her background and our knowledge of what she has said to us,

18  that she thought this was a very good idea.

19  　　　　Of course she has long wanted sex reassignment

20  surgery.  But now finally in life, she's able to think more

21  clearly about the pluses and minuses and she thinks she has

22  more to learn.  And there was a possibility that she would not

23  do well at Framingham and I thought that would give her a

24  chance to have an election to either have surgery or an

25  election to not have surgery.

1          THE COURT:  Let me see if I can clarify this a bit

2   with this question.

3          Assume she can't go to Framingham, that for whatever

4   reason they will not permit her to go to Framingham.  Call it

5   security, real or imagined, they won't let her do that.  That

6   in fact is the case now.

7          Is -- do you think that she's an appropriate candidate

8   for sexual -- for surgery here under those circumstances?

9   Because now she knows everything she needs to know.  She's

10  going to be in a male facility; she's not going to be in a

11  female facility.  She's not going to learn or develop whatever

12  information she develops about going into a female facility by

13  kind of a one-year trial.  She knows all -- she knows about her

14  circumstances.

15         Does -- is she still a candidate, from your

16  perspective, under the Standards of Care for sexual

17  reassignment surgery?

18         THE WITNESS:  Yes, she is -- under the Standards of

19  Care, she is a candidate for the surgery.  But my point is --

20         THE COURT:  No.  I think I know -- I understand your

21  point, but maybe I can phrase it and you can respond to it.

22         THE WITNESS:  Yes.

23         THE COURT:  Is that, from your perspective, the best

24  way to prepare her for all of the sequelae of this surgery

25  under the assumption that she goes to Framingham is for her to

1    be in Framingham and to see what it's like to be in a women's

2    prison under those circumstances.  Is that fair?

3            THE WITNESS:  That's right.  And to have the

4    opportunity to change her mind.

5            THE COURT:  Right.  Well, that's a different issue, I

6    guess, but I want to understand the point.  Okay.

7            MS. HANCOCK:  May I just have a moment, Your Honor?

8            THE COURT:  Yes.

9    BY MS. HANCOCK:

10   Q.   Now, you're aware that the DOC denied Ms. Soneeya's

11   transfer, correct?

12   A.   Yes.

13   Q.   And the DOC asked the committee to determine whether any

14   alternatives to transfer existed, correct?

15   A.   I'm not aware of that.

16   Q.   You didn't meet to discuss alternatives to transferring

17   Ms. Soneeya.  Is that what you're saying?

18   A.   May I elaborate?

19           THE COURT:  Maybe -- again, I'm sorry, but this may

20   expedite rather than delay.

21           Were you aware that the DOC has taken the position

22   that she can't be transferred to --

23           THE WITNESS:  Yes.

24           THE COURT:  -- Framingham for security reasons?

25           THE WITNESS:  Yes.

```
 1              THE COURT:  Okay.
 2   BY MS. HANCOCK:
 3   Q.   And the committee met to discuss alternatives to treatment
 4   in response to that denial, correct?
 5   A.   Yes.  And I -- I think the committee decided to appeal.
 6   Q.   Let's turn to Tab 29, please.  This has been premarked as
 7   Exhibit 20.
 8              These are the April 13 minutes?
 9   A.   Yes.
10   Q.   If you turn to the second sentence --
11   A.   The second sentence?
12   Q.   I'm sorry.  The committee determined that after Ms. --
13              MS. HANCOCK:  I'm sorry.  Give me one second, Your
14   Honor.  Sorry, just one moment, Your Honor.
15              THE COURT:  Yes.
16   BY MS. HANCOCK:
17   Q.   So I'm in the wrong tab, that's why.  If you go to Tab 27,
18   these are the March 16, 2018 minutes.
19              THE COURT:  Is that premarked --
20              MS. HANCOCK:  Pardon?
21              THE COURT:  -- as an exhibit in the case?
22              MS. HANCOCK:  Yes.  It has been premarked as Exhibit
23   18.
24   BY MS. HANCOCK:
25   Q.   Now, if you look at the second bullet, the first bullet
```

1    says, "The DOC denied transfer to a female facility," correct?

2    A.   Correct.

3    Q.   And underneath that it says, "Discussed potential

4    alternative treatment plan as requested by the DOC.  Discussed

5    the fact that without allowing transfer to Framingham, it is

6    not possible to evaluate how Ms. Soneeya would adjust."

7         Do you see that?

8    A.   Yes.

9    Q.   And the committee determined that no treatment

10   alternatives to transfer existed, correct?

11   A.   Yes.

12   Q.   And now, sitting here today, you would still like to see

13   Ms. Soneeya transferred; isn't that right?

14   A.   Yes.

15        MS. HANCOCK:  No further questions, Your Honor.

16        THE COURT:  Anything else?

17        MS. STAPLES:  Just very, very briefly, Your Honor.  I

18   just want to clarify some things.  Thank you.

19   REDIRECT EXAMINATION BY MS. STAPLES:

20   Q.   Dr. Levine, you've been hired as a consult for the GD

21   committee, correct?

22   A.   Yes.

23   Q.   Okay.  And the Department of Correction -- correct me if

24   I'm wrong, but the Department of Correction actually hired a

25   vendor for its medical treatment and mental health treatment.

1    Isn't that true?

2    A.    Yes.

3    Q.    And who is the current medical or mental health vendor?

4    A.    I think it's an institution -- an organization called CCS.

5    Q.    Has it recently changed to Wellpath?

6    A.    Yes.

7    Q.    Okay.  So is that the person who basically has hired you,

8    not the department?

9    A.    Oh, right.  Yes.

10   Q.    You work for the vendor?

11   A.    I work -- I have a contract from the vendor, yes.  I'm

12   sorry.

13   Q.    Not the department?

14   A.    That's right.

15   Q.    Okay.  And in fact, when you make an evaluation or you're

16   asked to make an evaluation or consult on a case, you're asked

17   by the vendor's doctors, not by the department, most of the

18   time.  Isn't that true?

19   A.    I'm never -- I'm not sure who is doing what in the system.

20   It's -- I'm not well-acquainted with the layers of bureaucracy,

21   as I think you're pointing out.

22   Q.    Okay.

23   A.    So I think the answer to your question is yes, but I don't

24   know.

25   Q.    You worked with Dr. Andrade and Dr. Thompson on a regular

1    basis with regard to inmates in the department's custody with

2    gender dysphoria, correct?

3    A.   Yes.  And Dr. Andrade --

4    Q.   He has left.  It is now Dr. Thompson, and I think this --

5    whoever took Dr. Andrade's place.  I forget his name.

6    A.   Yeah.

7    Q.   But you work with the committee?

8    A.   I work with the committee, yes.

9    Q.   And they talk about treatment of inmates with gender

10   dysphoria?

11   A.   I help them process difficult cases that are -- that pose

12   difficulties for them, yes.

13   Q.   Okay.  And when you make those sort of recommendations,

14   it's really for the benefit of the inmate, not for the benefit

15   of the department, correct?

16   A.   I'm very clear about that, yes.

17   Q.   Okay.  So you don't make decisions for the department.  In

18   other words, you don't make recommendations that the department

19   asks.  You make recommendations based on what is best for the

20   inmate you are evaluating?

21   A.   That's my understanding exactly.

22   Q.   And in fact, this case is evidence of that.  Because you

23   made a recommendation Ms. Soneeya be transferred to Framingham,

24   and in fact the department reviewed that and felt that based on

25   safety and security reasons that was not a viable option.

1   A.    Yes.  I see my role as trying to make a decision that

2   would be most helpful to the inmate.

3   Q.    Okay.  I just want to go over briefly the standard that's

4   in the Standards of Care, the paragraph of the Standards of

5   Care that talks about their applicability to --

6           THE COURT:  If I may interrupt just to --

7           MS. STAPLES:  Of course.

8           THE COURT:  -- just to understand this.

9           During the period of time that Dr. Levine has been a

10   consultant --

11           MS. STAPLES:  Yes.

12           THE COURT:  -- how many different vendors have there

13   been?

14           MS. STAPLES:  I believe, Your Honor -- and I don't

15   have the exact number, but I want to say three.

16           THE COURT:  Okay.  And did his colleagues on the

17   committee change with each vendor?

18           MS. STAPLES:  No.  Oftentimes they transferred within

19   the company, within the vendor.

20           THE COURT:  Okay.

21           MS. STAPLES:  So oftentimes, if I may, Your Honor, the

22   vendor would come in and this committee had been established

23   with Dr. Levine and they kept it in place and offered new

24   contracts to the people so they remain in place.

25           THE COURT:  Were all of the people on the committee

1   consultants or were they employees of the vendor, the others?

2         MS. STAPLES:  Dr. Levine is the only consultant.

3         THE COURT:  Okay.  So these were employees who are

4   offered -- in some cases, offered the ability to continue on in

5   that work but with a different vendor?

6         MS. STAPLES:  Correct.

7         THE COURT:  I think it would be helpful for me to have

8   a -- perhaps one of your other witnesses is going to be able to

9   do it, but so that I can see a kind of composition of the

10  committee during the time period that --

11        MS. STAPLES:  Of course.

12        THE COURT:  -- Dr. Levine has been a consultant.

13        MS. STAPLES:  Absolutely.  Director of behavioral

14  health is actually here today.  She may testify if we have

15  time.  If not, tomorrow morning.

16        THE COURT:  Okay.  Oh, it's nice to have her here, but

17  she's not going to be reached today.

18        MS. STAPLES:  She'll be here tomorrow morning and

19  that's part of the testimony --

20        THE COURT:  Okay.

21        MS. STAPLES:  -- bring to the court.

22  BY MS. STAPLES:

23  Q.  So if we can talk briefly about this paragraph in the

24  Standards of Care that apply to people in institutions, which

25  include prisons.

1          And you had talked about the fact that you disagreed

2    with that.  Can you just tell us the degree to which and how

3    you disagree with that?

4    A.   Yes.

5          THE COURT:  Is this just getting what he said earlier

6    again?  I mean, in the trenches, political warfare within the

7    committee?

8          MS. STAPLES:  Your Honor, he's actually -- I didn't

9    mean to interrupt the Court.  I'm sorry.

10          He's actually testified a little bit to the fact that

11    he agrees to a certain extent.  And I don't mean to testify for

12    Dr. Levine.  But what I'm trying to get to is similar to what

13    he has said but that there are other factors than just applying

14    the Standards of Care that should be considered especially for

15    people in prison.  That's essentially how I understand it.

16          THE COURT:  Okay.  I'll permit it, although I think

17    it's pretty obvious, both that proposition and Dr. Levine's

18    position with respect to that proposition.

19          MS. STAPLES:  Then I don't need to go further, Your

20    Honor.

21    BY MS. STAPLES:

22    Q.   The only other point I want to make, Doctor, you had

23    been -- you testified and were asked about the fact that you

24    made a statement that in fact somebody who has undergone the

25    surgery may never reach the potential of being a complete

1    woman.

2            Do you remember saying that?

3    A.    Yes.

4    Q.    Okay.  And do you remember the context you said that in,

5    the context in which you said that?

6    A.    Well, from 2008 until Ms. Soneeya's testimony this

7    morning, this concept of being a complete woman is emotionally

8    very meaningful to Ms. Soneeya.  I don't know -- she means, I

9    believe, that if her genital anatomy conforms with the female

10   structure, she will be a complete woman.

11           But on the other hand, she has told me that she has

12   to learn from other women how to be more feminine, more

13   womanlike.

14           So the concept of being a complete woman is a bit of

15   a paradox or a contradiction.  It's not -- see, I don't know if

16   we take natal women and ask them "Are you a complete woman?"

17   whether we would get an answer, yes, maybe, I don't know.

18           What is a complete woman?  When Ms. Soneeya talks

19   about being a complete woman, I think she only means getting

20   rid of her penile dysphoria and having a vulva or appearance of

21   female genitalia.  She realizes that there is much more

22   complexity to what is a woman and how a woman behaves, how a

23   woman feels, how a woman interacts with other women that she is

24   aware of.

25           And so the idea the surgery will make her a complete

1   woman is not correct.  It's -- she's clearly not correct in a
2   larger sense.  So we, the Court needs to understand that she
3   means anatomically she will be much more at ease.  It will be
4   psychologically beneficial as she continues her struggle with
5   gender incongruence.
6            Now, the studies that people were -- I was
7   cross-examined about earlier all recommend continuing
8   psychiatric care postsurgery because the incidence of
9   psychiatric decompensation is very high in Scandinavia.  Here
10  in America --
11           THE COURT:  Again, I think I have the thrust of the --
12  this is well beyond the question.
13  BY MS. STAPLES:
14  Q.   I'm sorry.  So your discussion about being a complete
15  woman is more about the fact that in society, she, even with
16  the surgery, may not be accepted as a woman might be and that
17  that's something she needs to be aware of?
18  A.   She needs to be aware of that.  But for the Court and for
19  Ms. Soneeya to understand even with gender reassignment
20  surgery, her subjectivity about not being a complete woman
21  might continue.
22           What surgery will do for her is decrease or will lose
23  the dysphoria over having male genitalia.  It doesn't necessary
24  cure gender dysphoria or gender incongruence.  It just makes it
25  a little easier to bear the fact that I began my life as a male

1  and I'm trying to finish my life as a female.  It's not cure.

2  It's improvement.  It's like psychologically beneficial, we

3  hope.

4          MS. STAPLES:  Thank you, Your Honor.

5          THE COURT:  All right.  Anything further?

6          MS. HANCOCK:  Yes.

7                     RECROSS-EXAMINATION

8  BY MS. HANCOCK:

9  Q.  Just a quick clarifying point, Dr. Levine.  You testified

10  that you wanted Ms. Soneeya to understand that she will not be

11  a complete woman even with surgery; is that right?  Let me

12  rephrase that.

13          You believe that it is not possible for any

14  transgender male to become a complete woman; is that correct?

15          THE COURT:  You know, I guess I have to say this

16  back-and-forth will not be helpful.  I think it's clear that

17  we're dealing with definitional terms that don't have a common

18  reference point, so I think I'm going to exclude that.

19          MS. HANCOCK:  No further questions.  Thank you.

20          THE COURT:  All right.  Thank you.  So we'll move on

21  to the next stage here.  I have to attend an emergency meeting

22  at -- I have to leave at 3:50 for an emergency meeting here of

23  the court.

24          So we can do a little less than 50 minutes of this.

25  I'd like to -- I will be surprised if we complete the process

1    here, and so I expect that both Dr. Ettner and Dr. Levine will

2    be back again tomorrow.

3          So with that understanding about timing, I want to be

4    sure that I've gotten the benefit, as much as I can absorb the

5    benefit of their presentations, and I'm not going to stop until

6    I do.  So we'll move on to the second stage.

7          And Dr. Ettner, if you could join Dr. Levine in the

8    witness box.

9          Are either of you going to be referencing the binders

10   themselves or particular documents, do you think?  Why don't we

11   clean that up, then, so that you're not -- you have your notes

12   or whatever you need.

13         MS. HANCOCK:  May I grab the binders?

14         THE COURT:  Yes.

15         So as I indicated, what I'd like to do is have a

16   conversation, and I've indicated topics that I -- at least

17   topical areas that I'd like to have focused here.  But there

18   are others that you may or may not want me to focus on for me

19   to understand better any reservations that you have about the

20   testimony of your colleagues.

21         Under the circumstances, I won't bar the parties from

22   objecting to questions and so on.  They should understand that

23   the -- I'm sure they do -- that the degree of deference that I

24   will afford objections under these circumstances is rather

25   limited because it's just me, not a jury.  And I certainly

1    don't want to have the flow of the conversation interrupted

2    here.  I may ask questions during the course of your

3    conversation perhaps to clarify, I will probably ask questions

4    at the end of it, and then I will permit counsel to do the

5    final questioning of each of you.

6              So, Dr. Ettner, my coin flip made you go first.

7              This has to do -- in my mind, anyway, it has to do

8    with the etiology of gender dysphoria.

9              DR. ETTNER:  So I'm going to begin with the simplest

10   terms and work my way up to some of the more difficult

11   technical --

12             THE COURT:  It's very polite of you to look at me, but

13   look at Dr. Levine because this is a conversation with him.

14             DR. ETTNER:  I looked at Dr. Levine during lunch, but

15   I'll look at him again.

16             So very early on, Richard Green discovered in his

17   large practice that there was a huge, large concordance of

18   gender dysphoria in families -- fathers and sons, mothers and

19   daughters -- which led him to suspect that there may be a

20   genetic component to the condition.

21             This of course was before we had all of the technology

22   that we now have that allows us to actually explore some of

23   those aspects and visualize brains and genes and other

24   underpinnings.  Gomez-Gil in --

25             THE COURT:  Permit me to say that this is a very long

1    wind-up.  I want to hear the pitch.

2            DR. ETTNER:  Okay.

3            THE COURT:  The pitch is a question, question directed

4    to --

5            DR. ETTNER:  In a study of 995 transsexuals, Gomez-Gil

6    found that the likelihood of someone -- a sibling of someone

7    who has transsexualism is five times as likely to have

8    transsexualism.

9            Milton Diamond, among others, as you may know, found a

10   very high concordance in twins even when those twins were

11   reared apart.

12           Genetic studies which came later demonstrated in the

13   largest genetic study ever done, and then duplicated in a

14   different country, showed androgen polymorphism in the genetic

15   alleles in male to female transsexuals.

16           Now, to just finish this line of thinking, when

17   functional magnetic resonance imaging came along and brain

18   morphometry, differences in male to female brains in white

19   matter, gray matter, and in cortical thickness have been

20   demonstrated over and over again.  So I'm going to ask you to

21   consider the fact that EEG studies show abnormalities --

22           DR. LEVINE:  Not EEG studies.

23           DR. ETTNER:  Yes, EEG studies do show --

24           THE COURT:  Well, just a moment.  I guess the question

25   is -- I'll put it in the lowest common denominator -- nature or

1    nurture.

2         And now I think that what Dr. Ettner is asking is for

3    your opinion of the degree to which physical characteristics,

4    I'll call them physical characteristics, are causative of

5    gender dysphoria.

6         DR. LEVINE:  I think Dr. Ettner fails to understand

7    the limitations of the studies that she quotes.

8         The American Journal of Psychiatry, in December 2017,

9    has published a paper reviewing the neuroanatomy and

10   neurofunctional studies that she makes reference to and the

11   hormonal studies that she has previously made reference to in

12   her testimony.  And if -- I wish I had them in front of me -- I

13   could read the fact that there is no -- there is as of December

14   2017, which is far after the studies that she is quoting, there

15   is no evidence that the etiology is simply biological.

16        THE COURT:  Can I -- I heard you to say "simply

17   biological."  Is there a biological component?

18        DR. LEVINE:  Well, in terms of a child's -- there are

19   five categories of gender dysphoria in terms of the onset, when

20   it has onset.

21        But the onset of gender dysphoria that arises early in

22   childhood, that is, emerges at two, two and a half, and three,

23   and the children consistently identify with the opposite sex,

24   there seems to be a biologic contribution to temperament.  Just

25   like every normal child, every child born to all the people in

1 this courtroom are known to have a temperament.  And some

2 temperaments are much more cross-gender identified than others.

3   In that sense, all behavior is biologic.  When she

4 quotes all these studies that have shown the differences in the

5 brain, the truth is that all the studies show different

6 differences in the brain.  There is no consistency on findings

7 in any of these studies, whether it's white matter or gray

8 matter, whether it's based on one form of complicated x-ray or

9 another.

10   And so the conclusion written by neuroscientists in

11 this December article is there is no firm evidence about the

12 biologic dictation of gender dysphoria in any human being.

13   Now, the fact that things run in families does not

14 indicate per se that it's genetic.  Obesity runs in families

15 because we overfeed people.  All kinds of things are familial

16 that are not necessarily genetic.  So the twin studies are the

17 most intriguing studies here, especially twins raised apart.

18 That just means that some have a larger genetic component than

19 others.

20   THE COURT:  Larger genetic component of what?

21   DR. LEVINE:  To the pathway to gender dysphoria.  You

22 see, in prisoners, the pathway to gender dysphoria seems to be

23 disrupted early childhood events, lack of attachment, autism,

24 and so forth.

25   THE COURT:  But I guess I want to get back to this.

1    Number one, I do want a copy of the article to which you refer,

2    and I'll expect to receive that tomorrow.  And if Dr. Ettner is

3    not familiar with it, I want it to be made available to her so

4    she can ask questions about it tomorrow if she chooses to.

5           Number two, so I'm clear, you're of the view that the

6    morphology of the brain studies that we're talking about here

7    are inconclusive.

8           DR. LEVINE:  Inconclusive.

9           THE COURT:  Number two, that the familial studies are

10   inconclusive in part because they reflect what I'll call both

11   nature and nurture.

12          DR. LEVINE:  That's right.

13          THE COURT:  And that the twin studies may provide some

14   insight but not entire.  Is that the --

15          DR. LEVINE:  Yes.  And Your Honor --

16          THE COURT:  I'm sorry.

17          DR. LEVINE:  -- or Dr. Ettner.

18          THE COURT:  I could barely restrain myself from asking

19   questions and so now I enter the conversation.

20          DR. LEVINE:  That's fine.

21          THE COURT:  The question for you is, are you -- do you

22   rule out biological causation of gender dysphoria, you

23   yourself, under current circumstances?

24          DR. LEVINE:  I do not rule out biologic contribution.

25   There is far more to the development of anyone's gender

1    identity than their biology.

2         I was -- as I was about to say to you, Dr. Ettner,

3    most of the research on the transgender population has been

4    preceded by even more vigorous research on -- about the cause

5    of homosexuality.  The studies that are -- have been done

6    recently for trans -- so there is a relationship, you know,

7    although the Standards of Care denies it entirely.

8         There is a relationship between orientation,

9    homosexual orientation and transgenderism.  In some transgender

10   people, at least -- and we've been trying for -- since in the

11   1970s to figure out what is the cause of homosexuality in men

12   and women, and the answer is we're not really sure.  It's

13   multiply determined.  But politically, we are assuming that

14   it's biologically --

15        THE COURT:  I don't want to hear -- I think I made

16   clear I don't want to hear the politics of this.  I understand

17   that it carries implications.  Just a moment.

18        What I'm really interested in is your view of the

19   science and the state of the science as it exists right now.

20   Whether or not people are predisposed intellectually to adopt

21   one view or another is a different matter.

22        So back to this question.  If I understand correctly,

23   you do believe that there is a -- the present state of the

24   evidence as it reaches you is that there is some contribution

25   that's biological.

1          DR. LEVINE:  Yes, I would not -- I would not deny that

2     there could be a biologic contribution to any particular

3     person's cross-gender identifications.  But most all of us in

4     this field do not talk about the etiology of this phenomenon

5     with certainty.  There is no certainty about the contribution.

6     The contributions are multiple at different phases of life.

7     They have to do with individual psychology, family life,

8     socialization, intellectual grasp of the issue, and

9     interpersonal conflict.

10          All those things can contribute to any particular

11     person's adaptation, their identity.  And identities evolve,

12     Your Honor.  And as Dr. Ettner knows, one can have an identity

13     at age 18 and it's a different identity at age 28 and age 58.

14     And you know, I write about there are 24 aspects of identity.

15     Gender identity is one of 24 different aspects.  And all

16     aspects of identity evolve over the life cycle.  I've watched

17     Ms. Soneeya's identity evolve, for example.

18          THE COURT:  Let me pause there and let Dr. Ettner

19     follow up a bit on this.

20          DR. ETTNER:  Well, I would disagree with Dr. Levine's

21     characterization of the literature.  And Cecelia Jenny, who you

22     have referred to many times, in a 2017 thesis has actually

23     cited you as someone who talks about identity family dynamics,

24     psychodynamics.  And she claims that there is no evidence to

25     support that.

1          She also provides evidence which has been replicated

2     about task-oriented imaging studies.  So for example, she

3     focuses on the fact that when odorous steroids are presented to

4     male-to-female transsexual people, the brain activation pattern

5     is identical to natural women.  There is a barrage of evidence

6     to indicate, including the finger ratio in male-to-female

7     transsexuals which occurs at 14 weeks of gestation.

8          THE COURT:  Okay.  So let me -- I'm interrupting, of

9     course.  But these are all the studies that have previously

10    been brought to my attention --

11         DR. ETTNER:  Yes.

12         THE COURT:  -- here.  And I understand that you're

13    saying they are sufficient for you to conclude what, with

14    respect to the biological contribution?

15         DR. ETTNER:  It is not just me that --

16         THE COURT:  No, but I'm asking you right now.

17         DR. ETTNER:  The scientific community concludes that

18    structural and functional imaging studies indicate that there

19    is a biological basis to transsexualism, and it is not a

20    derangement and it has existed throughout history.

21         THE COURT:  Right.  Let me go into this politics stuff

22    a bit.  Because it's clear that roiling beneath the surface or

23    maybe above the surface within those who are concerned with

24    this are disputes about derangement and the way in which the

25    DSM generally has kind of evolved over a period of time and all

1    that.  But I don't want to know about that right now.  I want

2    to keep myself innocent of that.

3          What I want to know is the state and your

4    understanding of the state of the science in this area.

5    Dr. Levine is -- believes that he cannot -- I think I fairly

6    say, he can't rule out biological impact.

7          How much of a contribution do you think it makes?

8          DR. ETTNER:  I think that the etiology of gender

9    dysphoria is an interaction of sex steroid hormones prenatally

10   in the developing brain.  Therefore it's sort of an anomalous

11   birth event.  Some people become aware of it at a certain age;

12   others become aware of it later on; and it varies, like all

13   conditions, across a continuum.  People like Ms. Soneeya, who

14   have a severe form of gender dysphoria, are one end of the

15   continuum.

16         But I do believe that there is a biological basis and

17   that there is a huge assemblage of research, more coming out

18   yearly, to state with certainty that this is a serious medical

19   condition.  And because it's a medical condition with known

20   treatments, the person's particular background or whether or

21   not we think they may be happy at some future point are really

22   not how we should be treating people who have this condition.

23         THE COURT:  Let me focus on that part of it; that is

24   to say, the seeming equivalence of medical cause and medical

25   necessity here.

1          And maybe a way to unpack this or for me to try to

2     think about unpacking it is to ask what component, if any, what

3     percentage, if any -- use that -- has the -- call it the

4     socialization process that Ms. Soneeya has been through,

5     throughout her life, had in contributing to this.

6          Or do you think to her gender dysphoria, do you think

7     is simply that we're dealing with -- I'll use the word "simply"

8     because it was used by Dr. Levine -- simply a biological

9     result?

10          DR. ETTNER:  Yes, I think it was biologically based.

11     People from resource-poor backgrounds have no idea that the

12     incongruence they feel -- they understand that they feel

13     different or odd or they're unlike their peers.  As one of my

14     colleagues said, the small child may think they call me "son"

15     but I feel more like "daughter."

16          Children often learn through shame, which is often how

17     we teach gender roles, not to discuss this.  They're often

18     punished for their atypical gender presentations.  But

19     oftentimes it's later in life that they learn, as in the case

20     of Ms. Soneeya, that there's a name for my pain and there are

21     treatments.

22          And when one is asked, like Dr. Levine has talked

23     about a motive for surgery, the motive is to attain relief.

24     It's not just about having congruent genitals.  It's about

25     removing the target organ that creates the testosterone that

1    kindles the dysphoria.

2           THE COURT:  Okay.  Sorry to interrupt.

3           But, Dr. Levine, do you want to respond and perhaps

4    inquire further yourself?

5           DR. LEVINE:  Well, I believe Dr. Ettner is too certain

6    about this subject and that when it comes to those people who

7    make conclusions about the nature of how human behavior gets

8    produced, she is in fact quite an outlier.

9           We talk about today gene/environment interaction.  And

10   an example, for example, an example that where there's enormous

11   research has been done is in the subject of alcoholism, which

12   is a far more relevant subject.

13          And the NIH puts millions of dollars every year to

14   study the environment/gene interaction of alcoholism.  And the

15   best conclusion about that is that 40 percent of the variance,

16   what we call 40 percent of the variance of alcoholism, may be

17   contributed to by genetic forces.

18          That all psychological disorders, even medical

19   disorders, exist in a social milieu and the outcome depends

20   upon the interaction of biologic givens, human capacity, and

21   social interactions.

22          So when we talk about -- I don't talk about etiology

23   because I don't like the term.  It's a term left over from

24   infectious disease.  The etiology of tuberculosis is a

25   bacteria.  The etiology of cholera is a bacteria.  But

1    tuberculosis and cholera, two devastating fatal diseases,

2    depend on environmental interactions.

3         The idea that we can say that transgenderism is

4    dictated by biology and by hormones, prenatal hormones,

5    although there is some evidence to suggest that, the evidence

6    is not incontrovertible, even if a group of scientists who

7    actually practice and earn their living with gender dysphoric

8    patients, even though they say so.

9         THE COURT:  Let me tell you something about the

10   questions having to do with who gets paid among professionals.

11        If it's not a disorienting amount of money or

12   disproportionate, I find it a clearing of the throat by

13   cross-examining attorneys on this.  Similarly, to refer to

14   everybody else is in it for the money, other professionals are

15   in it for the money and not to recognize that of course, you

16   receive money from it.

17        I'm really not concerned with at this point, unless

18   there's some evidence that what we have is corrupt influence

19   all throughout the professions, I'm not really interested in

20   that.

21        I'm interested in the validity of the science or

22   degree of reliance that we can place on the science.  There are

23   people who are more concerned with neuroscience, I suppose, and

24   some are more interested in larger questions of clinical

25   benefits from certain kinds of social interactions and so on.

1              I think I understand that.  I just want to get to

2     this.  As I understand the dispute between of two of you -- and

3     you'll both respond and refine and help me on this -- it is

4     that you, Dr. Levine, would like to have further in your

5     therapeutic direction, ensure that there's put in place some

6     form of social mechanisms that would be beneficial and

7     supportive of the choice to have surgery.  And that maybe that

8     takes a little bit of time.  I've asked about morphology or

9     biology versus social interactions to try to tease that out a

10    little bit.  But that's I think what you're saying.

11             DR. LEVINE:  I don't disagree with Dr. Ettner that

12    there's a biologic contribution to this and -- but I would add

13    to all human behavior.  So what I'm objecting to is the kind of

14    certainty that the etiology is dictated by prenatal events and

15    is manifested by different brain structures in adult life.

16             THE COURT:  So let's bring that back down to the

17    treatment opinions that are expressed by professionals here.

18             DR. LEVINE:  Yes.

19             THE COURT:  And I'll go back to Dr. Ettner here.

20             And really goes to this, which is how much, if at all,

21    you think that the social circumstances, call them social

22    circumstances of individuals, inflect the kind of treatment

23    opinion that you would offer.  I see the declaration of

24    independence in the SOC, that all people are created equal.

25    Except they're not in the sense that they're in different

1   settings, some of which can be changed, some of which cannot.

2   That's the problem with people in custody.

3          So I guess I want to know to what degree, if at all,

4   you think it's necessary or appropriate in making therapeutic

5   opinions to look to the actual social conditions of the

6   individuals.

7          DR. ETTNER:  Your Honor, I believe that best medicine

8   is always practiced on a case-by-case basis.  And what I do

9   object to are generalizations about prisoners or

10  generalizations about any group of people.  And I think that

11  people need to be looked at as individuals.

12         For some people, making a gender transition -- and I

13  am sure Dr. Levine knows this as well as I do -- is the most

14  socially daunting situation a person can find themselves in

15  they have to come out to their children.  They have to tell

16  their employer, their aging parents, their friends, et cetera,

17  et cetera.  They have enormous social losses to consider.

18         But in this case, in the case of Ms. Soneeya, we're

19  really -- we don't have those same social losses to consider.

20  We have a person who has consolidated their female identity,

21  who has been on hormones for years, and is -- now experiences

22  herself as half female and half male.  I don't think that

23  making prognostications about whether she'll be happy or

24  whether she may not be feel like a complete woman; she is a

25  person who is suffering.

1        THE COURT:  The question is in what context would that

2    suffering best be alleviated, social context in which it would

3    best be alleviated.

4        We do know that she's quite uncomfortable -- I call it

5    uncomfortable; that's an understatement -- in the male prison

6    for various social interaction reasons, restrictions on the

7    women that she encounters or can associate with, but also the

8    minatory kind of qualities that exist even after the various

9    legislation more recently.

10        On the other hand, we don't know very much about the

11    way in which she will interact in Framingham.  And so does not

12    a therapeutic opinion have to consider the context in which she

13    will either be supported or not supported in the choice that

14    she makes?

15        DR. ETTNER:  I think the overriding concern is

16    eliminating the gender dysphoria.

17        THE COURT:  All right.

18        DR. ETTNER:  We can never tell what the future holds

19    for anybody.  And I agree with Dr. Levine that a female prison

20    would be a better context for Ms. Soneeya.  She's worked among

21    females before in the prison and it was a very good experience

22    for her.

23        But I don't think that living in a female prison would

24    eliminate gender dysphoria.

25        THE COURT:  Well, I'm not sure that that's the

1    suggestion.  I guess it's maybe this, and I'll go back to maybe

2    law talk.

3          When the Supreme Court issued its opinion that

4    segregation was inherently violative, the Equal Protection

5    Clause, they made the announcement.  They didn't make a remedy.

6    They took a further step to have further hearings with respect

7    to remedy.  The remedy they came up with is that it has to be

8    dismantled with all deliberate speed and it has to be done by

9    district judges in individual cases.

10         Now, that's a recognition that moving from one state

11   to another requires a transition of some sort.  If I were to

12   characterize Dr. Levine or his committee's suggestion about

13   Framingham or a period of time in residence at Framingham, it

14   would be like that, transitional to give greater experience to

15   permit a more informed judgment about the way in which and the

16   point at which she receives the surgery.

17         That's the -- I guess, the context that I'm thinking

18   of.  I don't think that Dr. Levine disagrees that she is under

19   the present characterizations -- you'll tell me if I'm wrong

20   about this, Dr. Levine.  But under the present

21   characterizations of medical necessity, she's not entitled

22   to -- not entitled -- she would benefit from and is not

23   receiving relief because of her prison setting.

24         That's an Eighth Amendment violation, if there are

25   countervailing reasons.  So now I'm asking how, not whether.

1    And if it's how, not whether, you have one view, which is let's

2    get on with it and not wait.  Again, I'm characterizing your

3    position.

4         And he has another which is if it's possible, let's

5    try what the social experience would be at the women's prison.

6         What's wrong with that?

7         DR. ETTNER:  I think what's wrong with that is that as

8    medical or mental health providers, we do what is necessary at

9    the time.  And in 2016, I felt that surgery was necessary at

10   that time.  We know from evidence, including an article by

11   Bauer, published in the BMC Public Health journal, that

12   delaying medical and surgical treatment increases suicide

13   ideation and suicide risk.  There is harm in delaying

14   treatment.

15        THE COURT:  Okay.  So now let's go back to the point

16   that you made so effectively I think that this is

17   individualized evaluation.

18        So now I've heard from Ms. Soneeya.  I have the

19   benefit of your testing -- and this not to turn it around on

20   you -- that what Ms. Soneeya finds hopeful is the prospect,

21   more than anything else, of this.  That's one of two -- two

22   major deterrents to her either engaging in suicidal ideation or

23   self-mutilation.  I'll call it self-mutilation for lack of a

24   better term.

25        So the delay certainly has some role in that.  But

1     this does not seem to be a case in which if this isn't turned

2     around tomorrow we're going to be faced with suicide or

3     self-mutilation.  It's too much or too glib to call it delayed

4     gratification, but something like that.  And we balance that

5     off against finding a proper setting in which she can function

6     as effectively as she can toward her goal of becoming a

7     complete woman, described as that kind of a larger goal, life

8     goal.

9            Again, what's wrong with that, again, speaking to this

10    particular case?

11           DR. ETTNER:  In this particular case, we don't have

12    other options.  So we don't have the option of putting

13    Ms. Soneeya in anything other than a correctional institution.

14           THE COURT:  Right.

15           DR. ETTNER:  And we don't have the option of putting

16    her anywhere other than in a male facility or a female

17    facility.  Would she be better off in a female facility, having

18    eliminated gender dysphoria and having congruent genital-uro

19    structures, or would she be better off delaying surgery, which

20    we know increases harm, and still having gender dysphoria and

21    facing the challenges that she's admitted to today of entering

22    a new facility?

23           THE COURT:  You presented it initially but changed it

24    a little bit in the way in which you respond as the law of the

25    excluded middle.  Either a female facility or a male facility,

1    and then you introduce the question of delay.

2         I'm assuming that we start with the basic proposition

3    that she is a person who -- based on the opinions that have

4    been expressed by both of you, that she is a person for whom

5    the medical profession will say she -- in order to relieve her

6    from a severe condition, she needs surgery.

7         Now the question is where and -- where will she be

8    located afterwards, and when will it be delivered?

9         So the -- if the security arrangements are such that

10   it just can't be delivered, then we are presented with a

11   conundrum, I suppose.  On the other hand, we have to explore

12   both.  Which is why not at a male facility?  If that's what

13   they say, why not leave her in a male facility?

14         DR. ETTNER:  Absent surgery?

15         THE COURT:  Mm-hmm.

16         DR. ETTNER:  Because she will -- the -- the effect,

17   the outcome of doing that is predictable and dire.

18         THE COURT:  Predictable --

19         DR. ETTNER:  -- and dire of leaving her in a male

20   facility, absent surgery, with severe gender dysphoria.  We

21   have a good idea of what the outcome would be.  And

22   Ms. Soneeya's already said that she would harm herself if that

23   were the case, if she knew that she wouldn't --

24         THE COURT:  Just to address that, which is that we

25   have experience in the male facility.  We know that.  Now we're

1  talking about lack of experience in the female facility.

2       Now, it may be that it's so obvious what the outcome

3  would be that you don't need that kind of experience, but maybe

4  not.

5       In any event, it brings me to the next question, which

6  is, are you of the view and is Dr. Levine of the view that

7  we're not just talking about surgery?  We're talking about

8  surgery and relocation, or location in a particular place?

9  That is, that in order to alleviate gender dysphoria and

10  address the medical necessity that the Eighth Amendment would

11  tell us that we have to address, do we have to take the

12  package?

13       So it's the location question.  I think I know more or

14  less what your answer is, but Dr. Levine hinted at this before,

15  which is to say assume that they say no.  Would you say okay,

16  no surgery as a way of relieving this or would you say do the

17  best you can under these circumstances as someone who prides

18  himself on familiarity with the practicalities of the prison

19  system?

20       DR. LEVINE:  I would say that the Court or the

21  decision maker would be putting Ms. Soneeya at a greater risk

22  of doing surgery without a location change first.  I'm not

23  saying that there's no possibility that Ms. Soneeya would live

24  happily there ever after in her concept as a complete woman.

25       As to the dire consequences, since I've been involved

```
 1   with the Massachusetts Department of Corrections, which began

 2   in 2007, I believe, I'm unaware of any suicide of or even any

 3   suicide attempt of any transgender person in Massachusetts.  I

 4   have heard of threats but I have not heard --

 5            THE COURT:  You mean since 2008.  But certainly

 6   Ms. Soneeya is someone who has made a suicide attempt arising

 7   out of her gender dysphoria, and Kosilek as well did.  So there

 8   may be precursors, they may be before some sort of

 9   intervention, that sort of thing, but that there are suicide

10   attempts is in the case law now that I'm confronting.

11            DR. LEVINE:  You know, we have lots of evidence about

12   transgender people before and after surgery having ten times

13   the suicide ideation.

14            THE COURT:  I look at those studies and I have to say

15   I'm not sure -- I share the view of the Swedish author that you

16   can't draw conclusions from her study, if it was a her.

17            DR. LEVINE:  I wasn't actually referring to her study.

18            THE COURT:  Well, I am.  So she's done the largest

19   one, cohort of what, 104 people, to -- not 104?

20            DR. LEVINE:  No.  104 is the Danish study.  There are

21   354.

22            THE COURT:  And how many suicides in the Swedish

23   study?

24            DR. LEVINE:  There was 19 times the control rate.

25   It's hard to --
```

1              THE COURT:  I mean, is it math that I have to do,

2     which is a challenge, and I'm going to ask you to do it.

3              DR. LEVINE:  She is -- I think -- she has a control of

4     five people born on the same day who were male and five people

5     born on the same day who were female and studied the

6     psychiatric hospitalizations and the completed suicide rates

7     and the death rates of those groups of people.  And the suicide

8     rate of the transpeople who have had surgery was 19 times the

9     general population.

10             But as cross-examination has pointed out, she did

11    not -- for reasons that no one seems to understand, she did not

12    do the -- she did not provide the data of the transpeople who

13    were not given surgery.  So we can't really say.

14             THE COURT:  The problem with those studies is that

15    it's the larger problem of a kind of *post hoc ergo propter hoc*.

16    We don't know.  We don't have a big enough study and the study

17    wasn't controlled the way that you would to try to provide more

18    definitive information about it.

19             But let's just assume that I'm talking about the short

20    term.  You talked as well about the short term.  Short term

21    kind of question of prospect of suicide after, let's call it,

22    surgery without a soft landing in a new location.  We really

23    can't say that that's likely, can we?

24             DR. LEVINE:  That's my point.  My point is we know

25    there's an increased risk but there's no certainty about what

1  will happen to Ms. Soneeya, what Ms. Soneeya will choose to do

2  with her life.  There is absolutely no certainty.  The idea

3  that, you know, plaintiff's attorneys have always been

4  threatening suicide in every case I've been involved with.  In

5  fact --

6          THE COURT:  Well, but it exists as a -- in the

7  population, it happens.  It seems to be something that some

8  persons within gender dysphoria turn to.  Despair, so it's

9  there you have to think about it.

10          But I think maybe a different way of looking at this

11 and again using one of those anodynes for painful thought, but

12 it's in the air, first do no harm, okay?

13          So a question to ask of both of you is the locational

14 question of first do no harm, with respect to location.

15          I think both of you agree that staying in a male

16 facility is -- would be doing harm.  Am I correct?  After

17 gender surgery, even now?

18          DR. ETTNER:  I think that Ms. Soneeya belongs in a

19 female facility.  She has secondary sex characteristics.  She

20 has the same circulating sex steroids as her female peers.  Her

21 testosterone levels as of 2018 were almost undetectable.  She

22 presents as a female, and I believe that she belongs in a

23 female facility.

24          THE COURT:  Well, and that it would be harmful to be

25 in a male facility?

1          DR. ETTNER:  She's experiencing harm in the male

2     facility, yes.

3          THE COURT:  Okay, Dr. Levine.  That is, harm in the

4     male facility.  Any question about that?

5          DR. LEVINE:  Psychologically, it pains her to be in a

6     male facility.  In the male facility there are certain

7     behaviors that diminish her gender dysphoria and certain

8     behaviors that increase her gender dysphoria.

9          THE COURT:  Explain that to me.  Decrease and

10    increase.  What does and what doesn't?

11         DR. LEVINE:  Based on the three interviews I've had

12    with Ms. Soneeya, she's explained that when people compliment

13    her for her job well done, she likes that; it decreases her

14    suffering.  When people call her by a female name and don't

15    refer to her as her, you know, male person, that improves her

16    mood and decreases her suffering.  And when people make sexual

17    innuendo about her or call her a freak or something like that,

18    half man, half woman, and so forth, that increases her gender

19    dysphoria.

20         THE COURT:  Which predominates in that setting.

21         DR. LEVINE:  I think given the fact that the prison

22    system is evolving and is much more sensitive, we now have a

23    program for this.  We teach -- we -- I'm not part of it, but

24    prison guards are given explanations for this.  I think the

25    environment in the Massachusetts prisons are improving.  There

1    are people that, you know, privately still, I'm sure, abuse her

2    psychologically occasionally, but I don't think every day it

3    happens.

4          THE COURT:  But don't you think that's a somewhat

5    Pollyannaish view?  That is to say that certainly there are

6    evolution in attitudes -- and she refers to it as a result of

7    she calls it the major crimes bill, I think.  But whatever it

8    is, she refers to some legislative intervention that makes it

9    different in terms of the way in which she's talked to and

10    things that happen.

11          But I don't think anybody would say that the prison

12    system is woke on this issue.  It may be getting better.  So

13    now I'm looking at in the foreseeable future are we talking

14    about the likelihood that there's no difference between the

15    male facility and the female facility.

16          DR. ETTNER:  I think I'm talking about a person being

17    comfortable in their own skin.  And to me, the where she lives

18    is something she would acclimate to.  If she has problems,

19    she's very good at reaching out to mental health and using that

20    as a resource.  And I think that it's most important to

21    eliminate what I think has been a longstanding issue for

22    Ms. Soneeya which has failed to resolve even with hormones and

23    supportive psychotherapy and female accoutrements.  And for

24    some people, surgery is the only option.

25          THE COURT:  Right.  I don't --

1              DR. ETTNER:  And then I think a move -- I mean, I

2      agree with Dr. Levine that it would be nice if she could be in

3      a female facility.  I don't have a problem with that.

4              But I think that the need for surgery overrides that

5      and making that as a precondition of a medically indicated

6      procedure I think is a paternalistic view.

7              THE COURT:  My sensitive ear picks up on

8      paternalistic, that roiling politics that Dr. Levine has

9      referred to.  I really am into this kind of question, which

10     is -- and I'm going to have to leave it at this now.  We're

11     going to come back tomorrow:

12             I think it's fair to say you think we'll call it

13     chicken and egg.  That the chicken is surgery first and

14     location is subordinate to it, not that it's not very important

15     but you got to get to the surgery right away.

16             By contrast, Dr. Levine thinks that -- I'm ascribing

17     it to him -- that the egg is more important.  That is, get the

18     location right and then the surgery will either follow or it

19     won't but it will be fully informed by an understanding by

20     Ms. Soneeya about what it entails.

21             Much too simplistic way of saying it, but it's a way

22     of talking about location.  I don't think we've finished our

23     conversation about location and I want to continue it tomorrow.

24             I also would ask -- I'll hear you in just a minute.

25             But I would also ask you to be thinking about other

1    topics that you want to explore with each other of points of

2    agreement, points of disagreement.

3          But my focus here is really on medical necessity,

4    broadly conceived.  I understand it's informed by psychological

5    considerations.  But medical necessity, broadly conceived.

6          I will separately treat the question of overwhelming

7    security problems that are presented.  That's an evaluation of

8    how the prison system has dealt with this sort of thing, except

9    for one question, which is the degree to which the committee

10   was asked to opine with respect to aspects of the security

11   issues.  I want to take that up as well.  But in any event, I

12   want to take that up later.

13         I didn't let you speak, Dr. Levine, and you generally

14   get the last word.

15         DR. LEVINE:  Not to be disrespectful, Your Honor, but

16   I do object to one phrase you used.

17         THE COURT:  Right.

18         DR. LEVINE:  You said implying you've over-simplified

19   this situation.  And my opinion is you have gotten to exactly

20   the core of the situation; by no means is it

21   over-simplification.  I think you put your finger on it.  It is

22   a chicken or egg thing; and just as you said, I couldn't say it

23   as well as you said it.

24         THE COURT:  Flattery will get you nowhere, is all I

25   can say.

```
1            DR. LEVINE:  It's not over-simplified is my point.

2            THE COURT:  In any event, those are topics I want to

3    take up and we will continue.

4            Again I would request counsel not to consult with the

5    witnesses at this point.

6            And similarly, the various articles that were

7    referenced as being referred to by and relied upon by the

8    experts I'd like to have copies of.

9            MS. STAPLES:  Certainly, Your Honor.  I actually have

10   one copy of the December 2017 American Journal of Psychiatry.

11   I could give it to the Court if it wanted tonight and I could

12   email one over to --

13           THE COURT:  If you can make it available to your

14   friends.

15           MS. STAPLES:  I certainly can.

16           THE COURT:  Maybe if you can give it -- if I get the

17   first edition.

18           MS. STAPLES:  You have my first edition.

19           THE COURT:  Right.

20           MS. HANCOCK:  Your Honor, I understand we're not

21   supposed to talk to the experts.  But if we could get --

22   Dr. Ettner, if you want them to speak about the article?

23           THE COURT:  Right.

24           MS. HANCOCK:  I'm not sure she has -- she traveled

25   here so I'm not sure if she has access.
```

1          THE COURT:  Do you want to review that overnight?

2          DR. ETTNER:  I'd be happy to see the article, yes.

3          THE COURT:  Okay.  It can be emailed to her, just to

4     pass on the email.

5          MS. HANCOCK:  I just wanted to make sure in terms of

6     communicating.

7          THE COURT:  I think Dr. Levine said it wasn't

8     available to him immediately.  So if a copy can be made and it

9     can be emailed to you.

10         DR. LEVINE:  I have it.

11         THE COURT:  Okay.  So we'll be back to continue

12    tomorrow morning at 9:00.

13         MS. STAPLES:  Thank you, Your Honor.

14         COURTROOM CLERK:  All rise.

15         (Adjourned, 3:55 p.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                CERTIFICATE OF OFFICIAL REPORTER

 2

 3            We, Debra Joyce, RMR, CRR, and Kelly Mortellite,

 4   RMR, CRR, in and for the United States District Court for the

 5   District of Massachusetts, do hereby certify that the foregoing

 6   transcript is a true and correct transcript of the

 7   stenographically reported proceedings held in the

 8   above-entitled matter to the best of our skill and ability.

 9            Dated this 8th day of April, 2019.

10

11            /s/ Debra Joyce, RMR, CRR

12            _____

13            Debra Joyce, RMR, CRR

14            Official Court Reporter

15

16            /s/ Kelly Mortellite

17            _____

18            Kelly Mortellite, RMR, CRR

19            Official Court Reporter

20

21

22

23

24

25
```

1                            INDEX

2

3    WITNESS                                          PAGE

4

     KATHEENA NEVIA SONEEYA
5
        Cross-Examination                               7
6       By Ms. Staples
        Redirect Examination                           27
7       By Ms. Bellin

8    RANDI CAHAN ETTNER, Ph.D.

9       Cross-Examination                              31
        By Ms. Staples
10      Redirect Examination                           78
        By Ms. Hancock
11
     STEPHEN B. LEVINE, M.D.
12
        Cross-Examination                              87
13      By Ms. Hancock
        Redirect Examination by Ms. Staples           169
14      Recross-Examination                           177
        By Ms. Hancock
15

16

17                      E X H I B I T S

18
     Exhibit No.          Description          Received
19

20      7 and 16                                        6

21      2, 3, 26                                       31

22      11, 18, 20,                                    85
        32, 33, 34,
23      503
        35, 36, 37                                     86
24

25