1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3    _____

4    KATHEENA SONEEYA,

5                    Plaintiff,          Civil Action
                                         No. 07-12325-DPW
6    V.
                                         April 9, 2019
7    THOMAS A. TURCO III, in his official
     capacity as Commissioner of the
8    Massachusetts Department of Correction,  9:16 a.m.

9                    Defendant.
     _____
10

11

12              TRANSCRIPT OF BENCH TRIAL DAY 2

13         BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

14              UNITED STATES DISTRICT COURT

15           JOHN J. MOAKLEY U.S. COURTHOUSE

16                 1 COURTHOUSE WAY

17               BOSTON, MA 02210

18

19

20

21
                  KATHLEEN I. SILVA, RPR, CRR
22                   Official Court Reporters
                 John J. Moakley U.S. Courthouse
23               1 Courthouse Way, Room 5204
                      Boston, MA  02210
24                 kathysilva@verizon.net

25

```
1   APPEARANCES:

2

3   FOR THE PLAINTIFF:

4

5   Anne F. Hancock

6   Sara Bellin

7   Ropes & Gray - MA

8   Prudential Tower

9   800 Boylston Street

10  Boston, MA 02199-3600

11  617-235-1036

12

13  FOR THE DEFENDANT:

14

15  Jennifer M. Staples

16  Samuel A. Miller

17  Department of Correction

18  70 Franklin Street

19  Suite 600

20  Boston, MA 02110

21  617-727-3300

22

23

24

25
```

1                        <u>**I N D E X**</u>

2

3                        **EXAMINATIONS**

4    CAROL MICI

5            DIRECT EXAMINATION                    54

6            BY MR. ROATH

7            CROSS-EXAMINATION                    108

8            BY MS. STAPLES

9            REDIRECT EXAMINATION                 113

10           BY MR. ROATH

11

12                        **EXHIBITS**

13

14   Exhibit 1        received in evidence        119

15   Exhibit 6        received in evidence         53

16   Exhibit 10       received in evidence        119

17   Exhibit 12       received in evidence         53

18   Exhibit 14       received in evidence         53

19   Exhibit 17       received in evidence        119

20   Exhibit 19       received in evidence        119

21   Exhibit 21       received in evidence        119

22   Exhibit 22       received in evidence        119

23   Exhibit 23       received in evidence        119

24   Exhibit 24       received in evidence        120

25   Exhibit 25       received in evidence         53

| 1 | Exhibit 28 | received in evidence | 53 |
| 2 | Exhibit 30 | received in evidence | 120 |
| 3 | Exhibit 31 | received in evidence | 6 |
| 4 | Exhibit 38 | received in evidence | 42 |
| 5 | Exhibit 502 | received in evidence | 120 |

6

7                    * * * * * * * * * * *

8

9                    P R O C E E D I N G S

10              (The following proceedings were held in open

11    court before the Honorable Douglas P. Woodlock, United States

12    District Judge, United States District Court, District of

13    Massachusetts, at the John J. Moakley United States Courthouse,

14    1 Courthouse Way, Boston, Massachusetts, on April 9, 2019.)

15              THE CLERK:  All rise.

16              (Court enters.)

17              THE CLERK:  Civil action No. 07-12325, Soneeya versus

18    Turco.

19              THE COURT:  I apologize for being late.  I had a

20    telephone call with one of my colleagues, which is an awkward

21    position to be in since I do want a report with respect to the

22    lateness of yesterday.  The way in which I'd like to deal with

23    it in terms of timing is I'd like to deal with the experts, and

24    then I think take the report at that point, particularly if the

25    commissioner is here so that she can hear as well about that.

```
 1            Did you have a point that you wanted to make,
 2    Ms. Hancock, or just shifting in your chair?
 3            MS. HANCOCK:  I was just having trouble hearing you.
 4            THE COURT:  Okay.  Sorry.
 5            MS. HANCOCK:  No, no.
 6            THE COURT:  So can we put the experts back on the
 7    stand.
 8            MS. HANCOCK:  I'm sorry.  I do have just two
 9    housekeeping items.
10            THE COURT:  Sure.  Both Dr. Ettner and Dr. Levine can
11    get on the stand anyway.
12            MS. HANCOCK:  Perfect.  We just noticed on the exhibit
13    list that what was premarked as Exhibit 31, and that was
14    Dr. Levine's undated clinical intuition document, and I don't
15    think it made it on the exhibit list.
16            We also just wanted to clarify, we went back and
17    confirmed with the DOC that that document was produced in
18    response to a request for all documents relied upon or
19    considered by you, and this was to Dr. Levine and/or the GD
20    treatment committee, in conducting the December 5, 2017
21    evaluation in drafting or developing the January 12 report,
22    including without limitation the recommendation that
23    Ms. Soneeya be transferred to MCI-Framingham for a period of
24    one year.
25            THE COURT:  Two parts.  Number one, I thought it was
```

1   on the exhibit list.  Is there any dispute?

2           MS. HANCOCK:  It is.  I just don't think it made it

3   onto the official --

4           THE COURT:  Okay.  Is there any dispute that it was

5   tendered effectively, implicitly tendered and --

6           MS. STAPLES:  There's no dispute on that.

7           THE COURT:  So it's received in evidence and it will

8   appear on the official list.

9           (Marked, Exhibit 31 received in evidence.)

10          THE COURT:  Now, second, with respect to your

11  recitation of where it came from or the grounds for it, I think

12  if you simply file a notice of -- with respect to whatever the

13  document production or request was pursuant to which it was

14  received, that would be fine.

15          MS. HANCOCK:  Okay.

16          THE COURT:  But put it on the record as a filing.

17          MS. HANCOCK:  Okay.  We wanted to clarify for your

18  Honor because I know there was some confusion about it

19  yesterday.

20          And then we -- I also previewed to the DOC that we

21  would like to move into evidence the Norsworthy report that we

22  discussed at length during Dr. Levine's cross-examination.

23          THE COURT:  With respect to that, are you offering it

24  for impeachment purposes or are you offering it as some sort of

25  substantive statement on the part of Dr. --

1          MS. HANCOCK:  We would offer it as an exhibit for your

2    Honor to --

3          THE COURT:  That's like saying we're offering it as a

4    piece of paper.  It's not responsive to my question, which is

5    is it substantive or for impeachment?

6          MS. HANCOCK:  For impeachment.

7          THE COURT:  I'm not going to take it for that purpose.

8    I note it's here.  You made reference to it.  To the degree

9    you've made reference to it, of course I'll consider it.

10          MS. STAPLES:  Your Honor, I'm sorry.  I think we just

11    wanted to let the Court know we were going to -- by agreement

12    with the Court's permission, we were going to switch the

13    scheduling of the witnesses so the commission would go before

14    Ms. Peterson, if that works for the court.

15          THE COURT:  Okay.  That's fine.

16          MS. STAPLES:  Thank you.

17          THE COURT:  Turning then back to the question of the

18    experts, I think where I'd like to start here, now having read

19    the Mueller -- if I pronounce the name the same way that

20    another Mueller in the news name is pronounced -- article in

21    the American Journal of Psychiatry, the 2017 article that was

22    discussed, I'd like to start with that, and I'd like to start,

23    Dr. Ettner, with your views with respect to this article.

24          DR. ETTNER:  I'm familiar with the authors of this

25    article.  And one of the authors, Dr. DeCuypere, Griet, has

```
 1   actually contributed to a medical textbook which I've edited.
 2   So I'm quite familiar with their views.
 3           THE COURT:  Mm-hmm.
 4           DR. ETTNER:  And I agree that transgender people have
 5   many comorbid psychiatric issues which need to be addressed in
 6   conjunction with gender dysphoria, just like a person with
 7   cancer might have bronchitis or other issues.  And they do note
 8   that there is biological research, pieces of a puzzle, no
 9   smoking gun, but they also talk about the victimization and the
10   discrimination that transexual people are subjected to as a
11   cause of many of these comorbid treatments.  And --
12           THE COURT:  Let me focus on a couple of things that
13   have come up during the course of this trial.
14           First, their reference to and discussion of what they
15   call neurobiological correlates.  But this is a kind of
16   physical as opposed to social or psychological issue.  I read
17   this to be saying that the research in this area is promising
18   or suggestive, but not definitive.
19           DR. ETTNER:  I printed out, your Honor, last night
20   several articles, one from the New York Times which concludes
21   that there's a durable biological underpinning to gender
22   identity.
23           THE COURT:  New York Times struck me as --
24           DR. ETTNER:  Right.  It's a lay --
25           THE COURT:  Or a peer-reviewed -- or the peers are a
```

1    rather limited group of peers.  I'm looking for science.

2             I'm sorry I'm interrupting you, but to an end.

3             DR. ETTNER:  Of course.

4             THE COURT:  The issue, I guess, is that we just don't

5    have enough yet.  That's what they seem to me to be saying.  We

6    just don't have enough yet, although we have suggestive

7    research and science, to give a fullbodied neurobiological

8    support.

9             Although I understand that Dr. Levine doesn't like

10   other people using the word "etiology" in this context, but

11   that's what they use, to justify saying we can say for sure

12   that a contributing cause is physical or neurobiological.  And

13   that seems to be what they're saying here.  I don't know if you

14   disagree with my capsulation of it, but in any event, I'd like

15   to hear your response to that, whether you think that needs

16   refinement or development.

17            DR. ETTNER:  I agree with your characterization.  I

18   think that there are studies that conclude that there is

19   sufficient evidence to at least suggest that there is a

20   biological basis, and that the -- it is not a psychiatric

21   disorder that arises purely from a disordered identity due to

22   environmental factors.

23            THE COURT:  Okay.  Can I just -- I want to be sure I

24   understand what you're saying.  There is suggestive research --

25   I don't mean to diminish the importance of it.  There is

1    suggestive research for a neurobiological basis, but that's not

2    at the exclusion of a psychological basis as well, is it?

3         DR. ETTNER:  I think in some cases it does exclude it.

4    Because there --

5         THE COURT:  When you say "some cases," do you mean as

6    we evaluate each individual person, you put greater emphasis or

7    maybe entire emphasis on neurobiological causation as opposed

8    to psychological causation?

9         DR. ETTNER:  I think it might depend on the severity

10   of the condition.  So I think with people who have severe

11   gender dysphoria, what we previously called transexual, there

12   has been evidence of four different phenotypes:  a person who

13   is male, what you might call natal male; natal female; a person

14   who's a male-to-female transexual; and a female-to-male

15   transexual.  And that's all in the literature.

16        However, yesterday Dr. Levine referred to me as an

17   outlier.

18        THE COURT:  You know, frankly --

19        DR. ETTNER:  I just want to say that --

20        THE COURT:  Can I?

21        DR. ETTNER:  Yes.

22        THE COURT:  I will hear whatever you have to say

23   because nobody should just sit back and say I'm going to take

24   that.  But I have to tell you that one of the disappointing

25   aspects of all of such research as I've done so far is the

1    recourse to epithets on all sides.  Because Dr. Levine is

2    referred to, including in court opinions, as an outlier.  I

3    want to think things, not words.  So I want to understand what

4    people stand for and try to make my determination there without

5    awarding or -- "award" is not the right word, characterizing

6    someone as an outlier.  So you understand where I stand.

7             DR. ETTNER:  I do.

8             THE COURT:  But you heard him say that.  So you want

9    to respond to it.  Go ahead.

10            DR. ETTNER:  I just want to state that my position is

11   that even though we don't know the exact cause of this most

12   misunderstood area of human behavior, there is sufficient

13   evidence, with more accumulating monthly from all over the

14   world looking at genes, looking at tasks on functional and

15   anatomical resonance through imaging, to indicate a biological

16   basis for the condition.

17            We don't know the exact origin of cancer, but we do

18   know that it has a biological basis.

19            THE COURT:  Right.  I understand that.  I think -- the

20   problem -- not problem -- what I'm trying to get at is what I

21   am to make of the Mueller article as a kind of summary of where

22   we stand now.  You know, science is evolving.  This is an area

23   in which there's been substantial evolution over the -- and

24   understanding and appreciation, broader appreciation of the

25   challenges over the last 30 years.

1          And right now if I were to take the Mueller article as

2     the snapshot of where we are, it is -- looks like there's a

3     effect, but we don't have robust enough science to say that

4     definitively.

5          DR. ETTNER:  I'd like you to take this article.

6          THE COURT:  Okay.  You've waved a document that you

7     want me to look at.

8          DR. ETTNER:  Yes.

9          THE COURT:  Has it been referenced yet in the --

10         DR. ETTNER:  No.

11         THE COURT:  Okay.  So I thought a little bit last

12    night about the question of Dr. Levine raising the other

13    Italian study and other studies that come up in the course of

14    this.

15         I'm of the view that I'm going to receive them, if

16    they're relying upon them, recognizing of course that that

17    sometimes makes it difficult for purposes of cross-examination

18    and so on.  But there's -- science is being -- I'll call it

19    science -- is being generated.  At least peer-reviewed articles

20    are being generated on a pretty regular basis, even as we

21    speak.

22         And so I will take that one.  I will also take the one

23    that -- the Italian study that Dr. Levine has given me.

24         But can you make reference to it and do you have -- so

25    it's in the record.  And are there copies of it?

1          MS. HANCOCK:  Yes, your Honor.  We also have copies of

2     the two articles that Dr. Ettner referenced yesterday during

3     her cross-examination.

4          THE COURT:  Okay.  Do we have the Italian article as

5     well?

6          MS. STAPLES:  Your Honor, we don't.  I'm trying to get

7     that.  I have an abstract.  We are trying to track it down.  We

8     had to call the Social Law Library.  Apparently you have to

9     have a yearly subscription in order to get the article.  So

10    we're going to get that -- we'll get that hopefully by the end

11    of the day, but we'll get it to the Court.

12         THE COURT:  All right.  In any event, I'm going to

13    look at the articles.  I obviously haven't read them yet.  If

14    there's need for further examination, I'll permit the parties

15    to do some further examination if you want something more.  I

16    don't know how we're going to handle that, but --

17         MS. STAPLES:  That's fine, your Honor.  We'll look at

18    that too.

19         MS. HANCOCK:  Thank you.

20         DR. ETTNER:  Your Honor, may I add that I edited two

21    medical and surgical textbooks which are used in curriculums in

22    medical schools and surgical residencies.  And I authored the

23    chapter in both of those books on the etiology, and they

24    contain a summary of the information to date, when those

25    articles -- when those chapters were written.

1           THE COURT:  Okay.  I don't mean to be dismissive --

2    not dismissive, but to cut you off.  I want to see those as

3    well.

4           DR. ETTNER:  Those exist in Principles of Transgender

5    Medical -- Medicine and Surgery, and I think it's 2017 was the

6    most recent edition of that textbook.

7           THE COURT:  Okay.  So I'll look at those as well.  I

8    understand your view -- I summarize because I want to be sure

9    I'm getting it.

10           I understand your view to be Mueller's is as good as

11   something in 2017 would be, but there's additional information

12   that has fortified your position that there is a very

13   substantial -- I'll call it neurobiological basis.

14           DR. ETTNER:  That's exactly right.

15           THE COURT:  So, Dr. Levine, do you want to respond --

16   not so much respond, but characterize for me your view about

17   the accuracy or reliability of the Mueller article, the

18   transgender research article.

19           DR. LEVINE:  Well, I'm a clinical psychiatrist.  I

20   don't have practical daily experience evaluating MRI studies

21   and various neurophysiologic studies.  I rely upon those people

22   who in fact do these studies and are scholarly, Mueller being

23   one of them.

24           So when I read an article like this, it also plays

25   very easily into my clinical experience that early life

1   disruption of parental bonds, multiple traumas, and peer

2   influences also contribute.  Cultural or environmental

3   influences also seem to contribute to the development and the

4   evolution of gender identity as it goes through the life cycle.

5        My objection to Dr. Ettner's affidavit or views is

6   that she's rather certain that the etiology and story of gender

7   identity disorders as it presents throughout the life cycle is

8   neurobiologic or neuroendocrine and biologic.

9        And what I have been saying is I do not deny that some

10  children or some people have a predisposition towards

11  cross-gender identifications.  You can see that in very

12  feminine boys, for example, but it is not -- it is not correct

13  to say the etiology of transgender phenomena is well

14  established and therefore all we have to do is make the

15  diagnosis and recommend the treatment.

16       I think life is much more complicated than that, and I

17  think it's a premature conclusion about the origins of this

18  phenomenon.  And the reason this -- the reason I feel very

19  strongly about this is you see it makes intuitive sense if you

20  believe a disorder is simply biologically caused, then the

21  biologic treatment, in this case hormones and surgery, follows

22  naturally.

23       As you heard yesterday, you know, the reference to

24  other physical diseases.  And it's just that when the emphasis

25  is on the medical disease of transgenderism, it seems to be a

1    justification for any biologic treatment that the patient wants

2    and therefore an expert would provide.  And I just think that's

3    fallacious reasoning.

4         THE COURT:  Let me pause on that because now I want to

5    bring it back to Ms. Soneeya.

6         The difference between the two of you, it seems to me,

7    is over whether or not there should be that one-year period

8    here.  Neither one of you disagree with the appropriateness,

9    need for surgery in this circumstance.  I think you've

10   accurately stated what the perhaps over-arching approach would

11   be for someone who felt strongly -- felt strongly that there

12   was sufficient evidence with respect to the neurobiological or

13   neurobiological endocrine approach that it is enough to say

14   that we will treat that with a particular neurobiological

15   endocrine approach, a physical approach, that's surgery.

16        DR. LEVINE:  Surgery.

17        THE COURT:  But that's really not an issue here except

18   for the soft landing.  I'll call it the soft landing.  That is

19   the 12 months of experience at Framingham before the surgery

20   that you think is necessary takes place.

21        The flip side of that, of course, is someone who feels

22   very strongly that this is largely psychiatric and

23   psychological would say I want to put greater emphasis on the

24   soft landing aspects of this.  That has to be solved in

25   conjunction with and perhaps before the surgery itself.  But

1  those are matters of emphasis.

2         I want to piece this out to understand more fully from

3  the two of you what the sources of your positions are.  I

4  understand that, I think, a little bit better than I did before

5  on that.

6         Did you want to add -- because I want to move on to

7  something else.  Not that I want to cut you off, but I want to

8  move on to something else.  Is there more to say about this

9  aspect?

10         DR. ETTNER:  About what aspect specifically?

11         THE COURT:  About the question of whether or not the

12  science is robust enough as to neurobiological, neurobiological

13  endocrine etiology, to use a phrase that's not necessarily

14  shared by both of you, for the disorder that Ms. Soneeya or

15  other GD patients have.

16         DR. ETTNER:  The only thing I would like to add is

17  that Dr. Levine has referenced Cecilia Dhejne's work as -- in

18  his affidavit regarding suicide, that paper that I think you'll

19  recall.

20         THE COURT:  Mm-hmm.

21         DR. ETTNER:  And Cecilia Dhejne in 2017 has

22  specifically mentioned Dr. Levine as having mischaracterized,

23  among others -- among other people, but he's specifically

24  mentioned as someone who has mischaracterized her research.

25  And she 's also mentioned Dr. Levine as someone whose personal

1    theory of gender identity development has no evidence that she

2    can uncover in the literature.  And she presents finally

3    additional information about a biological basis for the

4    condition.

5           THE COURT:  Okay.  So do I, again, have the citation

6    for it in the documentation that I will have an opportunity

7    to --

8           DR. ETTNER:  The lawyers have that.

9           THE COURT:  But is it in your affidavit or report or

10   in the bibliography?

11          MS. HANCOCK:  We can confirm, your Honor.  We have

12   copies of it with us today.

13          THE COURT:  Okay.  Again, it's not something I can --

14   I want to read on horseback here.  If it exists, I'd like to

15   see it.

16          MS. HANCOCK:  Yes.

17          THE COURT:  And there will be an opportunity to

18   respond to it in various ways, depending on that, but I want to

19   see what's specifically referenced by each of the doctors here.

20   So that's one.

21          MS. HANCOCK:  Yes, your Honor.  I think -- yes.

22          DR. LEVINE:  So may I respond to that?

23          THE COURT:  Yes, you can.

24          When I say I want to move on, it's not that I don't

25   want to -- that I want to leave behind the question of suicide.

 1    That's a different set of discussions that are included in the

 2    Mueller report or the Mueller article.

 3           But go ahead, Dr. Levine.

 4           DR. LEVINE:  Number one, I'm unaware of what was just

 5    mentioned.

 6           Number two, I actually thought that the author herself

 7    has misrepresented her work or she didn't understand her work

 8    in the way I understood her work.

 9           I understood her work to mean that gender-confirming

10    surgery was a very effective treatment for genital dysphoria

11    but that the long-term adaptation after sex-reassignment

12    surgery, according to her, required continuing psychiatric care

13    and medical care.  Because the death rates as seen ten years

14    after surgery, the death rates were elevated, which was found

15    also in the Simonsen study from Denmark and the VA study by --

16    George Brown was a partial author -- that the psychiatric

17    hospitalization rates were very high, and the suicide attempts

18    that were not successful were also seven times the control

19    group.

20           So what I thought -- it's very clear that

21    sex-reassignment surgery, or it's called gender-confirming

22    surgery, is an effective treatment for males who have genital

23    dysphoria.  But the ongoing psychiatric problems of -- or the

24    adaptations, there was plenty of evidence.

25           She provided the evidence, to me the best evidence

1    that has ever been established because it's not based on

2    patient report.  It's not based on surgeon's report.  It is

3    based on the records that Scandinavian countries keep, the

4    health records and arrest records and motor vehicle accident

5    records that Scandinavian countries keep on every citizen.

6            So what I'm saying is if you say that I am -- I

7    disagree with -- or the author disagrees with me or I disagree

8    with the author, it's not about whether sex-reassignment

9    surgery is effective for genital dysphoria.  It's about the

10   long-term outcomes, both in mortality, criminality, automobile

11   accidents, suicide attempts, and the need for ongoing

12   psychiatric care.

13           THE COURT:  Okay.  So let's pause with that because

14   apart from engaging with -- remind me the name of the --

15           DR. LEVINE:  No one seems to be able to pronounce it.

16           DR. ETTNER:  Cecilia Dhejne.

17           THE COURT:  So apart from engaging specifically with

18   her response to you, going back to Mueller, we have first this

19   idea of short-term benefit, which I don't think you disagree

20   with.  And again, dealing with this case in particular, that

21   there would be at least a short-term benefit to Ms. Soneeya.

22           Then we have the long-term kind of longitudinal

23   dimension, which this article is pretty clear about, that what

24   we need but we don't have is a fully robust collection of

25   longitudinal studies that will be helpful on a variety of

1    topics, including the question of suicide or self-damage or

2    other morbidities farther down the line.

3         And there is an attenuation, isn't there, between --

4    at certain points between the surgery itself and its effect,

5    say 18 years out or 19 years out.  And one of the reasons for

6    urging ongoing psychological counseling or treatment or

7    observation is to ensure that you're able to ameliorate

8    whatever the ongoing life challenges are for the person who's

9    suffered -- not suffered -- who's received that surgery.

10        I'm not sure that that's inconsistent with the idea of

11   having surgery is simply -- not simply -- but it is cautionary

12   to say this is not a magic wand, things have to be followed

13   through on it, and it's particularly challenging in the context

14   obviously of a correctional facility.

15        Now, have I properly stated that?  And are there

16   refinements that either one of you would like to offer?

17        DR. ETTNER:  I would state that surgery eliminates

18   gender dysphoria.  It does not eliminate the other problems in

19   living that people have.

20        THE COURT:  When you say that, you mean it -- gender

21   dysphoria disappears --

22        DR. ETTNER:  Correct.

23        THE COURT:  -- with surgery?  And that's back to -- if

24   I'm correct, back to your neurobiological approach that this is

25   a biological problem.  We're going to solve it biologically.

1    There may be other things in a person's life that have to be

2    attended to, but the core question --

3              DR. ETTNER:  It eliminates the testosterone that gives

4    rise to the gender dysphoria.  So just the physiology of it, it

5    eliminates the gender dysphoria and is a virtual cure for that.

6              But it doesn't eliminate the other problems in living

7    that people will encounter.  I see in my clinical practice

8    people who have had surgery 18 years ago, and then a child dies

9    and they come to therapy to deal with that.

10             THE COURT:  Okay.  Let me pause on that, because I

11   do -- this is a case about Ms. Soneeya.  The general theory

12   is -- I want to understand the general theory is so I can

13   understand your positions.

14             What difference does it make in Ms. Soneeya's

15   circumstance as to your view or Dr. Levine's view?  You've both

16   come to the conclusion that it is necessary to have the

17   surgery, that it is appropriate to have follow-on that is

18   psychologically based.  It may go to the question of the

19   immediacy.  I understand that, but that's a different question.

20   What difference does it make here?

21             DR. ETTNER:  Well, we know that Ms. Soneeya reaches

22   out to her therapist when she experiences some sort of issue

23   that she needs to discuss.  So she has relied on mental health

24   in a very resourceful way.  Not in insight-oriented therapy but

25   for her immediate issues.

1          If she were to go to a female prison with the

2     vestigial male genitals that she has, I don't think her

3     adaptation would be as successful as if she had female genitals

4     and could shower with other people and actually not be

5     separated from the females who she is trying to integrate with.

6          THE COURT:  Okay.  Let me unpack that in terms of

7     hierarchy of choice.

8          Both of you agree she should have surgery.  You

9     disagree about when or what a precondition is of it.  But I

10    think that precondition is when.

11         Assume that she follows where she's gone before, which

12    is that she is intent upon the idea both of surgery and being

13    in a female setting, which given the limited settings within

14    prison systems she's intent on a female setting in the prison

15    system.

16         Where do we put this in terms of the hierarchy?  You

17    would like to have the surgery first -- you, Dr. Ettner, would

18    like to have the surgery first, to be followed immediately by

19    location in Framingham.

20         Dr. Levine would like to have location in Framingham,

21    confirming, although it doesn't seem to me that it's going to

22    dissuade Ms. Soneeya -- that's perspective judgment on my

23    part -- to have the surgery, but at least she'll have a clear

24    understanding of what's available, what's going to happen to

25    her.

1            What we're now focusing on is that 12-month period.

2    Is it necessary for effective treatment here?  This is really a

3    kind of a prescriptive approach.  Does she have to have that

4    12 months to be fully successful in the surgery that I think

5    all of us, if we were betting people -- of course none of us

6    are -- that she's going to have sooner or later or at least

7    aspire to sooner or later.  Is it necessary to have that

8    12-month period?

9            DR. ETTNER:  According to the Standards of Care, no,

10   it's not.

11           THE COURT:  Well, you say according to the Standards

12   of Care.  I have to say the Standards of Care seem to be

13   somewhat open-textured on this issue.

14           DR. ETTNER:  I'm sorry.  To be --

15           THE COURT:  Open-textured on this issue.  They're not

16   prescriptive.  They say here are the things that have to

17   happen.  They don't say you can't have what I'll call the soft

18   landing.

19           This is my reading of the document which was imposed

20   on the DOC by Judge Tauro and by Judge Young.  It frequently

21   happens that the drafters of a document think it's clearer than

22   the people who have to interpret it think.

23           But take as a given that I don't think that the

24   standard of care requires it.  At least respond with that

25   assumption in mind.

1          DR. ETTNER:  It does require 12 months of continuous

2     living in one's affirmed gender role.

3          THE COURT:  I understand that.  The question there is

4     it -- judges like to use, or lawyers, or both, like to use

5     Latin as a way of avoiding clearly confronting something.  So

6     you are essentially taking the Latin canon *exclusio unius*

7     *exclusio alterius;* that is, to exclude one thing is to exclude

8     everything else.

9          I don't read it that way.  I read it to say here are

10    the things you've got to do before you can make that diagnosis.

11    Both of you have done it and both of you have come to that

12    conclusion.

13         Now, Dr. Levine has bells and whistles.  You don't

14    think the bells and whistles are necessary.  You tell me that

15    you think that's not in the SOC.  Let's not spend very much

16    time on that because I construe documents, and that's what I'm

17    going to do here.

18         Back to the practical question, then.  If it's not in

19    the SOC -- let's assume that for present purposes -- do you say

20    it's just not right to be doing that; and if so, why?  Doing a

21    12-month, you know, experience in Framingham.

22         DR. ETTNER:  I say that it's not necessary.  I give an

23    example.  I don't know if this is entirely responsive to your

24    question.  But if there was a transgender woman who was working

25    as a forest ranger and living alone in a national forest and

1   required surgery, we wouldn't insist that she spend 12 months

2   in a corporate setting or in a setting or a society with other

3   women.

4        THE COURT:  No, but the difference there -- not to

5   engage too fully in hypotheticals that are not directly on

6   point, but the difference there is Ms. Soneeya aspires to going

7   to a different setting.  It's like the forest ranger aspiring

8   to go to the executive suites of Morgan Chase.  That's the

9   comparison.

10       Here we're talking about -- she's not been in

11  Framingham or a Framingham-like institution.  That's the only

12  other thing available to her here under present circumstances.

13  So she doesn't fully know, has not fully experienced that sort

14  of thing.

15       So I reject the hypothetical and now I'm back to this

16  question of as a practical matter, apart from what I referred

17  to perhaps too glibly yesterday as deferred gratification.

18  What's the problem?

19       DR. ETTNER:  The problem is we know that delaying

20  medical and surgical treatment increases a person's risk.  And

21  we actually have documentation in an article here that the

22  attorneys have and have provided, by Bauer and others who have

23  documented that when people are provided with identity

24  documents that match their affirmed identity, there's a

25  decrease in suicidal ideation and attempts.  And when they

1    complete medical and surgical treatment, there's a decrease in

2    suicidal ideation and suicidal attempts.

3              Ms. Soneeya has been waiting a long time.

4              THE COURT:  I understand that.

5              DR. ETTNER:  Yes.

6              THE COURT:  And I think I understand the thrust of it.

7    Now it's really kind of "what life is about" tradeoffs.  The

8    tradeoff between the opportunity to have exposure to a new

9    setting that she's not had before that she aspires to and

10   the -- I think perhaps Dr. Levine will differ on this, but I

11   don't think I do -- the idea that you should have your medical

12   procedure as promptly as you possibly can.

13             But that imports what is prompt and possible and what

14   are the tradeoffs in doing it more promptly than putting in

15   place structures that would make for a fuller understanding of

16   what she's doing and absorbing what is -- she's going to

17   encounter when she's there.

18             And when she's -- you know, this bleeds over into --

19   but it's not your writ or Dr. Levine's.  It bleeds over into

20   the question of security.  Put to one side the various

21   justifications for saying that there's overwhelming evidence.

22   It is that living in Framingham as a transgender woman who has

23   had a history of criminality -- abusive criminality involving

24   women is not likely to be a walk in the park.  That's just the

25   way it is.

1          Now, maybe you'll differ with me and say that there's

2     been a transformation.  I'll of course hear that argument.  But

3     that's more something we're going to have to hear from the

4     people whose responsibility is security.

5          I'm simply talking about the real -- call it the real

6     world in which Ms. Soneeya is going to have to function.

7     What's the problem with giving her a sense of what life in

8     Framingham is going to be like before the surgery?

9          DR. ETTNER:  Would she be more accepted as a

10    transgender woman who still has some male physiology and is

11    therefore viewed as possibly as other and may actually trigger

12    some problems with women who have been abused by men, et

13    cetera, or would she be more likely to be accepted if she is

14    entirely female anatomically.

15         THE COURT:  Okay.  I think that's a very fair way of

16    asking the question.  Now you'll answer it.

17         DR. ETTNER:  I think I've been answering it for two

18    days.

19         THE COURT:  Perhaps.  But now we've titrated the

20    solution sufficiently to get to this particular issue.

21         DR. ETTNER:  I think that when Ms. Soneeya enters this

22    new environment feeling comfortable in her own skin, having

23    eliminated gender dysphoria, she will be able to overcome the

24    challenges that she will face.  And if she needs help, she'll

25    be able to reach out, as she has in the past, to mental health.

1          THE COURT:  Two parts of that.  Number one, that's

2     your view of Ms. Soneeya, and I'll accept that.

3          The second part is the environment, your view of the

4     environment.  Will the environment be more welcoming if she has

5     had surgery before than it would be if she had this period of

6     what I call soft landing, but being present there but without

7     the anatomical change.

8          DR. ETTNER:  Undoubtedly, your Honor, because we know

9     how society feels in general about transgender people, and we

10    know that there's a lot of prejudice.

11         THE COURT:  But do we know -- all of that; but do we

12    know that much about the difference between someone who

13    initially encounters someone in transition and then ultimately

14    has surgery as opposed to someone who initially encounters a

15    new group of people and has had surgery before, how they're

16    going to respond?

17         Are they simply going to say, look it, surgery, no

18    surgery, she's the same person that she was that would give

19    rise to my prejudice as a person in Framingham, a woman in

20    Framingham?  Do we know enough about that, or are we simply

21    saying my -- I'll call it gut instinct, to pick up some

22    language that's been used here earlier.

23         DR. ETTNER:  Well, what we do know is that people feel

24    better, are more confident, and generally improve in all areas

25    postsurgery in terms of their sense of well-being.

1          THE COURT:  That's Ms. Soneeya.

2          Now, the other aspect of it, as to which you may not

3    have a view.  It may be that it's simply too speculative to

4    have a view.  I'm not suggesting one way or the other but I

5    want to be sure I've gotten your perspective.

6          DR. ETTNER:  My view is that people in prisons -- and

7    I've been in quite a few now -- are often, including the

8    correctional staff themselves, not inclined to be particularly

9    generous towards transgender inmates.  And that may affect

10   Ms. Soneeya if she is a preoperative --

11         THE COURT:  And postoperative too?

12         DR. ETTNER:  Possibly.  But I think that she would be

13   more able to assimilate postoperatively.  She wouldn't need to

14   be secluded.  She wouldn't need to be isolated as she is now.

15   She could shower publicly.  She could be in the general

16   population.  She would have a better chance of interacting in a

17   wholesome -- in a full-hearted way with others.

18         THE COURT:  Okay.  That is very helpful to understand

19   the differences in your approach to the 12-month period of

20   visitation.

21         Do you want to respond however briefly to that?  I'm

22   not sure that you haven't said everything that you want to say

23   about this issue.

24         DR. LEVINE:  Well, this hot tub has enabled me to --

25         THE COURT:  Can you speak into the microphone?

1           DR. LEVINE:  I've just realized another significant

2     area of disagreement between the two experts.  Just as

3     Dr. Ettner insists that the etiology of this condition is well

4     established, she also insists that sex-reassignment surgery or

5     surgery will cure gender dysphoria.

6           If you notice my language, I've taken pains to say

7     that the surgery will cure genital dysphoria, meaning the

8     distress about the male genitalia.  The idea that people are

9     cured of gender dysphoria is a very self-serving notion, and it

10    belies -- it is belied by the fact that after sex-reassignment

11    surgery many patients in the community seek additional surgery.

12          THE COURT:  Let me just interrupt you on that.  I

13    think I understand your approach and your perspective, but I'm

14    not sure we're talking about absolutes here.

15          DR. LEVINE:  No, we're not.

16          THE COURT:  What we're talking about -- at least what

17    I'm talking about is how is one choice as compared to another?

18          And so I go back to my magic wand reference.  I don't

19    think either one of you think that there's that -- the choices

20    that are available to Ms. Soneeya are going to result in a

21    magic wand transformation of her circumstance.

22          You're asking is there something that we can do that

23    would make her better able to deal with her condition, broadly

24    conceived.

25          You say yes -- you, Dr. Levine, say that it would be

1  transformative for the genital-based disorder concern.

2          Dr. Ettner would say it deals with gender disorder,

3  broadly conceived, although it doesn't necessarily deal with

4  the environment in which she's going to have to function.

5          But I'm simply saying, you know, which is better?

6  Which one of these choices is better.  Not best, better,

7  because there isn't a best.  So that's why I'd like you to

8  speak to this --

9          DR. LEVINE:  The reason why I think that our

10  recommendation is, in fact, more beneficial to the inmate is

11  that in the course of litigation of course the inmate is going

12  to represent herself as having no ambivalence that this is what

13  she wants.

14          THE COURT:  But that isn't really what -- how

15  Ms. Soneeya presents.  I mean, you know, I listened to her

16  testimony, what she submitted.  You yourself have recognized a

17  increasing, deepening understanding of her circumstances.  And

18  I'm not sure that she also would think that this was a magic

19  wand that was going to make everything change.

20          But what it -- what I understand her to be saying is

21  this is better than where I am and will reduce the dysphoria,

22  however related, better than what I now face.

23          And now I'm saying what's the difference between the

24  preparation at Framingham as opposed to the other?  Which is

25  better?  That's what I'm saying.  I understand people say

1    things in litigation.  I understand that there is a scripting

2    and staging.  That's why we are having a hot tub --

3            DR. LEVINE:  Good.

4            THE COURT:  -- here so I can talk directly to you, not

5    filtered through the litigation positions of the parties.

6            All of that having been said, you know -- or you've

7    got substantial experience with Ms. Soneeya.  I think it's fair

8    to say that your concern is that she doesn't know enough about

9    what Framingham means and that's why you wanted her to have

10   that experience.

11           On the other hand, an argument can be made that

12   sending her in in her current condition, anatomical condition,

13   may cause there to be created barriers that will linger

14   afterwards.

15           So I want to know more specifically how you respond to

16   that, because -- you know, it goes back to -- I mean, it's a

17   strained comparison, you know, Churchill's response to

18   democracy, it's not very good but it's better than all the

19   others.

20           So what do you say about, you know, the idea that she

21   go in there with these concerns, call it cold turkey, however

22   you want to characterize it, without having this preparation

23   and not having to face this environment that is a challenging

24   environment?

25           DR. LEVINE:  I'm not impressed that Ms. Soneeya is a

1    very adaptive human being, gregarious, and I think she tends to

2    be isolating.  I think she's so wary of other human beings

3    because her entire life has been one of victimization.  And

4    therefore I think there is a possibility that when she

5    encounters this new and, to me, unpredictable environment, she

6    will use her coping skills of isolation and this may trouble

7    her a great deal.

8           As I said yesterday, I do think that in the community

9    gender reassignment surgery is always an elective procedure.

10   And I think our recommendation has been to give her a chance to

11   elect this after she's had an experience of adaptation there.

12          Whether it's positive or negative, we then would say I

13   think if she wants to do this after an extended period of

14   successful adaptation, however she and the mental health

15   professionals who care for her agree is a successful

16   adaptation, then I think she can go ahead.  And I believe this

17   will benefit her at least in terms of her genital dysphoria.

18          THE COURT:  Okay.  I think we we've probably exhausted

19   what can be said apart from perhaps -- the differences of

20   opinion that you have.  And I understand them and I'll try to

21   move on from it.

22          Let me go to another issue.  We did talk a little bit

23   about suicide.  I think we've -- or follow-on over a

24   longitudinal period.

25          I don't think either one of you disagree that there

1    has to be careful psychological follow-on for Ms. Soneeya under

2    any circumstances here.  I'm not sure that that's critical to

3    your respective decisions.

4         I do want to talk, however, about this question of --

5    that I think differs between the two of you of looking at prior

6    life history, particularly criminal activity.  And I'll break

7    it into two parts.  First, the prior criminal activity which in

8    this case is 38 years old, something like that, and the

9    question of -- these are the terms that are used in the

10   Sentencing Guidelines, but acceptance of responsibility.

11        I understood Dr. Ettner to say that she records all of

12   this but did not consider it to be important in your opinion

13   with respect to Ms. Soneeya now.  Do I properly say that?

14        DR. ETTNER:  I don't regard it as a reason to withhold

15   what I believe is medically indicated treatment.

16        THE COURT:  Okay.  So let me just say if the criminal

17   activity took place a year ago and the evidence was

18   overwhelming with respect to guilt, would you have the same

19   opinion here?  Would you say it just falls out altogether?

20        DR. ETTNER:  If a person was -- had active sociopathy

21   that had not been controlled --

22        THE COURT:  Active --

23        DR. ETTNER:  -- sociopathy.  That would be a reason,

24   and I think the Standards of Care indicate that, that that

25   would be a reason to not provide surgery.

1          THE COURT:  Okay.  So now we've set up the two, or at

2     least I've tried to set up the two ends of the spectrum.

3          That is to say it's prior criminality and acceptance

4     of responsibility are things to be considered in making a

5     recommendation, except when they aren't.

6          Now I want to understand when do they stop being

7     important?  Not that I'm going to say seventeen and a half

8     years, but I want to understand where you find it less

9     compelling that there was prior criminal activity and a failure

10    to accept -- I'll call it failure to accept responsibility or

11    at least refusal to accept that the decision of the courts was

12    correct.

13         DR. ETTNER:  So from my point of view, Ms. Soneeya is

14    unlikely to commit any further acts of violence.  Her

15    testosterone, which we know increases aggression, is virtually

16    undetectable, and she's not had any violent or criminal

17    activity in I think almost 40 years, as you mentioned.  Neither

18    does she show on psychodiagnostic testing any tendency towards

19    that.

20         So psychodiagnostic testing is very important in sort

21    of filtering out these tendencies that we can't just ask about

22    in interview or intuit.  It actually provides data.  And given

23    the testing that I've done on two occasions and her history in

24    MCI-Shirley, I believe that Ms. Soneeya would be more likely to

25    harm herself than to ever harm another human being.

```
 1          THE COURT:  Okay.  So let me then now turn to the
 2   question of -- I call it acceptance of responsibility.  Maybe
 3   we can call it self-awareness or maybe we can call it an
 4   unwillingness to confront an unhappy fact.
 5          The fact is that she's been convicted.  She's
 6   challenging it.  I certainly don't want to burden the exercise
 7   of a challenge to conviction for whatever reason.
 8          On the other hand, does it play a role in your
 9   analysis in any way that she continues to maintain that she is
10   not guilty of the offenses of which she was convicted?
11          DR. ETTNER:  At this point, no, it doesn't, because I
12   see the severity of the gender dysphoria as the overriding
13   concern.  And as a provider, my responsibility would be to
14   treat what is medically indicated at the time.  So for
15   instance, if someone came into my office and was having a major
16   depressive disorder or some other psychiatric or medical
17   problem, the first order of business would be to treat that
18   condition or at least to diagnose it and to make some referrals
19   for treatment.
20          And we wouldn't question people about either their
21   past criminal history, whether they take responsibility for it,
22   how they feel about it now, are they in denial?  I mean, those
23   may be issues to work out with a mental health therapist in the
24   institution, but not my role as an evaluator of whether or not
25   and what treatment is appropriate presently.
```

1           THE COURT:  Okay.  Thank you.

2           So, Dr. Levine, you had, from my perspective, a

3    somewhat different degree of emphasis on past criminal activity

4    and if I can call it acceptance of responsibility.

5           DR. LEVINE:  Yes.  I have a longitudinal --

6           THE COURT:  Can I have you --

7           DR. LEVINE:  I have a longitudinal perspective on

8    every human life.  That's my work as a clinician.  I believe

9    the past infiltrates the present in every human being.  And so

10   the idea that one's adolescent sexual life, one's adolescent or

11   young-adult vocational life, one's criminal activities,

12   including these murders, are totally irrelevant and are totally

13   controlled because she has low testosterone levels.

14          Females who have committed murder in Framingham have

15   low testosterone levels.  Testosterone level per se does

16   decrease aggressiveness, but the more important aspect of this

17   is the feminine identification that Ms. Soneeya has I think is

18   in part an escape from her past very chaotic and aggressive

19   background.

20          To me, it's not determinative but it certainly is an

21   influence.  Because I believe the past inevitably infiltrates

22   the present in terms of the subjective mental life of every

23   human being.

24          I think Dr. Ettner puts much more emphasis on the

25   diagnosis per se, and I put more emphasis on making the

1   diagnosis and understanding how the diagnosis came about in

2   terms of the development of the person.

3          So I agree that Ms. Soneeya is a rather pacific human

4   being.  She sits very still for three, four hours in an

5   interview.  She shows very little affect.  She's a very

6   well-controlled person.  But that does not tell me what is

7   going on internally in her mind.

8          I hear very clearly that -- the aspiration to be a

9   complete woman, but it's very hard to understand what that

10  means in terms of her past aggressiveness.  I believe it's an

11  escape from her past aggressiveness, and therefore, I support

12  it and applaud it and want to help her achieve psychological

13  benefit.

14         THE COURT:  Okay.  So, again, this is part inquiry to

15  help me understand the premises on which both of you reach your

16  recommendation.  But considering all of those factors, which

17  you did, and Dr. Ettner's suggesting they were not so

18  significant in her evaluation, you both end up with the same

19  recommendation, right?  That is, she should have the surgery.

20  She's an appropriate candidate for surgery, something that you

21  weren't prepared to say in 2008 and 2012.

22         And that's -- in part -- I mean, in service I suppose

23  or evidence of your longitudinal approach to all of this, but

24  by different avenues, you both come to the same conclusion with

25  respect to the surgery.

1          DR. LEVINE:  Yes.  Our disagreements are conceptual,

2     theoretical.  It's reassuring to me that both of us have

3     reached reasonably similar conclusions.  I do believe that I'm

4     looking out for Ms. Soneeya.  I believe Dr. Ettner believes she

5     is looking out for Ms. Soneeya.  I'm trying to minimize the

6     possibility of harm to her by granting her what she wants if

7     she wants it in the future.

8          THE COURT:  I think this has been very helpful to me

9     anyway in understanding this.

10          So do counsel have questions of either Dr. Ettner or

11     Dr. Levine?

12          MS. HANCOCK:  Yes.

13          THE COURT:  So, Ms. Hancock, I think for orderliness

14     purposes, although I'll ask them to stay there rather than

15     bounce back and forth, for -- I'm sorry.

16          We'll take a break at this point.  I have to have --

17          MS. HANCOCK:  That would be helpful --

18          THE COURT:  -- further conversation.  Let's say we'll

19     take a 15-minute break.

20          MS. STAPLES:  Sure.

21          THE COURT:  At least 15 minutes.

22          MS. STAPLES:  Sure, your Honor.

23          THE CLERK:  All rise.

24          (Court exits.)

25          (A recess was taken.)

```
 1              THE CLERK:  All rise.

 2              (Court enters.)

 3              THE COURT:  So, Ms. Hancock, will you be doing both of

 4     the experts or just one?

 5              MS. HANCOCK:  I just have one specific follow-up

 6     question for Dr. Ettner and one general question for

 7     Dr. Levine.

 8              THE COURT:  Okay.  But you'll be doing both --

 9              MS. HANCOCK:  If the court permits.

10              THE COURT:  That's fine.  I just want to understand

11     who does what.  But you will -- you'll ask your questions of

12     Dr. Ettner first, and then if there are any questions that will

13     be asked by --

14              MS. STAPLES:  None for Dr. Ettner for mine, your

15     Honor, just Dr. Levine.

16              THE COURT:  Then you'll do Dr. Ettner and then we'll

17     go to Dr. Levine.

18              MS. HANCOCK:  Perfect.

19              Doctor, you referenced a Bauer study a few times in

20     the course of the hot tub.  I just want to refine it a little

21     bit because I think it might have gotten muddles.  The Bauer

22     study collected data from individuals over --

23              THE COURT:  Can I pause -- do we have a citation or an

24     exhibit number for the Bauer study?

25              MS. HANCOCK:  Not yet, your Honor, but --
```

1          THE COURT:  Are you going to be relying on it?  She's

2     indicated she relies on it.

3          MS. HANCOCK:  Of course.

4          THE COURT:  So I'll mark it as Exhibit 38.

5          (Exhibit No. 38 received in evidence.)

6          MS. BELLIN:  Your Honor, may I approach?

7          THE COURT:  Yes, please.

8          DR. ETTNER:  Excuse me.  Do I need to get my copy in

9     order to answer your question?

10          MS. HANCOCK:  Sure, if that's helpful.

11          MS. BELLIN:  I can give you a copy.

12          DR. ETTNER:  Thank you.

13          THE COURT:  Unless you have notes that you want to

14     refer to on your copy.  Okay.  So why don't you provide a copy

15     to her.

16          MS. HANCOCK:  And the study collected data from

17     individuals over the course of one year, and a subgroup of

18     those individuals were individuals who are in the process of

19     transitioning.  And the study, as I understand it, studied the

20     effects of medical treatment on the subgroup of individuals who

21     were in the process of transitioning, like Ms. Soneeya.

22          What were the findings on the -- with respect to the

23     effects of medical treatment on reduced suicidal ideation and

24     reduced suicide attempts?

25          DR. ETTNER:  I remember that without actually finding

1    it here, that the authors -- oh, I do see it here.  The author

2    said that 240 attempts per 1,000 persons could be avoided if

3    medical and surgical treatment was completed.

4           THE COURT:  Where are you referencing?

5           MS. HANCOCK:  I think page 12 might have the most

6    helpful...

7           DR. ETTNER:  Page 12 of 15.

8           MS. HANCOCK:  So I think what we're looking at is

9    where it starts -- and correct me if I'm wrong -- completing a

10   medical transition had beneficial individual and population

11   effects.  It was associated with a 62 percent relative risk

12   reduction in ideation and on a transpopulation level, to

13   facilitate completion of medical transition when desired would

14   correspond to preventing 170 cases of ideation per year per

15   1,000 transpersons, representing 44 percent of ideation, and

16   further preventing 240 attempts per 1,000 ideation or 69

17   percent of attempts in this group.

18          So I guess what is the significance of this finding to

19   you?

20          DR. ETTNER:  That delay in care leads to suicidal

21   ideation and suicidal attempts.

22          MS. HANCOCK:  Do you have any questions for

23   Dr. Ettner?

24          MS. STAPLES:  I do not have questions for Dr. Ettner.

25          MS. HANCOCK:  If I may move on, I just have one

1    follow-up question for Dr. Levine.

2            THE COURT:  Yes.

3            MS. HANCOCK:  Throughout the course of the hot tub and

4    examination, we've been assuming that transfer for one year is

5    possible.  The DOC has denied that transfer through a security

6    review, and you've agreed that Ms. Soneeya needs surgery.  Her

7    current treatment plan is hormone and therapy.  It does not

8    include surgery.

9            So since she cannot be transferred for one year, isn't

10   surgery in her best interest?

11           DR. LEVINE:  As I've said, I believe that changing her

12   genital structure would be psychologically beneficial to her.

13   I think it would be beneficial to her, but it would carry a

14   greater risk of unhappiness if it were done without a transfer

15   first.  I don't know what else to say.  I'm just being

16   repetitive to the Court.

17           There is a chance that -- I'm sure that immediately

18   postoperatively for months thereafter while the healing

19   occurs -- I don't know when she would be transferred to

20   Framingham postsurgically; I have no idea.  But I think she

21   would be subjectively much happier.

22           But then, again, she has -- she's now -- she's now

23   permanently housed in a female facility.  She has all the

24   adaptive challenges.  I don't know how well she would do with

25   those adaptive challenges.

1            You know there are people who have had

2    sex-reassignment surgery who've actually gone back and lived as

3    a male in free society.  I know the data written by the

4    surgeons and so forth in this field show that there's a very

5    low limited -- low rate of regrets, but there are many examples

6    of people who have regretted having sex-reassignment surgery.

7            MS. HANCOCK:  If I may, I want bring it back to

8    Ms. Soneeya.  That's why we're here today.

9            DR. LEVINE:  I think I've answered your question.  The

10   question is --

11           THE COURT:  Go ahead.  Well, don't go ahead.

12           The problem is this, I suppose, which is -- and

13   perhaps Dr. Levine will differ with me.  The primary

14   recommendation is that she have surgery.  The secondary

15   recommendation -- I'll call it secondary in the sense that it's

16   supportive of the primary -- is that she have the opportunity

17   to be at Framingham before the surgery.  Do I properly say it?

18   But the primary is that she have surgery.

19           DR. LEVINE:  I guess that's true.

20           THE COURT:  Okay.  So really now we're dealing with

21   the art of the possible or perhaps the art of whatever a judge

22   might order.  That's how this happens, if it happens.  But I

23   think it's beyond the writ of the two experts to be able to

24   address that, except in an argumentative sort of way.

25           MS. HANCOCK:  Fair enough.

1          I think we're all done.

2          THE COURT:  You may step down.

3          MS. STAPLES:  Your Honor.

4          THE COURT:  Thank you very much for participating.

5          MS. STAPLES:  Your Honor.

6          THE COURT:  I'm sorry.

7          MS. STAPLES:  That's all right.  I just have a few

8    questions, just follow-up for Dr. Levine, if I might.

9          THE COURT:  Go ahead.

10         MS. STAPLES:  Dr. Levine, I want to be clear about

11   your recommendation.  As the Court noted, you made a

12   recommendation that Ms. Soneeya live at Framingham for a

13   year -- that would be the female prison -- and then have the

14   surgery if she's successful.  Is that correct?

15         DR. LEVINE:  Yes.  If she elects and is successful.

16         MS. STAPLES:  So if she's successful and if she still

17   wants the surgery?

18         DR. LEVINE:  Yes.

19         MS. STAPLES:  So those are the two preconditions you'd

20   want prior to any surgical intervention.

21         DR. LEVINE:  Yes.

22         MS. STAPLES:  That's because there's a possibility if

23   she wasn't successful but had the surgery there's no going

24   back, correct?

25         DR. LEVINE:  Exactly.  As I understand it, if she is

1   now anatomically female she must be housed in a female

2   facility.

3          MS. STAPLES:  Okay.  And you also based your

4   recommendation on the assumption that if Ms. Soneeya went to

5   Framingham and was not successful, she could just be

6   transferred back to the male facility; isn't that true?

7          DR. LEVINE:  Yes.

8          MS. STAPLES:  And you did not check with the

9   Department of Correction about whether that was possible.

10         DR. LEVINE:  No, I didn't.

11         THE COURT:  All of which is to say it's in the hands

12  of the Department of Corrections, and it's in the context of

13  litigation over these matters that has been commented upon by a

14  number of judges of this court concerning a kind of

15  slow-walking approach to all of this.

16         MS. STAPLES:  Correct.

17         THE COURT:  So again, it's beyond their scope.

18         MS. STAPLES:  I understand that.

19         MS. HANCOCK:  If I may, your Honor, I have one

20  brief --

21         THE COURT:  I said two to a customer.  I guess two to

22  a customer after the hot tub is appropriate.

23         MS. HANCOCK:  May I inquire?

24         THE COURT:  Yes.

25         MS. HANCOCK:  Dr. Ettner, one clarifying question.

1              Based on the science and literature, what are the

2     rates of reversal and rates of regrets for individuals who have

3     undergone surgery?

4              DR. ETTNER:  Rates of regret are less than 1 percent.

5     Requests for surgical reversal, in the newest study, which has

6     just been submitted by Burleigh, et al., are 0.3 percent.

7              MS. HANCOCK:  That's it, your Honor.  Thank you.

8              THE COURT:  Is Burleigh available to me?

9              MS. HANCOCK:  If it's not it will be, your Honor.

10             THE COURT:  Thank you very much.  I appreciate --

11    perhaps it's not willingness, but acquiescence in this

12    particular process, which frankly is particularly helpful to me

13    in a contested area like this.  And I appreciate the candor

14    with which you both responded to the questions and let me try

15    to force you into areas where I get the answers that I'm

16    looking for here, even though you have additional things that

17    you'd like to offer here.  But I've heard both the answers and

18    the additional things.  Thank you.

19             MS. HANCOCK:  Thank you.

20             DR. ETTNER:  Thank you.

21             THE COURT:  So the commissioner will be the next

22    witness?

23             MS. STAPLES:  Yes, your Honor.

24             THE COURT:  Maybe while the commissioner is here I can

25    hear the explanation for why it was that the department was

1     unable to produce Ms. Soneeya in a timely fashion yesterday.

2           MS. STAPLES: I can certainly speak to that, your

3     Honor.

4           I can tell the Court that once we realized that, we

5     did call back to get an explanation, and the commissioner was

6     actually actively involved in that. It was human error, but I

7     want to explain what that was.

8           Since the Court understands with the new Criminal

9     Justice Reform Act, one of the issues that we now do and one of

10    the processes we now do is give inmates who are gender

11    dysphoric or gender nonconforming the preference of search,

12    whether they're searched by females or males.

13          Ms. Soneeya has made it clear and if she is

14    searched -- strip-searched by female officers. When the call

15    came from the MIT and that was put in, the phone call missed --

16    the information about her search preference did not make it in

17    time.

18          THE COURT: When you say the "MIT," it's essentially

19    the writ of habeas corpus prosequendum that brought her in

20    here.

21          MS. STAPLES: Correct.

22          THE COURT: And so the department did not have a

23    mechanism for identifying that when someone like this in a case

24    like this is -- needs to have, under the statute, a female

25    corrections officer do the search?

1          MS. STAPLES:  We do have a process and the process is

2     in place.  The problem that happened was there was a phone call

3     placed to the transportation people that was made before the

4     IMS was checked, which was the human error, and it should not

5     have happened that way.

6          THE COURT:  It's human error.  It's also systemic.

7          MS. STAPLES:  It's not, your Honor, because the

8     process works if it's done in reverse, which is exactly what

9     happened --

10          THE COURT:  But it wasn't so it didn't.  So the

11     question is, do you have a process that can be -- can deal with

12     this problem of human error?

13          MS. STAPLES:  Yes.

14          THE COURT:  And why wasn't it dealt with here?

15          MS. STAPLES:  It was an error on one person's part.

16          THE COURT:  Then it's not a process that deals with

17     human error.  You tell me that if you make a phone call too

18     early then the requirement is not met.

19          And I want to be sure that this doesn't happen in the

20     future, number one.

21          Number two, I don't understand why it happened here,

22     why there weren't special efforts even if there wasn't a

23     systematic -- systemic way of dealing with it, there weren't

24     special efforts to be sure that this didn't cause a problem.

25          MS. STAPLES:  I understand, your Honor.  All I can

1   tell you is the minute we found that out, everybody at the

2   department from the commissioner on down was finding out what

3   was happening.

4          We did not want to have Ms. Soneeya have to be

5   searched and we would not have her strip-searched by a male.

6   But she did need to get here and we wanted to be sure we did it

7   right.

8          It's not going to happen again.

9          THE COURT:  Why isn't it going to happen again in the

10  context of phone calls that come earlier than a MIT?

11         MS. STAPLES:  Because it's been explained, especially

12  at MCI-Shirley, but at all facilities the process has been

13  reinforced that there needs to be a double-check on the

14  processes of search and that someone is available who is the

15  search preference if this -- if it's a GD or GM inmate.

16         THE COURT:  So you've got someone who is known to be

17  required to appear in court who has registered that she wants

18  to have a female officer do the search.  How in similar

19  circumstances to this is this going to be caught again?

20         MS. STAPLES:  Through training and reinforcement of

21  the process.

22         THE COURT:  What does that mean?

23         MS. STAPLES:  Well, we're going to make sure that

24  people are trained as to the process.  The process is in place

25  and it does work.  We have not had this problem.

1          THE COURT:  Except when it doesn't, and it didn't

2    here.

3          Now I'm asking a question about the system of the

4    process that you should have in place -- or will have in

5    place -- that could give me a sense of security that I don't

6    have now that every time there is a case involving, say, a GD

7    inmate that the first day of trial we're going to have a

8    problem of production resulting in the Court drawing adverse

9    conclusions about the sensitivity of the department to the

10   particular responsibilities they have for GD inmates.

11         MS. STAPLES:  I understand, your Honor.  I can assure

12   the Court that the process in place does work and should have

13   worked.  We are a department of humans and we do have errors on

14   occasion.  It was very unfortunate it happened in this case

15   with this court, and we do apologize.

16         THE COURT:  I guess I've heard you.  And I don't mean

17   to go much further beyond this, but I think I want a writing

18   that tells me that there is now going to be a system in place

19   to deal with this idea that you're a department of humans.  We

20   all are.  That's why we have systems.  This system didn't work.

21   So going forward in dealing with the department of humans, what

22   are you going to do.  I want it in writing.

23         MS. STAPLES:  We can do that, your Honor.

24         THE COURT:  I want it to be something other than we'll

25   do better next time.

1          MS. STAPLES:  No, your Honor.

2          THE COURT:  I'll see what you do.

3          MS. STAPLES:  We'll explain the process to the Court

4   and we'll explain exactly how the process will not fail and it

5   should be fail-safe.  And we will explain that all for the

6   Court.

7          THE COURT:  All right.  Okay.  Let's proceed to the

8   commissioner.

9          MS. STAPLES:  Thank you, your Honor.

10         We would call Commissioner Carol Mici, please.

11         And your Honor, with Commissioner Mici to the stand,

12  we would offer her affidavit that was already submitted to the

13  court.

14         And I would also ask the Court, the exhibits that are

15  coming in with Commissioner Mici are Exhibits 6, 12, 14, 25,

16  and 28.

17         THE COURT:  Okay.  Those are received.

18         **(Exhibit No. 6 received in evidence.)**

19         **(Exhibit No. 12 received in evidence.)**

20         **(Exhibit No. 14 received in evidence.)**

21         **(Exhibit No. 25 received in evidence.)**

22         **(Exhibit No. 28 received in evidence.)**

23                    <u>**CAROL MICI, sworn**</u>

24         THE CLERK:  Please state your full name.

25         THE WITNESS:  Carol Mici.

1          THE COURT:  I'm sorry.  I haven't been introduced to

2     counsel.

3          MR. ROATH:  Hi, your Honor.  I'm Patrick Roath.  I'm

4     one of the attorneys for plaintiff.

5          THE COURT:  Okay.  You may proceed.

6          MR. ROATH:  Thank you, your Honor.

7                          DIRECT EXAMINATION

8     BY MR. ROATH:

9     Q.   Good morning, Ms. Mici.  I'm Patrick Roath, as you just

10    heard.

11    A.   Good morning.

12         MR. ROATH:  We have a binder that has the various

13    witnesses -- the various exhibits we're going to refer to.  Is

14    it okay if we pass those out to the Court?

15         THE COURT:  Yes.

16         MR. ROATH:  Thank you, your Honor.

17    Q.   So Commissioner Mici, I'm going to refer throughout this

18    examination to the affidavit that Ms. Staples just proffered to

19    the Court.

20          This affidavit represents your sworn testimony in

21    this matter; is that right?

22    A.   Correct.

23    Q.   I think you'll have it in front of you now.  It's Tab 1 of

24    the binder in front of you.

25          Now, you're the commissioner of the department,

1    correct?

2    A.    Correct.

3    Q.    And before taking your current role, you served as the

4    acting commissioner of correction; is that right?

5    A.    Yes.

6    Q.    Before that, you served as the deputy commissioner of

7    clinical services in reentry, right?

8    A.    Yes.

9    Q.    While you were in that position, you were responsible for

10   conducting security reviews pursuant to the GD policy; is that

11   correct?

12   A.    Yes.

13   Q.    So would you say you're familiar with the GD policy?

14   A.    Yes.

15   Q.    Would you say you're very familiar with the GD policy?

16          THE COURT:  If I can interrupt.  Is there a binder for

17   me?

18          MR. ROATH:  Oh, certainly.

19          THE COURT:  So, I'm sorry.  Counsel, I didn't get your

20   name -- I'm racing through the filings to see if I can avoid

21   asking you specifically your name.  And if you could spell it.

22          MR. ROATH:  I'm a newer member of the team.  My first

23   name is Patrick and my last name is Roath.  That's R-o-a-t-h,

24   like "oath" with an R at the beginning.

25          THE COURT:  Okay.  Thank you.

1          MR. ROATH:  Okay.  Thank you.

2     Q.   Commissioner, you participated in the security review for

3     Ms. Soneeya; is that correct?

4     A.   Yes.

5     Q.   That security review was limited to the treatment of the

6     GD treatment committee's recommendation that Ms. Soneeya should

7     be transferred to MCI-Framingham?

8     A.   Correct.

9     Q.   In other words, what the security review was considering

10    was what the judge referred to this morning as the soft

11    landing?

12    A.   Correct.

13    Q.   And the security review did not address security risks

14    that would be associated with just providing Ms. Soneeya

15    surgery, correct?

16    A.   No.

17    Q.   When you say "no," are you saying that that's incorrect,

18    or that they didn't consider the surgery?

19    A.   The security review was to review whether or not she

20    should be transferred to MCI-Framingham for a year prior to

21    possible surgery.

22    Q.   Okay.  Got it.

23          And this was the first security review you

24    participated in pursuant to the GD policy?

25    A.   Yes.

1    Q.   And so you attended a meeting on January 23, 2018, to

2    review the GD treatment committee's recommendation; is that

3    right?

4    A.   Yes.

5    Q.   Superintendent Allison Hallett, who oversees

6    MCI-Framingham, she also presented at that meeting; is that

7    right?

8    A.   Yes.

9    Q.   Superintendent Hallett discussed the various security

10   issues that might be associated with Ms. Soneeya moving to that

11   facility; is that right?

12   A.   Yes.

13   Q.   Is it fair to say you gave Superintendent Hallett's views

14   on security a good deal of weight?

15          MS. STAPLES:  Objection.

16          THE COURT:  Well, she can answer if that's the first

17   thing she did.

18   A.   It wasn't the first thing, but it certainly was part of

19   the review.  Her views were considered, yes.

20   Q.   They were considered?

21   A.   Yes.

22   Q.   Would you say you strongly considered her views since she

23   was the expert on security at MCI-Framingham?

24   A.   They were strongly considered.

25   Q.   Now, after this meeting, just about three weeks later, as

1  I understand it, you drafted the security report that is at

2  issue for Ms. Soneeya with then Deputy Commissioner Gelb; is

3  that right?

4  A.    Correct.

5  Q.    And you and Deputy Commissioner Gelb shared roughly the

6  same views on the report's recommendations as to Ms. Soneeya;

7  is that right?

8          (Stenographer interrupts.)

9  Q.    Is it true that you and Deputy Commissioner Gelb shared

10 roughly the same views as to the contents of the report?

11 A.    Yes.

12 Q.    And then Commissioner Turco ultimately approved the report

13 you drafted; is that right?

14 A.    Yes.

15 Q.    The commissioner just wrote "approved" on the report; is

16 that correct?

17 A.    Correct.

18 Q.    And you're not aware of any additional conversations

19 between Commissioner Turco and Deputy Commissioner Gelb about

20 the contents of the report; is that correct?

21 A.    Not that I'm aware of.

22 Q.    And Commissioner Turco, of course he did not attend the

23 January 23, 2018 meeting; is that right?

24 A.    That's correct.

25 Q.    And he didn't ask -- Commissioner Turco didn't ask you any

1   questions about the report either; is that right?

2   A.   He did not.

3   Q.   Now, are you aware that when Commissioner Turco reviewed

4   the report he didn't consider that some of the -- he did not

5   consider that several of the reasons that were articulated in

6   the report were relevant to his ultimate decision to approve?

7           MS. STAPLES:  Objection.

8           THE COURT:  She can answer that question.  Were you

9   aware or not aware?

10  A.   I think you need to repeat the question.

11  Q.   Sure.  It was a complicated question.  So I'll slow down.

12          Were you aware that when Commissioner Turco reviewed

13  the report he found several of the reasons that were

14  articulated in the report not persuasive; that is, he did not

15  consider them relevant to his decision to approve the report?

16  A.   I'm not aware of that.

17  Q.   So you're not aware that Commissioner Turco did not

18  believe that Ms. Soneeya represented a greater escape risk than

19  an anatomical woman?

20          MS. STAPLES:  Objection.

21          THE COURT:  If you're going to be going through

22  various of the things that Commissioner Turco purportedly

23  didn't find persuasive, then I think you're trying to introduce

24  it for substantive purposes.  What you have is the percipient

25  response of this witness that she doesn't know what was

```
 1    persuasive or not.

 2            Now, that then gets to the question of are you going

 3    to be offering in some way Commissioner Turco's positions?

 4            MR. ROATH:  Your Honor, Commissioner Turco isn't

 5    testifying.

 6            THE COURT:  I understand that.  That makes it a little

 7    more difficult for purposes of the hearsay rule to accept any

 8    of this.  So you've asked her; she says she doesn't know.  I

 9    mean, I suppose you could ask her a little bit more.  You can

10    find out that she doesn't know.  But at a certain point, I'm

11    not considering this.

12            MR. ROATH:  Fair enough, your Honor.  Ill move on.  I

13    only have one or two questions on that.

14    BY MR. ROATH:

15    Q.   Now, you're aware that the security meeting asked the GD

16    treatment committee for alternatives after their recommendation

17    was disapproved?

18    A.   I'm sorry.  Can you repeat that?

19    Q.   So after Commissioner Turco approved the denial of the GD

20    treatment committee's recommendation, are you aware that the

21    security -- that the DOC then reached out to the GD treatment

22    committee and asked for alternatives?

23    A.   Yes.

24    Q.   And you're aware that they could not provide any?

25    A.   Correct.
```

```
 1    Q.    So is it true the DOC is currently housing Ms. Soneeya
 2    without providing the treatment that the treatment committee
 3    recommended?
 4           MS. STAPLES:   Objection.
 5           THE COURT:   No, she can answer this question.
 6    A.    She's being housed at MCI-Shirley.
 7    Q.    Right.   Which is contrary to the recommendation of the
 8    treatment committee?
 9    A.    Correct.
10    Q.    Now, you testified in your affidavit that the commissioner
11    is the final decision-maker under the GD policy?
12    A.    Correct.
13    Q.    And that's you now?
14    A.    It is now.
15    Q.    Returning to your direct testimony, you testified there
16    were a number of factors you relied on in reaching your opinion
17    that the committee's recommendation should be denied.   I've got
18    a few questions about those various questions that are in your
19    affidavit, and I'll direct you to the affidavit when I'm
20    talking about it, which is at Tab 1.
21           You testified that one factor that you considered in
22    deciding to deny Ms. Soneeya's transfer --
23           THE COURT:   When you're pointing -- just as a way of
24    helping me keep up.   When you're pointing to a particular part
25    of the affidavit, unless you're trying to test her recollection
```

```
 1    of the numbers of the pages in the affidavit, if you could
 2    identify where you want her to be looking --
 3             MR. ROATH:  Sure.
 4             THE COURT:  -- and inferentially me.
 5    BY MR. ROATH:
 6    Q.   It may help to start at Paragraph 24.  So you testified
 7    here that one of the factors you considered is "plaintiff's
 8    lack of insight into her crimes and her failure to accept
 9    responsibility for her crimes, which were also very concerning
10    to me."  And that's going to appear here on the screen.
11             Did I read that fairly?
12    A.   There's nothing on the screen.
13             THE COURT:  Do you have a copy --
14             THE WITNESS:  I have it in front of me, so that's
15    fine.
16             THE COURT:  Whichever way you want to look at it, but
17    it's not on your screen.
18             THE WITNESS:  It just came up.
19    BY MR. ROATH:
20    Q.   So that's at Paragraph 24.  I'll reread it just so we have
21    it for the record.
22             You testify, "Plaintiff's lack of insight into her
23    crimes and her failure to accept responsibility for her crimes
24    were also very concerning to me."  Is that fair?
25    A.   Yes.
```

1    Q.   And in your affidavit you also testify -- and this is a

2    little bit later; this is at Paragraph 69 -- that because

3    Ms. Soneeya has not accepted responsibility for her crimes she

4    lacks insight into her past criminal behavior, which creates a

5    greater risk that she could repeat similar behavior in the

6    future.  Did I read that fairly?

7    A.   Correct.

8    Q.   Now, you're aware that Ms. Soneeya's case is still on

9    appeal, right?

10   A.   It could be.  I'm not aware personally.

11        THE COURT:  Just so I'm clear on this.  Is there some

12   sort of motion for new trial or something?  I thought it was

13   affirmed on direct appeal.

14        MR. ROATH:  Your Honor, to the extent I'm aware, I

15   believe there's some postconviction relief proceeding.

16        THE COURT:  So it's a postconviction collateral attack

17   on the conviction?

18        MR. ROATH:  That's right.  There was affirmance at the

19   SJC at one point.

20        THE COURT:  Frankly, I want to see the papers on this.

21   I'll leave it to plaintiff's counsel to submit the docket

22   number and any memoranda or substantive papers that were

23   submitted in connection with the collateral attack on the

24   conviction.

25        MR. ROATH:  We'll do that, your Honor.

1  BY MR. ROATH:

2  Q.   So Commissioner Mici, I -- through that, I can represent

3  to you that Ms. Soneeya's case is still on appeal.

4           And inmates have been wrongfully convicted in the

5  past, correct?

6           MS. STAPLES:  Objection.

7           THE COURT:  Well, I'll let her answer -- this is a

8  prelude to a question about the challenge, I guess, to the

9  conviction.  I'm not sure that we want to take extensive

10  excursions into this.

11           MR. ROATH:  I do not take on the integrity of the

12  conviction.  The line of questioning has to do with --

13           THE COURT:  Let's focus on this:  That her awareness

14  of Ms. Soneeya's disagreement with the conviction.

15  BY MR. ROATH:

16  Q.   So, Commissioner Mici, you're aware that there are

17  currently women who are incarcerated at MCI-Framingham who

18  dispute their crimes, correct?

19  A.   I would not know that.

20  Q.   Would it seem like a reasonable inference to draw that of

21  the many inmates currently at MCI-Framingham that some of them

22  dispute that they committed the crimes they are convicted of?

23  A.   That is appropriate to say.

24  Q.   Imagining that some of those inmates exist, is there --

25           THE COURT:  No, I don't want imagination here.  I

1    think you've established the point that disputing the crime

2    does not distinguish Ms. Soneeya from at least some portion of

3    the Framingham population.

4    BY MR. ROATH:

5    Q.   And MCI-Framingham is required to safely house any inmate,

6    including those who dispute their crime, correct?

7    A.   Correct.  If they're sentenced there, correct.

8    Q.   And the facility does, in fact, safely house inmates who

9    dispute their crimes, as well as other inmates?

10   A.   Yes.

11   Q.   Now, you participated in the security review for an

12   individual that we're calling in this proceeding Jane Smith; is

13   that right?

14   A.   Yes.

15   Q.   You recommended that Jane Smith be transferred to

16   MCI-Framingham despite the fact that she also disputed her

17   crimes; is that right?

18   A.   With conditions, yes, I did.

19   Q.   And you deemed in that circumstance that the fact that she

20   disputed her crimes did not lead to the kind of overwhelming

21   concerns that the security committee identified in

22   Ms. Soneeya's case, correct?

23   A.   It was part of the consideration but it wasn't as great.

24   Q.   Now, another question that relates to one of the other

25   security review undertakings that you've been a part of,

1    there's another inmate we're referring to as Jane Doe in these

2    proceedings.

3              Are you familiar with that inmate, if I use that

4    term?

5    A.    Yes.

6    Q.    In August of 2008, you participated in the security review

7    process for Ms. Doe, correct?

8              MS. STAPLES:   Objection.

9    A.    August 2008?

10   Q.    I'm sorry.  2018, excuse me.  Off by ten years.

11   A.    Yes, I did.

12   Q.    And you testified that after the security review meeting

13   for Jane Doe you recommended that Superintendent Hallett, who's

14   the superintendent of MCI-Framingham, develop a plan to prepare

15   for Jane Doe's arrival at MCI-Framingham; is that right?

16   A.    Yes.

17   Q.    I'd like to turn to that aspect of your affidavit.  That's

18   Paragraph 60, please, if you could put that up on the screen.

19             Do you have that in front of you?

20   A.    I do.

21   Q.    The third sentence, it's the last sentence on page 18.

22   And you testify, "I further recommended that Superintendent

23   Hallett develop a thorough plan to include where Jane Doe would

24   be housed, training of staff regarding gender non-conforming

25   inmates, and the promotion of an inclusive environment for all

1    inmates housed at MCI-Framingham."

2         Did I read that fairly?

3    A.   Yes.

4    Q.   So clearly you thought there were things that the

5    department could do that would help prepare for the arrival of

6    an anatomical male such as Jane Doe at MCI-Framingham; is that

7    correct?

8    A.   Yes.

9    Q.   To your knowledge, did Superintendent Hallett adopt your

10   recommendation to take these steps?

11   A.   Yes.

12   Q.   So all of the staff at MCI-Framingham have been trained on

13   how to deal with gender nonconforming inmates; is that right?

14   A.   Correct.

15   Q.   And the staff at MCI-Framingham is working to create an

16   inclusive environment for all of the inmates that are housed

17   there; is that right?

18   A.   I believe so.

19   Q.   So you did all of this for Jane Doe in August.

20        But in January, in the security review for

21   Ms. Soneeya, you did none of those steps; is that right?

22   A.   Those steps, no, correct.

23   Q.   So you didn't consider proposing a thorough plan for where

24   Ms. Soneeya would be housed at MCI-Framingham, correct?

25        MS. STAPLES:  Objection.

1          THE COURT:  She can answer the question.

2     A.   It didn't get to that point because the security review

3     was denied.

4     Q.   So when you say the security review was denied, which

5     precluded getting to this point, that suggests that the

6     consideration of these different alternatives, the thorough

7     plan for housing, the gender -- the training of the staff, for

8     example, you view that as different than the security review

9     considerations; is that right?

10         MS. STAPLES:  Objection.

11         THE COURT:  She may answer.

12    A.   The risk was greater for the security review, so we didn't

13    go any further beyond that.

14    Q.   So you viewed the options that could emerge from the

15    security review as twofold:  either there could be a transfer

16    or there couldn't be.  Is that correct?

17    A.   Correct.

18    Q.   There was no consideration of these alternative -- I'll

19    call them mitigating steps, like preparing a thorough housing

20    plan, training the staff.  Those factors weren't considered,

21    correct?

22         MS. STAPLES:  Objection.

23         THE COURT:  Overruled.  You may answer.

24    A.   Each review is case by case.  The factors are considered

25    for each review.  Some factors are more considered if we plan

1    to make a recommendation to the commissioner.

2    Q.   Okay.  So the outcome of the security review dictates the

3    factors that are considered during the security review.  Is

4    that what I just heard you say?

5    A.   No.  The factors are -- there's always factors in every

6    security review.  They might be different based on each case,

7    but some are always the same.

8         The security review regarding today was not

9    considered.  It was too great of a risk to recommend the

10   transfer or recommend the approval of the transfer to the

11   commissioner.  So it doesn't -- I'm not saying that factors

12   weren't considered.  It was just a greater risk, this case.

13   Q.   So other factors were considered but not the factors that

14   you identified with respect to Ms. Doe; is that right?

15   A.   Correct.

16   Q.   So you didn't discuss the other factors such as training

17   the staff regarding gender nonconforming inmates, correct?

18   A.   No.  I wouldn't say that.  We talked about training,

19   because training needed to be done anyways.  We talked about

20   housing.  We just -- it wasn't -- the security review was not

21   recommended that she transfer there.  So I just outlined the

22   things that we referred to as far as the denial.  We did look

23   at everything.

24   Q.   You say you looked at everything, but you also said that

25   the only outcomes were either transfer or nontransfer, correct?

1    A.    Those are the two final outcomes, yes.

2    Q.    So then you didn't consider alternatives to the

3    committee's medical recommendation that stopped short of an

4    outright denial; is that right?

5             MS. STAPLES:   Objection.

6             THE COURT:   No.   She may answer the question.

7    A.    The considerations were all of the factors, and the

8    recommendation was not to recommend a transfer.

9    Q.    But in the course of evaluating those considerations, as

10   you just put it, was there an acknowledgment that there might

11   be something that the commissioner -- excuse me, that the

12   department could do that was either -- that was somewhere

13   between either a full transfer as had been recommended or

14   purely the denial of the transfer?

15   A.    Not for the security review.

16   Q.    So you didn't consider something like a trial period where

17   Ms. Soneeya could be transferred on a preliminary or a

18   probationary basis and then be transferred back to MCI-Shirley

19   if it didn't work out, right?

20   A.    No.

21   Q.    You didn't consider whether Ms. Soneeya could be

22   transferred to an institution outside of Massachusetts, for

23   example; is that right?

24   A.    I did not.

25   Q.    You didn't consider reaching out to other states that had

1  inmates who were similarly positioned as Ms. Soneeya and

2  discussing with them how they dealt with their inmate

3  population?

4          MS. STAPLES:  Objection.

5          THE COURT:  She may answer the question.

6  A.   I personally did not call other states.

7  Q.   Was there any discussion in the security review meeting

8  about considering other states or other institutions?

9  A.   I don't believe so.

10 Q.   I'd like to move to another concern that you discuss in

11 your testimony.

12          You mentioned you were also concerned about how

13 Ms. Soneeya might be housed at MCI-Framingham if the transfer

14 were to occur; is that right?

15 A.   Yes.

16 Q.   Now, in the security report, you discussed some of the

17 housing considerations at MCI-Framingham, correct?

18 A.   Yes.

19 Q.   I think I'd like to introduce that security report.  So

20 that's Exhibit 12 on our premarked list but it's Tab 6 in the

21 binder in front of you.

22          THE COURT:  It's Exhibit 12 that's already been

23 introduced into evidence?

24          MR. ROATH:  It's already been introduced.

25 BY MR. ROATH:

1   Q.   If we could put up on the screen just on the second page

2   under the MCI-Framingham subheading.

3   A.   Yes.

4   Q.   This is going to break to the next page but I'll read

5   aloud from here.

6         "MCI-Framingham is the DOC's only medium-security

7   facility for female offenders.  MCI-Framingham houses both

8   sentenced offenders and pretrial detainees.  Last year,

9   MCI-Framingham received 2,992 new admissions.  There are no

10  single cells within the MCI-Framingham general population;

11  inmates are housed in two-person cells or dormitories and

12  detainees are housed in the Awaiting Trial Unit."

13        Did I read that fairly?

14  A.   Yes.

15  Q.   After the security meeting, you didn't believe there was

16  anywhere appropriate to house Ms. Soneeya at MCI-Framingham,

17  correct?

18  A.   No, I did not.

19  Q.   No -- just to be clear, because I ended my question with

20  "correct," you did not believe that there was anywhere

21  appropriate to house Ms. Soneeya at MCI-Framingham?

22  A.   Correct.

23  Q.   But you're aware that there's no capacity limit at

24  MCI-Framingham, correct?

25  A.   Yes.

1    Q.    And MCI-Framingham can't turn away inmates, correct?

2    A.    Correct.

3    Q.    And the aspect -- the sentence that I just read from the

4    security report, that suggested there is a concern with single

5    cells at MCI-Framingham; is that fair to say?

6    A.    We were outlining the design of the facility and that

7    there are no single cells generally available in general

8    population.

9    Q.    That's in the security report because it was one of the

10   concerns of the security review committee?

11   A.    Yes.  In the event that a single cell was needed, correct.

12   Q.    Did you believe that a single cell was needed, at the

13   security meeting?

14           MS. STAPLES:  Objection.

15           THE COURT:  You may answer.

16   A.    It probably was a possibility during the discussion.

17   Q.    But did you have that concern that a single cell was

18   needed at MCI-Framingham to house Ms. Soneeya at the security

19   review meeting?

20   A.    Yes, I'm sure I did.

21   Q.    But you since abandoned this concern, right, because it's

22   not in your affidavit today, correct?

23           MS. STAPLES:  Objection.

24           THE COURT:  She may answer that question.

25           If it's somewhere referenced directly or indirectly in

1  her affidavit, you can answer that.

2  A.   I didn't hear the question.  I'm sorry.

3  BY MR. ROATH:

4  Q.   Sure.  I'm asking whether you abandoned the concern about

5  not having appropriate housing for Ms. Soneeya at

6  MCI-Framingham because there's no reference to this concern in

7  the affidavit you submitted today.

8  A.   Have I abandoned it?

9  Q.   Yes.  In the sense that in the security review report

10  there was a discussion of the housing issues at MCI-Framingham.

11  We just discussed how it was a concern of yours at the security

12  review meeting, but there was no discussion of it in the

13  affidavit that was submitted to the Court today.

14  A.   So in the security review, I was outlining what the

15  commissioner needed to know about the facility that he may not

16  have known.  So it probably was just more extensive because

17  that was a memo directly to the commissioner so he could make a

18  decision.

19  Q.   Are you aware that MCI-Framingham is, in fact, well under

20  capacity as an institution?

21  A.   It depends on how you look at that.  If you look at a

22  design capacity or an operational capacity, but it is -- the

23  count is lower than it has been in the past years.

24       THE COURT:  Does that -- both as to design or

25  operations or is it simply as to operations?

1            THE WITNESS:  I base it on the operational count.

2   BY MR. ROATH:

3   Q.   Would it surprise you to learn that Commissioner Turco

4   testified in this matter that the population is, in fact, down

5   by about 50 percent?

6            MS. STAPLES:  Objection.

7            THE COURT:  I'll let her answer the question, but I'm

8   telling you this is not coming in back door.  So if she says

9   no, she's not aware and doesn't embrace it, then there's no

10  evidence of this.

11           MR. ROATH:  Understood.

12           THE COURT:  You may answer.

13           THE WITNESS:  I'm not aware what he said.

14  BY MR. ROATH:

15  Q.   Is it true that some inmates at MCI-Framingham are housed

16  alone in double units?

17  A.   That is a possibility.  That's up to the superintendent of

18  the facility.

19  Q.   Do you recall testifying that that was true at

20  MCI-Framingham?

21  A.   Yes, I could have.  I mean I'm sure it's a possibility.

22  Q.   I think it's worth just -- just to refresh your

23  recollection, I'd like to return to that aspect of your

24  deposition.  So that's at Tab 2 of your binder in front of you.

25           MR. ROATH:  If we could bring up page 139 of

1    Commissioner Mici's deposition at line 15.

2    Q.   Hopefully this helps refresh your recollection.  I'll just

3    read.

4              The question was, "Are you aware that some inmates

5    are housed alone in double-unit cells?"

6              The answer was, "Alone or in a double unit?"

7              And the question was, "Correct," confirming that

8    understanding of the question.

9              And you said in response, "Yes."

10             Does that help?

11   A.   Yes.

12   Q.   The inmate we're referring to is Jane Doe.  She's

13   currently housed at MCI-Framingham alone in a double cell,

14   correct?

15   A.   Yes, she is.

16   Q.   And Jane Doe is housed in the general population at

17   MCI-Framingham; is that right?

18   A.   She is right now, correct.

19   Q.   And she doesn't have any separate shower time at

20   MCI-Framingham, correct?

21   A.   I don't believe so.

22   Q.   So I'd like to turn to another one of the factors you

23   considered in the security review meeting, according to your

24   affidavit.

25             One of these factors -- and this is -- I'm getting

1   this from a few different points in the affidavit but perhaps

2   most clearly at Paragraph 69.

3           You said one of the factors you considered was the

4   fact that Ms. Soneeya is afflicted by a history of acute mental

5   illness; is that right?

6   A.   Yes.

7           THE COURT:  Can I just pause?  Perhaps I should know

8   this but I don't.  Has Jane Doe had surgery?

9           THE WITNESS:  No.  Not that I'm --

10          THE COURT:  So she's anatomically male?

11          THE WITNESS:  Correct.

12  BY MR. ROATH:

13  Q.   So in the affidavit, you said that plaintiff also has a

14  history of acute mental health issues.  And you also stated --

15          In fact, could we just bring up Paragraph 69 of

16  Commissioner Mici's affidavit.  Let's just do the full

17  paragraph.

18          So just about in the middle is the sentence that

19  says, "Plaintiff also has a history of acute mental health

20  issues.  In fact, the GD Treatment Committee specifically

21  references in its recommendation plaintiff's long term risk for

22  depression and potential suicide."

23          Do you see that?

24  A.   I do.

25  Q.   So I'd like to then move us to the GD treatment committee

1   report, which is what this references.  That's Exhibit 11.

2   That was introduced yesterday and it's Tab 5 in your binder.

3             If you could bring that up on the screen.

4             So the first page here is the cover email, and we can

5   flip to the fourth page of the report itself, please, and the

6   second full paragraph.

7             Just about the second -- the third sentence here

8   beginning with "Our concern."

9             And just to preview where this is going; this is, I

10  believe, where you're getting the statement that's in your

11  affidavit.  But you can of course correct me if I'm wrong.

12            What the report says is, "Our concern with completing

13  surgery prior to living at MCI-Framingham is that if she has

14  surgery first and is then unable to successful transition to

15  the only female facility, that she will be more isolated than

16  she is now, resulting in increased depression and would then be

17  at risk for suicide."

18            Did I read that fairly?

19  A.   Yes.

20  Q.   So what the report actually says then is that if

21  Ms. Soneeya has surgery first and were then unable to acclimate

22  at MCI-Framingham, then she could be at risk for depression and

23  suicide; isn't that right?

24            MS. STAPLES:  Objection.

25            THE COURT:  You may answer the question.

1    A.    I mean, what it says is that -- what it stated, that if

2    she has the surgery first, then it may be an increased

3    depression and a risk for suicide if she was unable to

4    successful transition.  That's how I understand it.

5    Q.    Right.  That's how the sentence parses.

6          If this happened, then it would be possible for her

7    to experience this depression and suicide risk, correct?

8    A.    Yes.

9    Q.    And you're aware that Ms. Soneeya did not display any

10   signs of serious mental illness at the time of the security

11   review, correct?

12         MS. STAPLES:  Objection.

13         THE COURT:  Overruled.  You may answer.

14   A.    She wasn't present at the security review.  So I'm not

15   sure what you're asking.

16   Q.    I'm asking about your awareness of whether she displayed

17   any signs of concurrent serious mental illness at that time.

18   I'm aware she wasn't present.

19   A.    At that time, not that I'm aware of.

20   Q.    And at that January 23, 2018 meeting, you didn't review

21   any medical reports about Ms. Soneeya's well-being, correct?

22   A.    Medical reports -- we reviewed her current state and

23   her -- anything previously, yes.  Probably more on the mental

24   health side.

25   Q.    Okay.  Just to help refresh your recollection, I'd like to

1    go back to the deposition transcript.  That's at Tab 2.  We're

2    going to go to page 181, lines 6 through 9.

3            Actually, excuse me.  Can we start at the top of the

4    page?  So we'll go through 2 through 9.

5            So the question put to you was, "With respect to

6    Ms. Soneeya's mental health, did you review her mental health

7    records?"

8            You said, "That was brought to the security review by

9    the director of behavioral health."

10           Then the question was, "Are you aware that

11   Ms. Soneeya displays no overt signs of current serious mental

12   illness?"

13           And you said, "Yes."

14           Is that fair?

15   A.   Yes.

16   Q.   And you're not qualified to make medical opinions,

17   correct?

18   A.   Correct.

19   Q.   Now, one of the concerns discussed in the report that we

20   referred to here is the risk that because of these mental

21   health issues that you deemed to be present in the report --

22           MS. STAPLES:  Objection.

23           THE COURT:  What's the objection?

24           MS. STAPLES:  I'm sorry?

25           THE COURT:  What's the objection?

1          MS. STAPLES:  The mental health issues you deem

2    present in the report.  I don't think that report deems any

3    mental health issues present.  In fact, Commissioner Mici just

4    testified at the time Ms. Soneeya was not displaying any mental

5    health issues.  So I think it misstates the evidence and the

6    report.

7          THE COURT:  Well, I guess I want to be sure that we're

8    making the proper comparison.  Certainly in her deposition she

9    said that she was not aware of any present mental health

10   issues, but referring -- and maybe counsel can focus me on it.

11         Where is it that you say that disparity in her

12   deposition and the affidavit occur?

13         MR. ROATH:  It's true the affidavit says the plaintiff

14   has a history of acute mental health issues.

15         THE COURT:  Right.

16         MR. ROATH:  What we're trying to draw out here is that

17   the only source for that appeared to be the treatment committee

18   report, which did not suggest that those --

19         THE COURT:  It seems to me there are two different

20   questions.  The first question -- I'll say the first one is the

21   question that is put to her in the deposition in which she's

22   asked current.  The second is a more broadly stated question of

23   whether or not she has had mental health issues.

24         Is there a dispute that she has had mental health

25   issues?

1          MR. ROATH:  Your Honor, this is all precursor to a

2     line of questioning regarding --

3          THE COURT:  I'll hear it, but the point, I guess I

4     want to be sure that we get focused on is precisely where, if

5     you're saying that there is an inconsistent statement, where

6     the inconsistent statement takes place.

7          If you're saying that there is a broad area that just

8     isn't addressed, then that's a different issue.  I guess that's

9     where you intend to go; is that right?  That is, to deal with

10    mental health issues in the last five years, six, seven years

11    as opposed to the last 30 years?

12         MR. ROATH:  That's right, your Honor.

13         THE COURT:  I'll permit you to keep going on this, but

14    I want to attended to those distinctions between impeaching on

15    the basis of inconsistent statements and impeaching because

16    there is an inadequate support for what was presented in the

17    security report.

18         MR. ROATH:  Okay.

19    BY MR. ROATH:

20    Q.   So one of the concerns that -- to turn to the security

21    report, one of the concerns that's discussed in the report that

22    you prepared is the risk that Ms. Soneeya could require civil

23    commitment while at MCI-Framingham and then be transferred to a

24    DMH facility, which the report claims is less secure; is that

25    right?

1    A.    That's correct.

2    Q.    Let's turn to the report.  It might help clarify.

3          That's at Tab 6, if we could bring that up on the

4    screen.  It's Exhibit 12 in evidence.

5          So the second full paragraph begins with "Similarly,"

6    on page 3.

7    A.    Okay.

8    Q.    I'm just waiting for the screen to catch up to us.

9          So the report states -- I'm going to begin at the

10   sentence that starts with "However" -- "However, DMH inpatient

11   facilities are not nearly as secure as a DOC facility, and in

12   the past some DOC female offenders have walked away from DMH

13   inpatient facilities.  This would present a significant public

14   safety risk should Ms. Soneeya require mental health treatment

15   at a DMH facility should she be housed at MCI-Framingham."

16          Did I read that fairly?

17   A.    Yes.

18   Q.    This discussion about the DMH facility inadequacy came up

19   at the security review meeting, correct?

20   A.    It did.

21   Q.    But when you drafted the report a few weeks after the

22   security review meeting, is it true that you did not know how

23   many inmates had walked away from DMH facility in the past?

24   A.    No, I probably didn't know the number.

25   Q.    Okay.  Are you now aware that the last time that an inmate

1  escaped from DMH was 22 years ago, in 1997?

2  A.   Yes.

3         MR. ROATH:  I'd like to introduce Exhibit 25, which I

4  believe was among the exhibits that were entered into evidence

5  at the beginning of this exchange.

6         THE COURT:  Yes.

7         MS. STAPLES:  It was, your Honor.

8  BY MR. ROATH:

9  Q.   And that's at Tab 8 of the binder.

10        So this is an email exchange among a number of the

11 staff at the Department of Corrections.  You'll note that the

12 date is June 2018.  So this is some months after the security

13 review report was prepared.  And the subject line of the email

14 is, "Attempted escapes at MCI-Framingham DMH."

15        So I think it makes sense to start at the beginning

16 of the email, which is on the next page.  The first email is on

17 April 19, 2018.  So this is an email sent from Tracie

18 Mucciarone to Rich McFarland.

19        I'll try to keep my summary of the document fairly

20 concise here.  It's an email exchange, so there's a lot going

21 on.

22        The email states, "Hi, Rich.  Per your request,

23 attached please find three attempted escape incidents that

24 occurred at MCI-Framingham in 2008, 2011, and 2017.  I am

25 researching your other request regarding DMH and I'll let you

1  know."

2          Did I read that fairly, Commissioner Mici?

3  A.   Yes.

4  Q.   And then I'd like to read the responding email, which was

5  sent on April 20 at 8:00 a.m.  This is Tracie Mucciarone's

6  response, and it breaks over the page.

7          She writes, "Good morning, Rich.  Please see below

8  the answer to your second question regarding DMH.  The sole

9  incident occurred 21 years ago, a former inmate from Taunton

10 after bartering with a staff member who then allowed her to

11 escape.  She was apprehended several days later.  The

12 staffperson was arrested, and as you can imagine, no one can

13 walk away since all units have two locked doors at a minimum."

14         So based on this email and your awareness, it's true

15 that the inmate didn't walk away but escaped through the help

16 of a DMH staff member, correct?

17 A.   According to this email, yes.

18 Q.   Do you have any reason to think that Ms. Mucciarone is

19 incorrect?

20 A.   No.

21 Q.   And before that incident, the last time any inmate escaped

22 from DMH was 46 years ago, in 1973; is that right?

23 A.   Yes.

24 Q.   We can continue through the email, but that's also

25 represented in the email.  And those inmates also did not just

1    walk away, but rather they escaped because a staff person was

2    in love with an inmate and provided the inmate with keys,

3    correct?

4    A.   According to the email.

5    Q.   And in fact, no one can just walk away from the DMH

6    facility because there are always at least two doors locked,

7    correct?

8            MS. STAPLES:  Objection.

9            THE COURT:  Well, if she knows she can answer.

10   A.   I do not know.

11           THE COURT:  But you included it in your security

12   report nevertheless; is that correct?

13           THE WITNESS:  Based on what I was told.

14           THE COURT:  Okay.

15   BY MR. ROATH:

16   Q.   And who -- based on what you were told by whom?

17   A.   Allison's staff.  Allison Hallett's staff did research on

18   it, and it appears that they're behind two locked doors.

19   Previously they may not have been and maybe that's why the

20   escapes occurred.  I'd be speculating.

21   Q.   But Superintendent Hallett's staff did the research after

22   the security report was written, correct?

23   A.   It is after, yes.

24   Q.   And you still testified in your affidavit that you think

25   DMH is less secure, correct?

1  A.    Yes.

2  Q.    And just to be clear, this concern about walking away from

3  a DMH facility, that's not specific to Ms. Soneeya.  Anyone

4  could walk away from a DMH facility, correct?

5  A.    Anybody could, correct.

6  Q.    So the -- the fact that you continued to assert that the

7  DMH facility is less secure in your affidavit today, is that

8  based on anything other than the inmates walking away and the

9  two doors -- excuse me, the unlocked doors?

10  A.    It's based on that it's -- there are locked facilities,

11  there are unlocked facilities.  It's based on bed availability.

12  We don't determine where our 18A goes.  DMH does.  So some of

13  the settings over the years have been concerning, absolutely.

14        THE COURT:  When you say "ACA," just so I understand

15  what ACA means --

16        MS. STAPLES:  Your Honor, I think she said 18A, which

17  is the statute.

18        THE COURT:  Oh, 18A.  I'm sorry.

19        MR. ROATH:  Okay.  I may have a follow-up question or

20  two on that, but I'd like to just move on.

21        THE COURT:  Yes.

22  BY MR. ROATH:

23  Q.    And I'll depart from the affidavit a little bit to go back

24  to the January 23, 2018 meeting we've been discussing.

25        So according to your affidavit, you reviewed a number

1  of documents at that meeting, right?

2  A.   Yes.

3  Q.   One of the documents you reviewed was Ms. Soneeya's 2017

4  classification report; is that correct?

5  A.   Yes.

6  Q.   So I'd like to introduce that.  It's been introduced in

7  evidence.  It's Exhibit 6 in evidence and it's Tab 4 in your

8  binder, if you could flip to that, please, and we can get it on

9  screen.

10          So I'd like to start on this first page and maybe we

11  could blow up the box that says objective classification,

12  reclassification.

13          So this conveys, as you see here at line 3, that

14  Ms. Soneeya has never attempted to escape from a DOC facility;

15  is that correct?

16  A.   That is correct.

17  Q.   And when you're considering institutional adjustment in

18  the context of a security review, whether an inmate has

19  attempted to escape is extremely relevant in your view; is that

20  right?

21  A.   Yes.

22  Q.   Ms. Soneeya's been incarcerated at MCI-Shirley since 1998,

23  correct?

24  A.   Yes.

25  Q.   But you'll agree that the security report that you

1  prepared doesn't mention the fact that Ms. Soneeya never

2  attempted to escape from the facility, correct?

3  A.   It doesn't.

4  Q.   Now, turning back to that objective classification box at

5  Tab 4, you'll see in the bottom right that the total

6  reclassification score for Ms. Soneeya is a 3.  Is that right?

7  A.   Yes.

8  Q.   And in the department's system, a reclassification score

9  of 3 denotes a lower -- the minimum or lower security for that

10  inmate; is that correct?

11  A.   The number does denote that, yes.

12  Q.   And that was the total reclassification score for

13  Ms. Soneeya?

14  A.   Yes, it was.

15  Q.   Now, you testify in your affidavit -- and I'm going to

16  turn us to Paragraph 30 of the affidavit.

17        MR. ROATH:  If we can get that up on screen too,

18  please.

19  Q.   So you state that "Finally, because plaintiff was having

20  few difficulties while being housed at MCI-Shirley, as she was

21  housed in general population, had not been the victim of any

22  physical or sexual assaults by other inmates, nor had she

23  complained to staff that she had been subject to harassment by

24  other inmates while confined at MCI-Shirley, I believe she

25  could continue to be safely held and would continue to do well

1    at MCI-Shirley."

2            Did I read that fairly?

3    A.   Yes.

4    Q.   Let's go back to the classification report, again at

5    Tab 4, one of the documents that you reviewed in this meeting.

6            MR. ROATH:   If we could go to page 3 of that document.

7    If you could bring it up on the screen when you get a moment.

8    Q.   So under the box that says "classification for appeal" and

9    then "reason for appeal," there's some text here.  And I can

10   represent to you and you can read for yourself, but this is

11   clearly written by the plaintiff, Ms. Soneeya, correct?

12   A.   Yes.

13   Q.   So I'd like to begin reading the -- I'll begin reading at

14   the sentence that begins "Socially," in the middle of the

15   paragraph.

16            Maybe we could highlight that?

17            So that reads, Ms. Soneeya writes, "Socially I can't

18   have a normal conversation with anyone because conversations

19   either turn sexual or they're staring at my breasts the whole

20   time."

21            Did I read that correctly?

22   A.   Yes.

23   Q.   Now, I'll jump to a few lines later, the sentence

24   beginning "This why."

25            That sentence reads, "This why a woman facility is

1  the only place that I can be safe."  Is that right?

2  A.    That's what's written.

3  Q.    So you reviewed this statement but you still came to the

4  view that Ms. Soneeya was having few difficulties at

5  MCI-Shirley; is that correct?

6  A.    Yes.

7  Q.    It's also true that the last time that a fight or a

8  violent episode was listed on Ms. Soneeya's disciplinary

9  reports was about 15 years ago; is that right?

10  A.    I believe so.

11  Q.    So would you say you committed an error in not fully

12  considering the statement by Ms. Soneeya that was contained in

13  the document you reviewed?

14          MS. STAPLES:  Objection.

15          THE COURT:  No.  She can answer.

16  A.    No.

17  Q.    You don't view this as undermining the credibility of your

18  statement that she was having few difficulties at MCI-Shirley?

19          MS. STAPLES:  Objection.

20          THE COURT:  No, she may answer.

21  A.    She's not alone in that.  Many people have those isolation

22  issues in prison.  She said that she was safe but wanted to

23  live in a female facility.  I didn't dismiss them.

24  Q.    But she also said this is why "a woman facility is the

25  only place that I can be safe," correct?

1  A.    She did say that.

2  Q.    Okay.  I'd like to return to another question or two about

3  the security report that was prepared for Ms. Soneeya.  So if

4  you could flip to that.

5        MR. ROATH:  That's Tab 6, if we could bring that up on

6  the screen, please.

7        THE COURT:  Just because the record is more legible

8  for anybody else who reviews it, when you refer to an exhibit,

9  if you could refer to the exhibit in evidence, which I believe

10 is 12.

11       MR. ROATH:  That's right.

12       THE COURT:  But you're using the binder there as 6.

13 If it's in evidence, please reference the exhibit in evidence.

14       MR. ROATH:  Okay.

15       THE COURT:  As well as the binder.  Okay?

16       MR. ROATH:  Thank you, your Honor.

17 BY MR. ROATH:

18 Q.    So this is Exhibit 12.  I'd like to direct your attention

19 to the second page just above the MCI-Framingham header.

20 There's a paragraph -- that's right, that's "our review."

21       Would you mind reading those two sentences?

22 A.    "Our review of Ms. Soneeya's institutional records

23 indicates that while confined at MCI-Shirley in general

24 population she has not been the victim of any physical or

25 sexual assaults by other inmates.  Nor do the records show that

1    she complained to staff that she has been subject to harassment

2    by other inmates while confined at MCI-Shirley."

3    Q.    Okay.  Thank you.  I think you might have noticed as you

4    read there's a minor typo in there where it says "has she."

5    You stumbled over it.  Right.  So "nor do the records show that

6    has she complained to staff."  I think we understand what it

7    means.

8    A.    She has.

9    Q.    Now, you drafted these sentences with Deputy Commissioner

10   Gelb, correct?

11   A.    Correct.

12   Q.    And this discussion -- this is a discussion tailored to

13   Ms. Soneeya, right?  It's about her record of institutional

14   adjustment?

15   A.    Correct.

16   Q.    Okay.  So we've discussed a few times now how you're also

17   involved in security review for Jane Doe.  I'd like to move to

18   that report as well.  This is Exhibit 28 in evidence.  It's

19   Tab 9 of your binder.

20         MR. ROATH:  Just so the Court is aware, for the

21   security reviews for the other two inmates, the versions of

22   them that are in evidence have redactions for the names of the

23   inmates.  So when we put it up on the screen, we won't be

24   showing the world.

25         THE COURT:  Right.

1    BY MR. ROATH:

2    Q.    Again, if we can go to the second page just above the

3    MCI-Framingham subheader, the sentence that begins "Our

4    review."  Would you mind reading those two sentences.

5    A.    "Our review of Ms. Doe's institutional records indicates

6    that while confined in MCI-Norfolk's general population, she

7    has not been the victim of any physical or sexual assaults by

8    other inmates.  Nor do the records show that she has complained

9    to staff that she has been subjected to harassment by other

10   inmates while confined at MCI-Norfolk."

11   Q.    So these two sentences are identical to those that were

12   found in the Soneeya report, except for, of course, the

13   inmate's name and the prison, correct?

14   A.    Pretty close.

15   Q.    Even the typo.

16   A.    Yes.

17   Q.    And you were also involved in the security review process

18   for another inmate.  That's the one we're we've been referring

19   to here as Jane Smith, correct?

20   A.    Yes.

21   Q.    So I'd like to refer to the Jane Smith report, which is

22   Exhibit 14 in evidence and it's Tab 7 of your binder.

23         MR. ROATH:  If we could get that up on screen, please.

24   So, again, page 2.  Just above the MCI-Framingham -- page 3,

25   thank you.  Just above the MCI-Framingham header.

1   Q.   So you may see where this is heading, Commissioner Mici.

2   I'll read the sentences this time.

3        "Our review of Ms. Smith's institutional records

4   indicates that while confined at NCCI's general population, she

5   has not been the victim of any physical or sexual assaults by

6   other inmates.  Nor do the records show that she has complained

7   to staff that she has been subject to harassment by other

8   inmates while confined at NCCI."

9        Did I read that fairly?

10  A.   Yes.

11  Q.   So those two sentences are also identical to the other

12  sentences we just reviewed in the other reports, correct?

13  A.   Yes.

14  Q.   And even the typo, right?

15  A.   Yes.

16  Q.   So you copied and pasted to make these reports, correct?

17  A.   Some of the information, some of the information was copy

18  and pasted because it's the same.  We look at the same factors

19  and some of it was similar.  So yes, it's easier to just cut

20  and paste then to retype the whole thing.

21  Q.   Did you use a template to create the security reports?

22  A.   No, there was no template.  It was just -- no, there's no

23  template.

24  Q.   You testified that you used some of the material that was

25  repeated to copy and paste throughout the reports.  But isn't

1    it also true that the institutional adjustment records for each

2    of the inmates was different for each inmate, correct?

3            MS. STAPLES:  Objection.

4            THE COURT:  No.  She may answer if she knows.

5    A.   I mean, I would have to look at the institutional

6    adjustment.  I mean, this is a general sense of there was no

7    real issues in general pop that had been reported.

8    Q.   Well, we already discussed for Ms. Soneeya that that's

9    incorrect, based on the information in the 2017 classification

10   report, correct?

11           MS. STAPLES:  Objection.

12           THE COURT:  Overruled.

13   A.   It's not incorrect.  The institutional record reported

14   what it reported based on what the correctional officer wrote,

15   and that was Ms. Soneeya's appeal.  So I wouldn't say the

16   information in the classification report was inaccurate.

17   Q.   It was incomplete, however, in the sense that it didn't

18   include the self-reported information from Ms. Soneeya,

19   correct?

20   A.   It did not include the self-reported information.

21           MR. ROATH:  Excuse me.  Thank you, your Honor.

22   Q.   And you're aware that Ms. Doe requested a transfer to

23   MCI-Framingham because she was the victim of groping and

24   harassment at MCI-Norfolk, correct?

25           MS. STAPLES:  Objection.

1          THE COURT:  Overruled.  You may answer.

2     A.   There was some discussion about that, yes.

3     Q.   Okay.  And just one more question along these lines.  If

4     we could go back to Tab 4, which is the 2017 classification

5     report.  And that is Exhibit 6 in evidence.

6          MR. ROATH:  If we could flip to page 12, please.  So

7     if we can make a larger view of the active enemies at the top

8     of the table here.

9     Q.   Now, this represents that there are at least two, as of

10    the time this report was made, active enemies of Ms. Soneeya at

11    MCI-Shirley; is that fair to say?

12    A.   Two active enemies doesn't mean they're at MCI-Shirley.

13    If they're enemies, we would not put them in the same

14    institution.

15    Q.   Fair enough.  One of them said that they -- I'm reading

16    the comments next to the "AS" -- or the active inmate at

17    MCI-Norfolk.  And this inmate assaulted Hunt in 1985 because

18    Hunt refused to have sex with him, correct?  Did I read that

19    correctly?

20    A.   Yes.

21    Q.   And you're aware that Ms. Soneeya's former surname is

22    Hunt?

23    A.   I didn't understand what you said.

24    Q.   Ms. Soneeya used to be known as Mr. Hunt, correct?

25    A.   Oh, yes.

```
 1   Q.   Just to be clear for the record.

 2        The other comment about this enemy is that enemy

 3   situation from 2002, under a redacted previous commission

 4   number, who "attempted to sexually assault inmate Hunt."

 5        Did I read that fairly?

 6   A.   Yes.

 7   Q.   And you reviewed this information in the report at a

 8   security review meeting as well, correct?

 9   A.   Correct.

10   Q.   So a few more specific questions about the facility at

11   MCI-Framingham.

12        THE COURT:  So I'm clear.  The purpose of the active

13   enemies dimension of the classification report is just to avoid

14   colocation at the same facility?

15        THE WITNESS:  Correct.

16        THE COURT:  There was no colocation of Ms. Soneeya

17   with either of these individuals?

18        THE WITNESS:  Not to my knowledge.  Correct.

19        THE COURT:  And that's an ongoing kind of surveillance

20   of the inmate population and the way in which they relate?

21        THE WITNESS:  Constantly.

22   BY MR. ROATH:

23   Q.   But for those assaults to have taken place, they would

24   have had to have been at some point housed with Ms. Soneeya,

25   correct?
```

1    A.    Absolutely.

2    Q.    Okay.  Just to be clear.

3           So I'll turn to some specific questions about the

4    MCI-Framingham facility that we have been discussing.

5           Are you familiar with MCI-Framingham?

6    A.    I am.

7    Q.    MCI-Framingham is the only female state correctional

8    facility in Massachusetts, correct?

9    A.    There's a minimum prerelease across the street, South

10   Middlesex Correctional Center, so there's -- and then there's

11   MCI-Framingham, which is the medium-security facility and the

12   reception center.

13   Q.    So it's -- okay.  So MCI-Framingham is the only female

14   correctional facility that could house an inmate like

15   Ms. Soneeya, assuming that she has all the external female

16   genitalia, correct?

17   A.    Correct.

18   Q.    And MCI-Framingham houses inmates that have been convicted

19   of the most dangerous crimes, correct?

20   A.    Yes.

21   Q.    You testified there would be inmates who committed heinous

22   crimes, in your deposition.  So fair to say that "heinous" and

23   "most dangerous" are roughly synonymous?

24   A.    Okay.

25   Q.    And MCI-Framingham houses inmates that have been convicted

1   of murdering women, correct?

2   A.   Yes.

3   Q.   And MCI-Framingham houses inmates that have committed

4   sexual crimes as well, correct?

5   A.   Yes.

6   Q.   MCI-Framingham houses inmates that are classified as

7   predators, correct?

8   A.   Yes.

9   Q.   And MCI-Framingham also houses inmates that are classified

10  as victims, correct?

11  A.   Yes.

12  Q.   In fact, MCI-Framingham houses inmates that might be -- or

13  excuse me -- are classified simultaneously as both predators

14  and as victims, correct?

15  A.   It could be, yes.

16  Q.   And MCI-Framingham houses female-to-male inmates who are

17  on male hormone treatment, correct?

18  A.   Yes.

19  Q.   And because of that, it's fair to say that MCI-Framingham

20  houses inmates who as a result of that treatment might have

21  masculine features, correct?

22  A.   Yes.

23  Q.   So it's also fair to say that some of those female

24  prisoners who are taking testosterone, the male hormone, would

25  have greater physical strength, correct?

1          MS. STAPLES:  Objection.

2          THE COURT:  She may answer if she knows.

3    A.   I don't know.

4    BY MR. ROATH:

5    Q.   Well, you testified that they would have --

6          THE COURT:  You have to answer orally, or at least I

7    didn't hear it.

8          THE WITNESS:  I'm sorry.  I said I don't know.

9    BY MR. ROATH:

10   Q.   So you testified that they would have masculine features

11   as a result of the hormone treatment, correct?

12   A.   Visibly, yes.

13   Q.   Such as perhaps facial hair or other masculine features,

14   correct?

15   A.   Yes.

16   Q.   Would it be reasonable to assume that testosterone also

17   has the effect of increasing muscle mass and making them

18   stronger than average?

19         MS. STAPLES:  Objection.

20         THE COURT:  She may answer if she knows.

21   A.   It's reasonable.

22   Q.   And MCI-Framingham has its own mental health unit on the

23   premises, correct?

24   A.   Yes, it does.

25   Q.   MCI-Framingham in fact houses some women who have mental

1  health issues, correct?

2  A.   Correct.

3  Q.   And MCI-Framingham currently houses Jane Doe, who is a

4  preoperative male-to-female inmate, correct?

5  A.   Correct.

6  Q.   Okay.  And in the past MCI-Framingham has housed

7  postoperative male-to-female inmates, correct?

8  A.   I believe so.

9  Q.   Now, you testified that as the commissioner you're -- I'm

10  just going to refer to affidavit Paragraph 2 here.

11       You testified that your duties include being

12  responsible for performing the duties set forth in the law.

13  The duties include in relevant part the maintenance of

14  security, safety, and order at all state correctional

15  facilities and that you're mandated to take every appropriate

16  legal measure at your disposal to protect the safety and

17  security of inmates, staff, and the general public.

18       Did I read that correctly?

19  A.   Yes.

20  Q.   That would include the duty to keep prisoners from killing

21  each other, correct?

22  A.   Yes.

23  Q.   No matter what crimes they've committed before they're

24  institutionalized?

25       MS. STAPLES:  Objection.

1          THE COURT:  I'm not sure I understood the question.

2     Keep them out of what?

3          MR. ROATH:  Keep them from committing violence against

4     one another.

5          THE COURT:  Oh, yes.

6          MR. ROATH:  And I believe the witness answered yes.

7          THE COURT:  Go ahead.

8     BY MR. ROATH:

9     Q.   And the follow-up question is no matter what crimes

10    they've committed before entering the prison system, correct?

11    A.    Correct.

12    Q.   I'd like to introduce another exhibit.  This is Exhibit 1,

13    which has been entered into evidence.  This is located at Tab 3

14    of your binder.  So you'll recognize this is the 2010 GD policy

15    that the department created?

16         THE COURT:  Just so it's clear, I don't believe this

17    has been introduced in evidence or formally introduced in

18    evidence.  I'll receive it at this point as Exhibit 1.

19         MR. ROATH:  Thank you, if your Honor.

20         **(Exhibit No. 1 received in evidence.)**

21    BY MR. ROATH:

22    Q.   I'd like to, if you could, pull it up on screen.  And if

23    we could go to page 19, which reflects Section 652.08.

24         So I'll read the first sentence under 652.08 next

25    to 1.  That says, "An inmate who is committed to the department

1  shall be placed in a gender-specific institution according to

2  the inmate's biological gender presentation and appearance.

3  This shall include the inmate's intact external genitalia and

4  secondary sex characteristics."

5          Did I read that fairly?

6  A.   Yes.

7  Q.   Under this policy which places inmates in an institution

8  based on their external genitalia, a postoperative

9  male-to-female would have had to have been housed at

10 MCI-Framingham, correct?

11 A.   Can you ask that again?

12 Q.   Sure.  It was a long question.

13 A.   Yeah.

14 Q.   So under that policy that I just read that says that an

15 inmate who is committed to the department shall be placed in a

16 gender-specific institution according to the inmate's

17 biological gender presentation and appearance, and that shall

18 include the inmate's intact external genitalia and secondary

19 sex characteristics.

20          So based on that, an inmate who had female secondary

21 sex characteristics and external female genitalia would have

22 had to have been housed at MCI-Framingham?

23          THE COURT:  Well, that's not the complete section,

24 which says specific cases with partial completion surgery and

25 so on shall be determined on a case-by-case basis.

1          MR. ROATH:  Yes, your Honor.  I suppose my

2     hypothetical was presuming a presentation of external female

3     genitalia and not --

4          THE COURT:  Right.  But I don't know why we're

5     referring to this, but if we're referring to it, it has to be

6     in full context, I think.

7          MR. ROATH:  Well, okay.  The witness should take as

8     much as time she'd like to read through the 2010 --

9          THE COURT:  What are you getting at?

10          MR. ROATH:  The point here is that had -- the

11     probative value of this line of questioning is that we believe

12     that had Ms. Soneeya had the surgery under the old -- in 2010

13     under the old policy, the department's very policies would have

14     required that she be housed at MCI-Framingham.

15          THE COURT:  But we're not here on the old policy.

16          MR. ROATH:  Correct, your Honor, but the point --

17          THE COURT:  So I'm not sure we should spend very much

18     time on this.

19          MR. ROATH:  I suppose, your Honor, the point is that

20     it's somewhat odd that this all comes down to just a question

21     of timing, that had it happened when she first requested, there

22     wouldn't have been an issue here.  And in fact we're here all

23     these years later because they've been slow-walking in

24     deferrals --

25          THE COURT:  This is too far afield.  We're dealing

1   with the question whether or not the security review as of the

2   time it was undertaken was appropriate.  So I don't want to

3   spend any time.

4           MR. ROATH:  Okay.  Well, that's -- okay.

5           So, your Honor, I have a few questions that may go to

6   some of the aspects of the physical plant at MCI-Framingham,

7   that the DOC has requested remain sealed.  We had discussed at

8   the pretrial conference at this point that members of the

9   public should be excluded.  And we have one or two things we

10  want to talk to you about in this process, but I'm happy to

11  raise it now.

12          THE COURT:  You want to talk to me when?

13          MR. ROATH:  Now might be a good juncture.  The one

14  concern that we want to express is we have discussed with our

15  client the importance of keeping any sealed aspects of the

16  MCI-Framingham layout to herself, that she's bound by the

17  confidentiality order.

18          The one thing that gives us pause that we wanted to

19  talk through in open court is whether the DOC would, down the

20  line, use that knowledge against her in the correctional

21  setting or with respect to the transfer requests.  It strikes

22  us that there's a concern that they might take the position

23  that because she's tainted by the sealed knowledge that we

24  might discuss today, they might burden her in the prison system

25  further.

```
 1            THE COURT:  You think I'd let that happen?

 2            MR. ROATH:  Well, I suppose --

 3            THE COURT:  I just find it passing strange.

 4            MS. STAPLES:  Your Honor, there's absolutely no way

 5   based on the Court's order would we ever refuse Ms. Soneeya a

 6   transfer based only on the fact that she heard some evidence.

 7            THE COURT:  Or in part.

 8            MS. STAPLES:  Or in part of any evidence heard today.

 9            THE COURT:  So that's clarified.

10            Now, the question is, are there people in the

11   courtroom who are not affiliated with the parties or in some

12   fashion should be excluded at this point?  And I guess I have

13   to look to both parties to tell me.

14            MR. ROATH:  I believe there may be -- to my knowledge,

15   there may be several individuals who are not affiliated with

16   the parties.

17            THE COURT:  People who are not now subject to some

18   sort of protective order or duty.

19            MS. STAPLES:  I believe there are two, your Honor.

20            THE COURT:  Okay.  If you don't understand yourself to

21   be subject to a protective order here, which is not to disclose

22   information that is about to be discussed in open court, or not

23   affiliated in any way with one of the parties here and as a

24   consequence subject to that protective order, I'd ask you to

25   leave because we're dealing with security matters that are not
```

1  properly to be discussed in open court, at least until there's

2  been some further challenge to it.  Anyone who falls in that

3  category, I'd ask you to leave.

4          MR. ROATH:  Your Honor, do you mind if I briefly have

5  a moment to confer with my co-counsel.

6          THE COURT:  Yes.

7          MR. ROATH:  Thank you, your Honor.  Just a few more

8  questions for the witness.

9          ***SEALED PORTION OF PROCEEDINGS BOUND SEPARATELY***

10  BY MS. STAPLES:

11  Q.   Commissioner Mici, there are also inmates at Framingham,

12  correct, that have mental health problems?

13  A.   Yes.

14  Q.   Can you describe some of the mental health problems they

15  might suffer from?

16  A.   A great deal of the female population have dealt with a

17  lot of trauma, sexual abuse, domestic violence, substance use.

18  I think about 65 percent of the population there are seen by

19  mental health or are on some kind of medication for mental

20  health.  So there's a high incidence of mental health in the

21  female population.

22  Q.   And I think you heard the testimony about -- from

23  Dr. Levine about -- well, let me tell you -- explain or ask you

24  about the treatment committee's recommendation for Ms. Soneeya.

25  And that was the transfer to MCI-Framingham to see how she did

1    prior to any recommendation for surgery.  Do you recall that

2    being the recommendation?

3    A.    Yes.

4    Q.    And that if she -- and did you hear Dr. Levine testify

5    that if she didn't do well, he would assume she could be

6    transferred back to MCI-Shirley if it didn't work out at

7    Framingham?

8    A.    Yes.

9    Q.    From a security point of view, what's your opinion of

10   having somebody go to Framingham and then if they didn't work

11   out being moved back to MCI-Shirley?

12   A.    My opinion?  I'm certain it would be possible, but I think

13   it would be a difficult transition going and coming back.

14          I mean, I think we'd really need to do some planning

15   for that.  I have no guarantee, which I guess you don't with

16   anyone, of if she transferred to Framingham that it would be

17   successful.

18          And I do think about what if it isn't successful?

19   Does she go back to Shirley?  Does she go somewhere else?

20   There's a lot of balls in the air and it's somebody -- it's

21   somebody's placement within the department and you want it to

22   be the most appropriate.  You want it to be safe.  You want it

23   to be meaningful, to the best of your ability when you're in

24   prison.

25          So classification of offenders, you'll see it

1    anywhere nationally it's the brains of how a criminal justice

2    system works.  Brains of how a correctional facility works and

3    you have to do it right.  You don't classify the right people

4    to the right place, you have problems.  And that's what keeps

5    correctional facilities safe is putting them in the right spot.

6    Q.   Okay.  And you talked about Jane Doe.  And overall, how is

7    she doing?

8    A.   She had some bumps at MCI-Framingham.  She was placed in a

9    restrictive housing unit for a period of time due to D reports.

10   Q.   What was the last D report she received for?

11   A.   She assaulted another female sexually.

12   Q.   Is she being charged criminally for that?

13   A.   She is.

14   Q.   Where is she held currently?

15   A.   She is back in the Smith building at MCI-Framingham.

16          THE COURT:  Is that general population?

17          THE WITNESS:  That is general population.

18   BY MS. STAPLES:

19   Q.   And I just want to be clear about the classification

20   report from Ms. Soneeya that you've discussed previously.  You

21   had said that her score was a 3, which was low.  Do you

22   remember that?

23   A.   Yes.

24   Q.   Okay.  Her overall score was not a 3, though, correct?

25   A.   Her overall score is a 3, but there are overrides or

1   restrictions.  And because of her life first sentence, as well

2   as her ICE detainer, the department does not put people with

3   those detainers or those restrictions in the lower security --

4   or lower than medium security.

5         THE COURT:  Just so it's clear, however, there are

6   people at Framingham who have a 6, based on life sentence and

7   ICE detainers.  Is that right?

8         THE WITNESS:  That's possible, absolutely.

9   BY MS. STAPLES:

10   Q.   And my only other -- last question, Commissioner, is you

11   had talked about you reviewed the classification report for

12   Ms. Soneeya at the security review, correct?

13   A.   Yes.

14   Q.   And you were pointed out by plaintiff's counsel there was

15   a statement she made where she felt like she wanted to move to

16   Framingham, correct?

17   A.   Yes.

18   Q.   Did any of the institutional records that you reviewed

19   support or demonstrate that she had experienced any assaults or

20   anything like that while at MCI-Shirley?

21   A.   No.

22   Q.   So there were no reports of that, other than Ms. Soneeya's

23   appeal in her classification?

24   A.   Not that I'm aware of.

25         MS. STAPLES:  I have nothing further.

1          MR. ROATH:  Your Honor, if you'd permit?

2          THE COURT:  Yes.  I think your colleague also may have

3    some thoughts she wants to share with you too.

4          MR. ROATH:  The redirect opened a few, expanded the

5    scope a little bit.  I just have a few questions.

6          THE COURT:  Okay.  Maybe if you consult to be sure you

7    are comprehensive.

8          Maybe before you examine I'll ask one or two questions

9    that are on my mind about the classification issue.

10         You've got a classification background, right?

11         THE WITNESS:  I do.

12         THE COURT:  Okay.  So the larger challenges of

13   classification are pretty clear, I think, but it's a day-to-day

14   problem, isn't it, of transfer?  You're day-to-day adjusting

15   where it is that people are going to be located based on

16   changing conditions?

17         THE WITNESS:  Correct.

18         THE COURT:  So this is not something new to you, if

19   you have to transfer Ms. Soneeya or do transfer Ms. Soneeya to

20   Framingham and send her back to another facility?

21         THE WITNESS:  So the concept isn't new, no.  It's

22   something that we have to --

23         THE COURT:  What's the different challenge that's

24   involved in this?  Colocation is not the issue.  Whether she's

25   functioning in a particular way in Shirley before or a

```
 1    substantial period of time isn't an issue.  What's the
 2    particular challenge?
 3              THE WITNESS:  Anatomical male in a female facility.
 4              THE COURT:  What we're assuming here is that she's
 5    gotten transferred into Framingham and now we're taking her
 6    out.
 7              THE WITNESS:  Oh, I'm sorry.  Okay.  I mean, the
 8    challenge is just her success.
 9              THE COURT:  Right.  But it's not different in kind
10    from the same kind of challenge that any transfer presents.
11    Part of it is security, but part of it is to be as successful
12    as a person can be within the system.
13              THE WITNESS:  Correct.
14              THE COURT:  Different flavor but the same substance.
15              THE WITNESS:  Fair.
16              MR. ROATH:  Thank you, your Honor.
17                          REDIRECT EXAMINATION
18    BY MR. ROATH:
19    Q.   Commissioner Mici, just a few questions that actually
20    mostly build on that.
21              When we were discussing just now the potential for a
22    transfer on a, say, probationary basis with a potential
23    transfer back to another facility, you said that that certainly
24    would be possible, correct?
25    A.   Yes.
```

1  Q.   But you did not consider it at the January 23, 2018

2  security review meeting, correct?

3  A.   No, because it wasn't being recommended.

4  Q.   And you said that you might have concerns about housing

5  her at MCI-Framingham pursuant to that scheme.  But didn't you

6  also testify that MCI-Framingham can handle any inmate?

7  A.   It has to handle anyone that comes through the door

8  sentenced by the court.

9  Q.   And then just one further question on the classification

10 report which we discussed and Ms. Staple returned to in the

11 redirect.  I think it might be most useful if we return to the

12 classification report at Tab 4.  If we turn back to page 12,

13 which we've already visited, this is where the active enemies

14 are listed, if we could put it on the screen, please.

15          THE COURT:  The classification report is Exhibit 10 in

16 evidence here?

17          MR. ROATH:  I believe it's Exhibit 6.  I'm sorry.  I

18 just don't have my list with me right now.  It's Exhibit 6 in

19 evidence.

20          THE COURT:  Okay.

21 BY MR. ROATH:

22 Q.   If you go back to the active enemies list at page 12.

23 A.   Yes.

24 Q.   Earlier when we stated that these active enemies -- these

25 individuals had to have been housed with Ms. Soneeya at some

1  point for the assault to occur, isn't it also the case that

2  these assaults occurred at MCI-Shirley?  And I'll direct you to

3  the upper right corner of the document where it says

4  "Institution MCI-Shirley."

5  A.   All right.  So that institution means that's where she's

6  housed in this report, which is 2017.

7  Q.   Okay.

8  A.   Okay?

9  Q.   Then if we go down into the comments where it says enemy

10  situation from 2002.

11  A.   Yes.

12  Q.   Was Ms. Soneeya housed at MCI-Shirley in 2002?

13  A.   I believe she's been there since 1998, if I'm not

14  mistaken.  I was trying to find it in the class board.

15  Q.   I believe that's correct.

16  A.   So if that is the case, '98 I believe is the correct

17  time -- I'm not used to the printed boards -- then I would

18  assume that probably did happen.  These assaults, if they

19  occurred, which apparently they did because there's some

20  documentation, would have been before this documentation.  So I

21  just want to be clear that we didn't just leave two inmates

22  together that we knew had an issue.  There was an issue and

23  then we separated them.

24  Q.   This is a historical report?

25  A.   This is history, right, within the classification report

1  from 2017, correct.

2  Q.   Just to be clear where it says "location" in bold, that

3  column and it lists other locations.  That is the location to

4  which those active enemies have been transferred or are now

5  situated, correct?

6  A.   Correct.

7         MR. ROATH:  Okay.  Thank you.  No further questions,

8  your Honor.

9         THE COURT:  One question that I have perhaps you can

10  help me on.  I think it's fully developed, but in the current

11  operations of Framingham, it is possible to have a single cell

12  for Ms. Soneeya?  It does not disrupt the operations as they

13  exist now?

14         THE WITNESS:  No.  The only disruption is that we

15  don't generally give single cells out a lot because it is a

16  premium.  It's a bit of a privilege.  But the count -- it

17  really depends on bed counts sometimes, but I'm not going to

18  say it's not a possibility.

19         THE COURT:  So for Jane Doe?

20         THE WITNESS:  We gave her a single cell.

21         THE COURT:  She continues in a single cell in Smith?

22         THE WITNESS:  I believe so, yes.

23         THE COURT:  Now, turning to your affidavit -- there's

24  a discussion in connection with I believe Jane Doe of -- I'm

25  not finding it right away, but there's a reference that I

1   recall to some sort of facility construction, that you were

2   considering a new line or high line or something like that.

3              THE WITNESS:  New line.

4              THE COURT:  New line.

5              THE WITNESS:  That's within the Smith building as

6   well.  That's the real secure building within MCI-Framingham.

7              THE COURT:  Okay.  But what's going on there or what

8   was going on there?  Again, we don't have people.

9              THE WITNESS:  It's the orientation unit.  New line.

10  It's where -- usually everybody starts there.  You go through

11  an orientation.  And some stay there.  We use an internal

12  housing risk placement to assess internal housing.  It was

13  talked about earlier, victims should live with victims,

14  predators with predators, and you should never mix them.

15  External classification determines the custody level and the

16  facility.  Internal classification, a different assessment will

17  guide you on housing.

18             THE COURT:  So how does someone end up in Smith?  I

19  mean, they've got prior disciplinary problems, they're --

20  they've got a high classification.  Is it a predator building?

21  Is it a victim building?

22             THE WITNESS:  So it's probably more predatory.  They

23  are people that are brand-new that we don't know very well, so

24  we have to get to know who they are.  They're also inmates that

25  were in a close-custody unit or restrictive housing that got

1    into trouble or received a disciplinary report.  They would

2    come back and start out at new line and then -- Framingham is

3    set up a little bit differently than male institutions.

4          It's all based on your pathway and your programming.

5    So depending on your internal housing risk assessment and your

6    pathway, what got you into the criminal justice system, we

7    house them together as much as we can in separate units.  And

8    it's based on like inmates.  That's the general philosophy is

9    you want to put like inmates with like inmates.

10         THE COURT:  Okay.  So that answers the question I had

11   about new line.

12         Anything else from counsel?

13         MS. STAPLES:  No.

14         MR. ROATH:  No.

15         THE COURT:  You may step down.

16         THE WITNESS:  Thank you.

17         THE COURT:  Ms. Peterson, that's the last witness?

18         MR. ROATH:  Yes, you Honor.

19         MR. MILLER:  Good afternoon, your Honor, Sam Miller

20   for the defendants.

21         At this time, we'd be moving to admit the affidavit of

22   Mitzi Peterson, which was signed on February 28, 2019 and

23   previously filed with the court.  There are also ten associated

24   exhibits.  That's Exhibit 1, 10, 17, 19, 21, 22, 23, 24, 30,

25   and 502.

1          THE COURT:  And -- 5-0 -- I'm sorry?

2          MR. MILLER:  502.

3          MR. RODRIGUEZ:  If I could be heard before those are

4    introduced, we had an objection to Paragraphs 12 and 13 of

5    Ms. Peterson's affidavit on the grounds those contain hearsay

6    testimony.

7          THE COURT:  I'm sorry?

8          MR. RODRIGUEZ:  On the grounds of hearsay testimony,

9    and as you referred to, totem pole hearsay.  Now Ms. Peterson

10   is testifying as to statements that Drs. Andrade, Thompson, and

11   Levine made during two meetings on December 8, 2017.

12         THE COURT:  I'm not taking those for the truth of the

13   matter but that they were said in her presence.  So she has

14   notice of them.

15         We need your name also for the record.

16         MR. RODRIGUEZ:  I'm sorry, yes.  Michael Dalton

17   Rodriguez.

18         THE COURT:  I overrule the objection on that basis.

19         **(Exhibit No. 1 received in evidence.)**

20         **(Exhibit No. 10 received in evidence.)**

21         **(Exhibit No. 17 received in evidence.)**

22         **(Exhibit No. 19 received in evidence.)**

23         **(Exhibit No. 21 received in evidence.)**

24         **(Exhibit No. 22 received in evidence.)**

25         **(Exhibit No. 23 received in evidence.)**

1          **(Exhibit No. 24 received in evidence.)**

2          **(Exhibit No. 30 received in evidence.)**

3          **(Exhibit No. 502 received in evidence.)**

4                **MITZI SCOTT PETERSON, sworn**

5          THE CLERK:  Please be seated and state your full name.

6          THE WITNESS:  Mitzi Scott Peterson.

7          MR. RODRIGUEZ:  I'm sorry, your Honor.  We actually

8    have witness binders.  I don't know if there's already one on

9    the podium.

10          THE WITNESS:  This is the commissioner's.

11          MR. RODRIGUEZ:  Oh, it is.  Okay.  May I approach to

12    provide binders to the witness and the Court?

13          THE COURT:  Yes, please do.

14          Let me pause for a minute.  Maybe the court

15    security -- or the corrections officers can help you.  There's

16    going to be a transition, as I understand it, in personnel.

17          CORRECTION OFFICER:  Yes.

18          THE COURT:  But will there still be a female

19    correctional officer?

20          CORRECTION OFFICER:  Not at this time.

21          THE COURT:  Okay.  I think that under the

22    circumstances -- I recognize your need to change over.

23          I'm not going to take the testimony at this time,

24    because it creates some issues, I take it, for Ms. Soneeya here

25    and the need -- not need, but the importance of having a female

1    correctional officer guarding her.  Okay?

2         So I'm not going to take the testimony of Ms. Peterson

3    at this point because we have to make that transition.  And we

4    have the question of the superintendent at Framingham.  And she

5    still is the superintendent at Framingham; is that right?

6         MS. STAPLES:  She is, correct, your Honor.

7         THE COURT:  I think the more I reflect on it, I

8    appreciate the efforts of counsel to make this as streamlined

9    as possible, but I have to hear her to understand this fully.

10   So arrangements have to be made for her.  Now, perhaps we can

11   discuss this further on Friday.

12         (Discussion between court and clerk.)

13         THE COURT:  I would very much like to be able to do

14   the superintendent on Friday --

15         MS. STAPLES:  Okay.

16         THE COURT:  -- here and make whatever arrangements.

17         I also want you to be thinking about what you want to

18   do as post-evidentiary matters.  Ordinarily I ask in cases like

19   this -- that is, not jury cases -- for further marked-up

20   findings and conclusions that incorporate the testimonies

21   actually received, a/k/a modify them so that I can run through

22   what the parties contend.

23         And then I would after that have what is denominated

24   closing argument.  But you've had enough experience with me to

25   know that I will not sit as a potted palm in what's denominated

1    closing argument.  It will be interactive.  But that's what I

2    think I would like to do.

3            Now, am I correct that you have daily copy on this or

4    not?

5            MS. STAPLES:  The state hasn't been getting daily

6    copies, your Honor, but I can certainly speak to my --

7            THE COURT:  But has Ms. Soneeya?

8            MS. HANCOCK:  Yes.

9            THE COURT:  Well, I'd ask you to -- don't take it from

10   the perimeter security capital funding request, but get -- so

11   we can deal with this as promptly as possible.

12           MS. STAPLES:  Certainly I'll let them know.

13           THE COURT:  So we can get a sense of the timing as a

14   result of that.

15           MS. HANCOCK:  Okay.

16           THE COURT:  I'm not --

17           All right.  So I think we will conclude for the day

18   just to be sure that concerns about the proper complement of

19   corrections officers don't cause some anxiety here.

20           I would ask that the department be assured that they

21   have a female correction officer both when Ms. Soneeya is

22   brought in here but also during the rest of the proceedings

23   here so that the concerns that have been expressed and were

24   expressed earlier on are not interfering with the ability to

25   move forward here or potentially interfering with the ability

 1  to move forward.  So I count on the department to make those

 2  arrangements.

 3          MS. STAPLES:  I'll pass that along.  When would you

 4  like the report from the department about the procedures for

 5  searching?

 6          THE COURT:  I would hope by Friday.

 7          MS. STAPLES:  We can certainly do that.

 8          THE COURT:  Close of business on Thursday would be

 9  helpful so that I can see that, apart from opportunities for

10  human error, that at least that hole in the dike has been

11  plugged.

12          MS. STAPLES:  Certainly.

13          THE COURT:  Okay.  Anything else that we should take

14  up by way of preliminary?

15          MS. HANCOCK:  Not from us, your Honor.

16          THE COURT:  Okay.  So we'll be in recess.  We'll see

17  you at, I believe, 9:30 on Friday.

18          THE CLERK:  All rise.

19          THE COURT:  I'm sorry, Ms. Peterson.  I didn't inquire

20  about your schedule.

21          THE WITNESS:  I will make myself available.

22          THE COURT:  Okay.  Thank you.

23  (12:40 p.m.)

24

25

1    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8            I certify that the foregoing is a correct transcript

9    from the record of proceedings taken April 9, 2019 in the

10   above-entitled matter to the best of my skill and ability.

11

12

13   /s/ Kathleen Mullen Silva              4/9/19

14   Kathleen Mullen Silva, RPR, CRR              Date

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25