UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KATHEENA NEVIA SONEEYA,          )
f/k/a KENNETH HUNT,              )
                                 )
              Plaintiff,         )          CIVIL ACTION NO.
                                 )          07-12325-DPW
v.                               )
                                 )
CAROL MICI, in her official      )
capacity as Commissioner of the  )
Massachusetts Department         )
of Correction,                   )
                                 )
              Defendant.         )

FINDINGS OF FACT
AND
CONCLUSIONS OF LAW
REGARDING
PLAINTIFF'S CURRENT TREATMENT PLAN

February 12, 2024

TABLE OF CONTENTS

I. SUMMARY BACKGROUND ........................................................................ 3

II. CHARACTERIZING AND TREATING THE RELEVANT CONDITION .............. 6

III. SONEEYA I ........................................................................................... 8

    A.   2012 Findings of Fact ......................................................................... 9

    B.   2012 Conclusions of Law ................................................................. 12

IV. DEVELOPMENTS FOLLOWING SONEEYA I ........................................... 14

V. FINDINGS BASED ON EVIDENCE FOR 2019 TRIAL ................................ 16

    A.   Readiness to Begin Preparation for SRS ........................................... 17

        1.   Dr. Ettner as Expert ......................................................... 18

        2.   Dr. Levine as Expert ........................................................ 22

    B.   Constraints Imposed by Purported Security Concerns ....................... 29

    C.   Applicable Legal Principles ............................................................. 39

        1.   Sufficiently Serious Medical Need ..................................... 40

        2.   Sufficiently Culpable State of Mind Establishing Deliberate Indifference to Serious Medical Need ......................................................... 41

VI. COMMENCING A COMPLETELY RESPONSIVE REMEDY ........................ 51

VII. CONCLUSION ..................................................................................... 53

Katheena Nevia Soneeya is a male-to-female transgender prisoner serving a life sentence without the possibility of parole in the custody of the Massachusetts Department of Correction ("DOC").  She has a long and well-established diagnosis of a condition now generally labeled as gender dysphoria ("GD"), but before 2013 labeled gender identity dysphoria ("GID").  She seeks to compel the DOC to implement a treatment plan for her condition that would include sexual reassignment surgery ("SRS") upon her transfer to MCI-Framingham, the Massachusetts medium security correctional facility that is designated by the DOC to house female inmates.

For the reasons set forth below, I find and conclude that by willfully, arbitrarily and pretextually failing to treat Ms. Soneeya's medical condition in accordance with the recommendations of experts assigned the task of making such recommendations, the DOC has violated Ms. Soneeya's Eighth Amendment right not to be subjected to cruel and unusual punishment.  I will now order the DOC to transfer Ms. Soneeya to MCI-Framingham as a predicate to providing her with SRS on the terms and conditions set forth below.

## I. SUMMARY BACKGROUND

The essential narrative foundation for the development of Ms. Soneeya's case now before me can be found in Judge Tauro's Memorandum and Order of March 29, 2012.  *Soneeya* v. *Spencer*, 851 F. Supp. 2d 228 (D. Mass. 2012)

("*Soneeya I*").[1]  Briefly stated, the arc the litigation took can be summarized as follows.

In 1982, Ms. Soneeya was convicted in the Superior Court Department of the Massachusetts Trial Court of the murders of two women and sentenced to life imprisonment without the possibility of parole.  Since her conviction, Ms. Soneeya has been in DOC custody housed at all-male correctional facilities.

In 1990, after a failed attempt at self-castration, Ms. Soneeya was diagnosed by DOC physicians with what was then labeled GID.  Following that diagnosis, she has been living as a transgender woman in all-male correctional facilities and has consistently sought medical treatment from the DOC for her condition.  It is not in dispute that Ms. Soneeya suffers from GD; she does.  Nor do the parties disagree that Ms. Soneeya's condition causes her severe distress; it does.  The record establishes that her current and future health is threatened by the DOC's failure to provide adequate treatment for the sufficiently serious medical need her GD condition creates.

In December 2007, Ms. Soneeya, representing herself, filed her initial complaint in this case.  After preliminary screening of that *pro* se pleading, the case was assigned to Judge Gertner in January 2008.  In August 2008, Judge

---

[1] I refer to Judge Tauro's 2012 Memorandum and Order, *Soneeya* v. *Spencer*, 851 F. Supp. 2d 228 (D. Mass. 2012), as "*Soneeya I*" because it is reported in the West Federal Supplement series.  I recognize that none of the other rulings in the case, although reflected in the docket, have been published in that fashion.  Nevertheless, for continuity of presentation and because Judge Tauro's 2012 Memorandum and Order anchors the Findings and Conclusions I make, I believe "*Soneeya I* " should be helpful as a short-hand reference identification.

Gertner referred the case to the court's *pro bono* coordinator for consideration of appointment of counsel.  Ms. Soneeya's motion to appoint counsel was granted later that month and in September 2008, the law firm of Ropes & Gray LLP was appointed to represent her.

In December 2008, Ms. Soneeya through appointed counsel filed her First Amended Complaint.  In April 2010, Judge Gertner referred the case to Magistrate Judge Collings for full pretrial proceedings other than dispositive motions.  In December 2010, Ms. Soneeya filed a Second Amended Complaint, the operative complaint before me, alleging that the DOC was violating her Eighth and Fourteenth Amendment rights under the United States Constitution and her rights under Article 114 of the Declaration of Rights of the Massachusetts Constitution[2] by enforcing a discriminatory policy as to inmates with GID and refusing to provide necessary medical care to her in compliance with the recommendations of her doctors and the applicable standards of care for those with GID.

In April 2011, in anticipation of Judge Gertner's assumption of senior status the next month, this case was reassigned to Judge Stearns.  However, in May 2011 at the joint direction of Judge Stearns and Judge Tauro, the case was reassigned to Judge Tauro.

---

[2] Because the Commonwealth had not waived its immunity under the Eleventh Amendment, Judge Tauro concluded he did not have jurisdiction to address Ms. Soneeya's purely state law claim. *Soneeya I*, at 251-52.  I have not been asked to, nor will I, disturb that determination.

Judge Tauro denied the DOC's previously filed motion for summary judgment on July 7, 2011 and conducted a bench trial in January and February 2012.

Judge Tauro thereupon issued a "permanent injunction" against the DOC in March 2012 setting forth detailed directives mandating actions it must take regarding Ms. Soneeya's treatment and ordered the case closed. *Soneeya I*, 851 F. Supp. 2d at 252-53.

Judge Tauro's permanent injunction order was not appealed.  Nor has there been full compliance with it.

## II. CHARACTERIZING AND TREATING THE RELEVANT CONDITION

In 1980, the American Psychiatric Association had introduced the diagnostic term "gender identity disorder" in the third edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM").  [Dkt No. 279-1, at 32 ("Ettner July 10, 2018 Report")].  In 2013, the year after Judge Tauro issued his permanent injunction, the fifth edition of the DSM ("DSM-5"), identifying GID as a treatable medical condition rather than a mental illness, replaced the diagnostic term gender identity disorder with the diagnosis of gender dysphoria or GD.  [*Id.*]  GD is described in DSM-5 as a "marked incongruence between one's experienced/expressed gender and assigned gender . . . ." [3]  [*Id.* at 34].  Except where necessary to identify the chronology of professional approaches

---

[3]  The change in diagnostic term for the condition during the course of Ms. Soneeya's incarceration is material to this case only in so far as it indicates the continual engagement of medical and mental health professionals with the ongoing effort to find and adapt appropriate protocols for treatment.

to characterization and treatment, I will use the diagnostic term label GD in this Memorandum.

The World Professional Association of Transgender Health's Standards of Care ("WPATH SOC") are governing standards of care for transgender individuals.  The 7th version of the WPATH Standards of Care ("WPATH SOC-7") was published in 2011.[4]  There are no other standards for the treatment of transgender individuals that are accepted by any nationally or internationally recognized medical professional group.  The WPATH SOC are considered flexible clinical guidelines that individual health professionals and programs may modify "'because of a patient's unique anatomic, social, or psychological situation; an experienced health professional's evolving method of handling a common situation; a research protocol … or the need for specific harm reduction strategies.'"  *Soneeya I*, 851 F. Supp. 2d at 232 (quoting WPATH SOC-7, at 2); *see also* 2019 Tr. Ex. 2, at 2.

The WPATH SOC-7 identified the following as evidence-based protocols for treating individuals with GD: (1) support for changing an individual's gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity); (2) hormone therapy to

---

[4] In 2022, WPATH published the 8th version of its standards of care ("WPATH SOC-8").  The criteria for recommending hormone treatment and surgeries are similar in the WPATH SOC-7 and the WPATH SOC-8.  There is no basis to believe the two principal gender dysphoria experts who testified before me — Dr. Randi I. Ettner, for the Plaintiff, and Dr. Stephen B. Levine, for the Defendant — would change their current opinions about Ms. Soneeya's medical needs based on these revisions to the WPATH SOC and no submissions have been made by either of the parties seeking to do so.

feminize or masculinize the body; (3) surgery to alter primary and/or secondary sex characteristics (*e.g.*, breasts, genitalia, facial features, and body contouring); and (4) providing access to psychotherapy addressing issues such as the negative impact of stigma, alleviating internalized transphobia, enhancing social and peer support, improving body image, and promoting resiliency.  2019 Tr. Ex. 2, at 9.

Eligibility criteria for patients under consideration for SRS in the WPATH SOC-7 are: (1) persistent, well documented GD; (2) capacity to make a fully informed decision and consent to treatment; (3) age of majority in given country; (4) if significant medical or mental health concerns are present, they must be well controlled; and (5) twelve months of hormone therapy as appropriate to the patient's gender goals (unless hormones are not clinically indicated for the individual).  The purpose of hormone therapy before SRS is to permit a period of reversible treatment before irreversible surgery.  2019 Tr. Ex. 2, at 105-06.

### III. *SONEEYA I*

In *Soneeya I*, Judge Tauro issued findings of fact and conclusions of law, ruling that the DOC's 2010 GID policy was facially invalid in violation of the Eighth Amendment because it prohibited certain accepted treatments for inmates with GID in all cases.  More specifically, he ordered the DOC to conduct an individualized assessment of Ms. Soneeya's readiness for SRS applying accepted community standards for treating patients with GID,

followed by a good faith security review, taking into account Ms. Soneeya's individual history and circumstances.

## A.     *2012 Findings of Fact*

Judge Tauro found that the DOC's response to Ms. Soneeya's requests for medical treatment to that date were "characterized by a series of delays, bureaucratic mismanagement, and seemingly endless security review with no clear rhyme or reason." *Soneeya I*, 851 F. Supp. 2d at 236. Judge Tauro's findings provide a foundation for my own conclusion that the DOC has remained deliberately indifferent to Ms. Soneeya's serious medical needs for an extended period of time through today in its flouting of clear judicial directions.

Judge Tauro provided a factual chronology of Ms. Soneeya's DOC evaluations and treatment, which I outline below. *See generally Soneeya I*, 851 F. Supp. 2d at 236-41. Beginning between 1990 and 2003, several psychological evaluations of Ms. Soneeya confirmed her GID and diagnosed comorbid psychological disorders. Based on these diagnoses, the DOC provided Ms. Soneeya with psychotherapy. The assigned providers, however, had little or no experience in treating gender identity disorders.

In 2003, pursuant to a DOC contract for the provision of mental health care for inmates, Ms. Soneeya was evaluated by Drs. Randi Kaufman and Kevin Kapila, who were associated with the Fenway Clinic. They recommended that Ms. Soneeya should begin hormone therapy immediately, coupled with ongoing psychotherapy. While they did not believe Ms. Soneeya was a good candidate for SRS at that time, they recommended that she be reconsidered for SRS as

her treatment progressed.  In September 2003, based on this report, Ms. Soneeya began hormone therapy under the care of endocrinologist Maria Warth, M.D.

In 2005, Drs. Kaufman and Kapila recommended to the DOC that Ms. Soneeya be allowed to feminize her appearance further by having access to female canteen items and clothing and permanent removal of facial and body hair.  Dr. Warth also recommended that Ms. Soneeya be provided with more feminine items, undergo permanent hair removal procedures, and be assessed for readiness for sex reassignment surgery.

In late 2005, the DOC was advised by its contracted mental health care provider that "further delay in providing the recommended treatment likely will result in continued or increased levels of distress for [Ms. Soneeya], with the possibility of self-inflicted injury, and, to that extent, the treatment recommendations are medically necessary."  The DOC, however, elected not to receive these communications as treatment recommendations because they were not submitted on the right form. It effectively ignored them.

The DOC did not provide Ms. Soneeya with any female clothing or cosmetics until late 2009.  As of 2012, the DOC still had failed and refused to provide Ms. Soneeya with permanent hair removal.

Prior to 2010, the DOC's treatment of prisoners with GID was unguided by regulation.  In 2010, the DOC enacted a formal GID policy ("2010 Policy"). 2019 Tr. Ex. 1.  The 2010 Policy created a GID Treatment Committee ("GID Treatment Committee") responsible "for reviewing the overall treatment of [GID]

10

diagnosed inmates ... on a quarterly basis," [*Id.* at 19; 103 DOC 652.05 A)3.] and a GID Management and Security Committee tasked with reviewing "any elements of the Treatment Plan that may potentially present security, safety, or operational difficulties within a correctional environment." [*Id.*; 103 DOC 652.06 A)1.]

The 2010 Policy included a blanket ban on certain types of treatment, providing, in relevant part:

> 6. The Treatment Plan for inmates diagnosed with [GID] shall not contain provisions for services that are not medically necessary for the treatment of [GID] within the Department. These elective or cosmetic services generally include but are not limited to:
>
>> a. Feminization or masculinization procedures such as laser hair removal and/or electrolysis for permanent facial, chest or other body hair removal . . .
>>
>> b. Plastic surgery, including . . . rhinoplasty, tracheal shaving, facial feminization/masculinization, mastectomy . . . (FTM), and breast augmentation (MTF) . . .
>>
>> c. Genital sex reassignment surgery is prohibited as it presents overwhelming safety and security concerns in a correctional environment.

[*Id.* at 16-17; 103 DOC 652.03 D)6.a.-c.]

The 2010 Policy required that treatment recommendations by the GID Treatment Committee be subject to a security review by the GID Management and Security Committee, the results of which were to be forwarded to the DOC Commissioner for a final security determination. If the Commissioner did not support the recommended treatment plan, the plan was to be returned to the GID Treatment Committee for "consideration of potential clinical alternatives

11

that meet the inmate's needs." [*Id.* at 13; 103 DOC 652.03 C)5.]  Under the

2010 Policy, "[t]he decision of the commissioner regarding any aspect of a GID

inmate's management within the Department [was] final." [*Id.* at 21; 103 DOC

652.06 A)4.]

**B.     *2012 Conclusions of Law***

Judge Tauro made clear his conclusion that Ms. Soneeya's GID was a

serious and redressable medical need, subject to improvement as she gradually

obtained access to additional treatment for GID.  He held that the 2010 Policy,

which instituted a blanket ban on certain types of treatment, "without

consideration of the medical requirements of individual inmates, to be exactly

the type of policy that was found to violate Eighth Amendment standards in

other cases both in this district and other circuits."  *Soneeya I,* 851 F. Supp. 2d

at 247.

Judge Tauro concluded that Ms. Soneeya was not being provided with

adequate treatment because the DOC had "not performed an individual

medical evaluation aimed solely at determining the appropriate treatment for

her [GID] under community standards of care."  *Id.* at 248.  He further

concluded that the DOC had displayed deliberate indifference to Ms. Soneeya's

medical needs where:

> Ms. Soneeya waited nine years after her initial diagnosis to receive
> a treatment plan that applied community standards of care.  She
> waited another four years to receive an evaluation by an expert in
> gender identity disorders.  She has yet to be evaluated by an expert
> within the DOC for further feminization or sex reassignment
> surgery.  Ms. Soneeya has been forced to wait months, and
> sometimes years for the implementation of basic recommendations,

12

such as access to female undergarments and makeup.  This pattern
of denials and delay occurred without any formal structure in place
for reviewing treatment recommendations, or security concerns.

*Id.*

Judge Tauro declined to defer to the judgment of the DOC and the
Commissioner because "[t]he DOC and Commissioner Spencer [were] aware of
Ms. Soneeya's serious medical need, and yet have chosen to deliberately
disregard that need by failing to undertake a good faith evaluation of her
medical care, or the security implications of the various treatment options." *Id.*
at 250.  He found that, in light of the DOC's 2010 GID Policy and "long history
of obstruction and delay," the inadequate care was likely to continue.  *Id.* at
251.

Based on his findings of fact and conclusions of law, Judge Tauro
entered "a permanent injunction requiring the Department of Correction to
ensure that [Ms. Soneeya] receives consistent and timely ongoing treatment for
her [GID] in accordance with the [WPATH SOC] and applicable community
standards." *Id.* at 252.  The injunction ordered the DOC to conduct an
individualized evaluation of "[Ms. Soneeya's] medical needs and to consider
whether sex reassignment surgery or other treatments [were] medically
indicated at this time." *Id.*  As to security considerations, the injunction
ordered the DOC to conduct an "individualized security review of treatment
recommendations" and required that such review "be timely, undertaken in
good faith, and ... provide articulable and justifiable reasons for any denial of

medical care." *Id.* at 252-53.  Judge Tauro's permanent injunction order was not appealed despite the fact that he simultaneously ordered the case closed.

## IV. DEVELOPMENTS FOLLOWING SONEEYA I

On March 7, 2014, dissatisfied with the DOC's response to Judge Tauro's 2012 *Soneeya I* Order, Ms. Soneeya filed a motion to compel DOC's compliance with the permanent injunction.

The case was assigned for management to Judge Young, since Judge Tauro had assumed senior status in September 2013.  On May 12, 2014, Judge Young granted Ms. Soneeya's motion to the extent that he ordered each of the parties to propose three independent medical professionals, one of whom would ultimately be selected by the court and designated as an independent evaluator to perform certain tasks identified in the order.  [Dkt. No. 178]. Judge Young specified that the individuals proposed by the parties as independent evaluators had to have expertise in the treatment of GD; maintain an active medical practice that included treatment of individuals with GD; "accept[] and appl[y] the tenets of the WPATH Standards of Care Version 7 in treating individuals with [GD]" and could "not [be] a current or former employee/agent/independent contractor of the DOC or the DOC's medical or mental health services providers."  [*Id.* at 2].

The order further provided that the individual selected by the court would: (1) evaluate Ms. Soneeya's treatment needs and draft a comprehensive treatment plan for her GD and (2) evaluate Ms. Soneeya's readiness for SRS and provide a signed written opinion as to Ms. Soneeya's readiness for such

14

surgery ("SRS Opinion").  [*Id.*]  No later than thirty (30) days after the independent evaluator completed the SRS Opinion, the parties were to submit either a joint status report or separate status reports to the court, along with the SRS Opinion, and propose appropriate next steps.  [*Id.* at 3].

Meanwhile, after random reassignment to Judge Wolf in July 2014, when Judge Young's brief management role concluded, the case was reassigned to my session in August of 2014 because Judge Wolf, as a senior judge, was not eligible to receive reassigned cases.  Following an extended process by which the parties identified the independent evaluator, they finally agreed to appointment of  Dr. Randi I. Ettner, Ph.D. and I made that appointment.[5]

On April 4, 2016, after evaluating Ms. Soneeya, Dr. Ettner issued a report of her examination and her clinical recommendations for Ms. Soneeya's treatment.  Dr. Ettner concluded that "[d]espite years of hormone therapy, Ms. Soneeya continues to suffer from gender dysphoria," and that "[h]aving a female appearance and male genitalia creates significant anatomical distress."  2019 Tr. Ex. 3, at 11.  She reported that Ms. Soneeya "meets and exceeds, the [WPATH SOC-7] criteria for surgery," and that there "are no contraindications to the implementation of medically necessary surgical intervention for [Ms. Soneeya]."  [*Id.* at 13].

---

[5] The parties and I chose not to apply Judge Young's May 12, 2014 Order strictly in that although the Order required that the designated expert "maintain an active medical practice," Dr. Ettner is not an M.D.  She is, however, an active mental health practitioner.  Neither the parties nor I declined to implement her appointment on that or any other grounds.

In separate status reports filed by the parties on May 2, 2016, after Dr. Ettner issued her evaluation, Ms. Soneeya requested prompt implementation of Dr. Ettner's recommendations [Dkt. No. 212] and the DOC reported that it was in the process of implementing the recommendation for laser hair removal and had scheduled an appointment with an endocrinologist to evaluate changing the delivery of Ms. Soneeya's estrogen.  [Dkt. No. 213 at 2].  As to Dr. Ettner's recommendation for SRS, the DOC represented that it believed that Dr. Ettner's conclusion that Ms. Soneeya met the criteria for SRS was "seriously flawed" and reported that members of the DOC's GD Treatment Committee would meet with Ms. Soneeya to conduct an updated evaluation of her ability to provide informed consent to SRS [Dkt. No. 213, at 6].

Following an October 12, 2017 status conference, Ms. Soneeya filed a new motion to compel the DOC's compliance with Judge Tauro's 2012 permanent injunction and Judge Young's May 12, 2014 order as implemented. I denied the motion without prejudice, and, having heard from the parties at several status conferences and in repeated filings regarding their contested contentions, scheduled a bench trial to commence on March 4, 2019, a date that was continued at the parties' request to April 8, 2019.

## V. FINDINGS BASED ON EVIDENCE FOR 2019 TRIAL

I now turn from recitation of the law of the case and prior proceedings in this matter, observing that they provide a portion of the body of material I rely on for my own Findings and Conclusions. I separately and additionally make the following findings of fact to a fair preponderance from the record before me

on the basis of law of the case and my own assessment of evidence adduced in connection with the 2019 bench trial.

### A.      *Readiness to Begin Preparation for SRS*

Ms. Soneeya continues to experience significant distress because her female gender identity does not match her body.  She has been uncomfortable in her body since she was a child and has explicitly identified as a woman since at least 1990 when she was diagnosed with GID.  That diagnosis was prompted by her attempted self-castration with a razor blade and dental floss. Since she received the diagnosis of GID, she has consistently sought treatment for GID and GD from the DOC, including but not limited to SRS.  She has taken hormones since 2003.  She retains the remnants of male genitalia which cause her daily distress and, she feels, prevent her from being a complete woman.  The thought of having to live "in a man's body for the rest of [her] life" and being "isolated as the only woman at MCI-Shirley" has caused her to contemplate suicide.  Her "hope for obtaining surgery is what keeps [her] from acting on these thoughts."  [Dkt. No. 279-1, Ex A. ¶ 30 (Soneeya Aff.)].

While the DOC provides limited treatment to Ms. Soneeya for her GD, including hormone treatment, access to some feminine items from the canteen, therapy, and hair removal, the DOC has refused to approve more extensive recommendations from medical experts, including SRS for her.  Ms. Soneeya believes the "only treatment that will effectively treat her GD" is SRS and its denial "causes her a great amount of suffering."  [Dkt. No. 279-1, Ex A. ¶ 13 (Soneeya Aff.)].

17

Ms. Soneeya's incarceration at MCI-Shirley contributes to her suffering. She is isolated because some of the inmates do not accept her as female. She is treated as an outsider, made the subject of derision, and excluded from inmate activities. She does not feel safe at MCI-Shirley because she has secondary female characteristics that attract attention from other inmates, who stare at her breasts and make sexual comments.

1.    Dr. Ettner as Expert

In 2016, in response to Judge Young's 2014 order, the DOC and Ms. Soneeya agreed that Dr. Ettner could be retained as a joint independent evaluator to evaluate Ms. Soneeya and develop an individualized treatment plan in connection with this litigation. Dr. Ettner specializes in the diagnosis, treatment, and management of GD individuals. Her qualifications for her role as an independent evaluator and expert in this case are solid.

Dr. Ettner received her doctorate in psychology (with honors) from Northwestern University. She is a psychologist at the Center for Gender Confirmation Surgery at Weiss Memorial Hospital in Chicago, a role she assumed after serving as chief psychologist at the Chicago Gender Center for more than 10 years. In addition to being widely published, Dr. Ettner is the secretary and a member of the Executive Committee of the Board of Directors of WPATH, an author of the WPATH SOC-7, published in 2011, and was on the committee that drafted the WPATH SOC-8, published in 2022. Dr. Ettner is also the chair of the WPATH Committee for Institutionalized Persons and, in that role, provides training to medical professionals concerning healthcare for

transgender inmates.  Dr. Ettner estimates that since 1980, she has evaluated, diagnosed, and treated between 2,500 and 3,000 individuals with GD and mental health issues related to gender variance, referred approximately 300 patients for gender confirmation surgery, and assessed approximately 35 incarcerated individuals for GD.

Dr. Ettner evaluated Ms. Soneeya at MCI-Shirley in March 2016 for approximately three hours, during which she interviewed Ms. Soneeya and performed psychodiagnostics testing.  She reported the results of this evaluation in her April 4, 2016 report.  *See generally* 2019 Tr. Ex 3.  Dr. Ettner opined that Ms. Soneeya had persistent, well-documented, severe GD and exhibited gender identity disorder in childhood.  While Ms. Soneeya had been treated with hormone therapy for thirteen years, Dr. Ettner found the treatment protocols had been unorthodox and, at times, medically hazardous. Despite inconsistency in the efficacy of the hormone treatments, Ms. Soneeya had developed female secondary sexual characteristics.  Dr. Ettner further found that, even within the very challenging environment of an all-male prison, Ms. Soneeya had managed to change the social aspects of her gender expression, consolidating her female identity.

Based on observations during the interview, Dr. Ettner found no evidence of disorders of thought.  Ms. Soneeya was oriented in all spheres.  Her short and long-term memory were intact, and her attention span was within normal limits.  Dr. Ettner estimated that Ms. Soneeya's intelligence was average or slightly below average, with a fund of knowledge that was well below

19

average as a result of deficiencies in Ms. Soneeya's education.  Ms. Soneeya's thought processes were logical, responsive, directed, and without distortion. There was no evidence of current suicidal or homicidal ideation, delusions, paranoia, or abnormal perceptions.  Ms. Soneeya's affect was appropriate.  She presented as a female to the extent possible without exaggerating female characteristics and presentation.

Dr. Ettner opined, based on the results of the psychodiagnostics tests, that Ms. Soneeya experienced mild anxiety symptoms but did not meet the diagnostic criteria for any anxiety disorder or any mood or depressive disorder, nor did she exhibit dysfunctional behaviors related to posttraumatic stress, disassociation, somatization, or other dysfunctional behaviors.  Dr. Ettner found that Ms. Soneeya scored moderately high on a scale measuring the extent of hopelessness, which correlates with a risk of suicide.

Dr. Ettner was charged through Judge Young's order with developing an individualized treatment plan for Ms. Soneeya consistent with WPATH SOC-7 based on the evaluation.  And she did so.

First, she concluded that Ms. Soneeya met all of the WPATH SOC-7 requirements for a patient seeking SRS.  Ms. Soneeya had early onset, persistent, well-documented GD; had no significant mental health impairments; and was able to give informed consent and participate in decisions about her health care.  Indeed, Dr. Ettner deemed Ms. Soneeya "better informed and more realistic about surgical therapy than many patients who routinely undergo surgical reassignment."  Dr. Ettner explained that the

rationale for surgery for Ms. Soneeya was twofold:  congruent genitalia would alleviate her GD and her hormone requirements would be reduced after surgery, which would provide considerable health benefits.

Second, Dr. Ettner recommended a change in Ms. Soneeya's hormonal treatment to injectable estradiol, and regular monitoring of her estrogen levels.

Third, Dr. Ettner recommended additional assistance with social transitioning in the form of laser hair removal, grooming available to female inmates, and interactions with females such as the interactions she had been able to have in a previous work assignment.  She opined that Ms. Soneeya would not pose a threat of violence to other inmates and should be housed in a female correctional facility after surgery.

Dr. Ettner concluded that there were "no contraindications to the implementation of medically necessary surgical intervention for this inmate [and that] [t]he potential consequences of denying appropriate treatment … [were] predictable and dire."

In 2018, Ms. Soneeya moved to compel the DOC to comply with Judge Tauro's 2012 permanent injunction, Judge Young's 2014 order, and Dr. Ettner's 2016 treatment plan.  Ms. Soneeya formally retained Dr. Ettner as an expert on her own behalf for purposes of the evidentiary hearing to be convened by me.  In that capacity, Dr. Ettner re-evaluated Ms. Soneeya and prepared a July 10, 2018 report making further developed observations and recommendations with regard to Ms. Soneeya's treatment.  [Dkt. No. 279-1, at 30-43 (Ettner Aff.)].

In that July 10, 2018 report, Dr. Ettner reiterated her opinion that Ms. Soneeya met the WPATH SOC-7 criteria for SRS:  she had persistent, well-documented GD; had no mental impairments; was able to provide informed consent; understood the irrevocable nature of SRS; was over the age of majority; there were no mental health or medical contraindications to SRS; hormone therapy had resulted in irreversible anatomical changes; and Ms. Soneeya had lived in her affirmed and well-consolidated female gender for many years.  Ms. Soneeya experienced herself as half male and half female and was suffering as a result. Dr. Ettner opined that SRS, with follow-up psychological care, was medically necessary in Ms. Soneeya's case.  Dr. Ettner also stated her firm opinion that, with or without SRS, Ms. Soneeya belonged in a female facility, given that Ms. Soneeya already presented as a female, had the secondary sex characteristics of a female, and was experiencing harm by being housed in a male correctional facility.

### 2.    Dr. Levine as Expert

For its part, the DOC retained Dr. Stephen B. Levine to evaluate Ms. Soneeya in connection with the evidentiary hearing before me.  His credentials as an expert are, like those of Dr. Ettner, solid.

Dr. Levine is a board-certified psychiatrist and clinical professor of psychiatry at Case Western Reserve University School of Medicine.  In addition to his teaching, he is a psychiatrist in private practice.  Dr. Levine is widely published in the field of GD.  He was the chairman for writing the 5th edition of

the WPATH SOC, [6] but has not been involved in later editions, due to disagreements he has with the organizational direction WPATH has taken.  Dr. Levine estimates that he has evaluated at least 400 individuals with GD and other gender non-conforming individuals since 1974, in addition to his direct involvement in the treatment of GD.  He has been a consultant to prisons in Florida, Massachusetts, California, Virginia, and New Jersey concerning inmates with GD, and provided testimony and/or reports in several legal cases involving GD and gender non-conforming inmates.

As a once and current contractor of the DOC, Dr. Levine has an extensive history of evaluating Ms. Soneeya.  But as a consequence, unlike Dr. Ettner, he was ineligible to be an independent evaluator for the court.  He was, nevertheless, as a result of his prior contractual services, a percipient witness to the evolution of Ms. Soneeya's condition over a more extended time period.

Dr. Levine first evaluated Ms. Soneeya in 2008.  At that time, he determined that she was neither eligible nor ready for SRS.  [Dkt. No. 274-4, at 7 ¶ 30; *see* also 2019 Tr. Ex. 35].  For purposes of treatment, Dr. Levine recommended that Ms. Soneeya should continue with hormone therapy and engage in psychotherapy to address her traumatic past.  [*Id.* at 9, ¶ 37; *see also* 2019 Tr. Ex. 35].

Dr. Levine evaluated Ms. Soneeya again in January 2011.  After interviewing Ms. Soneeya, Dr. Levine agreed with Dr. Kaufman, the evaluator

---

[6]  At that time, WPATH was named the Harry Benjamin International Gender Dysphoria Association.

then engaged on behalf of Ms. Soneeya, that she had GD, had had no manifestations of significant major psychopathology while in prison, and had benefited from hormone therapy as treatment for her GD.  [*Id.* at 10, ¶ 40; *see also* 2019 Tr. Ex. 36].  Dr. Levine disagreed with Dr. Kaufman that Ms. Soneeya was ready for SRS because, in his view, she did not have a realistic appreciation of the risks associated with SRS.  [*Id.* at 42; *see also* 2019 Tr. Ex. 36].  Further, Dr. Levine did not believe that denying the surgery to Ms. Soneeya was likely to result in self-harm.  [*Id.* ¶ 41; *see also* 2019 Tr. Ex. 36].

In July 2012, Dr. Levine, with Drs. Robert Diener and Joel Andrade, evaluated Ms. Soneeya in connection with Judge Tauro's trial in accordance with his directives that SRS be viewed as a permissible recommendation for a prisoner; that the absence of real-life experience living as a woman not be considered to be prohibitive; that SRS be assumed to be an effective treatment for some individuals with GD; and that WPATH-SOC 7 be used as a guide to the evaluation.

After that July 2012 evaluation, which included a four-hour interview, a review of Ms. Soneeya's medical records, discussions with her treatment providers, and a review of Dr. Kaufman's evaluation and recommendations, Drs. Levine, Diener, and Andrade determined that Ms. Soneeya was not an appropriate candidate for SRS because she was not psychologically stable and could not give informed consent for SRS, which is a WPATH-SOC 7 criterion. Her lack of psychological stability was said to be shown by her "completely unrealistic" expectations about her future after SRS.  Her inability to provide

24

truly informed consent was said to be demonstrated by these unreasonable expectations combined with her unwillingness adequately to acknowledge that there were significant risks associated with a major, complex surgical procedure.  [Dkt. No. 274-4, at 11, ¶¶ 45, 47; *see also* 2019 Tr. Ex. 37].

Finally, Dr. Levine, with Drs. Joel Andrade and James Thompson, as members of the DOC GD Treatment Committee, re-evaluated Ms. Soneeya in December 2017.  At this point, the GD Treatment Committee, including Dr. Levine, saw clinically significant changes in Ms. Soneeya.  [Dkt. No. 274-4, at 12, ¶ 52; *see* also 2019 Tr. Ex. 11].  Accordingly, he made significant changes in his recommended treatment plan.

First, Dr. Levine agreed with Dr. Ettner that Ms. Soneeya did not display any signs of a current mental illness or abnormal thought processes or emotional instability.  Second, Dr. Levine agreed that Ms. Soneeya now appreciated that SRS could result in serious surgical complications and could even result in death and acknowledged that she would need a therapist to assist and support her if she became distraught or anxious following surgery. Third, Dr. Levine agreed with Dr. Ettner that SRS was medically necessary to alleviate Ms. Soneeya's suffering.

Dr. Levine's 2019 testimony before this court reflected and acknowledged that he made important changes in his own opinions about necessary treatment for Ms. Soneeya.  [Dkt. No. 318, Apr. 8, 2019 Tr. at 163-65].

I accept the opinions of Drs. Ettner and Levine that Ms. Soneeya does not presently show signs of any mental health impairment or emotional

instability that would disqualify her from SRS, and that it is medically

necessary that SRS be available, subject to appropriate conditions, to relieve

her suffering and prevent future harm.

There remains one material — although not fundamentally irreconcilable

— disagreement between Dr. Ettner and Dr. Levine about treatment for Ms.

Soneeya.

In Dr. Levine's view, Ms. Soneeya should be transferred to the women's

correctional facility, MCI-Framingham, *for a year-long trial residence*, with the

expectation that she would have SRS at the end of the year *if* she adapted to

living in a women's correctional facility and still desired to have the surgery.

By contrast, in Dr. Ettner's opinion, Ms. Soneeya met the WPATH SOC-7

criteria for *SRS*, and the *surgery was medically necessary without delay* to

relieve Ms. Soneeya's suffering and treat her GD.  As to adapting to the

environment in a women's correctional facility, she opined that Ms. Soneeya

would be more able to assimilate post-operatively because she would not need

to be isolated, as she presently was at MCI-Shirley.  After SRS, she could be

placed in the general population and, as a person who was more comfortable in

her skin, have a better chance of successfully interacting with other inmates.

[Dkt. No. 318, April 8, 2019 Tr. at 203; Dkt. No. 322, April 9, 2019 Tr. at 28,

30].

Without exploring the various intellectual dimensions to the inter- and

intra-professional disputes which provide the conceptual basis for the

difference in the specific therapeutic opinions rendered by Dr. Ettner and Dr.

26

Levine, it is sufficient to identify and address the precise difference in those opinions in order to assess the therapy choice I am called upon to resolve. The difference is one of predicate and timing for the next steps. Dr. Ettner takes the position that both transfer to MCI-Framingham and SRS for Ms. Soneeya can now proceed more or less simultaneously. Dr. Levine takes the position that while transfer to MCI-Framingham may now be effected for Ms. Soneeya, at least a year's experience in that facility is necessary as a predicate for SRS.

Although Dr. Levine's often curmudgeonly demeanor in presenting and defending his opinions over the years and his tendency to quibble over perceived linguistic distinctions and interest group politics that do not ultimately make a difference in addressing the substance of treatment recommendations was somewhat off-putting, I find his consistency in approach leading to a willingness to reconsider and change his opinion accordingly bolsters the opinion he has now come to. He effectively tasked Ms. Soneeya step by step to show her readiness to begin the final two stages of her preferred remedy of transfer to MCI-Framingham where a year's residence will provide insight to both her and her caregivers whether SRS is additionally appropriate. It is clear that the arc of Dr. Levine's opinions, resulting in a decision to move on in trial before me from the earlier opinions for which the DOC had offered his testimony, is the product of a principled and self-reflective process on his part.[7] This, no doubt, was something of a surprise and embarrassment to the

_____

[7] Belated discovery initiatives by Ms. Soneeya's trial team uncovered a confidential memo-to-file drafted by Dr Levine in which he outlines the various

DOC.  The DOC has subtly attempted to distance itself from him after his trial testimony.[8]  But I find his two-stage approach both measured and prudent and I will adopt it.  With the experts on both sides essentially in agreement, I find that Ms. Soneeya should now be transferred to MCI-Framingham for the final stage of preparation to see whether SRS should take place.

For her part, while Ms. Soneeya does not accept Dr. Levine's view that a transfer to MCI-Framingham should be a necessary prerequisite to SRS, her counsel at closing argument represented that Ms. Soneeya is prepared to accept such a transfer as a prerequisite to "get at least some relief for her gender dysphoria" [Dkt. No. 399, May 14, 2020 Tr. at 10] and as a step towards SRS.

_____

factors which are brought into play by this case.  The memorandum is an unvarnished reflection on the limitation of knowledge principally on the part of medical and mental health professionals, judges, and prison administrators, in the face of Ms. Soneeya's circumstances.  It recognizes the likely adverse political fallout by the general public concerning SRS paid for at government expense.  [Tr. Ex. 31].  Although the record is far from fully clear when the memorandum was prepared, I find to a fair preponderance it was first begun after Dr. Levine reviewed Dr. Ettner's April 16, 2016 Report and became the framework for Dr. Levine to identify the material and the incidental dimensions of the decision he was called on to make.  I find the balance he ultimately struck in his own report fully supportable.  The parties in their examinations and argument dealt cautiously with the memorandum, recognizing that its existence did not fully support the narrative either side was promoting.  For my part, I view it as exemplary of the commendable self-interrogation and intellectual rigor with which Dr. Levine took his task of fashioning a current opinion regarding Ms. Soneeya's appropriate treatment.

[8] The DOC, for example, seeks to suggest that Dr. Levine is not really the DOC's expert, but an expert hired by its medical consultants.  This is a recent contrivance.  Whatever the niceties of government contracting and billing in this context, it is clear that the DOC embraced Dr. Levine as its expert, until he rejected continuing the opinion they shared in the earlier stages of their relationship.

The DOC, however, has pressed a fallback position to supervene the opinions of the medical/psychological experts regarding transfer and SRS for Ms. Soneeya.  That is recourse to the deference afforded prison administrators regarding security and operational needs.[9]

### B.    Constraints Imposed by Purported Security Concerns

In January 2018, after the DOC's GD Treatment Committee, led by Dr. Levine, recommended that Ms. Soneeya be transferred to MCI-Framingham for a year in anticipation of being approved for SRS, Mitzi Peterson, DOC Director of Behavioral Health, referred the treatment recommendation to the Deputy Commissioner of Clinical Services and Reentry, and the Deputy Commissioner of the Prison Division for a security review.  [Dkt. No. 274-3, at 2, 4, ¶¶ 3, 13-14].  The security review meeting was held on January 23, 2018.  [Dkt. No. 322, April 9, 2019 Tr. at 56-57].

---

[9] The parties have alluded to, without actually relying upon, provisions of the federal Prison Rape Elimination Act, now codified at 34 U.S.C. ch. 303 §§ 30301-30309; Prison Rape Elimination Act Standards, 28 CFR, Part 115 and the Massachusetts statute governing Prisoner Gender Identity, Mass. Gen L. ch. 127 § 32A.  References to these statutory regimes appear in the boiler plate portions of various Deputy Commissioners' memoranda evaluating transfer and SRS recommendation.  While both regimes direct that prisoners may be housed in a correctional facility with inmates of the same gender identity, they both also provide that this directive will yield if the prison administrator determines that such placement would not ensure the prisoner's health or safety or that the placement would present management or security problems.  I do not find either statute to provide meaningful additional direction in this case since Eighth Amendment law incorporates the approach they embody.  Nevertheless, I note and find meaningful the participation of Ms. Soneeya's prison operations expert, James E. Aiken, as a member of the Commission established by the federal Prison Rape Elimination Act.  That appointment establishes his significant role in assessing and addressing the problem of gender-based violence in our nation's prison facilities.

Carol Mici, then Deputy Commissioner of Clinical Services and Reentry, attended the meeting and, some three weeks later, after discussions with Bruce Gelb, then-Deputy Commissioner of the Prison Division, drafted the security review and recommendation.  The security review recommended against accepting the GD Treatment Committee's recommendation that Ms. Soneeya be transferred to MCI-Framingham.  The basis of the adverse recommendation was that the transfer would "likely present overwhelming security, safety, and operational difficulties." [2019 Tr. Ex.  12, at 3 (unpaginated)].  On February 21, 2018, Commissioner Turco summarily accepted the GD Treatment Committee's recommendation by writing the word "approved" on the security review report with which he was presented.  [*Id.* at 1 (unpaginated)].  Pursuant to DOC regulations, Ms. Soneeya's case was then returned to the GD Treatment Committee with a request that the committee formulate alternative treatment recommendations.  The GD Treatment Committee reported that it was unable to provide any alternative treatment recommendation for Ms. Soneeya.

In response to the GD Treatment Committee report that it was unable to provide any alternative recommendation, Commissioner Turco definitively denied their recommendation that Ms. Soneeya be transferred to MCI-Framingham for a period of one year prior to making a final decision whether she would have a positive response to SRS.  [2019 Tr. Ex. 21].  His reasons for concluding that the recommendation "would present[] overwhelming security, safety and operation concerns" [*Id.* at 1], raised three basic issues: "risk of

30

escape" [*id.* at 2]; the lack of adaptability of the physical plant at MCI-Framingham to Ms. Soneeya's needs; and the nature of the crimes which brought her into the Massachusetts corrections system some three and half decades earlier.

The issue of "risk of escape" identified by Commissioner Turco had two components: risk because as the only medium security facility for female offenders, the MCI-Framingham "physical plant was not designed with male offenders in mind," particularly with respect to its perimeter fencing [*Id.*at 2] and also risk that if Ms. Soneeya were to "require longer term mental health treatment," she would be required to be committed to a Department of Mental Health facility, which the Commissioner viewed as "not nearly as secure as a DOC facility." [*Id.*]

The issue of lack of adaptability was said to arise variously from the lack of availability of single cell housing for Ms. Soneeya and the problems single cell housing for someone with her condition might generate in an inmate population where she could be either a predator or a victim or both.

The brutal and disturbingly sexualized nature of her decades-old underlying offenses was raised apparently as underscoring lack of remorse and a state of denial on the part of Ms. Soneeya, which together with a dated collection of disciplinary reports earlier in her incarceration may have been thought to foreshadow recidivism of some sort triggered by placement in an all-female prison environment.

31

I will treat Commissioner Turco's April 24, 2018 Statement in Response to the GD Treatment Committee report as the operative administrative determination against which Ms. Soneeya's motion for a further order should be measured. I observe that Commissioner Turco's current successor as Commissioner and current named defendant in this action, Ms. Mici, has signaled no intention to reconsider or otherwise disturb that determination without further court direction. [Dkt. No. 399, May 14, 2020 Tr. at 10-11].

Before turning to an assessment of the reasons asserted in Commissioner Turco's April 24, 2018 Statement in Response to the GD Treatment Committee Report, I add reference to an additional fact-finding exercise I independently undertook (coincidentally the same day, Dkt. No. 319), in connection with the ongoing formal bench trial before me. This was a view I chose to take of MCI-Framingham in the company of attorneys for both Ms. Soneeya and for the defendant. As will appear below, since the asserted reasons for likelihood that transfer to MCI- Framingham will "pose overwhelming security, safety and operational difficulties" as a factual matter turn on the condition of the facility, my own independent review of the physical plant and its features seemed necessary for a developed record.

Briefly stated, I did not find the actual physical condition of the facilities at MCI-Framingham pose security, safety, or operational difficulties to transfer of Ms. Soneeya. I note that other male to female prisoners have been transferred to MCI-Framingham since Ms. Soneeya began her quest for such a transfer. To be sure, the facility is run-down as a result of continued neglect

32

over a period of years, but it still functions as a medium security facility. Moreover, its population has decreased substantially making possible adjustments for particular security, safety, or operational needs to be addressed by minimal modifications rather than wholesale reorganization. The likelihood that Ms. Soneeya could successfully escape is minimal if the DOC is prepared to do the core work of meeting its obligations of supervising the facility even in its current state as a disintegrating capital asset of the Commonwealth.

Upon all the evidence before me, I find Commissioner Turco's asserted reasons unsupported and find no basis in an individualized assessment of Ms. Soneeya's condition, capabilities, and psychological adaptation to the facts of incarceration to justify those reasons.

To the contrary, on the basis of the evidence before me, I find that the security review relied upon essentially a robotic pretext untethered to a practical and reliable assessment of the actual state of security concerns about Ms. Soneeya.

The DOC's concern that Ms. Soneeya might be able to escape from MCI-Framingham is at best rank speculation. They were said to be based on the height of the perimeter fence (12 or 16 feet high, with razor wire on top of the 16-foot portions of the fence). The last time there was an escape from MCI-Framingham was in 1976. This was when an inmate departed — not by breaching the perimeter — but by kidnapping a correction officer and stealing his keys. [Dkt. No. 363, October 16, 2019 Tr. at 21; *see also id.* at 21-25

(identifying subsequent *attempts* involving unsuccessful efforts to breach perimeter).  It is undisputed that Ms. Soneeya has never attempted to escape from a DOC facility, and she is classified as a low-risk inmate.  The security review team made no effort to determine whether Ms. Soneeya, who was then 61 years old and had been on a decades-long regimen of feminizing hormones, would be capable of breaching the MCI-Framingham perimeter.  My own view of the facility and of Ms. Soneeya during court proceedings satisfies me that the prospect of Ms. Soneeya escaping MCI-Framingham is at the lowest level of possibility.

The reported concerns about escapes from DMH facilities are similarly based on stale and impertinent information.  Research by DOC staff members resulted in testimony that an inmate had last escaped from DMH custody some 21 years earlier by bartering with a staff member.  Prior to that incident, the last time an inmate had escaped from DMH custody was in 1973.  [Dkt. No. 322, April 9, 2019 Tr. at 85; *see also id.* at 85-86 (identifying the previous escape from DMH facility in 1973 occurring when a staff person was in love with an inmate and provided keys)].  In any event, Ms. Mici confirmed that she was aware, at the time of the security review, that Ms. Soneeya "display[ed] no signs of current serious mental illness" [*id.* at 80] that might result in a DMH commitment.

More fundamentally, while a DOC Commissioner may have views about the security of other Commonwealth facilities serving those with mental health needs, the decision to make such a transfer is not within the Commissioner's

writ.  Thus, a Commissioner's opinion — or, more accurately, speculation —
about the adverse security prospects raised by such a transfer is offered
gratuitously and is immaterial to the legal process for this type of transfer.  The
Commissioner's speculation is the functional equivalent of a DOC
Commissioner claiming apprehension from a Governor's independent authority
to pardon or commute the sentence of someone at MCI-Framingham.  It is
beside the point.

　　　The DOC also identified the nature of Ms. Soneeya's crimes as a reason
to be concerned about the effect her transfer would have on the climate at MCI-
Framingham.  But evidence related to the composition of the MCI-Framingham
population, including stipulation of the parties [Dkt. No. 362], was that MCI-
Framingham has a very diverse population.  It housed 53 prisoners convicted
of murder, including murders of women, it houses and manages the
incarceration of inmates convicted of sex crimes, some sex crimes committed
by women against women.  MCI-Framingham houses inmates who are
classified as either predators or victims and some inmates classified
simultaneously as predator and victim.  There were inmates housed at
Framingham who, like Ms. Soneeya, dispute the validity of their convictions.
In terms of gender incongruence, there were inmates at MCI-Framingham who
were natal females, identified their gender as male, were taking testosterone,
and had masculine features, such as facial hair.

　　　Prison authorities have shown themselves capable of developing
protocols for housing and managing its diverse population.  For example, in

anticipation of the transfer of Jane Doe, a female-to-male transgender inmate who had not had SRS, all members of MCI-Framingham's staff were trained on how to deal with gender nonconforming inmates.  MCI-Framingham thus has procedures available to address potential violence or conflicts among inmates as a result of transfers by transgender inmates into MCI-Framingham.  There is no basis for concluding it is incapable of adjusting such procedures further as necessary to receive Ms. Soneeya as an inmate.

As to housing arrangements, inmates in the general population at MCI-Framingham have generally been housed in the past in two-person cells.  Ms. Mici, however, confirmed that a male-to-female prisoner with GD who had not had SRS had been transferred to MCI-Framingham and housed in a single cell in the general population.  [Dkt. No. 322, April 9, 2019 Tr. at 75-77].  There is also evidence in the record that the inmate population at MCI-Framingham, the physical plant of which has been deteriorating over many years of neglect and has been stressed by pandemic challenges, has diminished substantially.  Mr. Fallon testified that it would be possible to house Ms. Soneeya alone at MCI-Framingham, either in a single or double cell.  [Dkt. No. 319, April 12, 2019 Tr. at 65].  The physical plant at Framingham provides no justifiable constraints on Ms. Soneeya's placement in the facility for incarceration.

MCI-Framingham is a medium security facility.  Ms. Soneeya has a security classification low enough to make her eligible for housing in a minimum-security facility but for her sentence of life in prison without the possibility of parole.  She has, from the DOC's perspective — if not from her

own — adapted well to incarceration.  MCI-Framingham houses inmates with much higher security risk classifications than she.

Because Ms. Soneeya identifies and presents as a woman in a male correctional facility, she does not feel safe from the possibility of sexual assault or other violence.  Other inmates exclude her from activities and assess her with hypersexual observations.  Dr. Levine noted that, for self-protection, Ms. Soneeya generally keeps to herself at MCI-Shirley.  James E. Aiken, Ms. Soneeya's security expert, opined in testimony that I find well-grounded that "Ms. Soneeya, as an inmate presenting as a female, is a greater risk of being victimized at MCI-Shirley, an all-male facility [where she currently is housed], than at MCI-Framingham, an all-female facility."

Ms. Soneeya's crimes were committed in 1980 and 1982, more than forty years ago.  Dr. Ettner's psychological testing "determined that Ms. Soneeya ranks in the lowest possible range for aggressive behavior or sexual activity." [Dkt. No. 279-1, at 37].  There is simply no evidence in the record that she poses a risk of predatory or other inappropriate behavior in a female correctional setting.

The DOC's efforts to characterize Ms. Soneeya as a potential predator or alternatively as a potential victim, or maybe both, is of piece with its effort to conjure up decades-old offenses as meaningfully related to potential for current or future harmful activity.  But the DOC undertakes no showing that Ms. Soneeya's long abandoned past will remerge.  Her unwillingness to accept responsibility is not in my experience an unusual coping strategy for those

sentenced to lengthy terms of incarceration.  Nothing in her conduct as she pursues SRS has suggested that latent sexualized criminal tendencies against women will be a part of the identity she has been fashioning for herself for the past several decades.

I find specious the DOC's proffered reasons for withholding the treatment that all qualified treatment professionals have now come to view as necessary to secure to the degree possible Ms. Soneeya's medical and mental health. When formally articulated, they are exposed as unjustified.

I must now address as a conclusion of law whether the near preternatural deference with which courts are generally directed to treat decisions by corrections administrators to decline to provide necessary treatment should be applied to Ms. Soneeya.  I conclude it should not.  If I were to do so, I would be enabling the DOC as a prison administration with sufficient skill, sophistication, and experience in obfuscation to avoid consequences for deliberate indifference to Ms. Soneeya's individual circumstances.  Rather, I find the DOC's obdurate resistance to be an embrace of perceived bureaucratic privilege unworthy of deference.

The gateway to understanding the Defendant's benighted view of indelible bureaucratic prerogative is general discussion of governing law in the First Circuit's decision in *Kosilek* v. *Spencer*, 774 F.3d 63 (1st Cir. 2014) (en banc).  This was the court's most recent discussion of the law of transgender rights in the corrections setting following Judge Tauro's opinion in *Soneeya I*. *Kosilek* recognized the two basic propositions which guide the law in this area.

38

First, that each prisoner's circumstance is unique and second that the outcome adopted for one prisoner does not necessarily require a similar outcome for another seemingly similarly situated prisoner.  Behind those propositions, however, lurks the mischief preventing Ms. Soneeya from redressing injury to her constitutional rights.  An extended review of *Kosilek*, and related case law that preceded and followed it, will disclose how that mischief works.

## C.    *Applicable Legal Principles*

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  "From this brief amendment, courts have derived the principles that govern the permissible conditions under which prisoners are held and that establish the medical treatment those prisoners must be afforded."  *Kosilek* v. *Spencer*, 774 F.3d at 82 (citing *Farmer* v. *Brennan*, 511 U.S. 825, 832 (1994)).  "Undue suffering, unrelated to any legitimate penological purpose, is considered a form of punishment proscribed by the Eighth Amendment."  *Id.* (citing *Estelle* v. *Gamble*, 429 U.S. 97, 103 (1976)).

Under the Eighth Amendment, "prison officials 'must ensure that inmates receive adequate … medical care.'"  *Sosa* v. *Mass. Dep't of Corr.*, 80 F.4th 15, 27 (1st Cir. 2023) (quoting *Farmer*, 511 U.S. at 834).  Not all denials of medical care descend to the level of an Eighth Amendment violation.  *Kosilek*, 774 F.3d at 82.  "The inquiry into whether an inmate has been deprived of constitutionally adequate medical care has two components, one

objective and one subjective." *Sosa*, 80 F.4th at 27.  The first component "requires that the medical needs of the inmate seeking care be 'sufficiently serious.'" *Id.* (quoting *Farmer*, 511 U.S. at 834).  The second component focuses on intent.  "Subjectively, prison officials must possess a 'sufficiently culpable state of mind' amounting to 'deliberate indifference to the [inmate's] health or safety.'" *Id.* (quoting *Zingg* v. *Groblewski*, 907 F.3d 630, 635 (1st Cir. 2018)).  In the prison context, officials must balance the medical needs of individuals with security and operational concerns.   The subjective prong recognizes that "in issues of security, [p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  *Kosilek*, 774 F.3d at 92 (citations and internal quotation marks omitted; omission and alteration in original).  Thus, "[a]s long as prison administrators make judgments balancing security and health concerns that are 'within the realm of reason and made in good faith,' their decisions do not amount to a violation of the Eighth Amendment."  *Id.*  (quoting *Battista* v. *Clarke*, 645 F.3d 449, 454 (1st Cir. 2011); *see also Bell* v. *Wolfish*, 441 U.S. 520, 548 (1979) ("[J]udicial deference is accorded [in part] because the administrator ordinarily will . . . have a better grasp of his domain than the reviewing judge . . . .").

1.   Sufficiently Serious Medical Need

As the first component of her claim, Ms. Soneeya must show that she has a "serious medical need for which she has received inadequate treatment."

*Kosilek*, 774 F.3d at 85 (citation omitted).  "A significant risk of future harm that prison administrators fail to mitigate may suffice under the objective prong."  *Kosilek*, 774 F.3d at 85 (citing *Helling* v. *McKinney*, 509 U.S. 25, 35 (1993)); *Roe* v. *Elyea*, 631 F.3d 843, 858 (7th Cir.2011) ("[T]he Eighth Amendment protects [an inmate] not only from deliberate indifference to his or her current serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to future health." (citation and internal quotation markers omitted)).

In this case, as in *Kosilek*, First Circuit precedent upon which Judge Tauro relied, and the First Circuit en banc majority itself relied, recognized without reservation "[t]hat [GD] is a serious medical need, and one which mandates treatment ...."  *Kosilek*, 774 F.3d at 86.[10]

2.    Sufficiently Culpable State of Mind Establishing Deliberate
      Indifference to Serious Medical Need

"The subjective component requires the plaintiff to show that prison officials, in treating the plaintiff's medical needs, possessed a sufficiently culpable state of mind.  That state of mind is one that amounts to deliberate indifference to the claimant's health or safety."  *Zingg*, 907 F.3d at 635 (citing *Perry* v. *Roy*, 782 F.3d 73, 78 (1st Cir. 2015).  "The phrasing itself implies at

---

[10] Courts in other circuits have similarly held that GD is a serious medical condition requiring treatment.  *See, e.g.*, *Edmo* v. *Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019); *De'Lonta* v. *Angelone*, 330 F.3d 630, 634 (4th Cir. 2003); *Cuoco* v. *Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000); *Maggert* v. *Hanks*, 131 F.3d 670, 671 (7th Cir. 1997).  *But see Gibson* v. *Collier*, 920 F.3d 212, 221 (5th Cir. 2019) ("WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate . . . ").

41

least a callous attitude, but subjective intent is often inferred from behavior
and even in the Eighth Amendment context … a deliberate intent to harm is
not required." *Battista*, 645 F.3d at 453 (1st Cir. 2011) (citing *Farmer*, 511
U.S. at 839-40). "[T]he *Farmer* test[] … leave[s] ample room for professional
judgment, constraints presented by the institutional setting, and the need to
give latitude to administrators who have to make difficult trade-offs as to risks
and resources." *Id.* A known risk of harm is not conclusive if the DOC's
balancing judgments are within the realm of reason. *Id.* Nonetheless, a
"composite of delays, poor explanations, missteps, changes in position and
rigidities" can suffice to show deliberate indifference to a serious medical need.
*Id.* at 455.

I find and conclude the DOC's treatment of Ms. Soneeya's serious
medical need continues to be inadequate. Dr. Ettner has consistently opined
that gender confirmation surgery is medically necessary for Ms. Soneeya. Dr.
Ettner asserts that Ms. Soneeya's long-term hormonal treatment has served to
intensify her anatomical dysphoria and having "a female appearance and male
genitalia generates profound distress." Dr. Ettner contends that Ms. Soneeya's
GD will worsen as she ages, due to hormonal changes and as a result, "[w]ith
the passage of time, [she] will experience greater distress, and no means of
relief" and that she is at great risk to succumb to feelings of hopelessness and
despair, leading to emotional destabilization and suicide." Dr. Ettner testified
that Ms. Soneeya has refrained from additional attempts at self-surgery
because she understands that the tissue that would be lost is necessary for

SRS.  She would, according to Dr. Ettner, be likely to attempt self-castration if she is denied SRS.

In their January 2018 report, Dr. Levine and other members of the DOC's GD Treatment Committee opined that a transfer to MCI-Framingham, in anticipation of — but at least one year before — SRS, was medically necessary for Ms. Soneeya.  [Dkt. No. 318, April 8, 2019 Tr. at 162].  When the DOC refused to implement this recommendation and asked for an alternative, the GD Treatment Committee informed the DOC that there were no treatment alternatives to transfer to MCI-Framingham for Ms. Soneeya's GD.  [Dkt. No. 318, April 8, 2019 Tr. at 169].

Yet notwithstanding the contrary consensus of the gender dysphoria experts, the DOC continues vainly to contend that it is adequately treating Ms. Soneeya's GD by providing psychotherapy, hormone therapy, access to female clothing and cosmetics, and electrolysis and emphasizes that Ms. Soneeya has made no further attempts at self-harm since her attempt more than three decades ago.  According to the DOC, Ms. Soneeya's movement to stable emotional status demonstrates the adequacy of DOC treatment.  A more attentive inference is that she has matured in her appreciation of the treatment choice she is making.

The DOC's contention is not persuasive.  This is not a case where the evidence shows that there are "two alternative courses of medical treatment ..., and both alleviate negative effects within the boundaries of modern medicine ...." *Kosilek*, 774 F.3d at 90; s*ee also Ferranti* v. *Moran,* 618 F.2d 888, 891 (1st

Cir. 1980) (there is no Eighth Amendment violation where there is a good faith "disagreement on the appropriate course of treatment").  To the contrary, the DOC has not pointed to evidence from any qualified individual with expertise in the treatment of GD who supports the DOC's position that it is now adequately treating Ms. Soneeya's GD.  Here, the GD experts proffered by both parties agree that Ms. Soneeya's severe GD persists notwithstanding the treatment provided by the DOC.

The DOC's extended record regarding treatment for Ms. Soneeya unequivocally establishes here a composite of delays, insufficient or illogical explanations, changes in position, and rigidities amounting to deliberate indifference to Ms. Soneeya's serious medical need.

This was true in August 2010, when injunctive relief mandating hormone therapy was entered by the district court in *Battista* over the DOC's objection. *See Battista*, 645 F.3d at 451-52.  That order for relief was affirmed in May 2011, when the First Circuit held the DOC had:

> forfeited the advantage of deference.  Initially, the district judge was far from anxious to grant the relief sought.  It was only after what the judge perceived to be a pattern of delays, new objections substituted for old ones, misinformation and other negatives that he finally concluded that he could not trust the [DOC] in this instance.

*Id.* at 455.

As the district judge referenced in *Battista*, I can, I believe, take judicial notice designed to underscore that the First Circuit's recitation accurately reflects my findings and holding there.  As the First Circuit summarized, I

found and concluded that subjective deliberate indifference was established in

*Battista*:

> even though it [did] not rest on any established sinister motive or
> 'purpose' to do harm.  Rather, the [DOC's] action is undercut by a
> composite of delays, poor explanations, missteps, changes in
> position and rigidities—common enough in bureaucratic regimes
> but here taken to an extreme.

*Id.*

This remained true in March of 2012, when Judge Tauro found that

since Ms. Soneeya had been diagnosed with GID in 1990, "the DOC's response

to her requests for treatment ha[d] been characterized by a series of delays,

bureaucratic mismanagement, and seemingly endless security reviews with no

clear rhyme or reason."  *Soneeya I*, 851 F. Supp. 2d at 236.  It continues to be

my finding and conclusion regarding Ms. Soneeya today.  The question is why

this state of affairs has not been modified by the Defendant.

One aspect of the answer is that the apparent consistency in the

applicable law obscures arbitrary inconsistencies in practice.  This is one of

those "places in the law through which a pair of mutually oblivious doctrines

run in infinitely parallel contrariety, like a pair of poolhall scoring racks on one

of the other side of which, seemingly at random, cases get hung up."  ANTHONY

G. AMSTERDAM, NOTE: THE VOID-FOR-VAGUENESS DOCTRINE IN THE SUPREME COURT,

109 U Pa. L. Rev. 67 (1960).  On the one hand, there is the doctrinal direction

that prison administrators should be deferred to so long as they exercise their

discretion with respect to security and operations in good faith.  However, the

choice to defer to the prison administrators, whose actions are subject to

45

judicial review, is effectively left by default to the judgment of the prison
administrators whether they find themselves acting in good faith.

While a court must defer to the judgment of prison administrators
"balancing security and health concerns that are 'within the realm of reason
and made in good faith,'" *Kosilek*, 774 F.3d at 92 (quoting *Battista*, 645 F.3d at
454), the court must assess that judgment in light of the record compiled by
the parties.  To the extent the DOC relies on an assertion that transferring Ms.
Soneeya to MCI-Framingham would be disruptive to the population at MCI-
Framingham, a contention that is not clearly articulated in the 2018 security
review [Tr. Ex. 12] or Commissioner Turco's subsequent statement [Ex. 21], the
contention is not supportable.  MCI-Framingham houses the most serious
female criminal offenders in Massachusetts, including women who have
murdered other women or committed domestic violence against female
partners.

Ms. Mici conceded that the DOC transferred the inmate sometimes
identified as M.K. to Framingham without changes to the physical plant.  DOC
transferred her notwithstanding concerns articulated by Allison Hallett,
Assistant Deputy Commissioner of Reentry, about the effect of the transfer on
MCI-Framingham inmates.  There is no longer, if there ever was, a need for
acronym identification of that inmate.  She is Michelle Kosilek, whose transfer
had earlier been denied in the First Circuit en banc *Kosilek* decision deferring
to the DOC's decision-making.  Ms. Mici testified to the steps the DOC took in
advance of Ms. Kosilek's transfer to MCI-Framingham following the First

46

Circuit's decision and agreed that the DOC could take similar steps if Ms. Soneeya were transferred. Michelle Kosilek's September 2019 transfer was uneventful. There were no issues between her and other inmates. [Dkt. No. 360 at 3-4, ¶ 11]. Ms. Kosilek reported she was "finally home." [Dkt. No. 430-9 at 45].[11]

The DOC has proffered a collection of comparators, which provide some basis for assessing arbitrariness in the DOC's refusal to provide transfer to Ms. Soneeya. Although any transfer of a convicted murderer raises questions, Ms. Kosilek's transfer, after the First Circuit's indulgence of deference to the DOC's decision not to do so, is most instructive. Commissioner Mici, the current Commissioner, chose to permit Ms. Kosilek's transfer from all male MCI-Norfolk to MCI-Framingham, despite her higher Total Reclassification Score [*compare* Tr. Ex. 49 at 1 (Ms. Kosilek) with Tr. Ex. 48 at 1 (Ms. Soneeya)]. In doing so, she resolved divergent recommendations from her Deputy Commissioners.

The grounds she cited in handwritten findings endorsed on the Deputy Commissioners' Memorandum for her decision to "Approve[ ] request to

---

[11] I note also that the DOC reports that D.I., a female transgender female convicted of first-degree murder and other crimes, was transferred to MCI-Framingham in March 2022, and is doing well. T.B., also a female transgender patient convicted of first-degree murder, first requested transfer to MCI-Framingham in or around July 2019. [Dkt. No. 430-9 at 36; Dkt. No. 373 at 1]. By July 9, 2020, she was approved for transfer to MCI-Framingham in anticipation of SRS. [Dkt. No. 430-10 at 1-2].

transfer to MCI-Framingham in accordance w/Treatment Committee recs."
were that Ms. Kosilek was a

-   "70 yr old, had identified as female at least since her
    incarceration in 1993";
-   had a "low disciplinary history (6 d-reports) throughout
    incarceration, none involved violence, she took responsibility for
    most of the infractions";
-   her underlying crime was "non-sexual in nature murder of her
    spouse";
-   had "no significant m/h issues other than symptoms related to
    GD diagnosis, which she has managed well over the years, no
    evidence of suicidal ideation"; and
-   "although perimeter fencing at MCI-Framingham is a concern,
    [Ms.] Kosilek is not a high escape risk given her age and overall
    good institutional adjustment at MCI-Norfolk; currently in
    G[eneral] P[opulation], employed and active in music program."

[Tr. Ex. 505].

Although the circumstances of every person suffering from GD are
unique, it is possible to make comparisons which can be helpful in identifying
arbitrariness in decision-making.  Such a comparison between the reasons
stated regarding transfer of Ms. Kosilek and of Ms. Soneeya clarifies the
unacceptable degree of arbitrariness.

At the time of decision-making by the Commissioner, Ms. Soneeya fell in
the same general elderly age cohort as Ms. Kosilek and had been identifying as
a female while incarcerated for more than a decade longer than Ms. Kosilek.

This factor makes Ms. Soneeya — who was not transferred to MCI-Framingham — even more appropriate for transfer than Ms. Kosilek, who was.

Ms. Soneeya's disciplinary history was generally speaking similar to that of Ms. Kosilek, using the four year look back of the Classification Report, with Ms. Soneeya having a slightly more favorable Reclassification Score.

While Ms. Soneeya's underlying murder offenses were more horrifying as reported,[12] than the description of Ms. Kosilek's murder of his wife,[13] it was

---

[12] A summary, included in Ms. Soneeya's Classification Report of the official version of the offenses provided by the District Attorney, reported:

On January 5, 1982, [Ms. Soneeya's] cousin was found dead in her apartment by her boyfriend around 11:30 PM in Springfield, MA. The Springfield Police were called to the scene and found that the victim had been bound, gagged and stabbed. An autopsy revealed that the victim was stabbed in the vagina, stomach, chest and neck. She had been sexually molested with a broom handle and stabbed more than forty times.

On March 3, 1980, a woman victim (age: 29) was found dead in her apartment. She had been sexually abused and died as a result of multiple stab wounds. [Ms. Soneeya] was arrested after divulging information only the police and the perpetrator could have known at the time.

[Ms. Soneeya] does not agree to committing either murder. Murder 1st is under appeal and refused to comment 6/7/17 SM Inmate disagrees with OV DA 6/26/20.

[Tr. Ex. 48 at 6-7].

[13] A summary, included in Ms. Kosilek's Classification Report of the police version of the offenses, reported that:

On May 20, 1990, Mrs. Kosilek was found wedged "between the front and rear seats of the floor of [her] car. She was wearing a gray sweat top that was pulled up over her breasts and a gray sweat bottom that had what appeared to be blood secretion in the groin area. Around her neck was a ligature made of rope." That ligature consisted "of coarse hemp-type rope and underneath the rope was a three strand wire which had been wrapped three times around her neck." Mrs. Kosilek was pronounced dead on the scene by the medical examiner who declared the cause of death, after autopsy, to be strangulation.

clearly erroneous for the Commissioner to characterize Ms. Kosilek's crime as "non-sexual in nature" when it was plainly based on acts of bizarrely sexualized gender-based violence focused on the decedent's vagina and breasts, accompanied by acting out through cross dressing in its immediate aftermath.

Both Ms. Soneeya and Ms. Kosilek had no significant mental health problems other than those related to GD which both had demonstrated were managed well over a comparable period of time, despite sporadic references to what could be characterized as suicidal ideation as part of their thoughts.

Neither Ms. Soneeya nor Ms. Kosilek can be characterized as a high escape risk — indeed both are minimal escape risks at most.  The institutional adjustments for both can fairly be characterized as "good," although Ms. Soneeya is the more introverted of the two.

The evidence shows that, where there are no legitimate security concerns about a particular female transgender inmate – and the DOC has not shown any as to Ms. Soneeya – the DOC is capable of preparing for and managing the transfer, housing, and inmates' adjustment to the transfer.  Furthermore, I

---

Her husband was traced leaving the location of the car.  When the police executed a search warrant on the couple's residence, Mrs. Kosilek's wedding ring, "which persons close to her state was never off her hand" was found in the residence and her husband was "dressed as a woman due to what he reported as a pattern of stress." On the advice of counsel, her husband left the residence on foot and was stopped following a motor vehicle accident where he was dressed as a woman.

The husband said he had been assaulted "with boiling water and a machete."  He contended he was "innocent of murder but guilty of manslaughter."

[Tr. Ex. 49 at 6-7].

accept Dr. Aiken's findings — evidenced in not only his trial testimony but also his declaration and expert report — that, where MCI-Framingham is the only medium security facility for women, the DOC must as an operational obligation, and does as a matter of fact, have the capability of adequately managing and securing the inmate population that is committed to MCI-Framingham, including female and male transgender inmates.  [Dkt. No. 319, April 12, 2019 Tr. at 109].

## VI. COMMENCING A COMPLETELY RESPONSIVE REMEDY

The Zeitgeist framing attitudes toward gender dysphoria, especially for incarcerated transgender individuals, has evolved as legal doctrine, treatment prescription and community attitude over the past decade.  Judge Kayatta in his *Kosilek* en banc opinion presciently captured both the then-current attitudes and the future prospects when he observed that affirming a trial judge's order for SRS

> happens to produce a result in this case that some find surprising and much of the public likely finds shocking.  Scientific knowledge advances quickly and without regard to settled norms and arrangements. It sometimes draws in its wake a reluctant community, unnerved by notions that challenge our views of who we are and how we fit in the universe.

774 F.3d at 115 (Kayatta, J. dissenting).

Judge Kayatta emphasized that supportable results under such circumstances should "continue the search for truth through continued examination of the evidence by the trial courts."  *Id.*

51

Judge Thompson expressed certainty she would not have had to dissent from the denial of relief to Ms. Kosilek "were [Ms. Kosilek] not seeking a treatment that many see as immoral" and that the majority's decision was only an interim step that would for a time "enable[] correctional systems to further postpone their adjustment to the crumbling gender binary." *Id.* at 113 (Thompson, J. dissenting).

Both Judge Thompson and Judge Kayatta observed that the decision's result could only be achieved by the majority's disregard of the trial judge's careful and detailed findings of fact.  Judge Thompson noted pointedly that there were "marked similarities between [*Battista*] and this [case].  That is, apart from their outcomes.  In *Battisa,* this court affirmed the district court's deliberate indifference determination."  *Id.* at 109 n.32. [14]

These developments now make it clear that Ms. Soneeya is entitled to the MCI-Framingham transfer that Ms. Kosilek and others have received.

---

[14] A duty of candor obligates me to observe that for my part as the trial judge in *Battista* and the successor trial judge in *Soneeya,* I share the view that Judge Torruella's en banc majority opinion in misconstruing the trial judge's findings thereby disregarded the deference to which they were entitled.  My duties in *Battista* and *Soneeya* have entailed deep review of the record in *Kosilek.*  Indeed, my involvement has given me the comparative advantage of continued examination of the relevant evidence.  In this connection, the more fully developed history over transgender treatment of incarcerated individuals in Massachusetts and elsewhere provides a full and nuanced basis for understanding the development of Dr. Levine's treatment recommendation for Ms. Soneeya and why it is now essentially in alignment of Dr. Ettner's recommendation.

I am well aware that the Covid crisis affected prison systems in particular with management challenges and those management challenges will continue.[15]  Nevertheless, in the absence of direct order from this court, it is clear beyond peradventure that the DOC will not undertake its constitutional obligations with respect to Ms. Soneeya.  I therefore order that 1) no later than March 4, 2024, Ms. Soneeya be housed in a single cell setting in MCI-Framingham, or its equivalent; 2) that the therapy regimen jointly recommended by the principal experts of the respective parties, Dr. Ettner and Dr. Levine, promptly begin thereafter subject to the refinement provided by Dr. Levine that not less than a year of further observation pass before Ms. Soneeya will become eligible for SRS; and 3) that Ms. Soneeya's current therapy regimen and the therapist relationship she has developed at MCI-Shirley, be adapted for her new place of incarceration at MCI-Framingham.

## VII. CONCLUSION

Pursuant to Judge Tauro's permanent injunction and Judge Young's 2014 Order, I now order that Ms. Soneeya be transferred no later than

---

[15] I note that recent media reports have confirmed that the aging infrastructure of the state's men's medium security prison, MCI-Concord, is planned for closure by the DOC for later this year.  Ivy Scott, *MCI-Concord, the state's oldest men's prison, to close by this summer, officials say: The announcement comes amid findings that Massachusetts has nearly halved its incarceration rate in 10 years.*  BOSTON GLOBE, January 24, 2024.  Senator Eldridge, Chair of the Judiciary Committee "applauded [the] announcement, and said he and other lawmakers have been advocating for months for the closure of both Concord and the women's prison in Framingham, which are the state's oldest facilities and 'fairly rundown.'"  Wholesale shutdown or renovation and repurposing of those facilities may provide an opportunity for the DOC to develop meaningful plans that will meet its constitutional responsibilities.

March 4, 2024, to MCI-Framingham to begin the final stages of her individually

designed treatment.


                                        ***/s/ Douglas P. Woodlock***
                                        DOUGLAS P. WOODLOCK
                                        UNITED STATES DISTRICT JUDGE